**FRANCHISE DISCLOSURE DOCUMENT**

# FIVE GUYS®

FIVE GUYS FRANCHISOR, LLC
a Delaware limited liability company
10718 Richmond Highway
Lorton, Virginia 22079
Phone: (703) 339-9500
www.fiveguys.com

As a franchisee, you will own and operate a FIVE GUYS® BURGERS AND FRIES fast casual restaurant which specializes in the sale of fresh made burgers and fries prepared in accordance with our recipes and ingredients, and other food items that we may specify periodically.

The total investment necessary to establish one FIVE GUYS® restaurant ranges from $306,200 to $641,250 ($381,200 to $716,250 for Alaska, Hawaii and Puerto Rico).  This includes the $25,350 that must be paid to the franchisor or its affiliates under the franchise agreement, and the $50,000 per restaurant ($125,000 per restaurant for restaurants to be located in Alaska, Hawaii, or Puerto Rico) that must be paid to the franchisor or its affiliates under the development agreement.  You must sign the Development Agreement if you will establish one or more FIVE GUYS® restaurants.  Your total investment necessary as a developer will vary based on the number of restaurants to be developed.

This disclosure document summarizes certain provisions of your franchise agreement and area development agreement and other information in plain English.  Read this disclosure document and all accompanying agreements carefully.  You must receive the disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to the franchisor or an affiliate in connection with, the proposed franchise sale.  **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact our Franchise Administration Department at 10718 Richmond Highway, Lorton, Virginia 22079, Attn: Legal Department, (703) 339-9500, and franchise@fiveguys.com.

The terms of your contracts will govern your franchise relationship.  Do not rely on the disclosure document alone to understand your contract. Read all of your contracts carefully.  Show your contracts and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment.  The information in this disclosure document can help you make up your mind.  More information on franchising, such as "*A Consumer's Guide to Buying a Franchise*," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission ("FTC").  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC 20580.  You can also visit the FTC's home page at *www.ftc.gov* for additional information.  Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.  Ask your state agencies about them.

**Issuance Date:**  April 30, 2022

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibits D and E. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit A includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only FIVE GUYS® business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a FIVE GUYS® franchisee?** | Item 20 or Exhibits D and E list current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

## What You Need To Know About Franchising Generally

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends**. The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Attachment A.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1.  **<u>Out of State Dispute Resolution</u>.** The franchise agreement and development agreement require you to resolve disputes with the franchisor by arbitration or litigation only in Virginia.  Out of state arbitration or litigation may force you to accept a less favorable settlement.  It may also cost more to arbitrate or litigate with the franchisor in Virginia than in your own state.

2.  **<u>Spousal Liability</u>.** Your spouse must sign a document that makes your spouse liable for all financial obligations under the franchise agreement even though your spouse has no ownership interest in the franchise.  This guarantee will place both your and your spouse's marital and personal assets, perhaps including your house, at risk if your franchise fails.

3.  **<u>Financial Condition</u>.** The franchisor's financial condition, as reflected in its financial statements (see Item 21), calls into question the franchisor's financial ability to provide services and support to you.

4.  **<u>Supplier Control</u>.** You must purchase all or nearly all of the inventory or supplies that are necessary to operate your business from the franchisor, its affilates, or suppliers that the franchisor designates, at prices the franchisor or they set.  These prices may be higher than prices you could obtain elsewhere for the same or similar goods. This may reduce the anticipated profit of your franchise business.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

## <u>NOTICE REQUIRED BY THE STATE OF MICHIGAN</u>

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS.  IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU:**

(a)     A prohibition on the right of a franchisee to join an association of franchises.

(b)     A requirement that a franchisee assent to a release, assignment, novation, waiver or estoppel which deprives a franchisee of rights and protections provided in this act.  This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)     A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than thirty (30) days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures and furnishings.  Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if:  (i) the term of the franchise is less than five (5) years, and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least six (6) months' advance notice of franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances.  This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state.  This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)     A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.  Good cause shall include, but is not limited to:

(i)     Failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(ii)     The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, franchisee has the right to request an escrow arrangement.

Any questions regarding this notice should be directed to:

Consumer Protection Division
525 W. Ottawa Street, 1st Floor
Lansing, Michigan 48933
(517) 373-7117

## **TABLE OF CONTENTS**

**Page**

ITEM 1    FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES.................. 1

ITEM 2    BUSINESS EXPERIENCE.................................................................................................. 5

ITEM 3    LITIGATION ....................................................................................................................... 6

ITEM 4    BANKRUPTCY .................................................................................................................. 7

ITEM 5    INITIAL FEES ..................................................................................................................... 7

ITEM 6    OTHER FEES ...................................................................................................................... 8

ITEM 7    ESTIMATED INITIAL INVESTMENT ......................................................................... 12

ITEM 8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES................................ 15

ITEM 9    FRANCHISEE'S OBLIGATIONS ................................................................................. 19

ITEM 10   FINANCING ..................................................................................................................... 21

ITEM 11   FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING.......................................................................................................................... 21

ITEM 12   TERRITORY ..................................................................................................................... 31

ITEM 13   TRADEMARKS ................................................................................................................ 34

ITEM 14   PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ................................ 35

ITEM 15   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS ..................................................................................................... 37

ITEM 16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL........................................ 38

ITEM 17   RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION .................... 39

ITEM 18   PUBLIC FIGURES ........................................................................................................... 45

ITEM 19   FINANCIAL PERFORMANCE REPRESENTATIONS .................................................... 46

ITEM 20   OUTLETS AND FRANCHISEE INFORMATION ......................................................... 46

ITEM 21   FINANCIAL STATEMENTS .......................................................................................... 55

ITEM 22   CONTRACTS ................................................................................................................... 56

ITEM 23   RECEIPTS ........................................................................................................................ 56

EXHIBITS

A -   FINANCIAL STATEMENTS

B -   DEVELOPMENT AGREEMENT (with state specific amendments)

C -   FRANCHISE AGREEMENT (with state specific amendments)

D -   LIST OF FRANCHISEES

E -   LIST OF FRANCHISEES WHO HAVE LEFT THE SYSTEM

F -   TABLE OF CONTENTS OF OPERATIONS MANUAL

G -   STATE SPECIFIC ADDENDA TO THE DISCLOSURE DOCUMENT

ATTACHMENTS

A -   STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS

STATE EFFECTIVE DATES    THIRD TO LAST PAGE

RECEIPTS    LAST TWO PAGES

## ITEM 1
## FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES

**Franchisor**

The franchisor is Five Guys Franchisor, LLC ("**Five Guys**," "**we**," "**us**," or "**our**").  "**You**" means the person or entity to whom we grant a franchise.  If you are a corporation, partnership, limited liability company, or other entity, your controlling principals must sign our documents in their individual capacity, which means the provisions of our Development Agreement (Exhibit B) and Franchise Agreement (Exhibit C), as applicable, will also apply to your owners.

We were formed as a Delaware limited liability company on April 20, 2017.  Our principal place of business is 10718 Richmond Highway, Lorton, Virginia 22079.  We do business under the name FIVE GUYS®.  Our business is limited to offering the franchises that are described in this Disclosure Document.  We do not offer other franchises or engage in any other line of business nor have we ever done so.

We have written the Disclosure Document in "plain English" in order to comply with legal requirements.  Any differences in the language in this Disclosure Document describing the terms, conditions or obligations under the Franchise Agreement, Development Agreement or any other agreements is not intended to alter in any way your or our rights or obligations under the particular agreement.

We began offering FIVE GUYS® restaurant franchises in June 2017.  We do not conduct a business of the type to be operated by our franchisees.

Our agents for service of process are listed in Attachment A.

**Our Parents, Predecessors and Affiliates**

We are a direct, wholly-owned subsidiary of Five Guys Funding, LLC ("**Five Guys Funding**"), a Delaware limited liability company.  Five Guys Funding is a wholly-owned subsidiary of Five Guys SPV Guarantor, LLC ("**Five Guys SPV Guarantor**"), a Delaware limited liability company.  Five Guys Funding and Five Guys SPV Guarantor share our principal business address.  Five Guys Funding and Five Guys SPV Guarantor were organized as part of the securitization transaction described below (the "**Securitization Transaction**") and are indirect subsidiaries of our Parent Company (defined below).

Five Guys Holdings, Inc., our ultimate parent company, is a Delaware corporation formed on September 20, 2007 ("**Parent Company**"), and is headquartered at 10718 Richmond Highway, Lorton, Virginia 22079.  Our Parent Company is a non-operating holding company and does not offer franchises in this or any other line of business.  Our Parent Company does not offer or provide any products or services to our franchisees.  During the formation process of our Parent Company, a minority portion of its capital stock was transferred to Big Horn, L.P., a Pennsylvania limited partnership located at 100 Front Street, Suite 1500, West Conshohocken, Pennsylvania 19428 ("**Big Horn**").  Neither Big Horn nor its principals have ever offered FIVE GUYS® restaurant franchises or franchises in any other lines of business.

An affiliate of FGE (as defined below), Five Guys, Inc., a Virginia corporation formed on January 7, 1997 ("**FGI**") with a principal address of 10718 Richmond Highway, Lorton, Virginia 22079, previously owned 7 FIVE GUYS® restaurants in Northern Virginia, the first of which was opened in February 1986.  FGI conducted this business for over 26 years.  FGO (defined below) took over operations for these 7 restaurants in 2011 and finalized the acquisition of them in 2012.  FGI has never offered FIVE GUYS® restaurant franchises nor has it offered franchises in any other lines of business.

The franchisor of the franchises described in this Disclosure Document before the closing of the Securitization Transaction in June 2017 was Five Guys Enterprises, LLC ("**FGE**").  FGE began offering franchises in December 2002.  Its principal place of business is 10718 Richmond Highway, Lorton, Virginia

22079.  FGE is a direct, wholly-owned subsidiary of our Parent Company and is the direct parent company of Five Guys SPV Guarantor.

Five Guys Properties, LLC ("**Five Guys Properties**") owns and operates FIVE GUYS® restaurants in the United States and Canada.  Five Guys Properties is a wholly-owned subsidiary of Five Guys Funding. It acquired the restaurants it owns and operates from an affiliate, Five Guys Operations, LLC ("**FGO**") as part of the Securitization Transaction.  FGO operated newly-constructed, non-franchised FIVE GUYS® restaurants, as well as several other FIVE GUYS® restaurants which were voluntarily reacquired from franchisees.  As of December 31, 2021, FGO owned and operated 479 FIVE GUYS® restaurants.  FGO has never offered FIVE GUYS® restaurant franchises, nor has it offered franchises in any other lines of business.

Five Guys Bakery, LLC ("**Five Guys Bakery**"), a Delaware limited liability company, contracts for the production of all required bread products (e.g., hamburger and hot dog buns) which you must purchase from Five Guys Bakery.  Five Guys Bakery was formed as part of the Securitization Transaction. Its principal place of business is 10718 Richmond Highway, Lorton, Virginia 22079.  Before the Securitization Transaction, Five Guys Foods, LLC ("**FGF**"), a Virginia limited liability company formed on December 23, 2002, contracted for and sold required bread products to franchisees beginning in December 2002.  Five Guys Bakery has never offered FIVE GUYS® restaurant franchises, nor has it offered franchises in other lines of business; Five Guys Bakery does not operate a business of the type being franchised.

FGE Canada Corp., our affiliate, was formed in Canada as a Nova Scotia unlimited liability corporation on November 8, 2011 ("**FGE Canada**").  FGE Canada's registered civic address is 900-1959 Upper Water Street, Halifax, Nova Scotia B3J 3N2.  FGE Canada employs individuals to supervise, monitor, and assist our franchisees operating FIVE GUYS® restaurants within Canada.  FGE Canada has never offered FIVE GUYS® restaurant franchises, nor has it offered franchises in other lines of business. FGE Canada does not operate a business of the type being franchised.

FGGC, LLC, our affiliate, is a Virginia limited liability company formed on March 21, 2014 ("**FGGC**").  FGGC's principal address is 10718 Richmond Highway, Lorton, Virginia 22079.  FGGC was formed to manage the issuance, maintenance and operation of our customer gift certificate and stored value card program.  FGGC has never offered FIVE GUYS® restaurant franchises, nor has it offered franchises in other lines of business.  FGGC does not operate a business of the type being franchised.

Except as otherwise described above, none of our predecessors or affiliates operate any FIVE GUYS® restaurants or engage in any other business activities.

### Securitization Transaction

Under the Securitization Transaction which closed in June 2017, our Parent Company and its affiliates were restructured.  As part of the Securitization Transaction, all existing U.S. franchise agreements and related agreements for FIVE GUYS® restaurants were transferred to us, and we became the franchisor of all existing and future Development Agreements, Franchise Agreements and other related agreements. Ownership and control of all U.S. trademarks and certain intellectual property relating to the operation of FIVE GUYS® restaurants in the U.S. were also transferred to us.

At the time of the closing of the Securitization Transaction, FGE entered into a management agreement with us to provide the required support and services to Five Guys franchisees under their Development Agreements and Franchise Agreements.  FGE also acts as our franchise sales agent.  We will pay management fees to FGE for these services.  However, as the franchisor, we will be responsible and accountable to you to make sure that all services we promise to perform under your Development Agreement and Franchise Agreement or other agreement you sign with us are performed in compliance with the applicable agreement, regardless of who performs these services on our behalf.

**Description of Franchise**

FIVE GUYS® restaurants are fast casual dining restaurants which specialize in the sale of hamburgers, french fries, and related accompaniments in accordance with our comprehensive and unique system (the "**System**"). The System includes distinctive signage, interior and exterior design, décor and color scheme; special recipes and menu items (including proprietary products and ingredients); uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; inventory, management and financial control procedures (including point of purchase and tracking systems); training and assistance; and quality control and promotional programs; all of which we may change, improve, and further develop, in our discretion. Certain aspects of the System are more fully described in this Disclosure Document and the Manuals that are provided to you as a franchisee. The restaurants are identified by certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, such as "FIVE GUYS", "FIVE GUYS FAMOUS BURGERS AND FRIES", "FIVE GUYS BURGERS AND FRIES", and others (collectively, the "**Marks**"). We will refer to the restaurants which use our System and Marks as "**FIVE GUYS® Restaurant(s)**" or "**Restaurant(s)**."

FIVE GUYS® Restaurants are typically located in retail shopping centers and other urban locations which are acceptable to us. We may, however, consider sites such as train stations, sports arenas, airports, university campuses or other captive market spaces on a case-by-case basis ("**Non-Traditional Locations**"). Each Restaurant will typically range between 2,000 and 3,000 square feet, and will offer a menu selection featuring food items prepared according to our specified recipes and procedures.

We offer the right to establish and operate a Restaurant under the terms of a single unit franchise agreement (the "**Franchise Agreement**"), Exhibit C to this Disclosure Document. You may be an individual, corporation, partnership or other form of legal entity. Under the Franchise Agreement, certain parties are characterized as "Controlling Principals" of the franchisee (referred to in this Disclosure Document as "**Principals**"). The Franchise Agreement is signed by us, by you, and by those individuals whom we designate as Principals. In most instances, we will designate your principal equity owners, executive officers, and certain affiliated entities as Principals. By signing the Franchise Agreement, your Principals agree to be individually bound by certain obligations in the Franchise Agreement, including covenants concerning confidentiality and non-competition, and to personally guarantee your performance under the Franchise Agreement. Depending on the type of business activities in which you or your Principals may be involved, we may require you or your Principals to sign additional confidentiality and non-competition agreements.

You must also designate an "**Operating Principal**" who will be the main individual responsible for your business. If you are an individual, you will be the Operating Principal. If you are not an individual, the person you designate as your Operating Principal must maintain an equity interest in you. The Operating Principal must sign the Franchise Agreement as the Operating Principal and as one of your Controlling Principals. The Operating Principal must individually make certain covenants in the Franchise Agreement and must personally guarantee your performance under the Franchise Agreement.

You must enter into a development agreement (the "**Development Agreement**") to develop one or more franchised Restaurants to be located within a specifically described geographic territory (the "**Territory**"). A form of the Development Agreement is attached as Exhibit B to this Disclosure Document. We will determine the Territory before you sign the Development Agreement, and it will be specified in the Development Agreement. The Development Agreement requires you to establish Restaurant(s) within the Territory according to a development schedule, to periodically provide us with your development plans during the life of your development schedule, and to enter into a separate Franchise Agreement for each Restaurant established under the Development Agreement. The Franchise Agreement for the first Restaurant developed under the Development Agreement will be in the form attached as Exhibit C to this Disclosure Document. For each additional Restaurant developed under the Development Agreement, you must sign the then-current form of Franchise Agreement that we are then offering to new franchisees, which

may differ from the current Franchise Agreement attached to this Disclosure Document.  The size of the Territory will vary depending on local market conditions and the number of Restaurants to be developed.

The person or entity signing the Development Agreement is referred to as the "**Developer**."  The Development Agreement contains concepts similar to the Franchise Agreement involving the Developer's Principals, Controlling Principals of the Developer, and an Operating Principal of the Developer.  For purposes of this Disclosure Document, the terms "Principals," "Controlling Principals," and "Operating Principal" include those persons having similar obligations identified in both the Development Agreement and Franchise Agreement, and the terms "you," "your," and "Franchisee" also include the Developer under the Development Agreement, unless we have noted otherwise.  Any reference to the "**Agreements**" means the Development Agreement and the Franchise Agreement, as applicable.  Upon the expiration or earlier termination of your Agreements, you will have no options, rights of first refusal, or similar rights to acquire additional franchises.

## Market and Competition

The restaurant market is well established and very competitive.  You can expect to compete in your market with locally owned businesses, as well as with national and regional chains, that offer menu selections featuring hamburgers, sandwiches, french fries, and other American-style food products.  Casual and fast-casual dining restaurant concepts compete on the basis of many factors, such as price, service, product quality, location, promotions and marketing programs.  These businesses are often affected by other factors as well, such as changes in consumer taste, economic conditions, seasonal population fluctuation, and travel patterns.  We believe our competitive position is enhanced by our operational format and by the food products offered by FIVE GUYS® Restaurants.  We plan to continue controlled expansion into areas that we determine can support the Restaurants to improve name recognition and the reputation of the System.

## Industry Regulations

The restaurant industry is regulated on the federal, state and local levels.  The preparation and handling of food is federally regulated by the Pure Food and Drugs Act of 1906; the Federal Food, Drug and Cosmetic Act and by rules and policies of the Food and Drug Administration.  State requirements relating to food safety typically pertain to sanitation and handling.  Local inspectors may also enforce sanitation and handling rules created on the state and/or local level.

The federal Clean Air Act and various implementing state laws require certain state and local areas to meet national air quality standards limiting emissions of ozone, carbon monoxide and particulate matters, including caps on emissions from commercial food preparation.  Some areas have also adopted or are considering proposals that would regulate indoor air quality.

The United States enacted the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (the "**USA Patriot Act**").  We must comply with the USA Patriot Act.  To help us comply with the USA Patriot Act, we ask you in the Franchise Agreement to confirm for us that neither you nor your directors, officers, shareholders, partners, members, employees, or agents are suspected terrorists or persons associated with suspected terrorists or are under investigation by the U.S. government for criminal activity.  You may review the Patriot Act and related regulations at http://www.treasury.gov/offices/enforcement/ofac/sdn.

The United States Foreign Corrupt Practices Act of 1977 (as amended, the "**FCPA**") and all such other laws of similar effect prohibit bribery or other improper payments made to obtain a business advantage.  You and we acknowledge and agree that you and we are committed to conducting business ethically and in full compliance with all applicable laws and regulations, including, without limitation, the FCPA.  You and each Controlling Principal agree to never take any action that could cause yourselves to be in violation of the FCPA.

Among the licenses and permits you may need are:  Zoning or Land Use Approvals, Sunday Sale Permits, Liquor Licenses, Sales and use Tax Permits, Special Tax Stamps, Fire Department Permits, Food Establishment Permits, Health Permits, Alarm Permits, County Occupational Permits, Retail Sales Licenses, and Wastewater Discharge Permits.  There may be other laws, rules or regulations which affect your Restaurant, including minimum wage and labor laws along with ADA, OSHA and EPA considerations.  We recommend that you consult with your attorney for an understanding of them.

## ITEM 2
## BUSINESS EXPERIENCE

President of Five Guys and FGE: Victor J. Murrell

Mr. Victor Murrell has been our President since April 2017.  He has been President of FGE since November 2002.  He has also served as Secretary and Treasurer of Five Guys Inc. since January 1997.

Secretary and Treasurer of Five Guys and FGE:  Jane Murrell

Mrs. Jane Murrell has been our Secretary and Treasurer since April 2017.  She has been Secretary and Treasurer of FGE since November 2002.  She has also served as President of Five Guys Inc. since January 1997.

Vice President of FGE:  James J. Murrell

Mr. James Murrell has been one of FGE's Vice Presidents since November 2002.  He has also served as one of the Vice Presidents of Five Guys Inc. since January 1997.

Vice President of FGE:  Matthew D. Murrell

Mr. Matthew Murrell has been one of FGE's Vice Presidents since November 2002.  He has also served as one of the Vice Presidents of Five Guys Inc. since January 1997.

Vice President of FGE:  Chad M. Murrell

Mr. Chad Murrell has been one of FGE's Vice Presidents since November 2002.  He has also served as one of the Vice Presidents of Five Guys Inc. since January 1997.

Vice President of FGE:  Benjamin J. Murrell

Mr. Benjamin Murrell has been one of FGE's Vice Presidents since November 2002.  He has also served as an Operations Manager of Five Guys Inc. since January 1998.

Vice President of FGE:  Tyler D. Murrell

Mr. Tyler Murrell has been one of FGE's Vice Presidents since November 2002.  He has also served as an Operations Manager of Five Guys Inc. since January 1997.

Chief Operating Officer of FGE:  Sam Chamberlain

Mr. Sam Chamberlain has been FGE's Chief Operating Officer since October 2007.

Chief Financial Officer of FGE:  Peter Hanson

Mr. Peter Hanson has been FGE's Chief Financial Officer since October 2008.

Vice President of Franchise Operations of FGE:  Robert Toomey

Mr. Robert Toomey has been FGE's Vice President of Franchise Operations since January 2011.

General Counsel of FGE:  Dale Thompson

Mr. Dale Thompson has been FGE's General Counsel since January 2003.

Deputy General Counsel of FGE:  Adam Aberra

Mr. Adam Aberra has been FGE's Deputy General Counsel since May 2015.  From January 2008 to May 2015, he served as FGE's Associate General Counsel.

Director of Franchise Sales of FGE:  Mark Moseley

Mr. Mark Moseley has been FGE's Director of Franchise Sales (f/k/a Director of Franchise Development) since June 2004.

Note: Unless otherwise stated above, each individual in Item 2 maintains an office at our headquarters in Lorton, Virginia.

We do not currently hire, employ, contract with, or otherwise use the services of any franchise brokers.

**ITEM 3**
**LITIGATION**

On January 14, 2005, in accordance with Sections 14-214 and 14-216 of the Maryland Franchise Law, the Maryland Attorney General required FGE to sign a Consent Order ("**Order**") for violations of those sections in that FGE sold a franchise before its franchise renewal registration became effective and offered to sell 2 others during this period of time.  The Order required FGE to offer rescission to the one franchisee who bought the franchise, and to enroll one of its officers in a franchise compliance training program.  FGE complied with the terms of the Order and the one franchisee declined the offer of rescission. The Order also provides that if FGE violates the Order, the Maryland Division of Securities may bring administrative or judicial proceedings against FGE for enforcement of the Order.

Michael Kim v. Five Guys Enterprises (State Case No. CAUD-33586; Fed Civil Action No. 8:10-cv-03060).  On October 13, 2010, FGE's former franchisee, Michael Kim (together with his affiliates, "**Kim**"), sought to enjoin FGE from terminating Kim's franchise rights due, in part, to Kim's election to close a FIVE GUYS® restaurant without FGE's approval and open a competing concept at the same location while still continuing to use certain methods, procedures, and proprietary elements which are unique to the FIVE GUYS® System (e.g., the FIVE GUYS® preparation method for burgers and fries, a red and white tiled interior décor, etc.) in violation of the non-competition provisions of his Franchise Agreements (the "**Maryland Complaint**").  In connection with this matter, FGE filed a federal complaint against Kim on October 28, 2010 in the United States District Court for the District of Maryland (the "**Federal Complaint**").  On January 10, 2011, both the Maryland Complaint and the Federal Complaint were withdrawn once Kim agreed to permanently leave the FIVE GUYS® franchisee network and FGE agreed to purchase all of Kim's 7 stores for an aggregate purchase price of $3,800,000 plus certain related expenses.

Karl Family Trust, et. al. v. Five Guys, et. al., (State Civil No. 130905668). The Judicial District Court for Salt Lake County, State of Utah. On August 23, 2013, the plaintiffs filed a complaint against

FGE, Jerry Murrell, and certain of its then current franchisees. The claims stem from a series of transactions related to the development of FIVE GUYS® restaurants in certain provinces in Canada (the "**Venture**").  The plaintiffs allege that FGE received false information from outside investors related to the Venture, and that FGE subsequently violated the plaintiff's franchise agreements by terminating their franchise rights.  The plaintiffs also allege that FGE breached its covenant of good faith and fair dealing, were unjustly enriched by taking franchisee fees from third parties, and that FGE negligently misrepresented that the plaintiffs were given rights to certain Canadian provinces.  Each claim alleges damages in excess of $10,000.  FGE's motion to compel arbitration was granted in part and the plaintiffs conceded that the remaining claims should be sent to arbitration in Virginia.  The plaintiffs have filed no claims in arbitration as of the date of this Disclosure Document.  The plaintiffs are continuing to litigate in Utah state court against the other defendants.

Other than the foregoing, no litigation is required to be disclosed in this Item.

## ITEM 4
## BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5
## INITIAL FEES

**Development Agreement**:  When you sign the Development Agreement, you must pay us a non-refundable territorial development fee equal to $50,000 for each Restaurant to be developed under the Development Agreement ("**Development Fee**").  We reserve the right to adjust this formula of the Development Fee depending on the size of the area acquired.  The Development Fee must be paid in a single, lump sum on the date you sign the Development Agreement.  The Development Fee is fully earned and non-refundable when paid, in consideration of administrative and other expenses we incur in entering into the Development Agreement.  After signing the Development Agreement, you must enter into a Franchise Agreement based on our then-current form for each Restaurant to be developed under the Development Agreement.  In the event you wish to only develop a single Restaurant, you must enter into a Development Agreement for that Restaurant.

**Franchise Agreement**:  You must pay us an initial franchise fee of $25,000 for the right to establish a single Restaurant under a Franchise Agreement ("**Franchise Fee**").  The Franchise Fee must be paid in a single, lump sum on the date you sign the Franchise Agreement. The Franchise Fee is fully earned and non-refundable when paid, in consideration of administrative and other expenses we incur in entering into the Franchise Agreement.  However, if you cannot obtain possession of an approved location for the Restaurant within 6 months after you have signed your first Franchise Agreement, we have the right to terminate the Franchise Agreement and refund 75% of your Franchise Fee.  Before returning any portion of the Franchise Fee, you must demonstrate to us that you have made a good faith effort to obtain the financing and possession of an approved location for the Restaurant.  This policy may be revoked by us at any time.  If we decide to revoke this policy, we will provide written notice to those franchisees that have signed a Franchise Agreement to establish a single Restaurant but have not yet developed their Restaurant, and will file all necessary amendment documentation with the applicable state commissions.  Any such notice will be given at least 60 days before the revocation takes effect.  This is the only refund provision currently available to you.  As stated above, in the event you wish to only develop a single Restaurant, you must enter into a Franchise Agreement and a Development Agreement for that Restaurant.  The Development Fee is not applied towards the Franchise Fee.  For the year ended December 31, 2021, we had deferred revenue for both Development Fees and Franchise Fees in the amount of $24,750,047.

**Alaska, Hawaii and Puerto Rico Fees**:  The Five Guys development and operations teams have determined that the market needs for Alaska, Hawaii and Puerto Rico will necessitate considerably more effort by our personnel (together with the incurrence of substantially more costs) than we typically

experience with our other domestic territories.  As such, the Development Fee described above and currently assessed to our franchisees will not apply to prospective franchisees for Alaska, Hawaii and Puerto Rico.  In order to ensure that the FIVE GUYS® brand standards are maintained in these specific regions, we are requiring that the per store Development Fee and Franchise Fee for Alaska, Hawaii and Puerto Rico be set at $125,000, and $25,000, respectively.

**Initial Training Fee**:  We do not charge a training fee for the initial training of your Operating Principal, your general manager, and one assistant manager. At your request, and subject to space availability, we or our designee will provide initial training to additional members of your personnel, but we may charge a fee for that training.  The additional training fee we currently charge is $1,500 per person ("**Additional Training Fee**").  The Additional Training Fee represents our costs of providing the training, including the cost of materials and our administrative costs of making personnel available for training purposes.  You must pay the Additional Training Fee for each additional member of your personnel before training begins.  The initial training fee is non-refundable and is charged uniformly to all franchisees, although actual dollar amounts may vary depending on how many additional persons are trained.

**Required Initial Inventory Purchase**:  Before your business opens, you must purchase the initial inventory of proprietary hamburger and hotdog buns from our affiliate Five Guys Bakery at a non-refundable cost of approximately $350, payable when you place the order.

There are no additional payments to or purchases from us or our affiliates before you open your Restaurant for business.

## ITEM 6
## OTHER FEES

| Fees (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee (2) | 6% of Gross Sales.  If the Restaurant is located in Alaska, Hawaii or Puerto Rico, the Royalty Fee is 8% of Gross Sales. | Weekly on Wednesdays | Amounts due will be withdrawn by electronic wire transfer from your designated bank account. |
| Creative Fund (3) | Up to 2% of Gross Sales (Currently 2%) | Weekly on Wednesdays | Amounts due will be withdrawn by electronic wire transfer from your designated bank account.  We may reduce your required contribution to the Creative Fund at our sole discretion. |
| Bread Products | Varies, depending on your bread product needs | Weekly on Mondays | Amounts due will be withdrawn by Five Guys Bakery via electronic wire transfer from your designated bank account. |
| Local Advertising | Not less than 2% of Gross Sales | Annually | We may require you to spend not less than 2% of Gross Sales on local advertising annually throughout the term of your Franchise Agreement. Any contributions to a Cooperative will be credited against your local advertising obligations. You pay third parties for your local advertising and promotion. |

| Fees (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Cooperative Advertising (4) | Maximum - 1½% of Gross Sales, which will be credited towards Local Advertising | As determined by Cooperative | Your Cooperative contribution may be allocated by us to the Creative Fund. |
| Interest | The lesser of (i) 10% per annum or (ii) the maximum rate allowed by applicable law | On demand | Interest may be charged on all overdue amounts. |
| Advertising & Promotional Materials | Varies, depending on your advertising needs | When billed | |
| Prohibited Product or Service Fine | $250 per day of use of unauthorized products or services | If incurred | In addition to other remedies available to us. |
| Initial Training of additional or replacement and successor personnel | $1,500 per person | Before Training | No charge for initial training for Operating Principal, general manager and one assistant manager. |
| Additional Assistance | If you request additional assistance, you must pay the current per diem charge for our employees used to provide the assistance and our associated costs. Current per diem is $500. | When billed | We provide opening assistance without additional charge.  Any additional assistance you request is billed at the current per diem rate. |
| Cash Register Upgrades | Approximately $5,000 | When incurred | You must make annual payments to a third-party vendor to maintain your Computer System.  It is anticipated that several updates and upgrades may be required by your third-party vendor during the term of your Franchise Agreement, and any such updates or upgrades will be at your expense.  We estimate that the cost of potential updates and upgrades is approximately $5,000. |
| Transfer Fee | $5,000 to reimburse us for our reasonable costs and expenses in reviewing the transfer application | Submitted with transfer application | No fee charged to an individual or partnership franchisee that transfers its rights to a corporation controlled by the same interest holders.  A transfer fee of a similar amount is charged under both the Franchise Agreement and the Development Agreement. |

| Fees (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Additional or Remedial Training | Cost in providing the training (Currently $1,500) | Before additional training | We reserve the right to charge a fee for additional or remedial training that is not mandatory.  We do not charge for mandatory training, but we do reserve to right to be reimbursed for costs incurred.  Cost will vary based on the staff, location, and type of training being offered. |
| Inspection and Testing | Cost of inspection or testing (Currently estimated at $5,000) | When billed | We may require you to pay us or an independent laboratory for the cost of inspection or testing. |
| Vendor/Equipment Approval Fee | $5,000 to reimburse us for our reasonable costs and expenses in reviewing and approving vendor equipment | As incurred | This fee is payable to us and covers the costs and expenses to evaluate a new vendor and equipment of your choice that is not currently on our approved vendor list. |
| Audit Fee | Cost of audit (Currently estimated at $5,000) | When billed | Payable only if we find, after an audit, that you have understated any amount you owe to us by more than 2%. |
| Late Payment or Reporting Fee | $50 per day you are late | Daily | If you fail to pay royalties when due or fail to submit royalty reports weekly as required, we may charge you $50 per day until the payment or report is received. This amount is in addition to any applicable interest penalties. |
| Site Evaluation Fee | A reasonable amount to be determined (Currently $500) | If incurred | For those additional on-site evaluations, or if the Franchise Agreement does not relate to your first Restaurant, we reserve the right to charge a reasonable fee for each evaluation as well as a fee for our reasonable expenses including the cost of travel, lodging, meals and wages. |
| Relocation Fee | $7,500 to reimburse us for our time, costs and expenses in reviewing the relocation application as well as the current and future sites | If incurred | This covers our costs to review the proposed relocation of one of your currently operating Restaurants.  We reserve the right to assess a relocation fee if your application to relocate your Restaurant is approved.  No fee will be assessed if your application is denied. |
| Gift Card Program | See note 5 | | |
| Time Extension Fee | $10,000 per Time Extension | On approval of extension to Development Schedule | The Time Extension will run for an additional 90-day period beginning on the expiration of the applicable development period, including any previous extensions. |

*Notes*:

(1)    All fees as described in this Item 6 are non-refundable.  Except as otherwise indicated in the preceding chart, we uniformly impose all fees and expenses listed, and you must pay them to us.  Except as specifically stated above, the amounts given may increase based on changes in market conditions, our cost of providing services and future policy changes.  At the present time, we have no plans to increase payments over which we have control.

(2)    For the purposes of determining the royalties to be paid under the Franchise Agreement, "Gross Sales" means all revenue from the sale of all services and products and all other income of every kind and nature related to, derived from, or originating from the Restaurant, including, without limitation, income related to (i) catering and delivery activities, (ii) any sales or orders of products or food preparation services of any kind provided from or related to the Restaurant, and (iii) all proceeds of any business interruption insurance policies, in each case whether for cash or credit, and regardless of collection in the case of credit.  If a cash shortage occurs, the amount of Gross Sales will be determined based on the records of the electronic cash register system and any cash shortage will not be considered in the determination.  Gross Sales expressly excludes the following:

(a)    Receipts from the operation of any public telephone installed in the Restaurant or products from pre-approved vending machines located at the Restaurant, except for any amount representing your share of the revenues;

(b)    Sums representing sales taxes collected directly from customers, based on present or future laws of federal, state or local governments, collected by you in the operation of the Restaurant, and any other tax, excise or duty which is levied or assessed against you by any federal, state, municipal or local authority, based on sales of specific merchandise sold at or from the Restaurant, provided that the taxes are actually transmitted to the appropriate taxing authority; and

(c)    Proceeds from isolated sales of trade fixtures not constituting any part of your products and services offered for resale at the Restaurant or having any material effect on the ongoing operation of the Restaurant required under the Franchise Agreement.

We may authorize certain other items to be excluded from Gross Sales.  We may revoke or withdraw any exclusion at any time.  The royalty fee will be withdrawn from your designated bank account by electronic wire transfer weekly on Wednesday based on Gross Sales from the preceding accounting period (see Section IV.B. of the Franchise Agreement), unless we require otherwise.  You must maintain a minimum of $3,000 in your designated bank account for the Restaurant.

(3)    We have established and will administer a national creative fund on behalf of the System to provide national or regional creative materials for the benefit of the System.

(4)    Cooperatives will be comprised of all franchised Restaurants located in designated geographic areas.  Each Restaurant has one vote in the cooperative.  No Cooperatives have been established as of the date of this Disclosure Document.  If a Cooperative is established, company-owned businesses will have the same voting power as other members of the Cooperative and will contribute the same amount of fees as franchised Restaurants.

(5)    You must participate in our gift card program.  All FIVE GUYS gift cards will be available for purchase and redemption at any Restaurant, and you must sell and redeem FIVE GUYS gift cards in accordance with the procedures we specify in the Manuals or otherwise in writing (e.g.,  procedures by which you will be reimbursed for gift cards issued by other Restaurants and redeemed at your Restaurant, and the manner in which to process payments to us or other franchisees for gift cards issued from your

Restaurant that are later honored by another Restaurant operated by us or such other franchisees).  The administration of all gift card proceeds and reimbursements will be controlled by us or our affiliate.

## ITEM 7
## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Expenditure | Estimated Amounts | When Payable | Method of Payment | To Whom Paid |
|---|---|---|---|---|
| Initial Franchise Fee (1) | $25,000 | On signing Franchise Agreement | Lump Sum | Us |
| Development Fee (1) | $50,000 per Restaurant ($125,000 per Restaurant in Alaska, Hawaii and Puerto Rico) | On signing Development Agreement | Lump Sum | Us |
| Leasehold Improvements (2) | $100,000 to $300,000 | As Arranged | As Invoiced | Independent Contractors |
| Lease Payments and other rental expenses (3) | $7,500 to $20,000 | Monthly | Per Lease | Landlord |
| Equipment (4) | $55,000 to $105,000 | As Arranged | As Invoiced | Designated Vendors |
| Signage (5) | $6,500 to $20,000 | As Arranged | As Invoiced | Designated Vendors |
| Initial Inventory (6) | $10,000 to $15,000 | As Arranged | As Invoiced | Designated Vendors and Five Guys Bakery |
| Architectural/ Engineering (7) | $7,000 to $25,000 | As Arranged | As Invoiced | Designated Vendor |
| Electronic Cash Register System with Modem (8) | $15,000 to $25,000 | Lump Sum | As Invoiced | Designated Vendor |
| Facsimile Machine (9) | $350 to $500 | Lump Sum | As Invoiced | Designated Independent Vendor |
| Travel, lodging and meals for initial training (10) | $100 to $5,000 | As Incurred | As Incurred | Independent Suppliers |
| Business Supplies (stationery, business cards, menus, gift cards, paper and other materials) (11) | $4,000 to $8,500 | Lump Sum | As Invoiced | Independent Suppliers |
| Business licenses, permits, utility deposits, etc. (for first year) (12) | $5,000 to $15,000 | As Arranged | As Incurred | Various Agencies |
| Delivery and catering expenses (13) | $0 to $1,000 | As Incurred | As Incurred | Us and Various Vendors |
| Insurance deposits and premiums (14) | $750 to $1,250 | As Arranged | As Invoiced | Independent Carrier |
| Additional Funds for first 3 months (15) | $20,000 to $25,000 | As Arranged | As Incurred | Various Vendors |

| Expenditure | Estimated Amounts | When Payable | Method of Payment | To Whom Paid |
|---|---|---|---|---|
| TOTAL (16) | $306,200 to $641,250 ($381,200 to $716,250 for Alaska, Hawaii and Puerto Rico) | | | |

In general, none of the expenses listed in the above chart are refundable, except any security deposits you must make may be refundable and the initial franchise fee is partially refundable in certain circumstances.

*Notes:*

(1)     You must pay an initial franchise fee of $25,000 when you sign a Franchise Agreement. The initial franchise fee is non-refundable under the terms of the Franchise Agreement, except that we currently have a policy under which we may refund 75% of the initial franchise fee if you are unable to locate an acceptable site within 6 months after signing your Franchise Agreement.  You must pay a Development Fee of $50,000 multiplied by the total number of Restaurants to be located outside of Alaska, Hawaii and Puerto Rico and $125,000 multiplied by the total number of Restaurants to be located within these jurisdictions, to be developed under the Development Agreement, even if it is only one Restaurant. The Development Fee is non-refundable and will vary depending on the number of Restaurants you commit to develop in your territory.

(2)     The cost of leasehold improvements will vary depending on numerous factors, including: (i) the size and configuration of the premises; (ii) pre-construction costs (e.g., demolition of existing walls and removal of existing improvements and fixtures); and (iii) cost or materials and labor which may vary based on geography and location.  These amounts are based on the cost of leasehold improvements.  These figures are our best estimate based on remodeling/finish-out rates and conditions in the Washington, D.C. metropolitan area and some estimates from other general contractors based in the United States.  These amounts may vary substantially based on local conditions, including the availability and prices of labor and materials.  These costs may also vary depending on whether certain of these costs will be incurred by the landlord.

(3)     The figures are for the first 3 months' rent and assume that the premises of the Restaurant will be in a strip shopping center or urban location ranging in size from approximately 2,000 to 3,000 square feet.  In addition to the rent, landlords will typically require a security deposit which is one month's rent. Further, the figures assume base annual rental rates ranging from $20 to $30 per square foot.  Landlords may vary the base rental rate and/or security deposit and may charge rent based on a percentage of gross sales.  In addition to base rent, the lease may require you to pay common area maintenance charges ("**CAM Charges**") for the mall or shopping center, your pro rata share of the real estate taxes and insurance for the mall or shopping center, and your pro rata share of other charges.  The actual amount you pay under the lease will vary depending on the size of the Restaurant, the types of changes that are allocated to tenants under the lease, your ability to negotiate with landlords and the prevailing rental rates in the geographic region.

(4)     You must utilize equipment meeting our specifications to be used in the Restaurant, including, a cooking grill, work tables, shelving, oven stand proofer, ice machine, and other related items including smallwares.  We have established relationships with equipment vendors for certain equipment used in Restaurants that meet our specifications.

(5)     These amounts represent your cost for menu boards, menu panels, neon logo and descriptive signs.  Your landlord may have different restrictions it places on interior and exterior signage which may affect your costs.

(6)     These amounts represent your initial inventory of food supplies and paper goods for use in the first 3 months of operating the Restaurant. This amount also includes the $350 for the proprietary hamburger and hotdog buns you must purchase from our affiliate Five Guys Bakery.

(7)     We will provide to you, without charge, our floor plan, reflected ceiling plan, and the FIVE GUYS® brand standard construction guidelines for a prototypical Restaurant (collectively, the "**Preliminary Design Package**"). You must obtain architectural, engineering, and design services from an architectural design firm that we approve, to adapt your Restaurant premises to our standards and specifications. The estimate above includes costs of obtaining architectural and design services necessary for the construction of the Restaurant.

(8)     We require that you use the point-of-sale system we specify, have high speed internet access and an email account to receive communications from us.

(9)     You must have a facsimile machine to communicate with us and to accept fax menu/catering orders, and it must be able to cut pages as they are received or print on single sheet paper. It will also be necessary to have a copy machine for general use.

(10)    We (or our designee) provide initial training to your Operating Principal, general manager, and one assistant manager at no additional charge. These estimates include only your out-of-pocket costs associated with the training of these personnel members (including travel, room, and board). These amounts do not include any fees or expenses for training any other personnel. Training is for not less than 10 days, which may not necessarily be consecutive days. These costs will vary depending on your selection of lodging and dining facilities and mode and distance of transportation.

(11)    You must purchase business cards, brochures, memorabilia and other written materials for use in the franchise business. You will typically purchase amounts that may last as long as 6 months. You may purchase these materials from us or independent vendors that we have approved.

(12)    These are estimates of the costs for obtaining local business licenses which typically remain in effect for one year. These figures do not include occupancy and construction permits which were included in the leasehold improvement costs. The cost of these permits and licenses will vary substantially depending on the location of the franchised business. This figure also includes the purchase of a "wine and beer" license from a government authority. The cost for these licenses can vary from city to city and state to state. The estimates also include your utility deposits. Utility deposits may or may not be needed if you have another operating business.

(13)    We may offer certain franchisees the option of providing their customers delivery and catering services. If you choose, and we approve you, to provide delivery and catering services from your FIVE GUYS® Restaurant, you will need to purchase additional signage for use in/on delivery vehicles, and may incur fuel costs and other additional costs. You are not required to purchase a motor vehicle to be used exclusively for your franchised business. Any existing motor vehicle available for your use is acceptable. You will need a vehicle if you choose, and we approve you, to provide delivery and catering services. You are not required to provide delivery and catering services. If you do not provide delivery or catering services, you will not incur these expenses.

(14)    These figures are the first 3 month's estimates of the cost of the initial deposit/premiums for the insurance you must obtain and maintain for the franchised business.

(15)    Beginning with the first FIVE GUYS® restaurant which opened in 1986, we have relied on 35 years of FIVE GUYS® Restaurant experience in compiling these estimates. Additional items that will need to be purchased or leased include telephone system, music system, floor mats, in store training, uniforms, etc. These amounts are our estimate of the amount needed to cover your expenses for the start-up phase (first 3 months) of your business. You must maintain a minimum of $3,000 in your checking

account for electronic wire transfer purposes and other costs. These figures are estimates, and you may incur additional expenses starting the Restaurant. Your actual costs will depend on factors such as your management skill, experience and business acumen; local economic conditions; the local market for products; the prevailing wage rate; competition; and the sales level reached during the start-up phase. These amounts do not include any estimates for debt service.

(16)    This total represents the initial investment for a single Restaurant. When you sign the Development Agreement, the Development Fee is multiplied by the number of Restaurants to be developed. The initial Franchise Fee for each Restaurant will be paid on the signing of each Franchise Agreement. Actual start-up costs pertaining to the actual Restaurants opened under the Development Agreement are as estimated above, subject to potential increases over time or other changes in circumstances. Because your primary responsibility under the Development Agreement is to execute Franchise Agreements for the establishment of Five Guys Restaurants, we anticipate that a developer's initial investment will be approximately equal to the totals in the chart above multiplied by the number of Restaurants to be developed. We do not offer financing directly or indirectly for any part of the initial investment (see Item 10).

**Development Agreement**

In connection with the Development Agreement, you will need access to working capital funds to cover the initial costs incurred each time you open a Restaurant within your development area. The vehicle costs you incur to view potential sites, oversee unit build-outs, supervise multiple locations, etc. will be approximately $2,100 for 3 months.

Except as specifically stated above, the amounts given may be subject to increases based on changes in market conditions, our cost of providing services and future policy changes. At the present time, we have no plans to increase payments over which we have control.

### ITEM 8
### RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

**Required Purchases and Operation Standards**

You must purchase or lease and install all fixtures, furnishings, equipment (including electronic cash registers, computer hardware and software), décor items, signs and related items we require, all of which must conform to the standards and specifications in our Manuals or otherwise in writing, unless you have first obtained our written consent to do otherwise. You may not install or permit to be installed on the Restaurant premises any fixtures, furnishings, equipment, décor items, signs, games, vending machines or other items without our written consent or which do not comply with our specifications. If you lease any of the property described above from a third party, we must approve the lease in writing before it is signed. We will not approve the lease unless it permits your interest in the lease to be assigned to us if the Franchise Agreement terminates or expires.

To ensure that the highest degree of quality and service is maintained, you must operate the Restaurant in strict conformity with the methods, standards and specifications that we prescribe in the Manuals or otherwise in writing. You must maintain in sufficient supply and use and sell at all times only those food and beverage items, ingredients, products, materials, supplies and paper goods that meet our standards and specifications. Except as described in this Item 8, you must purchase promotional material incorporating our Marks and proprietary products only from approved suppliers. Five Guys Bakery, our affiliate, is currently the only approved supplier for the hamburger and hotdog buns and rolls that you must use. All menu items must be prepared using the recipes and procedures specified in the Manuals or other written materials. You must not deviate from these standards and specifications by the use or offer of non-conforming items or differing amounts of any items, without obtaining our written consent first. You must sell and offer for sale only those menu items, products and services that we have expressly approved for

sale in writing.  You must offer for sale all products and services required by us in the manner and style we require, including dine-in and carry-out services.  You must not deviate from our standards and specifications without obtaining our written consent first.  You must discontinue offering for sale any items, products and services we may disapprove in writing at any time.  We can, and expect to, modify our standards and specifications as we deem necessary.  We will provide you notice of any changes in the Manuals.

You must permit us or our agents, at any reasonable time, to remove a reasonable number of samples of food or non-food items from your inventory or from the Restaurant free of charge for testing by us or by an independent laboratory to determine whether the samples meet our then-current standards and specifications.  Besides any other remedies we may have, we may require you to pay for the testing if we have not previously approved the supplier of the item or if the sample fails to conform to our specifications.

Except for proprietary products and promotional materials provided by us or our designated suppliers, you must obtain all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including kitchen equipment, office equipment, service area equipment, electronic point of sale systems, computer hardware, and software systems), and other products used or offered for sale at the Restaurant solely from suppliers who demonstrate, to our continuing reasonable satisfaction, the ability to meet our then-current standards and specifications. Our criteria for supplier approval may be found in the Manuals.  Among other things, the suppliers must have adequate quality controls and the capacity to supply your needs promptly and reliably.  If you wish to purchase, lease or use any products or other items from an unapproved supplier, you must submit a written request for approval, or must request the supplier to do so.  We have to approve any supplier in writing before you make any purchases from that supplier.  We can require that our representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to us or to an independent laboratory, for testing.  You must pay the Vendor/Equipment Approval fee, cost of the inspection, and the actual cost of the test must be paid by you or the supplier.  We reserve the right to re-inspect the facilities and products of any approved supplier and to revoke our approval if the supplier fails to continue to meet any of our then-current standards.  Our supplier approval procedure does not obligate us to approve any particular supplier.  However, we will notify you within 30 days after we complete the inspection and evaluation process of our approval or disapproval of any proposed supplier.

### Proprietary Products and Marks

We have and may continue to develop for use in the System products which are prepared from confidential proprietary recipes and other proprietary products which bear our Marks.  Because of the importance of quality and uniformity of production and the significance of those products in the System, it is to your and our benefit that we closely control the production and distribution of those products.  Accordingly, if those products become a part of the System, you will use only our proprietary recipes and other proprietary products and will purchase those items solely from us or from a source we designate all of your requirements for those products. After opening your FIVE GUYS® Restaurant, you may be required to purchase from us or our affiliates for resale to your customers any merchandise identifying the System that we require, such as FIVE GUYS® memorabilia and promotional products (such as t-shirts and jackets for resale), in amounts sufficient to satisfy your customer demand.  You must also obtain upgrades for your electronic cash register system from designated suppliers occasionally as we notify you that they have become available, as described below in this Item 8 under the subheading "Computer and Electronic Cash Register Systems."

All advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the Restaurant) and other items we designate must bear the Marks in the form, color, location and manner we prescribe.  In addition, all your advertising and promotion in any medium must be conducted in a dignified manner and must conform to the standards and requirements in the Manuals or otherwise.  You must obtain our approval before you use any advertising and promotional

materials and plans if we have not prepared or approved them during the 12 months before their proposed use.

## Insurance

Before you open the Restaurant for business, you must obtain the insurance coverage specified below for the Restaurant to protect you, and, separately, us (with our affiliates, successors and assigns, and our respective partners and the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of each of them, the "**Designees**") against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring on or in connection with the Restaurant. This insurance coverage must be maintained during the term of the Franchise Agreement and must be obtained from a responsible carrier or carriers acceptable to us. Except as additional coverages and higher policy limits may reasonably be specified by us occasionally, the policy or policies must include the following:

1. Commercial general liability insurance, including property damage, personal injury, advertising injury, completed operations, products liability, and contracts liability in the amount of $2,000,000 per occurrence and in the aggregate.

2. Property insurance providing coverage for "All Risks" of physical loss or damage and insuring all perils insured under the ISO "Special Form Causes of Loss" form, in an amount sufficient to cover the full cost of replacement of the Restaurant premises and all other related property in which you may have an interest with no coinsurance clause. The property insurance coverage must include coverage for business interruption in an amount sufficient to cover 12 months of the Restaurant's Gross Sales, and we reserve the right to require that the policy be extended to include coverage for earth movement, flood, wind and hail, and other perils we deem necessary.

3. Crime insurance for employee dishonesty in the amount of $10,000 per occurrence.

4. Worker's compensation insurance in amounts provided by applicable law or, if permissible under applicable law, a legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to us, so long as you maintain an excess indemnity or "umbrella" policy covering employer's liability and/or a medical/disability policy covering medical expenses for on-the-job accidents.

5. Commercial automobile liability insurance coverage for bodily injury and property damage for all owned, rented, leased, and/or hired vehicles you use in connection with the operation of the Restaurant in the amount of $1,000,000 per occurrence and in the aggregate.

6. Network security, media & cyber liability insurance covering acts, errors, omissions, breach of contract, and violation of any consumer protection laws arising out of your Restaurant operations or services with a limit of $2,000,000 per occurrence and in the aggregate. This coverage must include (i) contractual privacy coverage for data breach response and crisis management costs that we would incur in the event of a data breach including legal and forensic expenses, notification costs, credit monitoring costs, and costs to operate a call center; and (ii) third party and first party coverage for loss or disclosure of any data, including personally identifiable information and payment card information, network security failure, violation of any consumer protection laws, unauthorized access and/or use or other intrusions, infringement of any intellectual property rights (except patent), unintentional breach of contract, negligence or breach of duty to use reasonable care, breach of any duty of confidentiality, invasion of privacy, or violations of any other legal protections for personal information, defamation, libel, slander, commercial disparagement, negligent transmission of computer virus, or use of computer networks in connection with denial of service attacks.

7.      Employment practices liability coverage including endorsement for third-party claims in the amount of $2,000,000 per occurrence and in the aggregate.

8.      Such other insurance as may be required by the state or locality in which the Restaurant is located and operated.

You may, after obtaining our written consent, elect to have reasonable deductibles under the coverage required under paragraphs 1 - 8 described above; however, neither we nor our Designees will be responsible for any deductibles and/or waiting periods that may appear in your policies.  Also, related to any construction, renovation, refurbishment or remodeling of the Restaurant, you must maintain builders' risks insurance or equivalent course of construction coverage on your property insurance in an amount sufficient to cover the contract value of the project, plus any existing property (and this insurance must be extended to provide "*delay in opening*" coverage, where available).

All policies you obtain and maintain must (i) contain cross liability coverage and severability on interests language, (ii) include a waiver of subrogation in favor of us and our Designees (to the extent permitted by law), (iii) be primary and non-contributory with any and all coverages held by us and/or our Designees, and (iv) be issued by an insurance company rated at least 'A' 'VIII' in the most current edition of A.M. Best Guide.  We and our Designees must be included as additional insured under all above policies except worker's compensation insurance, and those policies must expressly provide that none of our interests will be affected by any breach by you of any policy provisions.  All policies must contain a provision that we and our Designees, although named as additional insured, will nevertheless be entitled to recover under the policies on any loss occasioned to us or our servants, agents or employees by reason of the negligence of you or your servants, agents or employees.

On execution of a Franchise Agreement, and thereafter 30 days before the expiration of any policy, you must deliver to us the Certificates of Insurance and Endorsements evidencing the existence and continuation of proper coverage with limits not less than those we require.  In addition, if we request, you must deliver to us a copy of the insurance policy or policies we require.  Further, all insurance policies must expressly provide that no less than 30 days' prior written notice will be given to us in the event of a material alteration to or cancellation of the policies.  All delivered Certificates of Insurance and Endorsements evidencing the existence and continuation of proper coverage must be sent electronically to insurance@fiveguys.com, with hard copies to the following address upon request, or such other address(es) as we may designate from time to time:

FIVE GUYS ENTERPRISES, LLC
10718 Richmond Hwy
Lorton, Virginia 22079
<u>Attention</u>: Risk Management Department

Should you, for any reason, fail to procure or maintain the insurance we require, as these requirements may be revised occasionally by us in writing, we will have the right and authority, but not the obligation, to immediately procure the insurance and charge you, which you must pay immediately on notice.  The foregoing remedies are in addition to any other remedies we may have at law or in equity.

**<u>System-Wide Information</u>**

Five Guys Bakery, an indirect subsidiary of our Parent Company, is currently the only approved supplier for the hamburger and hotdog buns and rolls that you must use.  You must pay Five Guys Bakery by electronic wire transfer once your order is placed. PAR Technology Corporation is currently the only approved supplier of the Point-of-Sale system.  All other supplies and products may be purchased from any supplier previously approved by us, provided they maintain and conform to our standards and specifications.  Other than Five Guys Bakery, there are no approved suppliers in which any of our officers owns an interest.

For the year ended December 31, 2021, $49,067,645 in revenue was derived by our affiliate Five Guys Bakery from the sale of hamburger and hotdog buns to our U.S. and Canadian franchisees, which amounted to 74% of Five Guys Bakery's total revenue for 2021.  Neither we nor our other affiliates derived any other revenue from required purchases or leases.

We may, occasionally when possible, negotiate purchase arrangements, including price terms, with designated and approved suppliers on behalf of us and the franchise system.  We may receive discounts on some products used in the franchise system, such as purchases of electronic cash register and software from approved suppliers, Restaurant equipment, and materials displaying our Marks, such as cups, napkins, business cards, stationery, flyers, brochures and other promotional materials and memorabilia.  These discounts will be made available to you if you purchase through the approved suppliers offering the discounts.  You must purchase from us or sources designated by us proprietary products and trademarked food products, as described in the Manuals.  (We may sell these items to you or have you purchase them through designated sources at our cost, plus shipping, handling, a reasonable mark up by the supplier and an amount to compensate us for our administrative overhead in connection with these arrangements.)  We do not undertake any obligation to negotiate the proportional price reductions as each supplier has their own position on the granting of (and tracking/accounting for) price reductions and/or rebates (which are described below).

In addition to the discounts described above, we or our affiliates will receive, and expect to continue to receive, rebates from some of our designated suppliers as a result of our franchisees' required purchases from these suppliers.  We estimate that these rebates will range from 1% to 5% of franchisees' purchases for products such as Coca-Cola beverages, Dr. Pepper beverages, Heinz products and Musiktoday.  We do not receive rebates from all of our designated suppliers, as some provide discounts to us and our franchisees (as described above) or do not provide any purchasing incentives.  Any rebates received serve to partially reimburse us for our costs in the initial sourcing, approval and ongoing monitoring of these suppliers' compliance with our quality standards.  In 2021, approximately 100% of the proceeds expensed from the rebate funds collected were used to compensate the system-wide, third-party administrators for the secret shopper program, MarketForce, and to issue Coca-Cola related rebates to Five Guys franchisees.

As of the date of this Disclosure Document, there are no purchasing or distribution cooperatives for any of the items described above in which we require you to participate.

You must purchase or lease virtually all goods and services necessary to establish and operate the Restaurants from us or our Designees, from suppliers we approve, or in accordance with our specifications.  We estimate that your purchases and leases from us and our approved suppliers will be approximately 90% to 100% of your costs to establish and operate the franchised business.

When determining whether to grant new or additional franchises, we consider many factors, including any development rights granted under a Development Agreement, compliance with the Franchise Agreement, and compliance with the requirements described above in this Item 8.

**ITEM 9**
**FRANCHISEE'S OBLIGATIONS**

**This table lists your principal obligations under the franchise and other agreements.  It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|
| a.    Site selection and acquisition/ lease | Section II of Franchise Agreement | Items 8 and 11 |

| | Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|---|
| b. | Pre-opening purchases/leases | Sections VI, VII and VIII of Franchise Agreement | Items 5, 6, 7, 8 and 11 |
| c. | Site development and other pre-opening requirements | Section II of Franchise Agreement | Items 1, 8 and 11 |
| d. | Initial and ongoing training | Section VI of Franchise Agreement | Items 5, 6 and 11 |
| e. | Opening | Section VI of Franchise Agreement | Items 5, 6 and 11 |
| f. | Fees | Sections IV and VIII of Franchise Agreement and Section II of Development Agreement | Items 5 and 6 |
| g. | Compliance with standards and policies/Manuals | Sections II, III, VI, VIII, IX, X, XI and XII of Franchise Agreement | Items 11 and 14 |
| h. | Trademarks and proprietary information | Sections IX and X and Attachment D of Franchise Agreement and Attachment B of Development Agreement | Items 11, 13 and 14 |
| i. | Restrictions on products/services offered | Section VII of Franchise Agreement | Items 8 and 16 |
| j. | Warranty and customer service requirements | Section VII of Franchise Agreement | Item 8 |
| k. | Territorial development and sales quotas | Section III of Development Agreement | Item 12 |
| l. | Ongoing product/service purchases | Section VII of Franchise Agreement | Items 6 and 8 |
| m. | Maintenance, appearance and remodeling requirements | Sections II, VII and XIV of Franchise Agreement | Items 8 and 11 |
| n. | Insurance | Section XII of Franchise Agreement | Items 7 and 8 |
| o. | Advertising | Section VIII of Franchise Agreement | Items 6, 8 and 11 |
| p. | Indemnification | Section XV of Franchise Agreement and Section X of Development Agreement | Item 6 |
| q. | Owner's participation/ management/staffing | Sections VI, XIV, XV and XIX of Franchise Agreement and Section VI of Development Agreement | Items 1, 11 and 15 |
| r. | Records and Reports | Sections IV, VII and XI of Franchise Agreement | Item 6 |
| s. | Inspections and audits | Sections II, VII and XI of Franchise Agreement | Items 6, 8 and 11 |
| t. | Transfer | Section XIV of Franchise Agreement and Section VII of Development Agreement | Items 6 and 17 |
| u. | Renewal or Extension of Rights | Section III of Franchise Agreement and Section III of Development Agreement | Items 6 and 17 |

| | Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|---|
| v. | Post-termination obligations | Section XVIII of Franchise Agreement and Section VII of Development Agreement | Items 6 and 17 |
| w. | Non-competition covenants | Section X and Attachment D of Franchise Agreement and Section IX and Attachment B of Development Agreement | Item 17 |
| x. | Dispute Resolution | Section XIX of Franchise Agreement and Section XV of Development Agreement | Items 6 and 17 |
| y. | Other:<br>- Liquidated damages<br>- Annual Development Plan | Section XVIII of Franchise Agreement<br>Section III of Development Agreement | Item 6<br>Item 1 |

## ITEM 10
## FINANCING

We do not offer, either directly or indirectly, any financing arrangements to you.  We do not guarantee your notes, leases or other obligations.

## ITEM 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, we are not required to provide you with any assistance**.

As noted in Item 1, we have entered into a management agreement with FGE for the provision of support and services to Five Guys franchisees.  However, we remain responsible for all of the support and services required under the Franchise Agreement.

**Pre-Opening Obligations**:

Before the opening of a Restaurant we or our designee will provide the following assistance and services:

1.      Our written site selection guidelines and the site selection assistance we deem advisable. (Franchise Agreement, Section V.(1).)  If you cannot obtain possession of an approved location for the Restaurant within 6 months after you have signed the Franchise Agreement, we have the right to terminate the Franchise Agreement and refund 75% of the initial Franchise Fee.

2.      One on-site evaluation, and additional on-site evaluations as we deem necessary or in response to your reasonable request for site approval.  (Franchise Agreement, Section V.(2).)

3.      The Preliminary Design Package for the Restaurant.  (Franchise Agreement, Sections VII.(D). and V.(3).)

4.      On loan, access to a set of the Manuals which we may revise.  (Franchise Agreement, Section V.(4).)

5.      A list of our approved suppliers that supply and/or deliver food and beverage items, ingredients, supplies, materials, signs, fixtures, furnishings, Equipment and other products used or offered

for sale at the Restaurant and the written standards and specifications for those items. (Franchise Agreement, Section V.(7).)

6.     An initial training program for your Operating Principal, general manager, and one assistant manager at no additional charge to you.  If you wish to have additional personnel trained, we may charge up to $1,500 per person.  (Franchise Agreement, Section V.(8).)

7.     5 days of on-site pre-opening and 5 days of post-opening management assistance at the Restaurant for your first Restaurant and in our discretion for each additional Restaurant.  Pre-opening assistance includes construction inspections and review.  Neither period may necessarily be consecutive days. (Franchise Agreement, Section V.(9).)

We are not required to provide any other service or assistance to you before the opening of the Restaurant.

**Post-Opening Obligations**:

We are obligated by the Franchise Agreement to provide the following services and assistance after the opening of the Restaurant:

1.     As we reasonably determine necessary, visits to, and evaluations of, the Restaurant and the products and services provided there to ensure that the high standards of quality, appearance and service of the System are maintained.  (Franchise Agreement, Section V.(5).)

2.     Advice and written materials (including updates to the Manuals) concerning techniques of managing and operating the Restaurant, including new developments and improvements in equipment, food products, packaging and preparation.  (Franchise Agreement, Section V.(4).)

3.     Certain merchandise incorporating our Marks, including promotional products and memorabilia, for use in the Restaurant and for resale to your customers, in quantities sufficient to meet your customer demand, at a reasonable cost are made available to franchisees in the System.  (Franchise Agreement, Section V.(6).)

4.     5 days of on-site post-opening management assistance at the Restaurant.  (Franchise Agreement, Sections V.(9) and VI.F.(3).)

5.     Training programs and seminars and other related activities regarding the operation of the Restaurant as we (or our designee) may conduct for you, or Restaurant personnel generally, which your Operating Principal, general manager and other Restaurant personnel may be required to attend.  (Franchise Agreement, Section VI.E(2).)

6.     On-site remedial training for your Restaurant personnel when you reasonably request it or as we find appropriate.  If the remedial training is requested by you, we may require you to pay the per diem of the employees providing the training and our expenses in providing the training.  (Franchise Agreement, Section VI.E(4).)

7.     Administration of the Creative Fund and advertising cooperatives described below, as applicable.  (Franchise Agreement, Section VIII.C and D.)

8.     Indemnification against and reimbursement for all damages for which you are held liable in any proceeding arising out of your use of any of the Marks (including settlement amounts), provided that you and your Controlling Principals have fully complied with the terms of the Franchise Agreement. (Franchise Agreement, Section IX.D.)

We are not required to provide any other service or assistance to you for the continuing operation of the Restaurant.

We have no obligations to perform any duties under the Development Agreement.

**Creative Fund**:

*The Creative Fund.* Our predecessor, FGE, established and we currently administer a creative fund to quality control and promote the System on a regional or national basis (the "**Creative Fund**"). You must contribute up to 2% of the Gross Sales of the Restaurant to the Creative Fund for each accounting period (the "**Weekly Contributions**"), as we determine and as set forth in Item 6. Company-owned units also contribute Weekly Contributions to the Creative Fund at the same level. These Weekly Contributions to the Creative Fund must be paid in the same manner as you make royalty payments.

We or our designated agent maintain and administer the Creative Fund as follows:

1.    We direct all promotional programs and have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs and their placement and allocation. Company-operated Restaurants contribute to the Creative Fund on the same basis as franchised Restaurants. The Creative Fund is intended to maximize customer service, brand awareness, quality control, general public recognition and acceptance of the Marks (including, without limitation, maintenance and remediation efforts to prevent the potential devaluation of the Marks) and improve the collective success of all Restaurants operating under the System. Therefore, we and our designated agents are not required to manage the Creative Fund so as to ensure (a) that your benefits from those expenditures are equivalent or proportionate to your contribution or (b) that any particular franchisee benefits directly or pro rata from the promotional programs.

2.    The Weekly Contributions to the Creative Fund are used solely for collecting and expending the quality control and secret-shopper initiatives administered by our third-party consultants and/or all other advertising efforts (including, without limitation, the cost of preparing and conducting any general marketing campaigns, public relations activities, employing market consulting agencies to assist therein, and costs of our personnel and other departmental costs for marketing and quality control measures that we internally administer or prepare). All Weekly Contributions to the Creative Fund will be recorded in a separate general ledger account for such purposes, such as paying for the costs of maintaining, administering, directing, and preparing the secret-shopper initiatives and rewards programs. We may later elect to use proceeds from the Creative Fund in advertising efforts including television, radio, magazine, and newspaper advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies; and costs of our personnel and other departmental costs for advertising that we may administer or prepare internally. In addition to the advertising costs described above, we may use the Creative Fund to defray our reasonable administrative costs and any overhead that we may incur in the administration or direction of the Creative Fund and related programs for you and the System. The Weekly Contributions to the Creative Fund and its earnings will not otherwise benefit us. Any sums paid to the Creative Fund that are not spent in the year they are collected will be spent in the following year or returned to the contributors in proportion to the respective amounts paid by them, without interest, on the basis of their respective contributions. For purposes of clarification, any rebates or similar allowances we receive and are subsequently contributed to the Creative Fund will be subject to our discretionary allowance and will not be subject to the restrictions described above.

3.    We will prepare an annual statement of the operations of the Creative Fund that will be made available to you on your written request to us. We are not required to have this Creative Fund statement audited.

4.      Although the Creative Fund is intended to be perpetual, we may terminate the Creative Fund at any time; however, the Creative Fund will not be terminated until all monies in the Creative Fund have been spent for advertising or promotional purposes or returned to contributors on the basis described in paragraph 2 above.  We may also reduce your required contribution to the Creative Fund at our sole discretion.

We currently promote the Restaurants and the products offered by the Restaurants primarily using initiatives aimed at increasing quality control measures to generate greater word-of-mouth publicity (e.g., our secret shopper program).  As the number of Restaurants in the System expands, we may consider limited use of other forms of media, including:  television, radio, magazine and newspaper advertising campaigns; and direct mail and outdoor billboard advertising.  The majority of any such advertising will be developed by members of our staff or third-party consultants.  For the fiscal year ended 2021, the Creative Fund spent 77% of the Weekly Contributions on the employee rewards program recognizing those store employees who performed well as determined by our third-party secret shopper consultants.  Additionally, the Creative Fund spent 21% of the Weekly Contributions, plus the balance of the Weekly Contributions rolled over from 2020, on certain online marketing efforts (e.g. Google, Waze, Cardilytics, and Facebook) in connection with our "Break-Away Fund" created in consultation with our Franchisee Advisory Council. The remaining 2% balance of the Weekly Contributions collected in 2021 was rolled over to the following year and earmarked for Creative Fund expenditures consistent with the expenses described above (i.e. the employee rewards program and "Break-Away Fund" expenses for fiscal year 2022).

***Local Advertising.***  We generally do not allow any advertising by our franchisees, but may approve limited advertising on a case-by-case basis.  Any advertising materials must first be approved by us before you use it.  You must not advertise or use our Marks in any fashion on the Internet, World Wide Web or via other means of advertising through telecommunication without our express written consent.  We have sole discretion and control over any profile(s) using or relating to the Marks, or that display the Marks, that are maintained on social media outlets, including without limitation MySpace, Facebook and Twitter or other similar outlets, that may exist now or in the future.  We may use part of the contributions we collect under the Franchise Agreement to pay or reimburse the costs associated with the development, maintenance and update of the profile(s).  We may (but are under no obligation to) establish guidelines under which you may establish profiles or otherwise establish a presence on the social media outlets.  In that event, you must comply with the standards, protocols and restrictions that we impose on that use.

In addition to the Creative Fund contributions described above, you may be required to spend annually throughout the term of the Franchise Agreement, 2% of the Gross Sales of the Restaurant for local advertising in your primary area of responsibility.  If we require such local expenditures, this amount will not be paid to us but will rather be spent by you.  If your landlord requires you to participate in any marketing or promotion fund, the amounts you pay may be applied towards satisfying such local advertising obligations.  Any advertising cooperative contributions (described below) will also be credited as part of your required local advertising obligations.

In the event we elect to require you to spend 2% of the Gross Sales of your Restaurant for local advertising, the costs and expenditures you incur with any of the following will **not** be included in your required expenditures on local advertising unless we approve in advance in writing:

1.      Incentive programs for your employees or agents, including the cost of honoring any coupons distributed in connection with the programs;

2.      Research expenditures;

3.      Food costs incurred in any promotion;

4.      Salaries and expenses of your employees, including salaries or expenses for attendance at advertising meetings or activities;

5.      Charitable, political or other contributions or donations;

6.      In-store materials consisting of fixtures or equipment;

7.      Seminar and educational costs and expenses of your employees; and

8.      Yellow page advertising.

***Advertising Cooperatives.***  There are presently no advertising councils; however, we may designate any geographic area in which 2 or more Restaurants are located as a region for purposes of establishing an advertising cooperative (a "**Cooperative**").  The members of the Cooperative for any area will consist of all Restaurants in that area, whether operated by us or franchised.  We will determine in advance how each Cooperative will be organized and governed and when it must start operation.  We have the right to dissolve, merge or change the structure of the Cooperatives.  Each Cooperative will be organized for the exclusive purposes of administering advertising programs and developing, subject to our approval, promotional materials for use by the members in local advertising.  If a Cooperative has been established for a geographic area where your Restaurant is located when the Franchise Agreement is signed, or if any Cooperative is established during the term of the Franchise Agreement, you must sign all documents we request and become a member of the Cooperative according to the terms of the documents.  A copy of the Cooperative documents applicable to the geographic area in which your Restaurant will be located will be provided to you if you request it.

If a Cooperative is formed in your area, you must contribute to the Cooperative the amounts required by its governing documents; however, you will not be required to contribute more than 1½% of your Gross Sales during each month to the Cooperative unless, subject to our approval, the members of the Cooperative agree to the payment of a larger fee.  We will credit any Cooperative payments toward satisfaction of your local advertising requirement.  Under certain special promotional programs, we may require that Cooperative payments be contributed to the Creative Fund, as described above.  Any Cooperative formed in your area must maintain and administer your payments to the Cooperative in accordance with its governing documents.  The Cooperative will be operated solely as a conduit for the collection and expenditure of the Cooperative fees for the purposes outlined above.  No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without first obtaining our approval.  If formed, each Cooperative will be obligated to prepare an annual financial statement reporting its expenditures for the previous year to its members.

***General Advertising Information.***  If we establish a Cooperative applicable to your Restaurant, your total required contribution to the Creative Fund and the Cooperative will not exceed 4% of your Gross Sales.

Neither the Creative Fund nor any Cooperative will use any funds for advertising that is principally a solicitation for the sale of franchises for Restaurants.

Unauthorized media interviews by you, your affiliates, officers, directors, shareholders, partners, agents, representatives, independent contractors and employees are strictly prohibited.

Except as described above, we are not obligated to spend any amount on advertising in the area where your Restaurant is located.

**Training**:

No later than 30 days before the date the Restaurant begins operation, your Operating Principal, general manager, and one assistant manager must attend and complete, to our satisfaction, our initial training program. This training will be conducted at our corporate headquarters or at another location we designate. Initial training programs will be offered at various times during the year depending on the number of new franchisees entering the franchisee system, replacement operating principals and general managers and other personnel needing training, the number of new Restaurants being opened and the timing of the scheduled openings of Restaurants to be operated by our franchisees generally. It is anticipated that the initial training program will be offered 5 or 6 times a year. The initial training program will generally last about 2 weeks. However, we may require up to 6 weeks of training. We or our designee will provide instructors and training materials for the initial training of your Operating Principal, general manager, and one assistant manager at no additional charge to you. You may also have additional personnel trained by us or our designee for the Restaurant, although we may charge $1,500 per person for that training. We will determine whether any training attendee has satisfactorily completed initial training. If your Operating Principal and general manager do not satisfactorily complete the initial training program (or if we determine that these persons cannot satisfactorily complete the training program) you must designate a replacement to satisfactorily complete the training. Any Operating Principal or general manager you subsequently designate must also receive and complete the initial training. We reserve the right to charge a reasonable fee for the initial training we or our designee provides to a replacement or successor Operating Principal or general manager, if we have not approved you to provide the training. You must pay all expenses you and your Operating Principal, general manager and other personnel incur for any training program, including costs of travel, lodging, meals and wages.

The Operating Principal, general manager and other personnel must attend additional training programs and seminars we may consider necessary. For all of these programs and seminars, we will provide the instructors and training materials. If the training is mandatory, we will not charge you a fee for attending the training. We reserve the right to charge a reasonable fee for any additional training programs and/or seminars that we provide to you or your personnel at your request. You must also pay all expenses you or your Operating Principal, general manager and other personnel incur in participating in any additional training, including costs of travel, lodging, meals, and wages.

For the opening of your first Restaurant, we will provide you with one of our trained representatives. The trained representative will provide on-site pre-opening and opening training, supervision, and management assistance to you for 10 days. This training and assistance will be provided to you at no additional expense. For any additional assistance you request and any similar assistance that we provide to a replacement Restaurant, if the premises are destroyed or the Restaurant must be closed for any other reason, we reserve the right to require you to pay us the per diem fee then being charged to franchisees generally for trained representative assistance, including payment of any expenses the trained representative incurs, such as costs of travel, lodging, meals and wages.

There is a formal training staff who will be conducting the opening training. The minimum experience of the training staff that is relevant to the subject taught and our operations is 2 years. Chad Murrell is the Training Manager, and he is also in charge of the training program. As stated in Item 2 of this Disclosure Document, Chad Murrell has been Vice President of FGI since 1997 and he also serves as one of FGE's Vice Presidents. He has over 20 years of experience in all aspects of our System and the operations of FIVE GUYS® Restaurants. We may also draw on the substantial experience of other Restaurant personnel in conducting Restaurant operations training. The instructional materials used in the initial training consist of our Operations Manual, marketing and promotion materials, programs related to the operation of the point of purchase system, and other written directives related to the operation of the Restaurant (collectively, the "**Manuals**").

The job training and instructions providing the initial training program are described below:

**TRAINING PROGRAM**

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Review Training Agenda; Review Operating Forms | 8 | 0 | Lorton, Virginia |
| Review Operations Manual; Review Recipes & Procedures Manual | 8 | 0 | Lorton, Virginia |
| Review Preparation List<br>Introduction to Kitchen Equipment<br>Cleanliness Procedures<br>Use of Cutting Boards<br>Use of Knife | 0 | 24 | Lorton, Virginia |
| Menu Descriptions Exam | 0 | 8 | Lorton, Virginia |
| Kitchen Open<br>Receiving Orders<br>Preparing Menu Items | 0 | 8 | Lorton, Virginia |
| Kitchen Open<br>Complete Preparing Menu Items<br>Review Dish Presentations | 0 | 8 | Lorton, Virginia |
| Review POS System We Specify | 0 | 8 | Lorton, Virginia |
| Marketing | 0 | 8 | Lorton, Virginia |
| Cook Training<br>Franchisee Training - Administration | 0 | 24 | Your Restaurant |
| Cook Training<br>Counter Training | 0 | 24 | Your Restaurant |
| Cook Training<br>Counter Training<br>Opening Night – Family & Friends | 0 | 8 | Your Restaurant |
| Soft Opening - Day 1 | 0 | 8 | Your Restaurant |
| Opening Week | 0 | 32 | Your Restaurant |

The entire training program is subject to change due to updates in materials, methods, manuals and personnel without notice to you.

Training programs will begin on a Monday morning.  The subjects and time periods allocated to the subjects actually taught to a specific franchisee and its personnel may vary based on the experience of those persons being trained.

If you reasonably request or as we deem appropriate, we will, during the term of the Franchise Agreement, subject to the availability of personnel, provide you with additional trained representatives who will provide on-site remedial training to your Restaurant personnel.  Any additional training we consider necessary must be attended by you (if an individual), your general manager, and at least one assistant manager.  For additional training that you request, you may be required to pay the per diem fee then being charged to franchisees under the System for the services of our trained representatives, plus their costs of travel, lodging, meals, and wages.  The per diem fee will not be charged if the assistance is provided based on our determination that the training is necessary; however, we reserve the right to charge for our reasonable expenses incurred in providing the assistance.

The Table of Contents for our Operations Manual is Exhibit F of this Disclosure Document.  The Operations Manual is a total of 212 pages.

**Site Selection**:

**_General Obligations._**  Under the Franchise Agreement for each Restaurant, we designate the Primary Area of Responsibility (defined below in Item 12) and approve or deny the proposed location for each Restaurant to be developed.  The Manuals and the terms of the Franchise Agreement you sign for each Restaurant will describe our then-current site selection guidelines.  You must assume all costs, liabilities, expenses and responsibility for locating, obtaining and developing a site for the Restaurant and for constructing and equipping the Restaurant at the accepted site.  You will select the site for the Restaurant subject to our approval.  The Restaurant may not be relocated without first obtaining our written consent.  Before you lease or purchase the site for the Restaurant, you must locate a site that satisfies our site selection guidelines.  You must submit to us, in the form we specify, a description of the site, including evidence that the site satisfies our site selection guidelines, together with other information and materials that we may reasonably require, including a letter of intent or other evidence that confirms your favorable prospects for obtaining the site.

We will provide you with our current written site selection guidelines and any other site selection counseling and assistance we think is advisable.  Our guidelines for site selection may require that you conduct, at your expense, an evaluation of the demographics of the market area for the location (including the population and income level of residents in the market area), aerial photography, size and other physical attributes of the location, shopping mall, tenant mix, proximity to residential neighborhoods and proximity to schools, shopping centers, entertainment facilities and other businesses that attract consumers and generate traffic.

Our current offering contemplates a 2,000 to 3,000 square foot Restaurant to be located in an end-cap space, in strip shopping centers, or in other urban locations (such as shopping malls, university campuses or hospitals).  We may consider other, non-traditional locations on a case-by-case basis.

We will also provide you an on-site evaluation of the proposed site for your first Restaurant without charge.  We will not, however, provide an on-site evaluation for any proposed site before receiving from you the materials described above.  We will provide additional on-site evaluations if you or we think such additional evaluations are necessary.  For those additional on-site evaluations, or if the Franchise Agreement does not relate to your first Restaurant, we reserve the right to charge a reasonable fee for each evaluation as well as a fee for our reasonable expenses including the cost of travel, lodging, meals and wages.

**_Lease Rider_**.  You must also obtain our approval of any contract of sale or lease for the Restaurant before you sign the contract or lease.  We will not approve any lease unless a rider to the lease, we prepare, is signed by you, by us and by the landlord.  The rider will contain the following provisions:

1.      During the term of the Franchise Agreement, the premises will be used only for the operation of the Restaurant.

2.      The landlord consents to your use of the Marks and signs, décor items, color schemes and related components of the System (and specific reference is made to our exterior signage requirements).

3.      The landlord agrees to give us copies of any and all letters and notices sent to you related to the lease and the premises, at the same time that these letters and notices are sent to you.

4.      We may enter the premises to make any modification necessary to protect the System and Marks or to cure any default under the Franchise Agreement or under the lease, without

being guilty of trespass or any other crime or tort.  The landlord will not be responsible for any expenses or damages owing from our conduct of those activities.

        5.      If we exercise our option to obtain your lease, you must assign the lease to us or our designee when the Franchise Agreement expires or terminates, and the landlord will consent to this assignment and will not charge any assignment fee or accelerate rent under the lease.

        6.      If the lease is assigned, we or our designee will agree to assume from the date of assignment all of your obligations remaining under the lease, and we or our designee will assume your occupancy rights, and the right to sublease the premises, for the remainder of the term of the lease.

        7.      You will not assign the lease or renew or extend the lease's term without obtaining our written consent first.

        8.      The landlord and you will not amend or otherwise modify the lease in any manner that could materially affect any of the above requirements without obtaining our written consent first.

        9.      The terms of the lease rider will supersede any conflicting terms of the lease.

       ***Timing for Site Approval.***  You must submit information and materials for the proposed site to us for approval no later than 30 days after you have signed the Franchise Agreement.  We will have 15 days to respond to your application for the proposed site and submitted materials with our final decision on approval or disapproval of the proposed site to be provided to you within 30 days.  If you cannot obtain possession of an approved location for the Restaurant within 6 months after you have signed the Franchise Agreement, we have the right to terminate the Franchise Agreement and refund 75% of the initial Franchise Fee.

       ***Construction and Buildout.***  We will provide you with a Preliminary Design Package which will include the floor plan, the reflected ceiling plan, and the FIVE GUYS® standard construction guidelines for a prototypical Restaurant.  You must, at your expense, obtain architectural, engineering and design services you deem necessary for the construction of your Restaurant from an architectural design firm which we approve, which approval will not be unreasonably withheld.  You must adapt the Preliminary Design Package for the construction of your Restaurant premises.  You must submit adapted architectural and design plans to us for our review before implementation.  We will notify you of our approval within 20 days of receiving the adapted plans.  If we determine that any adapted plans are not consistent with the best interests of the System, we may, at our option, reject the adapted plans.  Our notice of rejection will include a reasonably detailed list of the changes necessary to make the plans acceptable.  If we fail to notify you of an objection to your adapted plans within 20 days, you may use the adapted plans.  If we object to the plans, you must resubmit corrected plans to us, and we will notify you of our approval or disapproval of the resubmitted plans within 10 days of receipt.  If we fail to notify you of any objection within 10 days, you may use the resubmitted plans.  Our review of any adapted plans relates only to compliance with the System.  We may periodically review, revise, and/or otherwise supplement the adapted plans after acceptance and monitor the Restaurant's construction process to ensure compliance at all times with all FIVE GUYS® brand standards and specifications.

       ***Timing for Opening.***  We estimate that the time from the signing of the Franchise Agreement to the beginning of operations of the Restaurant will be about 6 to 12 months.  This time may be shorter or longer depending on the time necessary to obtain an accepted site, to obtain financing, to obtain the permits and licenses for the construction and operation of the Restaurant, to complete construction or remodeling as it may be affected by weather conditions, shortages, delivery schedules and other similar factors, to complete the interior and exterior of the Restaurant, including decorating, purchasing and installing fixtures, equipment and signs, and to complete preparation for operating the Restaurant, including purchasing

inventory and supplies.  You must open the Restaurant and begin business within 120 days after you obtain possession of the accepted location, unless you obtain a written extension of this time period from us.  If you do not obtain a site that we approve, and construct the Restaurant within the time periods required in Section II of the Franchise Agreement, we may terminate the Franchise Agreement.

**Computer and Electronic Cash Register Systems**:

You must maintain your books and business records according to our required format. To assist you with your reporting obligations to us, you must purchase or lease the specific POS System, electronic cash register, computer, thermal printers, AC line filters, remote printer interface and internet-based communications (collectively, the "**Computer System**") we have approved for use at your Restaurant.  The total cost of purchasing the Computer System ranges from $10,000 to $20,000.  The cost of leasing the Computer System ranges from $8,000 to $12,000 annually.  The cost is subject to change based on market conditions, availability of the product, and changes in technology, among other factors.  The Computer System will record all sales information with respect to the Restaurant.  We require that your Computer System be set up and interfaced with our system so that we are able to poll your daily receipts figures from our headquarters at any time.  We may require computer hardware and software upgrades in the future.  The frequency of these upgrades could be as often as annually or bi-annually.  The costs of incorporating any upgrades into your Restaurant(s) will be your financial obligation.

You must make annual payments to a third-party vendor to maintain your Computer System.  It is anticipated that several updates and upgrades may be required by your third-party vendor during the term of your Franchise Agreement, and any such updates or upgrades will be at your expense.  We estimate that the cost of potential updates and upgrades is about $5,000.  We have no contractual obligation with any third party to upgrade your Computer System, but we may require upgrades in accordance with the terms of the Franchise Agreement.  There is no limitation on the frequency or cost of these upgrades.

All data that you provide to us from your Computer System as well as other information that we may otherwise collect from you is owned exclusively by us, and we will have the right to use that data in any manner we deem appropriate without compensating you.  We will have independent access to the information generated by and stored on the Computer System.

You must keep your cash registers and Computer System in good repair, at your expense, and you must promptly install additions, changes, modifications, substitutions and replacements to the cash register and Computer System as we may reasonably require.  You will have the sole and complete responsibility for: (a) acquiring, operating, maintaining and upgrading your own cash register and Computer System; (b) the manner in which your cash register and Computer System interface with our computer systems, if any, and the computer systems of third parties; and (c) all consequences that may arise if your cash register and Computer System are not properly operated, maintained and upgraded.  We do specify the kind or type of Computer System that you must obtain and operate, but we do not take on any responsibility for maintaining or upgrading any computer equipment or cash registers that you operate.  We cannot provide an estimate of the cost you will incur to maintain the cash register and Computer System.

**PCI Compliance**:

For purposes of clarification, you will be solely responsible for ensuring that your POS System and Computer System are, and remain, compliant with all current "Payment Card Industry" (PCI) requirements periodically promulgated by VISA®, MasterCard®, American Express®, Discover®, and/or any other credit card brand honored at your franchised restaurant(s).  You must ensure that the Restaurant adheres to the standards applicable to electronic payments including PCI standards or any equivalent standards.  If we or one of the credit card companies requires, you must provide us with evidence of compliance with the applicable standards and provide, or make available, to us copies of an audit, scanning results or related documentation relating to the compliance.  You must pay any costs associated with an audit or to gain compliance with these standards.  You must immediately (in any event within 24 hours) notify us if you

suspect or have been notified by any third party of a possible security breach related to the cashless system (or related cashless data) used in the Restaurant.

## ITEM 12
## TERRITORY

**Development Agreement**:

Under the Development Agreement, you are assigned a Territory where you have to develop a pre-determined number of Restaurants in accordance with a specified development schedule which will be listed in Section III of the Development Agreement and agreed to before it is signed (the "**Development Schedule**"). The size of the Territory may be an Area of Dominant Influence or "ADI," a single or multi-county area, single state area or some other area, and will be described in Section I.A. of the Development Agreement. We will determine the Territory before you sign the Development Agreement based on various market and economic factors such as those described above regarding the Primary Area of Responsibility.

Except as stated below, if you are in compliance with the Development Agreement, we will not establish or authorize any other person or entity, other than you, to establish a Restaurant within the Territory during the term of the Development Agreement. We, any of our franchisees, and any other authorized person or entity may, at any time, advertise and promote the System in your Territory. We may also offer and sell and authorize others to offer and sell: (i) collateral products under the Marks, at or from any location, such as pre-packaged food or beverage products and FIVE GUYS® memorabilia, (ii) food and beverage services under the Marks at or through any FIVE GUYS® Restaurant or other permanent, temporary or seasonal food service facility providing in whole or in part the products and services offered by a Restaurant in any Reserved Area (as defined above) within the Territory; and (iii) any products or food and beverage services under any other names and marks, without compensating you. You will not receive an exclusive Territory under the Development Agreement. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

You must exercise the development rights only by entering into a separate Franchise Agreement with us for each Restaurant. We may, in our discretion, permit you to exercise the development rights through affiliated entities that are either your wholly owned subsidiaries or commonly controlled entities with ownership identical to yours. The Franchise Agreement to be signed for the first Restaurant you develop under the Development Agreement must be signed and delivered to us under the Development Schedule and will be in the form of the Franchise Agreement attached to this Disclosure Document. All additional Restaurants developed under the Development Agreement must be established and operated under our form of Franchise Agreement then being used by us for new franchised Restaurants. The then-current form of Franchise Agreement may differ from the form attached to this Disclosure Document.

In order to maintain your rights within the Territory under the Development Agreement, you must adhere to the Development Schedule set forth in Attachment C to your Development Agreement. You must open each Restaurant developed and begin business in accordance with the Development Schedule, unless you obtain an extension of the Development Period (as defined in the Development Agreement), at the expiration of which, you were to have had a Restaurant open and in operation. You may, subject to our approval, purchase from us extensions of the Development Period as may be necessary to complete construction and begin operation of the Restaurant. Each extension will be for an additional 90 day period beginning on the expiration of the applicable Development Period, including any previous extensions ("**Extension Date**"). No more than 2 extensions of any Development Period will be permitted. If we grant an extension of a Development Period, the opening date of your Restaurant will be extended to the Extension Date. No extension of any Development Period will affect the duration of any other Development Period or any of your other development obligations. If an extension is requested in the final Development Period, the term of the Development Agreement will be extended to the Extension Date and you will have no further rights under the Development Agreement.

For any Restaurant that you will be unable to complete construction of and begin operating by the expiration date of the Development Period (as defined in the Development Agreement) in which the Restaurant was to have been opened, you must notify us in writing at least 60 days before the projected opening date for such Restaurant.  You must include in the notice a description of the reasons for the failure to develop in a timely manner and the expected date of completion of construction and opening.  No extension fee will be charged for any Restaurant for which we have accepted a site in accordance with the Franchise Agreement and you have begun construction, as defined in the Franchise Agreement.

If you fail to open a Restaurant in compliance with the Development Schedule as required in the Development Agreement, or otherwise commit a material event of default under the Development Agreement as described in Item 17 and above, we may, in addition to our other remedies, terminate or modify your territorial rights, reduce the area of territorial rights, reduce the number of Restaurants that you may establish, or accelerate the development schedule under the Development Agreement.

**Franchise Agreement**:

The Franchise Agreement grants you the right to operate a Restaurant at a single location that you select within the assigned area and that we approve ("**Primary Area of Responsibility**").  We will designate the Primary Area of Responsibility for each Restaurant under the Franchise Agreement.  The Franchise Agreement and the Manuals describe our then-current site selection guidelines for each Restaurant. Attachment A to the Franchise Agreement lists the specific street address of the accepted location ("**Accepted Location**").  You must operate the Restaurant only at this Accepted Location and may not relocate the Restaurant without first obtaining our written consent.  You may not establish or operate another Restaurant unless you enter into a separate Franchise Agreement and, in certain cases, a Development Agreement.

During the term of the Franchise Agreement, if you are in compliance with the Franchise Agreement, we will not establish a Restaurant or authorize any other person or entity to establish a Restaurant within your Primary Area of Responsibility.  Your Primary Area of Responsibility will be described in Attachment A to the Franchise Agreement and is your exclusive territory.  It will generally consist of the contiguous property, controlled by the landlord, in which the Restaurant is located, such as the shopping mall, strip mall, university campus, or hospital.  Your Primary Area of Responsibility may be limited to the specific physical space occupied by the Restaurant.

In the event your Primary Area of Responsibility is limited to only the specific physical space occupied by the Restaurant, you will not be receiving an exclusive territory. In those cases, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

We will determine the Primary Area of Responsibility before the Franchise Agreement is signed based on various market and economic factors such as an evaluation of market demographics, the market penetration of the franchise system and similar businesses, the availability of appropriate sites and the growth trends in the market.  If permitted, any delivery or catering business that you or any of our other franchisees engage in may be conducted both within and outside of your or their Primary Area of Responsibility.

We may also offer and sell and authorize others to offer and sell:  (i) collateral products under the Marks, at or from any location, such as pre-packaged food or beverage products and FIVE GUYS® memorabilia, (ii) food and beverage services under the Marks at or through any FIVE GUYS® Restaurant or other permanent, temporary or seasonal food service facility providing in whole or in part the products and services offered by a FIVE GUYS® Restaurant in any Reserved Area (as defined below), and (iii) any products or food and beverage services under any other names and marks.  A "**Reserved Area**" is defined as all airports, sporting arenas and stadiums, and United States Department of Defense locations, military

installations and other federal government agencies (including Navy, Marine Corp, Army and Air Force bases and exchange service facilities). However, you may pursue, on a non-exclusive basis, opportunities to operate a Restaurant in an airport, sporting arena, or stadium located within the geographic borders of your Primary Area of Responsibility if you have secured all required permits and approvals from the necessary authorities. After you have secured such permits and approvals, we may approve of your proposed location on the same terms and conditions as we would for a location outside of a Reserved Area.

You may sell our proprietary products and related merchandise to retail customers and prospective retail customers who live anywhere but who choose to dine in your Restaurant. You may not engage in any promotional activities or sell our proprietary products or similar products or services, whether directly or indirectly, through or on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system; through catalogs or other mail order devices sent or directed to customers or prospective customers located anywhere; or by telecopy or other telephonic or electronic communications, including toll-free numbers, directed to or received from customers or prospective customers located anywhere. You may not place advertisements in printed media and on television and radio that are targeted to customers and prospective customers located outside of your Primary Area of Responsibility. You may not sell our proprietary products to any business or other customer for resale (excluding sales to other Restaurants).

Although we have never engaged in such commercial activities in the past, we and our affiliates reserve the right to sell products under the Marks within and outside your Primary Area of Responsibility through any method of distribution other than a dedicated Restaurant, including sales through such channels of distribution as the Internet, temporary kiosks, grocery store offerings, or other manners of direct distribution (together, "**Alternative Distribution Channels**"). You may not use Alternative Distribution Channels to make sales outside or inside your Primary Area of Responsibility except as described in the following paragraph, and you will not receive any compensation for our sales (i.e. soliciting or accepting orders) from inside your Primary Area of Responsibility through Alternative Distribution Channels, except as described in the following paragraph.

If we engage in electronic commerce through any Internet, World Wide Web or other computer network site or sell through any other Alternative Distribution Channel, and we receive orders for any proprietary products or other products offered by a Restaurant calling for delivery or performance in your Primary Area of Responsibility, then we will offer the order to you at the price we establish. If you choose not to fulfill the order or are unable to do so, then we, one of our affiliates or a third party we designate (including another franchisee) may fulfill the order, and you will not be entitled to any compensation in connection with this. This electronic commerce program has not yet been instituted.

We have not yet established other franchises or company-owned outlets or another distribution channel selling or leasing similar products or services under a different trademark. We describe earlier in this Item 12 what we may do anywhere and at any time.

Except for the Restaurants operated by our affiliates, neither we nor any parent or affiliate has established, or presently intends to establish, other franchised or company-owned Restaurants which sell our proprietary products or services under a different trade name or trademark, but we reserve the right to do so in the future, without first obtaining your consent.

There are no options, rights of first refusal or similar rights to acquire additional franchises within the Primary Area of Responsibility or in any contiguous territories.

\* \* \* \* \*

Except as stated above, the territorial rights granted to you under the Franchise Agreement or the Development Agreement are not dependent on the achievement of a certain sales volume, market

penetration or other contingency.  Also, except as stated above, the Territory may not be altered before the Development Agreement expires or terminates.

Except as described above, we generally do not grant any right of first refusal to obtain additional Restaurant locations.  If you wish to obtain an additional location, you must either have entered into a Development Agreement that grants you the right to establish more than one Restaurant or enter into a separate Franchise Agreement for the additional location.

We do not currently operate, franchise, or conduct business through Alternative Channels of Distribution offering products or services similar to those offered by the Restaurant under different marks. There are, however, no restrictions in either the Franchise Agreement or Development Agreement that would restrict our ability to do so.

There are no options, rights of first refusal or similar rights to acquire additional franchises within the territory or in any contiguous territories.

## ITEM 13
## TRADEMARKS

The Franchise Agreement grants you the non-exclusive right and license to use the Marks, and any other proprietary marks that we may use, during the term of the Franchise Agreement in operating your Restaurant from its Accepted Location.  Your use of the proprietary Marks is limited solely to the operation of the Restaurant at its Accepted Location and only in accordance with our System.

Our Parent Company registered the following service mark registration for our principal trademarks on the Principal Register of the United States Patent and Trademark Office ("**USPTO**").  These service marks were transferred to us as part of the Securitization Transaction.

| Mark | Registration Number | Registration Date |
|---|---|---|
| FIVE GUYS | 2,576,160 | June 4, 2002; Renewed June 4, 2012 |
| FIVE GUYS BURGERS AND FRIES | 3,569,218 | February 3, 2009 Renewed February 3, 2019 |
| FIVE GUYS BURGERS AND FRIES | 3,571,563 | February 10, 2009 Renewed February 10, 2019 |
| FIVE GUYS | 4,252,320 | December 4, 2012 |

All required affidavits have been filed and we intend to renew the registrations for the Marks when they become due.

There are no agreements currently in effect that significantly limit or otherwise impact our rights to use or license the use of the Marks that are material to the franchise.

You may not use the Marks as a part of your corporate or other legal name, and you must comply with our instructions in filing and maintaining trade name or fictitious name registrations.  You must execute any documents we require to protect the Marks or to maintain their continued validity and enforceability.  In addition, you may not directly or indirectly contest the validity of our Parent Company's ownership of, or our rights in and to, the Marks.

There are no currently effective determinations of the USPTO, the trademark trial and appeal board, the trademark administrator of any state or any court, no pending infringement, opposition or cancellation proceedings and no pending litigation involving any of the Marks that may significantly affect the ownership or use of any Mark listed above.

We know of no superior prior rights or infringing uses of any Mark that could materially affect your use of the Marks in this or any other state.

You must immediately notify us of any apparent infringement of the Marks or challenge to your use of any of the Marks or claim by any person of any rights in any of the Marks.  You and your Controlling Principals are not permitted to communicate with any person other than us, or any designated affiliate, our counsel and your counsel involving any infringement, challenge or claim.  We can take action and have the right to exclusively control any litigation, USPTO proceeding or other administrative or agency proceeding caused by any infringement, challenge or claim or otherwise relating to any of the Marks.  You must sign any and all documents, and do what may, in our counsel's opinion, be necessary or advisable to protect our interests in any litigation, USPTO proceeding or other administrative or agency proceeding or to otherwise protect and maintain our interests and the interests of any other person or entity having an interest in the Marks.

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any of the Marks, provided that the conduct of you and your Controlling Principals in the proceeding and use of the Marks is in full compliance with the terms of the Franchise Agreement.

Except as provided above, we are not obligated by the Franchise Agreement to protect any rights granted to you to use the Marks or to protect you against claims of infringement or unfair competition with respect to them.  Although we are not contractually obligated to protect the Marks or your right to use them, as a matter of corporate policy, we intend to defend the Marks vigorously.

We may require you, at your expense, to discontinue or modify your use of any of the Marks or to use one or more additional or substitute trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin if we determine that an addition or substitution will benefit the System.

The license to use the Marks granted in the Franchise Agreement is non-exclusive to you.  We have and retain certain rights in the Marks including the following:

    1.    To grant other licenses for the use of the Marks outside of your Primary Area of Responsibility;

    2.    To develop and establish other systems using the Marks or other names or marks, and to grant licenses or franchises in those systems without providing any rights to you; and

    3.    To engage, directly or indirectly, at wholesale, retail or otherwise, in (a) the production, distribution, license and sale of products and services and (b) the use of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics we may develop for that purpose.

## ITEM 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

**Patents and Copyrights**:

We have no patents or registered copyrights that are material to the FIVE GUYS® franchise.  We do not have any pending patents or copyrights that are material to the FIVE GUYS® franchise.

**Confidential Manuals**:

You must operate the Restaurant in accordance with the standards and procedures specified in the Manuals.  One copy of the Manuals will be loaned to you by us for the term of the Franchise Agreement.

You must treat the Manuals and any other manuals we create or approve for use in your operation of the Restaurant, and the information contained in them, as confidential.  You must also use all reasonable efforts to maintain this information as secret and confidential and you must not duplicate, copy, record or otherwise reproduce these materials, in whole or in part, or make them available to any unauthorized person. The Manuals remain our sole property and must be kept in a secure place on the Restaurant premises.

We may revise the contents of the Manuals and you must comply with each new or changed standard.  You must also insure that the Manuals are kept current at all times.  If there is a dispute as to the contents of the Manuals, the terms of the master copy maintained by us at our home office will be controlling.  You must return to us all pages that are replaced in the Manuals.

**Confidential Information**:

We and or our affiliates claim proprietary rights in certain of our recipes which are included in the Manuals and which are trade secrets.  You and each of your Controlling Principals are prohibited, during and after the term of the Franchise Agreement, from communicating, or using for the benefit of any other person or entity, and, after the term of the Franchise Agreement, from using for your or their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the Restaurant that may be communicated to you or any of your Controlling Principals or that you may learn about, including these trade secrets.  You and each of your Controlling Principals can divulge this confidential information only to your employees who must have access to it to operate the Restaurant. Neither you nor your Controlling Principals are permitted at any time, without first obtaining our written consent, to copy, record or otherwise reproduce the materials or information nor make them available to any unauthorized person.  Any and all information, knowledge, know-how and techniques related to the System that we communicate to you, including the Manuals, plans and specifications, marketing information and strategies and site evaluation, selection guidelines and techniques, are considered confidential.

If you or your Controlling Principals develop any new concept, process or improvement in the operation or promotion of the Restaurant, you must promptly notify us and give us all necessary information, free of charge.  You and your Controlling Principals must acknowledge that any of these concepts, processes or improvements will become our property and we may give the information to other franchisees.

**Web-Based Training and Training Video Series**:

We will loan you one copy of any training videos that we may develop in the future for the term of the Franchise Agreement. We may also develop an internet-based training program and offer and/or require your participation in that program (together with the videos, the "**Training Devices**").

You must treat the Training Devices and any other training materials we create or approve for use in your operation of the Restaurant, and the information contained in them, as confidential.  You must also use all reasonable efforts to maintain this information as secret and confidential and you must not duplicate, copy, record or otherwise reproduce these materials, in whole or in part, or make them available to any unauthorized person.  The Training Devices remain our sole property and must be kept, as applicable, in a secure place on the Restaurant premises.

We may revise the contents of the Training Devices and you must return to us any Training Devices that are replaced by any updates we issue.

**ITEM 15**
**OBLIGATION TO PARTICIPATE**
**IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS**

When you sign the Agreements, you must designate and retain at all times an individual to serve as the Operating Principal under the Agreements.  If you are an individual, you must perform all obligations of the Operating Principal.  If you are a corporation, partnership or other form of entity, the Operating Principal must be one of your "Controlling Principals" and must continue to hold ownership interest in you or any entity that directly or indirectly controls you.  Except as otherwise provided in the Agreements, the Operating Principal's interest in you must remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or option.

The Operating Principal may, at his option, and subject to our approval, designate an individual to perform the duties and obligations of the Operating Principal described in the Agreements and in this Disclosure Document.  The Operating Principal must take all necessary action to ensure that the designee conducts and fulfills all of the Operating Principal's obligations and will remain fully responsible for his performance.  The Operating Principal (or his designee, if applicable) must devote substantial full time and best efforts to the supervision and performance of the Restaurant under the Agreements.  The Operating Principal must sign the Agreements as one of your "Controlling Principals," and will individually guarantee all of your obligations, and will be jointly and severally bound by all of your obligations and the obligations of the Operating Principal and your Controlling Principals under the Agreements.

The Operating Principal (and any designee) must meet our standards for these positions, as provided in the Manuals or other written instructions.  Under the Agreements, the Operating Principal (or his designee) must satisfy the training requirements stated in the Franchise Agreement.

If, during the term of the Agreements, the Operating Principal or any designee cannot serve as Operating Principal or no longer qualifies, you must promptly notify us and designate a replacement within 15 days after the Operating Principal or designee stops serving or no longer meets the requirements.  Any replacement must meet the same qualifications listed above.  You must provide for interim management of the Restaurant until you designate a replacement.  This interim management must be conducted in accordance with the Agreements.

As described in Item 1, we have identified certain persons under the Franchise Agreement and Development Agreement that we refer to in this Disclosure Document as your Principals.  Your Principals include your spouse, if you are a married individual, your Principals also include those of your business entity's officers and directors (including the officers and directors of your general partner, if applicable) whom we designate as your Principals and all holders of an ownership interest in you and in any entity that directly or indirectly controls you, and any other person or entity controlling, controlled by, or under common control with you.

If we designate certain of your Principals as Controlling Principals, they must sign the Franchise Agreement and Development Agreement, as applicable, and agree to be individually bound by certain obligations under the Agreements, including confidentiality and non-competition covenants and to personally guarantee your performance under the Agreements.  We typically designate your principal equity owners and executive officers, as well as any other affiliated entities that operate FIVE GUYS® Restaurants as Controlling Principals.  The franchise owners, partners, members and/or spouses are bound by these same obligations regarding the personal guaranty, confidentiality and non-competition covenants.

You must retain at all times a general manager and the other personnel as are required to operate and manage the Restaurant.  The general manager must satisfy our educational and business criteria as provided to you in the Manuals or other written instructions, and must be individually acceptable to us.  In addition, the general manager must be responsible for the supervision and management of the Restaurant, and must devote full time and best efforts to this activity.  The general manager also must satisfy the

applicable training requirements in the Franchise Agreement.  If the general manager cannot serve in the position or does not meet the requirements, he or she must be replaced within the same time period and under the same conditions stated above for the Operating Principal.  Your general manager does not have to own an equity interest in the Restaurant.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must comply with all of our standards and specifications relating to the purchase of all food, food products and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including electronic cash register, computer hardware and software), utensils and other kitchen items and products used or sold at the Restaurant.

You must sell or offer for sale all menu items, food products, and other products and services we require, in the manner and style we require, including dine-in and carry-out, as expressly authorized by us in writing.  You must sell and offer for sale only the menu items, and other products and services that we have expressly approved in writing to our specifications.  You must not deviate from our standards and specifications without first obtaining our written consent.  You must discontinue selling and offering for sale any menu items, products or services that we may disapprove in writing at any time.  We have the right to change the types of menu items, products and services offered by you at the Restaurant at any time, and there are no limits on our right to make those changes.

You must maintain in sufficient supply and use and sell only the food and beverage items, ingredients, products, materials, supplies, and paper goods that conform to our standards and specifications.  You must prepare all menu items with our recipes and procedures for preparation contained in the Manuals or other written instructions, including the measurements of ingredients.  You must not deviate from our standards and specifications by the use or offer of nonconforming items or differing amounts of any items, without first obtaining our written consent.

You must keep the Restaurant very clean and maintain it in good repair and condition.  You must conspicuously place a sign (e.g., near your cash register or your fountain drink station) which indicates to your patrons that your Restaurant is independently owned and operated by you.  You must make other additions, alterations, repairs and replacements, including, repainting or replacement of obsolete signs, furnishings, equipment, and decor as we may reasonably direct.  You must not make any changes to the premises without obtaining our written consent before you make the changes.  You must obtain and pay for any new or additional equipment, including electronic cash registers, computer hardware and software, fixtures, supplies and other products and materials that we require you to have in order to offer and sell new menu items from the Restaurant or to provide the Restaurant's services by alternative means, such as through carry-out, catering or delivery arrangements.

We may ask you to make other improvements to modernize the Restaurant premises, equipment, including electronic cash registers, computer hardware and software, signs, interior and exterior decor items, fixtures, furnishings, supplies and other products and materials required to operate the Restaurant, to our then-current standards and specifications.  You must, at our request, make the capital improvements or modifications described in the Franchise Agreement (i) on or after the 5th anniversary of the opening date of the Restaurant or (ii) at any time during the term of the Franchise Agreement, when a majority of the Restaurants that we operate have made or are exercising their best efforts to make the improvements or modifications.

We may offer guidance concerning the selling price for the goods, products and services offered from your Restaurant.  Except for maximum prices described below, you are in no way bound to adhere to any such recommended or suggested price.  You have the right to sell your products and provide services at any price that you determine, except that we reserve the right to establish maximum prices for any given product or service nationwide or within an advertising market (as we determine).  You must not exceed any

maximum price we establish, but you at all times remain free to charge any price below the maximum we establish.  You must sign any instruments or other writings we require to facilitate the provision of such products and services.  If you elect to sell any or all of your products or merchandise at any price we recommend, we make no guarantees or warranties that offering such products or merchandise at the recommended price will enhance your sales or profits.

We have developed certain products for use in the System that are prepared from confidential recipes and that are trade secrets of ours and certain products that bear our Marks.  Because of the importance of quality and uniformity of production and the significance of the proprietary recipe and trademarked products in the System, it is to our and your benefit that we closely control the production and distribution of the products.  You must use our proprietary recipe products.  You must purchase all of your requirements for these products only from us or from sources we designate.

All advertising and promotional materials, signs, decorations, and paper goods used in the Restaurant and on any Restaurant delivery vehicles and other items that we designate must have the Marks in the form, color, location and manner we specify.

We or our designee may make available and may require you to purchase from us or our designee for resale to your customers certain pre-packaged food products and promotional merchandise, such as T-shirts and re-fill cups in amounts sufficient to meet your customer demand.

We do not impose any other restrictions in the Franchise Agreement or otherwise, as to the goods or services that you may offer or sell or as to the customers to whom you may offer or sell, except as provided in Item 12.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

**This table lists certain important provisions of the franchise and related agreements pertaining to renewal, termination, transfer and dispute resolution.  You should read these provisions in the Agreements attached to this Disclosure Document.**

### THE FRANCHISE RELATIONSHIP

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| a. | Length of the term of the franchise | Section III.A. | Term continues for 10 years from the date of the Franchise Agreement unless terminated earlier |
| b. | Renewal or extension of the term | Section III.B. | Agreement may be renewed at your option for additional consecutive 10-year terms |
| c. | Requirements for franchisee to renew or extend | Section III.B.(1) - (8) | You must give notice at least 7 months in advance, repair and update equipment and Restaurant premises, not be in breach of any agreement with us, have the right to remain in possession of Restaurant premises, sign current agreement and general release, and comply with current qualification and training requirements.<br><br>You may be required to sign a new contract with different terms and conditions than your original contract, but the material terms and conditions of your original contract (i.e., the fees, protected territory and renewal rights) will remain the same in the new contract. |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| d.    Termination by franchisee | Not applicable | You may terminate the Franchise Agreement on any grounds available by law. These provisions are subject to state law. |
| e.    Termination by franchisor without cause | Not applicable | Not applicable |
| f.    Termination by franchisor with "cause" | Section XVII.A.(1) | Each of your obligations under the Franchise Agreement is a material and essential obligation, the breach of which may result in termination. |
| g.    "Cause" defined – curable defaults | Section XVII.B. | We may terminate you for cause if you fail to cure certain defaults, including:  if you or any of your affiliates fail to pay any monies owed to us or our vendors, and do not cure within 5 days after notice (or longer period required), fail to procure and maintain required insurance within 10 days after notice, use the Marks in an unauthorized manner, conduct or otherwise participate in an unauthorized Interview, and fail to cure within 24 hours after notice, fail to comply with the requirements of any other franchise agreement, development agreement, or other agreement to which you and we are a party, fail to cure any other default that is susceptible of cure within 30 days after notice. |
| h.    "Cause" defined – non-curable defaults | Sections XVII.A.(2) and (3) | We may terminate you for cause if you fail to cure certain defaults, including:  if you become insolvent, make a general assignment for benefit of creditors, file a petition or have a petition initiated against you under applicable bankruptcy laws, have outstanding judgments against you for over 30 days, sell unauthorized products or services, fail to acquire an accepted location within time required, fail to remodel when required, fail to open Restaurant when required, fail to comply with any term and condition of any sublease or related agreement, or any other franchise agreement, development agreement, or other agreement with us and have not cured the default within the given cure period, abandon or lose right to the Restaurant premises, are convicted of a felony or other crime that may have an adverse effect on the System or Marks, transfer any interest without our consent or maintain false books or records, failure to comply with applicable laws.  If we determine that you are repeatedly in default for failure to comply with the requirements of any other franchise agreement, development agreement, or other agreement to which we are parties or in material default for failure to substantially comply with the requirements of any other agreement, we may terminate the |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | Franchise Agreement and/or the other franchise agreement, development agreement or other agreement. If we terminate the Franchise Agreement it is considered an event of default agreement under any other agreement between us, and we have the right to terminate the other agreement. |
| i. Franchisee's obligations on termination/non-renewal | Section XVIII. | Obligations include:  You must cease operating the Restaurant and using the Marks and System and completely de-identify the business, pay all amounts due to us, return all Manuals and software and other proprietary materials, comply with confidentiality requirements, and at our option, sell or assign to us your rights in the Restaurant premises and the equipment and fixtures used in the business. |
| j. Assignment of contract by Franchisor | Section XIV.A. | We have the right to transfer or assign the Franchise Agreement to any person or entity without restriction.  However, no assignment will be granted except to an assignee who, in our good faith judgment, is willing and able to assume our obligations. |
| k. "Transfer" by franchisee – defined | Section XIV.B.(1) | Includes sale, assignment, conveyance, pledge, mortgage or other encumbrance of any interest in the Franchise Agreement, the Restaurant or you (if you are not a natural person). |
| l. Franchisor approval of transfer by franchisee | Section XIV.B.(2) | You must obtain our consent before transferring any interest.  We will not unreasonably withhold our consent. |
| m. Conditions for franchisor approval of transfer | Section XIV.B.(2) | Conditions include:  You must pay all amounts due us, not otherwise be in default, sign a general release, and pay a transfer fee. Transferee must meet our criteria, attend training and sign current Franchise Agreement. |
| n. Franchisor's right of first refusal to acquire franchisee's business | Section XIV.D. | Within 30 days after notice, we have the option to purchase the transferred interest on the same terms and conditions. |
| o. Franchisor's option to purchase franchisee's business | Sections XVIII.K. and XIV.D. | Other than assets on termination, non-renewal or right of first refusal, we have no right or obligation to purchase your business. |
| p. Death or disability of franchisee | Section XIV.E. | If you or a Controlling Principal are a natural person, upon death or permanent disability, distributee must be approved by us, or franchise must be transfer to someone approved by us within 12 months after death or within 6 months after notice of permanent disability. |
| q. Non-competition covenants during the term of the franchise | Section X.C.(1) | You are prohibited from operating or having an interest in a similar business. Non-competition provisions are subject to state law. |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| r. | Non-competition covenants after the franchise is terminated or expires | Section X.C.(2) | You and your Controlling Principals are prohibited from operating or having an interest in a similar business which is located, or is intended to be located within a 25-mile radius of any Restaurant in existence or under construction as of the earlier of (i) the expiration or termination of, or the transfer of all of your interest in, the Franchise Agreement or (ii) the time a Controlling Principal ceases to satisfy the definition of a Controlling Principal, as applicable. Non-competition provisions are subject to state law. |
| s. | Modification of the agreement | Sections X.A.(5) and XIX.B. | Franchise Agreement may not be modified unless mutually agreed to in writing.  You must comply with Manuals as amended. |
| t. | Integration/merger clause | Section XIX.B. | Only the terms of the Franchise Agreement and other related written agreements are binding (subject to applicable state law).  Any representations or promises made outside of the Disclosure Document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | Sections XIX.G., H., I., J. and K. | Except for actions brought by us for monies owed, injunctive or extraordinary relief, or actions involving real estate, all disputes must be arbitrated at our headquarters or arbitrated in Lorton, Virginia, subject to state law. |
| v. | Choice of forum | Section XIX.G., H., I. | The venue for all proceedings related to or arising out of the Franchise Agreement is in Fairfax County, Virginia, unless otherwise brought by us (subject to state law) (see Disclosure Document Addenda and State Amendments to Agreements). |
| w. | Choice of Law | Section XIX.H. | The Franchise Agreement is to be interpreted, governed and construed under Virginia law (subject to state law) (see Disclosure Document Addenda and State Amendments to Agreement). |

## THE DEVELOPER RELATIONSHIP

| | Provision | Section in Development Agreement | Summary |
|---|---|---|---|
| a. | Length of the term | Section V. | Term continues until you have completed your development obligations in accordance with the Development Schedule. |
| b. | Renewal or extension of the term | Section III.B. | We may extend the term of the Development Agreement for up to two 90-day Extension Periods, as described in Item 12 above.  In addition, we may renew your Development Agreement to allow you to develop additional Restaurants. |

| | Provision | Section in Development Agreement | Summary |
|---|---|---|---|
| c. | Requirements for Developer to renew or extend | Sections III.B.(2) and (4) | If we renew your Development Agreement, you will have the obligation to develop the additional Restaurants.  You will also need to sign a new Development Agreement, which may have materially different terms and conditions from your original contract. |
| d. | Termination by Developer | Not applicable | You may terminate the Development Agreement on any grounds available at law. These provisions are subject to state law. |
| e. | Termination by Franchisor without cause | Not applicable | Not applicable |
| f. | Termination by Franchisor with "cause" | Section VII.A.D. | Following certain defaults, we may terminate the Agreement, or we may modify your territorial rights or alter your Development Schedule, rather than terminate the Agreement. |
| g. | "Cause" defined - curable defaults | Sections VII.B. and C. | We may terminate you for cause if you fail to cure certain defaults, including:  If you or your affiliates fail to pay any monies owed to us, or our vendors, and do not cure within 5 days after notice (or longer period required), use the Marks in an unauthorized manner and fail to cure within 24 hours after notice or fail to cure any other default that is susceptible of cure within 30 days after notice.  If you have both a Development Agreement and a Franchise Agreement, an uncured default under one is also a default under the other. |
| h. | "Cause defined – non-curable defaults | Sections VII.A. and B. | We may terminate you for cause based on certain non-curable defaults, including:  If you become insolvent, make a general assignment for benefit of creditors, file a petition or have a petition initiated against you under federal bankruptcy laws or similar state laws, have outstanding judgments against you for over 30 days, fail to comply with the Development Schedule, fail to comply with any term and condition of any sublease or related agreement and have not cured the default within the given cure period, are convicted of a felony or other crime that may have an adverse effect on the System or Marks, or transfer any interest without our consent. |
| i. | Developer's obligations on termination/non-renewal | Sections VII.D. and E. | Obligations include:  You must cease developing Restaurants or, on a partial termination of territorial or development rights under Section VII.D, must continue to develop only in accordance with any modified Development Schedule, and must comply with all applicable confidentiality and non-competition covenants. |

| | Provision | Section in Development Agreement | Summary |
|---|---|---|---|
| j. | Assignment of contract by Franchisor | Section VIII.A. | We have the right to transfer or assign the Development Agreement to any person or entity without restriction.  However, no assignment will be granted except to an assignee who, in our good faith judgment, is willing and able to assume our obligations. |
| k. | "Transfer" by Developer - defined | Section VIII.B.(1) | Includes sale, assignment, conveyance, gift, pledge, mortgage or other disposal or encumbrance of any direct or indirect interest in the Agreement or you (if you are not a natural person). |
| l. | Franchisor approval of transfer by Developer | Section VIII.B.(2) | You must obtain our consent before transferring any interest.  We will not unreasonably withhold our consent. |
| m. | Conditions for Franchisor approval of transfer | Section VIII.B.(2) | Conditions include:  You must pay all amounts due us, not otherwise be in default, sign a general release, remain liable for pre-transfer obligations and pay a transfer fee.  Transferee must meet our criteria, assume post-transfer obligations, sign our then-standard Agreement and attend training. |
| n. | Franchisor's right of first refusal to acquire Developer's business | Section VIII.D. | Within 30 days after notice, we have the option to purchase the transferred interest on the same terms and conditions offered by a third party. |
| o. | Franchisor's option to purchase Franchisee's business | Not applicable | Not applicable |
| p. | Death or disability of Developer | Section VIII.E. | If you or a Controlling Principal are a natural person, on death or permanent disability, distributee must be approved by us, or interest must be transferred to someone approved by us within 12 months after death or 6 months after notice of permanent disability. |
| q. | Non-competition covenants during the term of the Development Agreement | Section IX.C.(2) | Except for Restaurants you operate under Franchise Agreements with us, you and your Controlling Principals are prohibited from operating or having an interest in a similar business in the U.S. or anywhere else we have used, registered or sought to register the Marks or where we operate or license others. Non-competition provisions are subject to state law. |

| Provision | Section in Development Agreement | Summary |
|---|---|---|
| r. Non-competition covenants after the Development Agreement is terminated or expires | Section IX.D.(2) | Except for Restaurants you operate under Franchise Agreements with us, you and your Controlling Principals are prohibited from operating or having an interest in a similar business which is located, or is intended to be located within a 25-mile radius of any Restaurant or food service facility in existence or under construction as of the earlier of (i) the expiration, termination, or the transfer of all of your interest in the Agreement or (ii) the time a Controlling Principal ceases to satisfy the definition of a Controlling Principal, as applicable. Non-competition provisions are subject to state law. |
| s. Modification of the agreement | Sections IX.G. and XV. | Agreement may not be modified unless mutually agreed to in writing, except we may unilaterally decrease the scope of certain non-competition covenants. |
| t. Integration/merger clause | Section XV.A. | Only the terms of the Agreement and other related written agreements are binding (subject to applicable state law).  Any representations or promises made outside of the Disclosure Document and Development Agreement may not be enforceable. |
| u. Dispute resolution by arbitration or mediation | Sections XV.B., C., D., E. and F. | Except for actions brought by us for monies owed, injunctive or extraordinary relief, or actions involving real estate, all disputes must be arbitrated at our headquarters or arbitrated in Lorton, Virginia, subject to state law. |
| v. Choice of forum | Section XV.C. | The venue for all proceedings related to or arising out of the Agreement is Fairfax County, Virginia unless otherwise brought by us (subject to state law) (see Disclosure Document Addenda and State Amendments to Agreements). |
| w. Choice of law | Sections XV.B., C. and D. | The Agreement is to be interpreted and construed under Virginia law (subject to state law) (see Disclosure Document Addenda and State Amendments to Agreements). |

## ITEM 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document.  Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets.  We also do not authorize our employees or representatives to make any such representations either orally or in writing.  If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet.  If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting us at 10718 Richmond Highway, Lorton, Virginia 22079, Attn: Adam Aberra, Legal Department, (703) 339-9500, franchise@fiveguys.com, the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20
## OUTLETS AND FRANCHISEE INFORMATION

### TABLE NO. 1
### SYSTEMWIDE OUTLET SUMMARY
### FOR FISCAL YEARS 2019 TO 2021

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2019 | 930 | 941 | +11 |
| | 2020 | 941 | 1,008 | +67 |
| | 2021 | 1,008 | 979 | -29 |
| Company-Owned* | 2019 | 492 | 496 | +4 |
| | 2020 | 499 | 444 | -52 |
| | 2021 | 444 | 479 | +35 |
| **Total Outlets** | **2019** | **1,422** | **1,437** | **+15** |
| | **2020** | **1,437** | **1,452** | **+15** |
| | **2021** | **1,452** | **1,458** | **+6** |

\*      Company-owned outlets refer to FIVE GUYS® Restaurants owned by Five Guys Properties.

### TABLE NO. 2
### TRANSFERS OF OUTLETS FROM FRANCHISEES
### TO NEW OWNERS (OTHER THAN FRANCHISOR)
### FOR FISCAL YEARS 2019 TO 2021

| State | Year | Number of Transfers |
|---|---|---|
| Alabama | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 2 |
| Arkansas | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 5 |

| State | Year | Number of Transfers |
|---|---|---|
| California | 2019 | 21 |
| | 2020 | 0 |
| | 2021 | 1 |
| Colorado | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 7 |
| Florida | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 2 |
| Hawaii | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 3 |
| Indiana | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 4 |
| Kentucky | 2019 | 2 |
| | 2020 | 0 |
| | 2021 | 0 |
| Louisiana | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 1 |
| Massachusetts | 2019 | 22 |
| | 2020 | 0 |
| | 2021 | 0 |
| Mississippi | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 2 |
| New Jersey | 2019 | 5 |
| | 2020 | 6 |
| | 2021 | 5 |
| New York | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 16 |
| North Carolina | 2019 | 5 |
| | 2020 | 0 |
| | 2021 | 8 |
| Oregon | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 1 |
| South Carolina | 2019 | 6 |
| | 2020 | 0 |
| | 2021 | 0 |

| State | Year | Number of Transfers |
|---|---|---|
| Tennessee | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 5 |
| Virginia | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 2 |
| Washington | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 13 |
| Wyoming | 2019 | 0 |
| | 2020 | 0 |
| | 2021 | 2 |
| **Totals** | **2019** | **61** |
| | **2020** | **6** |
| | **2021** | **79** |

**TABLE NO. 3**
**STATUS OF FRANCHISED OUTLETS**
**FOR FISCAL YEARS 2019 TO 2021**

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2019 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| | 2020 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| | 2021 | 15 | 0 | 0 | 0 | 5 | 0 | 10 |
| Arizona | 2019 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| | 2020 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| | 2021 | 12 | 0 | 0 | 0 | 0 | 1 | 11 |
| Arkansas | 2019 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2021 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| California | 2019 | 72 | 3 | 0 | 0 | 0 | 1 | 74 |
| | 2020 | 74 | 1 | 0 | 0 | 0 | 0 | 75 |
| | 2021 | 75 | 0 | 0 | 0 | 0 | 0 | 75 |
| Colorado | 2019 | 23 | 2 | 0 | 0 | 0 | 0 | 25 |
| | 2020 | 25 | 1 | 0 | 0 | 0 | 0 | 26 |
| | 2021 | 26 | 1 | 0 | 0 | 0 | 0 | 27 |
| Delaware | 2019 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2020 | 4 | 3** | 0 | 0 | 0 | 0 | 7 |
| | 2021 | 7 | 1 | 0 | 0 | 0 | 0 | 8 |
| Florida | 2019 | 73 | 3 | 0 | 0 | 0 | 4 | 72 |
| | 2020 | 72 | 4 | 0 | 0 | 0 | 5 | 71 |
| | 2021 | 71 | 2 | 0 | 0 | 1 | 0 | 72 |
| Georgia | 2019 | 19 | 1 | 0 | 0 | 3 | 3 | 14 |
| | 2020 | 14 | 0 | 0 | 0 | 0 | 0 | 14 |
| | 2021 | 14 | 1 | 0 | 0 | 0 | 0 | 15 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Hawaii | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Idaho | 2019 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | 2020 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | 2021 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| Illinois | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 2 | 0 | 0 |
| Indiana | 2019 | 27 | 1 | 0 | 0 | 0 | 0 | 28 |
| | 2020 | 28 | 3 | 0 | 0 | 0 | 0 | 31 |
| | 2021 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| Kansas | 2019 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| | 2020 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| | 2021 | 13 | 1 | 0 | 0 | 0 | 1 | 13 |
| Kentucky | 2019 | 11 | 0 | 0 | 0 | 0 | 1 | 10 |
| | 2020 | 10 | 0 | 0 | 0 | 0 | 0 | 10 |
| | 2021 | 10 | 0 | 0 | 0 | 0 | 0 | 10 |
| Louisiana | 2019 | 10 | 1 | 0 | 0 | 0 | 0 | 11 |
| | 2020 | 11 | 1 | 0 | 0 | 0 | 0 | 12 |
| | 2021 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| Maine | 2019 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | 2020 | 7 | 0 | 0 | 0 | 0 | 1 | 6 |
| | 2021 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| Maryland | 2019 | 33 | 1 | 0 | 0 | 0 | 2 | 32 |
| | 2020 | 32 | 2 | 0 | 0 | 1 | 2 | 31 |
| | 2021 | 31 | 2 | 0 | 0 | 0 | 0 | 33 |
| Massachusetts | 2019 | 42 | 3 | 0 | 0 | 0 | 0 | 45 |
| | 2020 | 45 | 2 | 0 | 0 | 0 | 0 | 47 |
| | 2021 | 47 | 0 | 0 | 0 | 0 | 0 | 47 |
| Michigan | 2019 | 30 | 1 | 0 | 0 | 0 | 0 | 31 |
| | 2020 | 31 | 0 | 0 | 0 | 0 | 1 | 30 |
| | 2021 | 30 | 2 | 0 | 0 | 31 | 1 | 0 |
| Minnesota | 2019 | 21 | 1 | 0 | 0 | 0 | 0 | 22 |
| | 2020 | 22 | 2 | 0 | 0 | 0 | 1 | 23 |
| | 2021 | 23 | 0 | 0 | 0 | 0 | 1 | 22 |
| Mississippi | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Missouri | 2019 | 12 | 1 | 0 | 0 | 0 | 0 | 13 |
| | 2020 | 13 | 1 | 0 | 0 | 0 | 0 | 14 |
| | 2021 | 14 | 0 | 0 | 0 | 0 | 0 | 14 |
| Montana | 2019 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2020 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2021 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Nebraska | 2019 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2021 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| Nevada | 2019 | 10 | 0 | 0 | 0 | 0 | 1 | 9 |
| | 2020 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| | 2021 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| New Hampshire | 2019 | 11 | 1 | 0 | 0 | 0 | 0 | 12 |
| | 2020 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| | 2021 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| New Jersey | 2019 | 42 | 2 | 0 | 0 | 0 | 1 | 43 |
| | 2020 | 43 | 3 | 0 | 0 | 0 | 2 | 44 |
| | 2021 | 44 | 3 | 0 | 0 | 0 | 0 | 47 |
| New Mexico | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York | 2019 | 78 | 3 | 0 | 0 | 0 | 0 | 81 |
| | 2020 | 81 | 2 | 0 | 0 | 0 | 4 | 79 |
| | 2021 | 79 | 3 | 0 | 0 | 0 | 0 | 82 |
| North Carolina | 2019 | 31 | 0 | 0 | 0 | 2 | 1 | 28 |
| | 2020 | 28 | 4 | 0 | 0 | 0 | 2 | 30 |
| | 2021 | 30 | 1 | 0 | 0 | 0 | 0 | 31 |
| North Dakota | 2019 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 1 | 0 | 0 | 0 | 1 | 5 |
| | 2021 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| Ohio | 2019 | 39 | 0 | 0 | 0 | 0 | 0 | 39 |
| | 2020 | 39 | 4 | 0 | 0 | 0 | 0 | 43 |
| | 2021 | 43 | 1 | 0 | 0 | 6 | 1 | 37 |
| Oklahoma | 2019 | 12 | 1 | 0 | 0 | 0 | 0 | 13 |
| | 2020 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| | 2021 | 13 | 0 | 0 | 0 | 0 | 1 | 12 |
| Oregon | 2019 | 16 | 0 | 0 | 0 | 0 | 0 | 16 |
| | 2020 | 16 | 1 | 0 | 0 | 0 | 0 | 17 |
| | 2021 | 17 | 2 | 0 | 0 | 0 | 0 | 19 |
| Pennsylvania | 2019 | 23 | 2* | 0 | 0 | 0 | 0 | 25* |
| | 2020 | 25* | 1 | 0 | 0 | 0 | 1 | 25 |
| | 2021 | 25 | 1 | 0 | 0 | 0 | 1 | 25 |
| Rhode Island | 2019 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 0 | 0 | 0 | 0 | 1 | 4 |
| | 2021 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| South Carolina | 2019 | 28 | 0 | 0 | 0 | 0 | 1 | 27 |
| | 2020 | 27 | 2 | 0 | 0 | 0 | 1 | 28 |
| | 2021 | 28 | 0 | 0 | 0 | 0 | 0 | 28 |
| South Dakota | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Tennessee | 2019 | 23 | 0 | 0 | 0 | 0 | 0 | 23 |
| | 2020 | 23 | 1 | 0 | 0 | 0 | 0 | 24 |
| | 2021 | 24 | 1 | 0 | 0 | 0 | 0 | 25 |
| Texas | 2019 | 16 | 0 | 0 | 0 | 0 | 0 | 16 |
| | 2020 | 16 | 49** | 0 | 0 | 0 | 0 | 65 |
| | 2021 | 65 | 3 | 0 | 0 | 0 | 2 | 66 |
| Utah | 2019 | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| | 2020 | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| | 2021 | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| Vermont | 2019 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 1 | 2 |
| Virginia | 2019 | 15 | 0 | 0 | 0 | 1 | 1 | 13 |
| | 2020 | 13 | 2 | 0 | 0 | 0 | 2 | 13 |
| | 2021 | 13 | 1 | 0 | 0 | 0 | 0 | 14 |
| Washington DC | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington | 2019 | 28 | 0 | 0 | 0 | 0 | 0 | 28 |
| | 2020 | 28 | 2 | 0 | 0 | 0 | 2 | 28 |
| | 2021 | 28 | 0 | 0 | 0 | 0 | 0 | 28 |
| West Virginia | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2021 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Wisconsin | 2019 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2021 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| Wyoming | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| **U.S. Subtotals** | **2019** | **866** | **29** | **0** | **0** | **6** | **16** | **873** |
| | **2020** | **873** | **92** | **0** | **0** | **1** | **26** | **938** |
| | **2021** | **938** | **28** | **0** | **0** | **45** | **10** | **911** |
| Canada | 2019 | 64 | 7 | 0 | 0 | 0 | 3 | 68 |
| | 2020 | 68 | 3 | 0 | 0 | 0 | 1 | 70 |
| | 2021 | 70 | 2 | 0 | 0 | 0 | 4 | 68 |
| **Totals** | **2019** | **930** | **36** | **0** | **0** | **6** | **19** | **941** |
| | **2020** | **941** | **95** | **0** | **0** | **1** | **27** | **1,008** |
| | **2021** | **1,008** | **30** | **0** | **0** | **45** | **14** | **979** |

*During 2019, 1 of the 2 outlets in Pennsylvania was opened as a relocated outlet, but the original outlet did not close until March 2020.  Therefore, there are 25 opened outlets in Pennsylvania in 2019 rather than 24 outlets.
**During 2020, 2 of the 3 outlets in Delaware and the 49 outlets in Texas were purchased by franchisees from Five Guys Properties.

**TABLE NO. 4**
**STATUS OF COMPANY-OWNED OUTLETS**
**FOR FISCAL YEARS 2019 TO 2021**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Alabama | 2019 | 6 | 1 | 0 | 0 | 0 | 7 |
| | 2020 | 7 | 0 | 0 | 0 | 0 | 7 |
| | 2021 | 7 | 0 | 5 | 1 | 0 | 11 |
| Arizona | 2019 | 19 | 0 | 0 | 0 | 0 | 19 |
| | 2020 | 19 | 0 | 0 | 0 | 0 | 19 |
| | 2021 | 19 | 1 | 0 | 0 | 0 | 20 |
| California | 2019 | 61 | 1 | 0 | 0 | 0 | 62 |
| | 2020 | 62 | 2 | 0 | 1 | 0 | 63 |
| | 2021 | 63 | 0 | 0 | 6 | 0 | 57 |
| Connecticut | 2019 | 24 | 1 | 0 | 0 | 0 | 25 |
| | 2020 | 25 | 0 | 0 | 1 | 0 | 24 |
| | 2021 | 24 | 0 | 0 | 1 | 0 | 23 |
| Delaware | 2019 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 2 |
| Florida | 2019 | 40 | 0 | 0 | 3 | 0 | 37 |
| | 2020 | 37 | 0 | 0 | 0 | 0 | 37 |
| | 2021 | 37 | 1 | 1 | 0 | 0 | 39 |
| Georgia | 2019 | 30 | 2 | 3 | 0 | 0 | 35 |
| | 2020 | 35 | 4 | 0 | 2 | 0 | 37 |
| | 2021 | 37 | 2 | 0 | 1 | 0 | 38 |
| Illinois | 2019 | 38 | 0 | 0 | 2 | 0 | 36 |
| | 2020 | 36 | 1 | 0 | 1 | 0 | 36 |
| | 2021 | 36 | 3 | 2 | 4 | 0 | 37 |
| Iowa | 2019 | 4 | 1 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 1 | 0 | 0 | 0 | 6 |
| | 2021 | 6 | 1 | 0 | 0 | 0 | 7 |
| Kentucky | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2021 | 1 | 0 | 0 | 0 | 0 | 1 |
| Louisiana | 2019 | 5 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 0 | 0 | 0 | 0 | 5 |
| | 2021 | 5 | 0 | 0 | 2 | 0 | 3 |
| Maryland | 2019 | 22 | 1 | 0 | 1 | 0 | 22 |
| | 2020 | 22 | 1 | 1 | 0 | 2 | 22 |
| | 2021 | 22 | 0 | 0 | 0 | 0 | 22 |
| Michigan | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2021 | 0 | 0 | 31 | 0 | 0 | 31 |
| Mississippi | 2019 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2020 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2021 | 6 | 0 | 0 | 0 | 0 | 6 |

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Missouri | 2019 | 11 | 1 | 0 | 0 | 0 | 12 |
| | 2020 | 12 | 0 | 0 | 1 | 0 | 11 |
| | 2021 | 11 | 2 | 0 | 1 | 0 | 12 |
| New Jersey | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2021 | 1 | 0 | 0 | 0 | 0 | 1 |
| New Mexico | 2019 | 7 | 0 | 0 | 0 | 0 | 7 |
| | 2020 | 7 | 0 | 0 | 0 | 0 | 7 |
| | 2021 | 7 | 0 | 0 | 0 | 0 | 7 |
| New York | 2019 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2020 | 6 | 0 | 0 | 1 | 0 | 5 |
| | 2021 | 5 | 0 | 0 | 0 | 0 | 5 |
| North Carolina | 2019 | 7 | 0 | 2 | 2 | 0 | 7 |
| | 2020 | 7 | 1 | 0 | 0 | 0 | 8 |
| | 2021 | 8 | 0 | 0 | 0 | 0 | 8 |
| Ohio | 2019 | 16 | 0 | 0 | 1 | 0 | 15 |
| | 2020 | 15 | 0 | 0 | 0 | 0 | 15 |
| | 2021 | 15 | 0 | 6 | 1 | 0 | 20 |
| Pennsylvania | 2019 | 36 | 0 | 0 | 1 | 0 | 35 |
| | 2020 | 35 | 0 | 0 | 0 | 0 | 35 |
| | 2021 | 35 | 0 | 0 | 1 | 0 | 34 |
| South Carolina | 2019 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2021 | 2 | 0 | 0 | 0 | 0 | 2 |
| Tennessee | 2019 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2020 | 6 | 1 | 0 | 0 | 0 | 7 |
| | 2021 | 7 | 0 | 0 | 0 | 0 | 7 |
| Texas | 2019 | 59 | 4 | 0 | 3 | 0 | 60 |
| | 2020 | 60 | 0 | 0 | 4 | 49 | 7 |
| | 2021 | 7 | 0 | 0 | 4 | 0 | 3 |
| Virginia | 2019 | 58 | 1 | 1 | 1 | 0 | 59 |
| | 2020 | 59 | 1 | 0 | 2 | 0 | 58 |
| | 2021 | 58 | 0 | 0 | 0 | 0 | 58 |
| Washington, DC | 2019 | 8 | 0 | 0 | 0 | 0 | 8 |
| | 2020 | 8 | 0 | 0 | 1 | 0 | 7 |
| | 2021 | 7 | 1 | 0 | 0 | 0 | 8 |
| West Virginia | 2019 | 5 | 0 | 0 | 1 | 0 | 4 |
| | 2020 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2021 | 4 | 0 | 0 | 0 | 0 | 4 |
| Wisconsin | 2019 | 12 | 0 | 0 | 0 | 0 | 12 |
| | 2020 | 12 | 0 | 0 | 0 | 0 | 12 |
| | 2021 | 12 | 2 | 0 | 1 | 0 | 13 |
| **Totals** | **2019** | **492** | **13** | **6** | **15** | **0** | **496** |
| | **2020** | **496** | **12** | **1** | **14** | **51** | **444** |
| | **2021** | **444** | **13** | **45** | **23** | **0** | **479** |

**TABLE NO. 5**
**PROJECTED OPENINGS**
**AS OF DECEMBER 31, 2021**

| States | Franchise Agreements* Signed But Restaurant Not Open | Projected Franchised Restaurant Openings | Projected Company-Owned Restaurant Openings |
|---|---|---|---|
| Alabama | 1 | 1 | 2 |
| Alaska | 0 | 0 | 0 |
| Arizona | 4 | 0 | 2 |
| Arkansas | 2 | 1 | 0 |
| California | 49 | 2 | 0 |
| Colorado | 18 | 0 | 0 |
| Connecticut | 0 | 0 | 2 |
| Delaware | 0 | 1 | 0 |
| Florida | 69 | 8 | 1 |
| Georgia | 15 | 0 | 2 |
| Hawaii | 5 | 0 | 0 |
| Idaho | 5 | 0 | 0 |
| Illinois | 0 | 0 | 1 |
| Indiana | 11 | 0 | 0 |
| Iowa | 0 | 0 | 0 |
| Kansas | 3 | 1 | 0 |
| Kentucky | 12 | 0 | 0 |
| Louisiana | 6 | 2 | 0 |
| Maine | 1 | 0 | 0 |
| Maryland | 0 | 3 | 0 |
| Massachusetts | 26 | 1 | 0 |
| Michigan | 0 | 0 | 0 |
| Minnesota | 4 | 1 | 0 |
| Mississippi | 3 | 0 | 0 |
| Missouri | 8 | 0 | 0 |
| Montana | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 |
| Nevada | 1 | 0 | 0 |
| New Hampshire | 3 | 1 | 0 |
| New Jersey | 18 | 2 | 0 |
| New Mexico | 0 | 0 | 0 |
| New York | 47 | 3 | 1 |
| North Carolina | 9 | 1 | 0 |
| North Dakota | 0 | 1 | 0 |
| Ohio | 8 | 4 | 0 |
| Oklahoma | 0 | 0 | 0 |
| Oregon | 10 | 1 | 0 |
| Pennsylvania | 7 | 3 | 0 |
| Rhode Island | 4 | 0 | 0 |
| South Carolina | 8 | 1 | 0 |
| South Dakota | 2 | 0 | 0 |
| Tennessee | 4 | 0 | 1 |
| Texas | 73 | 1 | 0 |
| Utah | 0 | 0 | 0 |
| Vermont | 1 | 0 | 0 |

| States | Franchise Agreements* Signed But Restaurant Not Open | Projected Franchised Restaurant Openings | Projected Company-Owned Restaurant Openings |
|---|---|---|---|
| Virginia | 2 | 0 | 2 |
| Washington, DC | 0 | 0 | 1 |
| Washington | 26 | 1 | 0 |
| West Virginia | 0 | 0 | 0 |
| Wisconsin | 1 | 1 | 0 |
| Wyoming | 1 | 0 | 0 |
| **U.S. Subtotals** | **467** | **41** | **15** |
| Canada | 64 | 1 | 0 |
| **Totals** | **531** | **42** | **15** |

\*      Franchise Agreements include signed, individual Franchise Agreements and projected stores reflected in signed Development Agreements.

**List of Current Franchisees**

The names of all franchisees and the addresses and telephones numbers of their businesses are listed in Exhibit D to this Disclosure Document.  The names of all franchisees/developers that had franchises that were not operational as of December 31, 2021 are also listed in Exhibit D of this Disclosure Document.

**List of Former Franchisees**

The name, city, state and current business telephone number (or if unknown, the last known home telephone number) of every franchisee who had a business terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the most recently completed fiscal year or who has not communicated with us within 10 weeks of the issuance date of this Disclosure Document are listed on Exhibit E to this Disclosure Document.  **If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

**Purchase of Previously Owned Franchise**

If you are purchasing a previously-owned franchised Restaurant from another franchisee, we will not provide you with any information on the previously-owned Restaurant.  If you are purchasing a previously-owned franchised Restaurant from us or one of our affiliates, we will provide you additional information on the previously-owned Restaurant in an addendum to this Disclosure Document.

**Confidentiality Clauses**

During the last 3 fiscal years, neither we nor our predecessor, FGE, have had any franchisees sign confidentiality provisions that would restrict their ability to speak openly about their experience with the FIVE GUYS® system.

**Trademark-Specific Franchisee Organizations**

There are no trademark-specific organizations formed by our franchisees that are associated with the FIVE GUYS® system.

**ITEM 21**
**FINANCIAL STATEMENTS**

FGE will be providing required support and services to franchisees under a management agreement with us.  The audited consolidated financial statements of our Parent Company, the parent of FGE, and

subsidiaries as of and for the years ended December 31, 2019, December 31, 2020, and December 31, 2021 and unaudited financial statements as of March 31, 2022 are attached and included in Exhibit A.  FGE is not a party to the Development Agreement, Franchise Agreement or other agreement that we sign with franchisees nor does it guarantee our obligations under the Franchise Agreement or other agreements that we sign with franchisees.  Our Parent Company has signed a Guaranty of Performance agreement in which it absolutely and unconditionally guarantees to assume FGE's duties and obligations under the management agreement.  A copy of the Guaranty of Performance is also attached to this Disclosure Document at Exhibit A.

Five Guys Funding issued fixed rate notes in the amount of $400 million and a variable funding note with a maximum principal amount of $40 million as part of the Securitization Transaction.  These funds were used, in part, to pay certain outstanding obligations.  Various assets have been pledged to secure this indebtedness, including all franchise agreements and other agreements existing as of the closing of the Securitization Transaction.  Certain subsidiaries and affiliates of Five Guys Funding have guaranteed the indebtedness, including us.  See the Footnotes to the financial statements in Exhibit A for more information about the Securitization Transaction.

Our fiscal year end is December 31st.

## ITEM 22
## CONTRACTS

Attached as Exhibits to this Disclosure Document are the following contracts and their attachments:

| | | |
|---|---|---|
| 1. | Development Agreement | Exhibit B |
| 2. | Franchise Agreement | Exhibit C |

## ITEM 23
## RECEIPTS

Two copies of an acknowledgment of your receipt of this Disclosure Document appear at the end of the Disclosure Document.  Please return one signed copy to us and retain the other for your records.

**EXHIBIT A TO THE DISCLOSURE DOCUMENT**

**<u>FINANCIAL STATEMENTS</u>**

## GUARANTEE OF PERFORMANCE

For value received, FIVE GUYS HOLDINGS, INC., a Delaware corporation (the "**Guarantor**"), located at 10718 Richmond Highway, Lorton, Virginia 22079, absolutely and unconditionally guarantees the performance by Five Guys Enterprises, LLC (the "**Manager**") located at 10718 Richmond Highway, Lorton, Virginia 22079, of all of its duties and obligations under that certain Management Agreement between the Manager and Five Guys Franchisor, LLC (the "**Franchisor**"), among others, dated June 27, 2017, as it may be amended, modified or extended from time to time (the "**Management Agreement**"), which duties and obligations include the Manager's required performance of the Franchisor's support and services to the Franchisor's franchisees under their franchise agreements and development agreements.

This guarantee continues until all such obligations of the Manager under the Management Agreement are satisfied, or until the liability of the Manager to the Franchisor under the Management Agreement has been discharged, whichever first occurs. Notice of acceptance is waived. The Guarantor does not waive receipt of notice of default on the part of the Manager. This guarantee is binding on the Guarantor and on its successors and assigns and inures to the benefit of the above-described franchisees.

The Guarantor signs this guarantee at Lorton, Virginia on the 30th day of April 2022.

GUARANTOR:

FIVE GUYS HOLDINGS, INC.

By: _____

Name:  Jane K. Murrell

Title:  Authorized Signatory

# Five Guys Holdings, Inc. and Subsidiaries

Consolidated Financial Statements as of and for the Years Ended December 31, 2021, 2020, and 2019, Independent Auditor's Report

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1–2 |
| CONSOLIDATED FINANCIAL STATEMENTS AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019: | |
| Balance Sheets | 3–4 |
| Statements of Operations and Comprehensive Loss | 5 |
| Statements of Changes in Stockholders' Deficit | 6 |
| Statements of Cash Flows | 7–8 |
| Notes to the Consolidated Financial Statements | 9–45 |

# Deloitte.

**Deloitte & Touche LLP**
7900 Tysons One Place
Suite 800
McLean, VA 22102
USA
www.deloitte.com

**INDEPENDENT AUDITOR'S REPORT**

To the Board of Directors of
Five Guys Holdings, Inc. and Subsidiaries
Lorton, VA

**Opinion**

We have audited the accompanying consolidated financial statements of Five Guys Holdings, Inc. and its subsidiaries (the "Company"), which comprise the consolidated balance sheets as of December 31, 2021, 2020, and 2019, and the related consolidated statements of operations and comprehensive loss, changes in stockholders' deficit, and cash flows for the years then ended, and the related notes to the consolidated financial statements (collectively referred to as the "financial statements").

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021, 2020 and 2019, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

We conducted our audits in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of the Company and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Responsibilities of Management for the Financial Statements**

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date that the financial statements are available to be issued.

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of

assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

Deloitte & Touche LLP

March 18, 2022

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2021, 2020, AND 2019**
 **(Dollars in thousands, except share and per share values)**

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| **ASSETS** | | | |
| | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | $ 176,399 | $ 144,567 | $ 42,546 |
| Restricted cash | 25,298 | 24,394 | 17,266 |
| Accounts receivable—net | 14,647 | 11,342 | 13,938 |
| Other receivables | 5,492 | 4,856 | 3,567 |
| Related-party receivable—current portion | 14,404 | 9,568 | 9,696 |
| Inventory | 4,464 | 3,441 | 3,269 |
| Prepaid expenses and other current assets | 11,056 | 10,677 | 12,922 |
| Assets held for sale | - | - | 18,677 |
| Prepaid taxes | 2,014 | 1,902 | 357 |
| Deferred commissions—current portion | 770 | 905 | 913 |
| Total current assets | 254,544 | 211,652 | 123,151 |
| | | | |
| PROPERTY AND EQUIPMENT—net | 120,932 | 113,508 | 135,205 |
| | | | |
| OTHER ASSETS: | | | |
| Security deposits and other | 5,992 | 4,494 | 4,551 |
| Long-term investments | 10,544 | 7,995 | 6,423 |
| Related-party receivables—net of current portion | 1,303 | 1,164 | 1,095 |
| Deferred commissions—net of current portion | 5,010 | 5,722 | 6,348 |
| Deferred charges—net | 432 | 551 | 743 |
| Intangible assets—net | 25,393 | 6,465 | 10,360 |
| Goodwill | 90,042 | 40,675 | 48,807 |
| Total other assets | 138,716 | 67,066 | 78,327 |
| | | | |
| TOTAL | $ 514,192 | $ 392,226 | $ 336,683 |

(Continued)

- 3 -

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2021, 2020, AND 2019**
**(Dollars in thousands, except share and per share values)**

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | |
| CURRENT LIABILITIES: | | | |
| Current maturities of long-term debt | $ - | $ 269 | $ - |
| Capital lease obligations—current portion | 1,032 | 1,107 | 1,552 |
| Accounts payable | 19,222 | 17,172 | 16,167 |
| Embedded derivative liability | 302,406 | 176,093 | 119,683 |
| Accrued expenses and other current liabilities | 35,982 | 33,751 | 27,631 |
| Liabilities held for sale | - | - | 1,560 |
| Accrued payroll and related taxes | 36,835 | 25,957 | 21,303 |
| Related-party payables | 118 | 86 | 125 |
| Deferred revenue—current portion | 3,428 | 4,062 | 4,023 |
| Total current liabilities | 399,023 | 258,497 | 192,044 |
| OTHER LIABILITIES: | | | |
| Long-term debt—net of current maturities | 583,750 | 464,358 | 398,248 |
| Capital lease obligations—net of current portion | 3,007 | 3,325 | 3,495 |
| Deferred revenue—net of current portion | 42,654 | 44,963 | 48,250 |
| Deferred compensation liability | 131,995 | 100,758 | 112,384 |
| Deferred rent and other | 34,799 | 31,272 | 24,191 |
| Total other liabilities | 796,205 | 644,676 | 586,568 |
| Commitments and Contingencies (See Note 11) | | | |
| STOCKHOLDERS' DEFICIT: | | | |
| Preferred stock—series A—noncumulative convertible preferred ($15 million aggregate liquidation preference)—$.001 par value—107,000 shares authorized, issued, and outstanding | - | - | - |
| Preferred stock—series B—noncumulative convertible preferred ($15 million aggregate liquidation preference)—$.001 par value—84,863 shares authorized, issued, and outstanding | - | - | - |
| Common stock—$.001 par value—1,808,137 shares authorized (Class A—1,758,137, Class B—50,000); 934,820, 934,657, and 934,657 shares issued as of 2021, 2020, and 2019; 901,739, 908,898, and 909,190 shares outstanding for 2021, 2020, and 2019, respectively. | 1 | 1 | 1 |
| Treasury stock—33,081, 25,759, and 25,467, shares outstanding for 2021, 2020, and 2019, respectively. | (26,403) | (15,903) | (15,603) |
| Additional paid-in capital | 9,444 | 4,994 | 4,413 |
| Accumulated deficit | (664,356) | (499,879) | (430,314) |
| Stockholder loans | (447) | (708) | (455) |
| Accumulated other comprehensive income | 725 | 548 | 29 |
| Total stockholders' deficit | (681,036) | (510,947) | (441,929) |
| TOTAL | $ 514,192 | $ 392,226 | $ 336,683 |

See notes to consolidated financial statements.                    (Concluded)

- 4 -

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019**
**(Dollars in thousands)**

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| REVENUE: |  |  |  |
| Restaurant sales | $ 640,519 | $ 546,257 | $ 569,255 |
| Bakery sales | 60,189 | 49,611 | 52,208 |
| Royalty fees | 100,087 | 79,688 | 77,581 |
| Development fees | 3,632 | 2,454 | 2,344 |
| Franchise fees | 1,768 | 1,673 | 1,848 |
| Other revenue | 3,509 | 2,015 | 2,188 |
| Creative fund revenue | 35,394 | 25,152 | 30,659 |
| Total revenue | 845,098 | 706,850 | 736,083 |
| OPERATING EXPENSES: |  |  |  |
| Cost of sales: |  |  |  |
| Food, beverage, and shipping | 182,068 | 155,129 | 163,167 |
| Labor | 217,794 | 188,109 | 192,188 |
| Occupancy | 65,060 | 64,928 | 67,203 |
| Other operating costs | 135,740 | 129,400 | 123,461 |
| General and administrative | 216,418 | 143,785 | 188,872 |
| Creative fund expense | 38,053 | 28,015 | 34,610 |
| Gain on sale of company-owned locations | - | (12,543) | - |
| Total operating expenses | 855,133 | 696,823 | 769,501 |
| INCOME (LOSS) FROM OPERATIONS | (10,035) | 10,027 | (33,418) |
| OTHER INCOME (EXPENSE): |  |  |  |
| Interest income | 485 | 503 | 638 |
| Interest expense | (27,223) | (24,553) | (18,961) |
| Gain on extinguishment of debt | 5,260 | - | - |
| Loss on embedded derivative | (126,313) | (56,410) | (41,559) |
| Other income (expense) | (1,485) | (1,900) | (2,306) |
| Total other expense | (149,276) | (82,360) | (62,188) |
| LOSS BEFORE INCOME TAX EXPENSE | (159,311) | (72,333) | (95,606) |
| INCOME TAX EXPENSE (BENEFIT): |  |  |  |
| Total income tax expense (benefit) | 1,156 | (5,412) | 574 |
| NET LOSS | (160,467) | (66,921) | (96,180) |
| OTHER COMPREHENSIVE INCOME (LOSS)— |  |  |  |
| Foreign currency translation adjustment | 177 | 519 | 371 |
| COMPREHENSIVE LOSS | $ (160,290) | $ (66,402) | $ (95,809) |

- 5 -

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' DEFICIT**
**FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019**
**(Dollars in thousands)**

| | Preferred Stock Series A | | Preferred Stock Series B | | Common Stock | | Treasury Stock | Additional Paid-In Capital | Accumulated Deficit | Stockholder Loans | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares Issued | Amount | Shares Issued | Amount | Shares Issued | Amount | | | | | | |
| BALANCE—January 1, 2019 | 107,000 | $ - | 84,863 | $ - | 934,657 | $ 1 | $ (8,403) | $ 2,111 | $ (320,378) | $ (1,183) | $ (342) | $ (328,194) |
| Distributions to stockholders | - | - | - | - | - | - | - | - | (2,974) | - | - | (2,974) |
| Comprehensive income (loss) | - | - | - | - | - | - | - | - | (96,180) | - | 371 | (95,809) |
| Treasury stock purchases | - | - | - | - | - | - | (7,200) | - | - | - | - | (7,200) |
| Stockholder loans—collections | - | - | - | - | - | - | - | - | - | 728 | - | 728 |
| Stock-based compensation | - | - | - | - | - | - | - | 2,302 | - | - | - | 2,302 |
| ASC 606 Beginning Balance Adjustment | - | - | - | - | - | - | - | - | (10,782) | - | - | (10,782) |
| BALANCE—December 31, 2019 | 107,000 | - | 84,863 | - | 934,657 | 1 | (15,603) | 4,413 | (430,314) | (455) | 29 | (441,929) |
| Distributions to stockholders | - | - | - | - | - | - | - | - | (2,644) | - | - | (2,644) |
| Comprehensive income (loss) | - | - | - | - | - | - | - | - | (66,921) | - | 519 | (66,402) |
| Treasury stock purchases | - | - | - | - | - | - | (300) | - | - | - | - | (300) |
| Stockholder loans—advances | - | - | - | - | - | - | - | - | - | (253) | - | (253) |
| Stock-based compensation | - | - | - | - | - | - | - | 581 | - | - | - | 581 |
| BALANCE—December 31, 2020 | 107,000 | - | 84,863 | - | 934,657 | 1 | (15,903) | 4,994 | (499,879) | (708) | 548 | (510,947) |
| Distributions to stockholders | - | - | - | - | - | - | - | - | (4,010) | - | - | (4,010) |
| Comprehensive income (loss) | - | - | - | - | - | - | - | - | (160,467) | - | 177 | (160,290) |
| Treasury stock purchases | - | - | - | - | - | - | (10,500) | - | - | - | - | (10,500) |
| Stockholder loans—collections | - | - | - | - | - | - | - | - | - | 261 | - | 261 |
| Stock-based compensation | - | - | - | - | - | - | - | 4,450 | - | - | - | 4,450 |
| Common stock issued upon exercises of stock options | - | - | - | - | 163 | - | - | - | - | - | - | - |
| BALANCE—December 31, 2021 | 107,000 | $ - | 84,863 | $ - | 934,820 | $ 1 | $ (26,403) | $ 9,444 | $ (664,356) | $ (447) | $ 725 | $ (681,036) |

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019**
**(Dollars in thousands)**

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |  |
| Net income (loss) | $ (160,467) | $ (66,921) | $ (96,180) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization | 44,936 | 50,747 | 51,661 |
| Amortization of debt issuance costs | 2,962 | 2,308 | 1,909 |
| Gain on extinguishment of debt | (5,260) | - | - |
| Impairment of long lived assets | 6,813 | 5,431 | 4,324 |
| Bad debt provision | 63 | 35 | 399 |
| Deferred income taxes (benefit) | (4,620) | 7,771 | (13,463) |
| Tax valuation allowance | 4,620 | (7,771) | 13,463 |
| Loss on property and equipment disposal | 255 | 225 | 639 |
| Loss on embedded derivative liability | 126,313 | 56,410 | 41,559 |
| Gain on sale of company-owned locations | - | (12,543) | - |
| Deferred compensation expense | 34,295 | (5,659) | 21,636 |
| Stock-based compensation | 4,450 | 581 | 2,302 |
| Changes in operating assets and liabilities: |  |  |  |
| Accounts receivable | (3,324) | 2,680 | (748) |
| Other receivables | 1,122 | (1,221) | 1,378 |
| Creative fund receivable | (1,903) | (42) | (1,649) |
| Inventory | (514) | (164) | (778) |
| Prepaid expenses and other current assets | (1,350) | 3,887 | (1,520) |
| Prepaid taxes | (113) | (1,544) | (5) |
| Long-term investments | (1,317) | (875) | (982) |
| Security deposits | (1,471) | 82 | (863) |
| Deferred commissions | 847 | 634 | 2,835 |
| Accounts payable | 2,051 | 1,004 | (2,809) |
| Accrued expenses and other current liabilities | 1,466 | 6,182 | 466 |
| Accrued payroll and related taxes | 10,979 | 9,092 | 3,730 |
| Deferred compensation liability | - | (4,000) | - |
| Deferred revenue | (2,867) | (3,247) | (5,666) |
| Deferred rent and other | (3,816) | 583 | (743) |
| Net cash provided by operating activities | 54,150 | 43,665 | 20,895 |
| CASH FLOWS FROM INVESTING ACTIVITIES: |  |  |  |
| Deferred compensation contributions | (1,519) | (1,125) | (1,033) |
| Deferred compensation distributions | 287 | 428 | 188 |
| Purchases of property and equipment | (33,004) | (21,893) | (41,057) |
| Proceeds from settlement of property insurance claims | 298 | 222 | 432 |
| Pre-purchase costs | 15 | 43 | (177) |
| Acquisitions of franchisee locations | (89,199) | (1,041) | (7,403) |
| Proceeds from sale of company-owned locations | - | 28,955 | - |
| Holdback settlements related to acquisitions | (300) | (405) | - |
| Holdback receipts related to dispositions | 765 | - | - |
| Advances to related parties | (5,005) | - | (170) |
| Collections of related party advances and other | 163 | 138 | 187 |
| Net cash provided by (used in) investing activities | (127,499) | 5,322 | (49,033) |

(Continued)

- 7 -

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019**
**(Dollars in thousands)**

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Payments under capital lease obligations | $ (1,036) | $ (1,230) | $ (1,695) |
| Proceeds from line of credit | - | 8,700 | 10,000 |
| Repayment of line of credit | (18,700) | - | - |
| Proceeds from long-term debt | 200,000 | 58,575 | - |
| Repayment of long-term debt | (50,000) | - | - |
| Payment of deferred financing fees | (8,966) | (3,205) | - |
| Payment of debt extinguishment costs | (1,039) | - | - |
| Employee loans—stockholder advances | - | (253) | - |
| Employee loans—stockholder collections | 261 | - | 728 |
| Purchase of treasury stock | (10,500) | (300) | (7,200) |
| Distributions | (4,010) | (2,644) | (2,974) |
| Payments related to tax withholding for share-based compensation | (102) | - | - |
| Net cash provided by (used in) financing activities | 105,908 | 59,643 | (1,141) |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 32,559 | 108,630 | (29,279) |
| NET EFFECT OF EXCHANGE RATES ON CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 177 | 519 | 371 |
| CASH, CASH EQUIVALENTS, RESTRICTED CASH—Beginning | 168,961 | 59,812 | 88,720 |
| CASH AND CASH EQUIVALENTS RESTRICTED CASH—End | $ 201,697 | $ 168,961 | $ 59,812 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION—Cash paid for: | | | |
| Interest | $ 23,868 | $ 21,765 | $ 18,917 |
| Income taxes | $ 503 | $ 102 | $ 27 |
| NONCASH INVESTING ACTIVITY—Accrued property and equipment purchases | $ 1,917 | $ 1,526 | $ 1,448 |

# FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2021, 2020, AND 2019**
**(Amounts in thousands, except share values, rights, and store count information)**

## 1.   THE BUSINESS

Five Guys Holdings, Inc. ("Holdings") together with its subsidiaries (collectively, the "Company" or "we" or "our") owns and franchises Five Guys Burgers fast casual eateries ("restaurants" or "stores" or "units"), which specialize in the sale of freshly made burgers and fries, primarily throughout the United States, Canada, Europe and Asia.

On June 27, 2017, the Company established a securitization financing structure to raise capital to fund our ongoing international expansion and to further develop our domestic operations. At the onset of the securitization transaction (the "Securitization Transaction"), the Company raised $400,000 and in July 2021, raised an additional $200,000. Refer to Note 8 for more information. Pursuant to the Securitization Transaction, Five Guys Funding, LLC. (the "Master Issuer"), a limited-purpose, bankruptcy-remote, wholly-owned indirect subsidiary of Holdings was formed.

The Company administers a Creative Fund, which is designed to promote and enhance the Five Guys brand for the benefit of all franchisee and Company-owned restaurants. The Creative Fund is funded through contributions from all stores and various vendor rebates. Expenditures are paid out to stores from the Creative Fund that meet certain criteria.

As of December 31, 2021, the Company sold 1,585 franchise rights and 409 rights remain available for franchisees to develop franchise units under various development agreements in existence throughout the United States and Canada. As of December 31, 2021, the Company and its franchisees operated 479 and 979 restaurants, respectively, throughout the United States and Canada.

As of December 31, 2021, the Company sold 256 franchise rights and 203 rights remain available for franchisees to develop franchise units under various development agreements in existence throughout the Middle East, Ireland, Switzerland, Luxembourg, Italy, Asia, Austria and Australia. Under these agreements, 47 international franchise restaurants were operating as of December 31, 2021. In addition, 17 international company-owned stores were operating in the Netherlands, Belgium, and Hong Kong as of December 31, 2021.

In 2012, the Company entered into a joint venture (the "JV") with a conglomerate in the United Kingdom ("UK"). As of December 31, 2021, 136 restaurant locations were operating. In 2012, the Company contributed £10 and intellectual property to the JV to obtain a 50% interest in the JV. The investment in the JV is accounted for using the equity method and had a carrying value of zero for the years ended December 31, 2021, 2020, and 2019.

In March 2015, the Company expanded its JV agreement with its United Kingdom partner to include the development rights in Germany, France, and Spain, with terms consistent with the original agreement. Under the expanded agreement, 75 restaurant locations were operating as of December 31, 2021.

The Company's development rights sold to franchisees within the United States and Canada consist of the following:

| | Sold Development Rights Count For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Beginning of year—total rights | 1,674 | 1,612 | 1,643 |
| New business | - | 70 | 7 |
| Released back* | (21) | (5) | (21) |
| Acquired rights** | (65) | (1) | (11) |
| Terminated | (3) | (2) | (6) |
| End of year—total rights | 1,585 | 1,674 | 1,612 |
| Stores opened through 12/31 | (1,176) | (1,161) | (1,117) |
| Remaining rights at 12/31 | 409 | 513 | 495 |

\*   Released back is a reduction in store counts through development agreement addendums.

\*\*   Represents acquired rights through store acquisitions that are assigned value. See Note 4.

The Company's development rights sold to franchisees within the Middle East, Ireland, Switzerland, Luxembourg, Italy, Asia, Austria and Australia consist of the following:

| | Sold Development Rights Count For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Beginning of year—total rights | 252 | 214 | 144 |
| New business | 4 | 53 | 85 |
| Released back * | - | - | (15) |
| Terminated | - | (15) | - |
| End of year—total rights | 256 | 252 | 214 |
| Stores opened through 12/31 | (53) | (43) | (42) |
| Remaining rights at 12/31 | 203 | 209 | 172 |

\*   Released back is a reduction in store counts through development agreement addendums.

The Company's store count consists of the following:

| | Store Count For the Years Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **Company-owned stores (U.S.):** | | | |
| Beginning of year | 444 | 496 | 492 |
| Openings | 13 | 12 | 13 |
| Closures | (23) | (14) | (15) |
| Acquisitions by Company | 45 | 1 | 6 |
| Acquisitions by franchisee | - | (51) | - |
| End of year | 479 | 444 | 496 |
| **Company-owned stores (International):** | | | |
| Beginning of year | 12 | 14 | 10 |
| Openings—Netherlands | 1 | - | 1 |
| Openings—Belgium | - | - | 1 |
| Openings—Hong Kong | 4 | 1 | 2 |
| Closures | - | (3) | - |
| End of year | 17 | 12 | 14 |
| **Franchises (U.S. & Canada):** | | | |
| Beginning of year | 1,008 | 940 | 930 |
| Openings | 30 | 44 | 35 |
| Closures | (14) | (26) | (19) |
| Acquisitions by Company | (45) | (1) | (6) |
| Acquisitions by franchisee | - | 51 | - |
| End of year | 979 | 1,008 | 940 |
| **Franchises (International):** | | | |
| Beginning of year | 40 | 40 | 30 |
| Openings | 10 | 1 | 11 |
| Closures | (3) | (1) | (1) |
| End of year | 47 | 40 | 40 |
| **Joint venture (UK):** | | | |
| Beginning of year | 110 | 100 | 88 |
| Openings | 26 | 10 | 14 |
| Closures | - | - | (2) |
| End of year | 136 | 110 | 100 |
| **Joint venture (France, Germany and Spain):** | | | |
| Beginning of year | 56 | 43 | 29 |
| Openings | 20 | 13 | 15 |
| Closures | (1) | - | (1) |
| End of year | 75 | 56 | 43 |
| Total restaurants at end of year | 1,733 | 1,670 | 1,633 |

- 11 -

2.   **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation**—The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles") and include the accounts of Holdings and each of its subsidiaries. The consolidated financial statements include the accounts of the Company as determined under the voting interest model. Where the Company holds at least 20% ownership interest in an entity or in which there are other indicators of significant influence but not control, the entity is accounted for by the equity method. The Company accounts for its joint ventures in the UK and Europe as equity method investments. Disclosures pertaining to our joint venture activities have been omitted because such activities are not material to our financial statements as a whole.

All material intercompany transactions and balances have been eliminated.

The Company has evaluated subsequent events through March 18, 2022, the date the consolidated financial statements were available to be issued.

**COVID-19**—In March 2020, the World Health Organization declared the novel coronavirus (COVID-19) a global pandemic. While we cannot predict the ultimate duration, scope or severity of the COVID-19 pandemic, we continue to monitor its impact on our business, results and financial condition. See Notes 8 and 10, for further information regarding certain impacts of the COVID-19 pandemic on our consolidated financial statements.

As a result of the COVID-19 pandemic, the Company underwent a restructuring resulting in $1,858 severance expense for the year ended December 31, 2020. Costs related to severance packages are recorded as general and administrative expenses on the consolidated statements of operations and comprehensive loss.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was signed into law. The CARES Act intended to provide economic relief to those impacted by the COVID-19 pandemic. Among other provisions, the CARES Act allows for the deferral of the employer's share of Social Security tax payments in an effort to enhance business' liquidity. The Company had elected to defer the employer-paid portion of social security taxes between March 27, 2020 and December 31, 2020, with payments due in two installments at the end of 2021 and 2022. The Company made the first payment of $4,432 in 2021 and has classified the remaining $4,432 due in 2022 as accrued payroll and related taxes, which is included as a current liability on the consolidated balance sheet.

In addition, the Company has received government grants related to its international operations. The funds are stimulus monies to assist eligible companies during the COVID-19 pandemic. The Company recorded reductions to labor in the consolidated statements of operations and comprehensive loss amounting to $102 and $810, related to international government assistance, for the years ended December 31, 2021 and 2020, respectively. The Company recorded a reduction to payroll expense included in general and administrative expenses in the consolidated statements of operations and comprehensive loss amounting to $668 for the year ended December 31, 2020. In 2021, the grant was partially repaid and $71 of payroll expense was recorded. Excluding those repaid in 2021, the remaining grants are not expected to be repaid as they are utilized in compliance with the governmental requirements.

**Estimates**—The preparation of consolidated financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Assets Held for Sale**—In August 2019, the Company signed an Asset Purchase Agreement to sell fifty restaurants to a franchisee for approximately $28,000. This transaction met the criteria to be classified as held for sale. As outlined in Note 5, the transaction was completed in two tranches. In February 2020, twenty-two restaurant locations were sold to the franchisee for cash receipts of $11,114 and twenty-seven locations were sold in November 2020 for cash receipts of $16,088. One location included in the initial Asset Purchase Agreement was retained and subsequently closed in November 2020. No assets and liabilities were held for sale as of December 31, 2021 and 2020.

The following were classified as assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2019:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 100 |
| Other receivables | | 263 |
| Inventory | | 350 |
| Prepaid expenses and other current assets | | 563 |
| Property and equipment—net | | 11,185 |
| Security deposits & other | | 124 |
| Deferred charges—net | | 54 |
| Intangible assets—net | | 1,146 |
| Goodwill | | 4,892 |
| Total assets held for sale | $ | 18,677 |
| Capital lease obligations—net of current portion | $ | 553 |
| Deferred rent and other | | 1,007 |
| Total liabilities held for sale | $ | 1,560 |

**Cash and Cash Equivalents and Restricted Cash**—Cash equivalents consist of liquid investments with maturities of three months or less at the time of purchase and cash in transit from customer credit card transactions. Restricted cash consists of (1) funds held in an escrow investment account of $15,616, $14,210, and $9,627 as of December 31, 2021, 2020, and 2019, respectively; (2) Creative funds of $9,682, $7,541, and $7,639 as of December 31, 2021, 2020, ad 2019, respectively; and (3) funds held in a residual account of $0, $2,643, and $0 as of December 31, 2021, 2020, and 2019, respectively. The escrow investment account holds funds for interest payments related to the Securitization Transaction. The Creative Fund is used to promote the Five Guys brand for the benefit of all franchisee and Company-owned stores. The residual account holds funds for interest payments related to the term loan, which was extinguished in 2021.

- 13 -

The following table provides a reconciliation of the Company's cash and cash equivalents and restricted cash that sums to the total of those amounts at the end of the periods presented on the Company's accompanying consolidated statements of cash flows:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Cash and cash equivalents | $176,399 | $144,567 | $42,546 |
| Restricted Cash | 25,298 | 24,394 | 17,266 |
| Total cash and cash equivalents and restricted cash | $201,697 | $168,961 | $59,812 |

**Accounts Receivable, Net**—Accounts receivable, net consists principally of amounts due from franchisee bread purchases and franchisee royalty fees. Such amounts are recorded at their estimated realizable value after reduction for an allowance for estimated uncollectible accounts based on historical experience. The allowance for uncollectible accounts as of December 31, 2021, 2020, and 2019, was $162, $142, and $227, respectively.

**Inventory**—Inventory is stated at the lower of cost (first-in, first-out) or net realizable value, and consists primarily of food items and supplies.

**Property, Equipment, and Leasehold Improvements**—Property, equipment, and leasehold improvements are stated at cost less accumulated depreciation or amortization. Depreciation is computed over the estimated useful lives of the assets (three to five years for furniture and computer equipment) using the straight-line method. Amortization of leasehold improvements is computed on the straight-line basis over the life of the restaurant's lease term (five to 10 years) or the economic useful lives of the assets, whichever is less. In 2013, the Company purchased an aircraft that was depreciated over seven years using the straight-line method. As of December 31, 2021, the aircraft is fully depreciated. Expenditures for major improvements are capitalized; maintenance and repairs are expensed as incurred.

The Company reviews properties for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset group may not be recoverable. Recoverability of an asset group is measured by a comparison of the carrying amount of an asset group to its estimated undiscounted future cash flows expected to be generated by the asset group. If the carrying amount of the asset group exceeds its estimated undiscounted future cash flows, an impairment charge is recognized as the amount by which the carrying amount of the asset group exceeds the fair value of the asset group to be held and used. Assets are grouped at the individual restaurant for purposes of the impairment assessment.

The Company classifies assets as held for sale and ceases depreciation of the assets when an Asset Purchase Agreement is signed, and those assets meet the held for sale criteria pursuant to Topic 360—*Property, Plant and Equipment*.

**Security Deposits and Other**—Security deposits and other consists of (1) security deposits of $5,956, $4,252, and $4,241 as of December 31, 2021, 2020, and 2019, respectively; (2) prepaid assets of $36, $242, and $310, as of December 31, 2021, 2020, and 2019, respectively.

**Long-Term Investments**—Long-term investments consists of corporate-owned life insurance accounted for at fair value of $10,544, $7,995, and $6,423, as of December 2021, 2020, and 2019, respectively.

**Deferred Charges**—Deferred charges consist of costs incurred in connection with restaurant lease agreements on newly opened Company-owned units. The costs are amortized on the straight-line basis over ten years, which is generally the store lease term. Related amortization expense amounted to $149, $180, and $201, for the years ended December 31, 2021, 2020, and 2019, respectively. Deferred charges of $1,815, $1,887, and $2,034, are reported net of accumulated amortization of $1,383, $1,336, and $1,291, as of December 31, 2021, 2020, and 2019, respectively.

**Other Intangible Assets**—Other intangible assets are amortized on the straight-line basis using the estimated useful lives. Favorable/unfavorable leases are amortized over the remaining terms of the respective leases. Reacquired area development rights are amortized over the remaining contractual period of the related development agreements, generally one to five years. Reacquired franchise rights are amortized over the remaining contractual period of the related lease.

The Company reviews amortizing intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amount of the intangible asset may not be recoverable. If such reviews indicate the intangible asset may not be recoverable, an impairment loss is recognized for the excess of the carrying amount over the fair value of the intangible asset.

The Company also evaluates the remaining useful life of amortizing intangible assets each reporting period to determine whether events and circumstances warrant a revision to the remaining period of amortization.

**Goodwill**—Goodwill represents the excess of the cost of an acquired entity over the fair value of the acquired net assets. Pursuant to *ASC 350, Intangibles – Goodwill and Other*, the Company amortizes its goodwill on a straight-line bases over 10 years. The Company tests goodwill for impairment when a triggering event occurs that indicates that the fair value of the asset may be below its carrying amount.

If the Company determines that impairment may exist, the amount of the impairment loss is measured as the excess, if any, of the carrying amount of the goodwill over its implied fair value. In determining the implied fair value of an entity's goodwill, the Company allocates the fair value of an entity to all of the assets and liabilities of that entity as if the entity had been acquired in a business combination and the fair value of the entity was the price paid to acquire the entity. The excess of the fair value of the entity over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. If the carrying amount of an entity's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. No goodwill impairment was recorded in 2021, 2020, and 2019.

Fair value estimates are subject to change as a result of many factors including, among others, any changes in our business plans, changing economic conditions, and the competitive environment. Should actual cash flows and our future estimates vary adversely from those estimates used, the Company may be required to recognize goodwill impairment charges in future years.

**Income Taxes**—The Company records income tax liabilities based on known obligations and estimates of potential obligations. A deferred tax asset or liability is recognized (1) whenever there are future tax effects from temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and (2) for operating loss, capital loss, and tax credit carryforwards. Deferred tax assets

and liabilities are measured using enacted tax rates expected to apply to the years in which those differences are expected to be recovered or settled.

The Company applies a recognition threshold and measurement attribute for financial statement recognition and measurement of potential tax benefits associated with tax positions taken or expected to be taken in income tax returns ("Uncertain Tax Positions"). A two-step process of evaluating a tax position is followed, whereby the Company first determines if it is more likely than not that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. A tax position that meets the "more likely than not" recognition threshold is then measured for purposes of financial statement recognition as the largest amount of benefit that is greater than 50% likely of being realized upon being effectively settled.

An annual review of the carrying amount of our deferred tax asset is made to determine if the establishment of a valuation allowance is necessary. A valuation allowance is required when it is more likely than not that all or a portion of a deferred tax asset will not be realized. All evidence, both positive and negative, is evaluated when making this determination. Items considered in this analysis include the ability to carryback losses to recoup taxes previously paid, the reversal of temporary differences, tax-planning strategies, historical financial performance, expectations of future earnings and the length of statutory carryforward periods. Significant judgment is required in assessing future earning trends and the timing of reversals of temporary differences.

The Company recognizes interest and penalties accrued on any unrecognized tax benefits as a component of income tax expense. Refer to Note 10 Income Taxes for further discussion regarding the CARES Act.

**Revenue Recognition**—The Company recognizes revenues as follows:

"Restaurant sales" at Company-owned restaurants are recorded at the point of sale and are subject to state and local sales tax in various jurisdictions. The Company excludes sales tax collected from revenues and cost of sales. Restaurant sales also include income for gift cards redeemed at Company-owned stores. The Company sells gift cards that do not expire. Upon sale of a gift card, a liability is established for the cash value; the liability is included in accrued expenses and other current liabilities in the consolidated balance sheets. The gift card liabilities as of December 31, 2021, 2020, and 2019 was $11,270, $10,272, and $8,837, respectively.

As noted above, the Company recognizes revenue from gift cards when (i) the gift card is redeemed by the customer at a Company-owned restaurant or (ii) the Company determines the likelihood of the gift card being redeemed by the customer is remote and there is not a legal obligation to remit the unredeemed gift card balance to the relevant jurisdiction. As of December 31, 2021, 2020, and 2019, the Company recognized $1,340, $1,037, and $1,185, respectively, in revenue related to unredeemed gift cards. Unredeemed gift card revenue is included in "Other revenue."

The Company also contracts with bakeries to provide bakery products to franchisee restaurants. "Bakery sales" are recorded as revenue when delivered by third-party bakeries to the restaurants.

"Royalty fees" includes royalties charged to franchisees for operating Five Guys restaurants. Royalty fees are recognized weekly when revenue is reported by franchisees.

"Development fees" are charged for the sale of a territory in which a developer has agreed to develop and operate a certain number of franchise restaurants. The related territory is unavailable to any other party and is no longer marketed by the Company. Development fees are recorded as deferred revenue when received, allocated to each agreed upon restaurant and are recognized over the contractual term of each respective franchise agreement, upon each store's opening. Development fees are considered highly interrelated with the franchise right and are accordingly recognized over the term of the related franchise agreement.

"Franchise fees" are upfront fees charged to franchisees to open franchise restaurants. Franchise fees are recorded as deferred revenue when received and are recognized over the contractual term of each respective franchise agreement, upon the store's opening. Franchise fees are considered highly interrelated with the franchise right and are accordingly recognized over the term of the related franchise agreement. Sales commissions incurred to secure the franchise contracts are recognized as deferred commission assets and subsequently amortized straight-line over the life of the related franchise agreement upon the store's opening.

"Other revenue" primarily consists of unredeemed gift card revenue and other inconsequential revenues.

"Creative fund revenue" includes contributions to the Creative Fund by franchisees and beverage rebates. Revenue related to these contributions is primarily based on a percentage of sales of the franchised restaurants and is recognized as earned.

As of December 31, 2021, 2020, and 2019, the Company has deferred revenue for both development rights and franchise fees in the amount of $46,082, $49,025, and $52,273, respectively. Accordingly, the Company has related deferred commissions in the amount of $5,780, $6,627, and $7,261, respectively.

See Note 3 for a description of the nature of goods and services underlying revenues, the disaggregation of revenue and information related to revenue contract balances.

**Start-Up Costs**—Preopening and similar start-up costs are expensed as incurred.

**Advertising**—Advertising costs are expensed as incurred. The Company administers a promotional fund (the "Creative Fund") on behalf of its entire system whereby both franchisee and Company-owned restaurants contribute a specified percentage of gross sales. Contributions received must be spent on advertising, marketing, and related activities for the benefit of the entire system of restaurants.

The Company is considered a principal of the fund and accordingly for the years ended December 31, 2021, 2020 and 2019, the contributions to and expenditures from the Creative Fund are recorded in "Creative fund revenue" and "Creative fund expense," respectively, in the consolidated statements of operations and comprehensive loss. The Company-owned restaurants' expenses, such as advertising expenses, and the resulting Creative Fund revenue are eliminated in consolidation. Included in the contribution to the Creative Fund are U.S. Company-owned restaurants portion of promotional allowances (as further discussed below).

The following reconciles the Creative Fund activity from the consolidated statements of operations and comprehensive loss to the increase in the consolidated fund balance:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Creative fund revenue | $35,394 | $25,152 | $30,659 |
| Creative fund expense | 38,053 | 28,015 | 34,610 |
| Creative fund net loss | (2,659) | (2,863) | (3,951) |
| Intercompany eliminations—net | 4,820 | 3,535 | 3,310 |
| U.S. Company-owned restaurants promotional allowance | 377 | 225 | 948 |
| Total net increase to Creative Fund | $ 2,538 | $ 897 | $ 307 |

For the years ended December 31, 2021, 2020, and 2019, advertising expense, consisting substantially of the U.S. Company-owned restaurants contribution to the Creative Fund, was approximately $12,266, $8,584, and $11,470, respectively. International Company-owned restaurants advertising expense contribution to the Creative Fund was approximately $636, $420, and $470, for the years ended December 31, 2021, 2020, and 2019, respectively. These advertising expenses include $377, $225, and $948, of promotional allowances contributed by U.S. Company-owned restaurants as of December 31, 2021, 2020, and 2019, respectively. There are no promotional allowances contributed by international Company-owned restaurants for the years ended December 31, 2021, 2020, and 2019. Beginning in mid-March through June 2020, the Company reduced the percentage of advertising collections for all domestic restaurants, international franchisees, and Company-owned restaurants in the Netherlands and Belgium in response to the COVID-19 pandemic. This resulted in decreased creative fund revenue for the specified period. The advertising collections resumed to regular levels effective as of June 2020. Advertising expenses for the years ended December 31, 2021, 2020, and 2019, are included in general and administrative expenses in the consolidated statements of operations and comprehensive loss.

**Promotional Allowances**—The Company receives incentives from certain vendors, including certain marketing support incentives based upon system-wide purchases.

Funds received from vendors related to Company-owned stores are recorded as a reduction of cost of goods sold. In 2021, 2020, and 2019, Company-owned stores received $2,376, $1,996, and $3,022, respectively, of such funds.

The Company has the option, on an annual basis, to contribute funds received from vendors (which are typically based upon system-wide purchases) to the Creative Fund; the Company elected to contribute vendor funds to the Creative Fund in 2021, 2020, and 2019. Vendor funds contributed to the Creative Fund amounted to $6,658, $6,247, and $11,130, in 2021, 2020, and 2019, respectively. The contributions that are retained are recorded as creative fund revenue. The contributions that are passed on to franchisees are included in accrued expenses and other current liabilities on the consolidated balance sheets prior to payment. As of December 31, 2021, 2020, and 2019, net accounts receivable from vendors amounted to $3,162, $1,280, and $751, respectively.

**Leases**—Restaurants are generally located on sites leased from third parties. At inception, each lease is evaluated to determine whether the lease will be accounted for as an operating or capital lease based on the lease terms. When determining the lease term, the

Company includes option periods for which failure to renew the lease imposes a significant economic detriment.

For operating leases, minimum lease payments, including minimum scheduled rent increases, are recognized as rent expense on the straight-line basis over the applicable lease terms. Rent expense related to Company-owned restaurants is included in the consolidated statements of operations and comprehensive loss as a component of occupancy within cost of sales. Rent expense related to the corporate office is included in the consolidated statements of operations and comprehensive loss in general and administrative expenses. Generally, lease terms are initially for 10 years, and the leases, in most cases, provide for rent escalations and renewal options. The term used for rent expense is calculated initially from the date we obtain possession of the leased premises through the expected lease termination date. We expense rent from possession date to the restaurant opening date. Certain lease agreements may contain a free-rent holiday period that generally begins on the possession date and ends on the rent commencement date. During the free-rent holiday period, no cash rent payments are typically due under the terms of the lease; however, expense is recorded for that period on the straight-line basis consistent with our straight-line rent expense policy.

Certain leases contain provisions for contingent rent that require additional rental payments based upon restaurant sales volume. Contingent rent is expensed each period as the liability is incurred.

Favorable and unfavorable lease amounts are recorded as components of intangible assets and deferred rent and other, respectively. Amortization of favorable and unfavorable lease amounts related to leases for Company-owned restaurants are included in the consolidated statements of operations and comprehensive loss as a component of occupancy within cost of sales. When the expected term of a lease is determined to be shorter than the original amortization period, the favorable or unfavorable lease balance associated with the lease is adjusted to reflect the revised lease term.

Management makes certain estimates and assumptions regarding each new lease agreement, lease renewal and lease amendment, including, but not limited to, property values, market rents, property lives, discount rates, and probable term, all of which can impact (1) the classification and accounting for a lease as capital or operating, (2) the rent holiday and escalations in payment that are taken into consideration when calculating straight-line rent, (3) the term over which leasehold improvements for each restaurant are amortized and (4) the values and lives of favorable and unfavorable leases. The amount of depreciation and amortization, interest and rent expense reported would vary if different estimates and assumptions were used.

**Concentration of Risk**—The Company had no customers, which accounted for 10% or more of consolidated revenues in 2021, 2020, or 2019. The Company has five main distributors of food, packaging, and beverage products, excluding breads, that serviced most of its Company-owned and franchised restaurants. The Company's vulnerability to risk concentrations related to significant vendors and sources of its raw materials is mitigated, as there are other vendors that can service the Company's requirements. However, if a disruption of service from the Company's main distributors were to occur, the Company could experience short-term increases in costs while distribution channels were adjusted.

The Company's restaurants are principally located throughout the United States and to a lesser extent, in Canada, the United Kingdom, Ireland, the Middle East, Europe, Asia, and Australia. The Company's restaurants are located in 49 states and the District of Columbia,

with the largest number in Florida, California, Virginia, New York, Texas, Maryland, Ohio and Pennsylvania. Because restaurant operations are generally located throughout the United States and to a much lesser extent, Canada and other foreign countries, the risk of geographic concentration is not significant. The Company could be adversely affected by changing consumer preferences resulting from concerns over nutritional or safety aspects of beef, French fries, or other products sold or the effects of food safety events or disease outbreaks.

Related to the Securitization Transaction, the Company holds cash in excess of Federal Deposit Insurance Corporation (FDIC) limits. The excess cash is held with reputable banking institutions.

The Company's exposure to foreign exchange risk is primarily related to fluctuations in the Canadian dollar, the British pound, the Euro, the United Arab Emirates Dirham, the Saudi Riyal, the Kuwaiti Dinar, and the Hong Kong dollar relative to the US dollar for international operations. However, the Company's exposure to foreign currency risk is mitigated by the fact that less than 20% of the Company's restaurants are outside of the United States. Excluding the stores associated with the JV, less than 10% of the Company's restaurants are outside the United States.

**Tenant Improvement Allowances**—The Company records tenant improvement allowances received as deferred rent in the consolidated balance sheets. This deferred rent is amortized on the straight-line basis as a reduction of rent expense over the applicable lease terms. Tenant improvement receivables are included in other receivables in the consolidated balance sheets when the lease is signed. Upon the completion of work, the Company invoices the landlord.

**Self-Funding Insurance**—The Company is self-insured for certain employee health benefit claims and for certain workers' compensation claims. The Company estimates a liability for aggregate losses below stop-loss coverage limits based on estimates of the ultimate costs to be incurred to settle known claims and claims incurred but not reported as of the balance sheet date. The estimated liability is not discounted and is based on number of assumptions and factors, including historical and industry trends and economic conditions. This liability could be affected if future occurrences and claims differ from these assumptions and historical trends. As of December 31, 2021, 2020, and 2019, an accrual of $6,663, $6,986, and $6,803, related to estimated claims was included in other current liabilities, respectively. The amount of non-healthcare and medical claims paid by the Company for the years ended December 31, 2021, 2020, and 2019, was $14,865, $15,737, and $16,219, respectively.

**Business Interruption Insurance** - The Company received $280, $119, and $159 for business interruption insurance recovery for the years ended December 31, 2021, 2020, and 2019, respectively. The proceeds are related to coverage for suspension of business due to property damage at Company-owned stores and are recorded as a reduction to other operating costs on the consolidated statements of operations and comprehensive loss. In June 2021, the Company received $500 for business interruption insurance recovery related to COVID-19, which is included in other revenue on the consolidated statements of operations and comprehensive loss.

**Embedded Derivatives**—As discussed in Note 14, the conversion option on the Series A and Series B preferred shares is bifurcated from the preferred stock and accounted for separately as a derivative contract. As discussed in Note 9, the make whole premium in the Securitization Transaction is also accounted for separately as a derivative contract. The change in fair value of the derivative contracts subsequent to the date of issuance is

recorded as a gain or loss on the embedded derivative line item within the consolidated statements of operations and comprehensive loss.

**Deferred Compensation Liability**—The Company's deferred compensation liability is composed of $131,995, $100,758, and $112,384, as of December 31, 2021, 2020, and 2019, respectively, related to deferred compensation and death benefit agreements with certain current and former executives as further described in Note 11.

**Treasury Stock**—The Company records the entire purchase price of repurchased common shares directly to treasury stock utilizing the cost method. For the years ended December 31, 2021, 2020, and 2019, the Company repurchased $10,500, $300, and $7,200, respectively, of common shares.

**Stock Options**—The Company grants stock-based compensation awards to certain employees and executives under the 2017 Stock Incentive Plan (the "Plan"). The Stock Options are based on fair value of the award at the date of grant. The fair value of the stock option is determined by the Black-Scholes option pricing model. The pricing model requires assumptions, including the expected volatility, expected dividend yield, expected term, and the risk-free interest rate. The stock options have maximum contractual terms of 10 years, vesting immediately at the grant date or ratably over a period between two and nine years. The Company records fully vested stock-based compensation as a non-cash payroll related expense, which is included in general and administrate expenses on the consolidated statements of operations and comprehensive loss. Forfeitures are accounted for as they occur. For the years ended December 31, 2021, 2020, and 2019, the Company recorded $0, $7, and $0, respectively, forfeitures of stock options. See Note 15.

**Foreign Currency Translation**—The Company's international operations generally use the local currency as the functional currency. Assets and liabilities are translated at exchange rates in effect as of the balance sheet date. Income and expense accounts are translated at the average monthly exchange rates during the year. Resulting translation adjustments are recorded as a separate component of accumulated other comprehensive income in the consolidated statements of stockholders' deficit. Foreign exchange transaction gains and losses are recorded as other income (expense) on the consolidated statements of operations and comprehensive loss.

**Accounting Standards Adopted**— In March 2021, the FASB issued ASU 2021-03, *Intangibles—Goodwill and Other (Topic 350): Accounting Alternative for Evaluating Triggering Events*. ASU 2021-03 provides private companies and not-for-profit entities with an accounting alternative to perform the goodwill impairment triggering event evaluation as required in Subtopic 350-20 as of the end of the reporting period, whether the reporting period is an interim or annual period. The Company adopted the amendment prospectively during 2021. The adoption of this guidance did not impact our consolidated financial statements and related disclosures.

In November 2021, the FASB issued ASU 2021-10, *Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance*. ASU 2021-10 requires annual disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. The required disclosures include the nature of the transactions and the related accounting policy, the line items on the balance sheet and income statement that are affected by the transactions and the amounts applicable to each financial statement line item, and significant terms and conditions of the transactions, including commitments and contingencies. The Company adopted the amendment prospectively during 2021. The required disclosures related to the adoption of this guidance are included in Note 2.

- 21 -

**Accounting Standards Under Evaluation—**In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842),* which supersedes the existing guidance for lease accounting, *Leases (Topic 840).* ASU 2016-02 requires lessees to recognize a lease liability and a right-of-use asset for all leases. Lessor accounting remains largely unchanged. Subsequently, in June 2020, the FASB issued ASU 2020-05, *Revenue from Contracts with Customers (Topic 606) and Leases (Topic 842): Effective Dates for Certain Entities*, deferring the effective date for entities in the "all other" category (other than public business entities) to fiscal years beginning after December 15, 2021 and interim periods within fiscal years beginning after December 15, 2022. Early adoption is permitted for all entities. ASU 2016-02 requires a modified retrospective approach for all leases existing at, or entered into after the date of initial adoption, with an option to elect to use certain transition relief. We are currently evaluating the impact of the adoption of this guidance on our consolidated financial statements and plan to reflect adoption for the year ended December 31, 2022. As shown in Note 11, there are $326,283 in future minimum rental payments for operating leases that are not currently on our consolidated balance sheet; therefore we expect the adoption of Topic 842 will have a significant impact on our consolidated balance sheet and related disclosures.

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*. ASU 2016-13 replaces the incurred loss impairment methodology in current GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. The amendments in this Update are effective for fiscal years beginning after December 15, 2022 and interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the effect this standard will have on the Company's consolidated financial statements and related disclosures.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes*. ASU 2019-12 simplifies the accounting for income taxes by removing certain exceptions to the general principles in Topic 740. The amendments also improve consistent application of and simplify GAAP for other areas of Topic 740 by clarifying and amending existing guidance. The amendment is effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. Early adoption is permitted.  The Company does not expect this standard to have a significant impact on the Company's consolidated financial statements and related disclosures.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*. ASU 2020-04 provides optional expedients and exceptions for applying generally accepted accounting principles (GAAP) to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. The amendments apply to transactions that reference LIBOR or another reference rate expected to be discontinued because of reference rate reform. The amendments in this Update give qualifying entities the option to apply the expedients and exceptions to contract modifications that are made until December 31, 2022.  The Company does not expect this standard to have a significant impact on the Company's consolidated financial statements and related disclosures.

3.   **REVENUE**

**Nature of Goods and Services**—The Company generates revenues from sales at Company-owned restaurants and earns fees and from franchised restaurants. Revenues are recognized upon delivery of food to the customer at Company-owned restaurants or

upon the fulfillment of terms outlined in the franchise agreement for franchised restaurants.

The franchise agreement provides the franchisee the right to construct, own and operate a Five Guys restaurant upon a site accepted by Five Guys and to use the Five Guys system in connection with the operation of the restaurant at that site. The franchise agreement generally provides for a 10-year term and a 5-year renewal subject to certain conditions. The franchise agreement requires that the franchisee pay a royalty based on a percentage of sales at the franchised restaurant, as well as make contributions to the Creative Fund based on a percentage of sales.

The Company also enters into development agreements with certain franchisees. The development agreement generally provides the franchisee with the right to develop a specified number of new Five Guys restaurants within a stated, non-exclusive territory for a specified period.

Royalties and contributions to the Creative Fund are generally due within a week subsequent to which the revenue was generated through sales at the franchised restaurant.

The following disaggregates revenue by primary geographical market and source for 2021, 2020, and 2019.

|  | **2021** | | | |
|  | **U.S.** | **Canada** | **International** | **Total** |
| Restaurant sales | $608,707 | $    - | $31,812 | $640,519 |
| Bakery sales | 46,144 | 2,924 | 11,121 | 60,189 |
| Royalty fees | 87,201 | 5,671 | 7,215 | 100,087 |
| Development fees | 2,210 | 162 | 1,260 | 3,632 |
| Franchise fees | 1,282 | 161 | 325 | 1,768 |
| Other revenue | 2,588 | 18 | 903 | 3,509 |
| Creative fund revenue | 31,918 | 1,989 | 1,487 | 35,394 |
| Total revenue | $780,050 | $10,925 | $54,123 | $845,098 |

|  | **2020** | | | |
|  | **U.S.** | **Canada** | **International** | **Total** |
| Restaurant sales | $524,905 | $    - | $21,352 | $546,257 |
| Bakery sales | 38,652 | 2,253 | 8,706 | 49,611 |
| Royalty fees | 70,156 | 4,305 | 5,227 | 79,688 |
| Development fees | 1,383 | 130 | 941 | 2,454 |
| Franchise fees | 1,267 | 162 | 244 | 1,673 |
| Other revenue | 1,141 | 14 | 860 | 2,015 |
| Creative fund revenue | 22,768 | 1,319 | 1,065 | 25,152 |
| Total revenue | $660,272 | $ 8,183 | $38,395 | $706,850 |

|  | **2019** | | | |
|  | **U.S.** | **Canada** | **International** | **Total** |
| Restaurant sales | $545,938 | $    - | $23,317 | $569,255 |
| Bakery sales | 39,317 | 2,443 | 10,448 | 52,208 |
| Royalty fees | 66,683 | 4,517 | 6,381 | 77,581 |
| Development fees | 1,470 | 181 | 693 | 2,344 |
| Franchise fees | 1,468 | 205 | 175 | 1,848 |
| Other revenue | 1,507 | 16 | 665 | 2,188 |
| Creative fund revenue | 26,338 | 3,024 | 1,297 | 30,659 |
| Total revenue | $682,721 | $10,386 | $42,976 | $736,083 |

The following provides information about receivables and contract liabilities (deferred development fees and franchise fees) from contracts with customers:

|  | **For the Years Ended December 31,** | | |
|  | **2021** | **2020** | **2019** |
| Receivables related to "Sales," "Royalty fees," and other in "Accounts receivable—net" and "Other receivables" | $   10,387 | $    7,876 | $   10,390 |
| Receivables, which are included in "Accounts receivable—net," "Other receivables," and "Creative fund receivable" | 4,605 | 2,368 | 2,507 |
| Deferred Development fees and Franchise fees | 46,082 | 49,025 | 52,273 |

Significant changes in deferred development and franchise fees are as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| Deferred development fees and franchise fees at beginning of period | $49,025 | $52,273 | $55,439 |
| Revenue recognized during the period | (5,400) | (4,127) | (4,192) |
| Acquisitions of franchisee units | (180) | - | (118) |
| Cash refunds to developers | - | (200) | (1,074) |
| Development fees offset against customer balances | - | - | (1,623) |
| New deferrals due to cash received and other | 2,637 | 1,079 | 3,841 |
| Deferred development fees and franchise fees at end of period | $46,082 | $49,025 | $52,273 |

The following reflects the estimated commissions expense to be recognized in the future related to performance obligations that are unsatisfied:

Deferred commission expected to be recognized:

| | |
| --- | --- |
| In one year or less | $   770 |
| In 13–24 months | 539 |
| In 25 months and thereafter | 4,471 |
| | $ 5,780 |

The following reflects our current estimated development fees and franchise fees to be recognized in the future related to performance obligations that are unsatisfied:

| | |
| --- | --- |
| In one year or less | $  3,428 |
| In 13–24 months | 3,294 |
| In 25 months and thereafter | 39,360 |
| | $ 46,082 |

## 4.  ACQUISITIONS OF FRANCHISED RESTAURANTS

The Company's growth strategy includes the opening of new restaurant locations along with the acquisition of existing restaurants from franchisees. The Company acquired 45, 1, and 6, restaurants from franchisees for the years ended December 31, 2021, 2020, and 2019, respectively.

For units acquired, the Company generally allocates the purchase price of such units to the tangible and intangible assets acquired and liabilities assumed at their estimated fair values with the remainder of balance allocated to goodwill. Other than the goodwill, the aggregate purchase price was primarily allocated to reacquired franchise rights; reacquired area development rights; favorable and unfavorable leases; and property, equipment, and leasehold improvements.

The goodwill recorded in these transactions is deductible for income tax purposes. Transaction-related costs are immaterial individually and in the aggregate for these acquisitions. At times, we holdback a portion of the agreed-upon purchase price for a limited time pending resolution of certain matters. The results of all restaurants acquired have been included in the consolidated financial statements since their respective acquisition date, when control is obtained, or when it is determined that the Company is

the primary beneficiary of the entity as a result of pre-acquisition management agreements.

During the year ended December 31, 2021, the Company acquired 45 restaurants from franchisees in four separate acquisitions.

## 2021 Acquisitions

***Gold Valley Development, LLC ("GVD")***—On April 1, 2021, the Company acquired five restaurants from GVD. The aggregate purchase price of $3,456 consisted of cash paid of $3,079 and a holdback of $377. The weighted-average amortization period for all of the intangible assets is 3 years.

***DFG Associates, LLC ("DFG")***—On September 1, 2021, the Company acquired six restaurants from DFG. The aggregate purchase price of $10,693 consisted of cash paid of $10,193 and a holdback of $500. The weighted-average amortization period for all of the intangible assets is 4 years.

***BAC Holdings, LLC & BAC Locations, Inc. ("BAC")***—On December 1, 2021, the Company acquired thirty-three restaurants from BAC. The aggregate purchase price of $75,471 consisted of cash paid of $74,971 and a holdback of $500. The weighted-average amortization period for all of the intangible assets is 5 years.

***KW Five II, LLC ("KW Five")***—On December 15, 2021, the Company acquired one restaurant from KW Five. The aggregate purchase price of $1,006 consisted of cash paid of $956 and a holdback of $50. The weighted-average amortization period for all of the intangible assets is 5 years.

| | Acquired From | | | | |
| | GVD | DFG | BAC | KW Five | Total |
|---|---|---|---|---|---|
| Inventory and security deposit | $    48 | $    75 | $    491 | $    24 | $    638 |
| Property and equipment | 928 | 2,071 | 9,024 | 207 | 12,230 |
| Reacquired franchise rights | 124 | 3,532 | 18,126 | - | 21,782 |
| Area development rights | - | 200 | - | - | 200 |
| Favorable (unfavorable) leases | 127 | (297) | (3,699) | (56) | (3,925) |
| Other assets | 62 | 137 | 564 | 5 | 768 |
| Capital lease obligation | (53) | (100) | (215) | - | (368) |
| Total net assets acquired | 1,236 | 5,618 | 24,291 | 180 | 31,325 |
| Goodwill | 2,220 | 5,075 | 51,180 | 826 | 59,301 |
| Total fair value of net assets acquired | 3,456 | 10,693 | 75,471 | 1,006 | 90,626 |
| Holdback | (377) | (500) | (500) | (50) | (1,427) |
| Initial cash paid for acquisitions | $3,079 | $10,193 | $74,971 | $    956 | $89,199 |
| Total expected purchase price | $3,456 | $10,693 | $75,471 | $1,006 | $90,626 |
| Number of stores acquired | 5 | 6 | 33 | 1 | 45 |

During the year ended December 31, 2020, the Company acquired 1 restaurant from a franchisee in one acquisition.

**2020 Acquisition**

***CV I CORPORATION ("CV I")***—On July 1, 2020, the Company acquired one restaurant from CV I. The aggregate purchase price of $1,067 consisted of cash paid of $1,041 and a holdback of $26. The weighted-average amortization period for all of the intangible assets is 4 years.

|  | Acquired From CV I |
|---|---|
| Inventory and security deposit | $    18 |
| Property and equipment | 318 |
| Reacquired franchise rights | 94 |
| Area development rights | - |
| Favorable (unfavorable) leases | (126) |
| Other assets | 17 |
| Capital lease obligation | (18) |
| Total net assets acquired | 303 |
| Goodwill | 764 |
| Total fair value of net assets acquired | 1,067 |
| Holdback | (26) |
| Initial cash paid for acquisitions | $1,041 |
| Total expected purchase price | $1,067 |
| Number of stores acquired | 1 |

During the year ended December 31, 2019, the Company acquired 6 restaurants from franchisees in three separate acquisitions.

**2019 Acquisitions**

***Worth The Weight, Inc. ("WTW")***—On September 1, 2019, the Company acquired two restaurants from WTW. The aggregate purchase price of $1,296 consisted of cash paid of $1,172 and a holdback of $125. The weighted-average amortization period for all of the intangible assets is 8 years.

***Atlanta's Best Burgers, LLC. ("ABB")***—On October 1, 2019, the Company acquired three restaurants from ABB. The aggregate purchase price of $5,864 consisted of cash paid of $5,574 and a holdback of $290. The weighted-average amortization period for all of the intangible assets is 3 years.

***SAJ, Inc. ("SAJ")***—On December 1, 2019, the Company acquired one restaurant from SAJ. The aggregate purchase price of $657 consisted of cash paid of $658 and a holdback of $0. The weighted-average amortization period for all of the intangible assets is 2 years.

| | | Acquired from | | |
| --- | --- | --- | --- | --- |
| | WTW | ABB | SAJ | Total |
| Inventory and security deposit | $ 26 | $ 64 | $ 20 | $ 110 |
| Property and equipment | 587 | 541 | 174 | 1,302 |
| Reacquired franchise rights | 424 | 929 | 104 | 1,457 |
| Area development rights | 200 | - | - | 200 |
| Favorable (unfavorable) leases | 57 | (55) | 4 | 6 |
| Other assets | 27 | 45 | 12 | 84 |
| Capital lease obligation | (25) | (47) | (13) | (85) |
| Total net assets acquired | 1,296 | 1,477 | 301 | 3,074 |
| Goodwill | - | 4,387 | 357 | 4,744 |
| Total fair value of net assets acquired | 1,296 | 5,864 | 658 | 7,818 |
| Holdback | (125) | (290) | - | (415) |
| Initial cash paid for acquisitions | $1,171 | $5,574 | $658 | $ 7,403 |
| Total expected purchase price | $1,296 | $5,864 | $658 | $ 7,818 |
| Number of stores acquired | 2 | 3 | 1 | 6 |

## 5. DISPOSITIONS OF COMPANY-OWNED STORES

During the year ended December 31, 2020, the Company completed the disposition of 52 Company-owned restaurants. As indicated in Note 2, twenty-two restaurant locations were sold in February 2020 and twenty-seven locations were sold in November 2020 to a franchisee. In addition, one restaurant location was closed due to a university's eminent domain for which the Company received cash consideration in February 2020, and two restaurant locations were transferred to a franchisee in September 2020. No restaurants were disposed of during the years ended December 31, 2021 and 2019.

The Company allocates the purchase price of the units to the tangible and intangible assets and liabilities transferred at their carrying values with the remainder of the balance allocated to gain or loss on the sale. The goodwill disposed of relates to divested stores from earlier acquisitions that was allocated based on the stores' proportionate share of the reacquired rights from the time of acquisition. The gains and losses recognized on dispositions are recorded gain on sale of company-owned locations in our consolidated statements of operations and comprehensive loss.

## 2020 Dispositions

***Encore FGBF Investments, LP ("Encore Tranche I")***—On February 1, 2020, the Company sold twenty-two restaurants to franchisee Encore in Tranche I. The aggregate purchase price consisted of cash received of $11,114 and a holdback of $485.

***CS Shopping Center, LLC ("CS")***—On February 29, 2020, the Company closed one restaurant in exchange for cash consideration of $1,753.

***Bethany Beach Burgers, LLC and Rehoboth Beach Burgers, LLC ("McLaughlin")***—On September 24, 2020, the Company transferred two restaurants that it was preparing to close to an existing franchisee in the territory and received no cash consideration.

***Encore FGBF Investments, LP ("Encore Tranche II")***—On November 1, 2020, the Company sold twenty-seven restaurants to franchisee Encore in Tranche II. The aggregate purchase price consisted of cash received of $16,088 and a holdback of $765.

The following is a summary of our disposition activity recorded for the year ended December 31, 2020:

| | Dispositions | | | | |
|---|---|---|---|---|---|
| | Encore Tranche I | CS | McLaughlin | Encore Tranche II | Total |
| Inventory, prepaids and security deposit | $   509 | $    2 | $  32 | $   823 | $ 1,366 |
| Property and equipment | 5,557 | 217 | 168 | 5,223 | 11,165 |
| Intangible assets | 678 | 7 | - | 523 | 1,208 |
| Other assets | 301 | 8 | - | 277 | 586 |
| Capital lease obligation | (275) | (9) | (2) | (192) | (478) |
| Deferred rent and other | (659) | (50) | - | (367) | (1,076) |
| Goodwill | 1,641 | - | - | 3,250 | 4,891 |
| Total net assets sold or disposed of | 7,752 | 175 | 198 | 9,537 | 17,662 |
| Initial cash received for dispositions | 11,114 | 1,753 | - | 16,088 | 28,955 |
| Holdback | 485 | - | - | 765 | 1,250 |
| Total expected sale price | 11,599 | 1,753 | - | 16,853 | 30,205 |
| Gain (loss) on sale | $ 3,847 | $1,578 | $(198) | $ 7,316 | $12,543 |
| Number of stores sold or transferred | 22 | 1 | 2 | 27 | 52 |

## 6.   PROPERTY AND EQUIPMENT

Property and equipment consist of the following:

| | December 31 | | |
| | **2021** | **2020** | **2019** |
|---|---|---|---|
| Furniture | $   65,768 | $   59,724 | $   57,931 |
| Leasehold improvements | 212,189 | 197,733 | 195,534 |
| Computers and equipment | 28,336 | 24,978 | 25,559 |
| Capitalized leases | 13,508 | 13,275 | 12,775 |
| Aircraft | 3,553 | 3,553 | 3,553 |
| Construction in progress | 5,440 | 3,797 | 4,825 |
| Total | 328,794 | 303,060 | 300,177 |
| Less accumulated depreciation | (207,862) | (189,552) | (164,972) |
| Net total | $ 120,932 | $ 113,508 | $ 135,205 |

Depreciation expense amounted to $31,975, $38,039, and $36,831, for the years ended December 31, 2021, 2020, and 2019, respectively. Accumulated depreciation under capitalized leases, included above, totaled $10,019, $9,377, and $8,152, as of December 31, 2021, 2020, and 2019, respectively.

The Company recorded impairment charges related to property and equipment in general and administrative expenses in the consolidated statements of operations and comprehensive loss of $6,813, $5,431, and $4,324, for the years ended December 31, 2021, 2020, and 2019, respectively.

## 7.   GOODWILL AND INTANGIBLE ASSETS

Goodwill is amortized on a straight-line basis over 10 years. Amortization expense amounted to $9,588, $8,896, and $9,114, in 2021, 2020, and 2019, respectively.

No goodwill impairment was recorded in 2021, 2020, and 2019.

The changes in the carrying amount of goodwill for the years ended December 31, 2021, 2020, and 2019 are as follows:

| | December 31, | | |
| | **2021** | **2020** | **2019** |
|---|---|---|---|
| Cost as of January 1 | $ 89,340 | $ 88,576 | $ 94,432 |
| Goodwill acquired during the year | 59,301 | 764 | 4,744 |
| Goodwill adjustment for settled holdback | (347) | - | - |
| Less accumulated amortization | (58,252) | (48,665) | (45,477) |
| Goodwill classified as assets held for sale | - | - | (10,600) |
| Accumulated amortization classified as assets held for sale | - | - | 5,708 |
| | $ 90,042 | $ 40,675 | $ 48,807 |

As of December 31, 2021, the estimated future amortization expense of goodwill is summarized in the table below as follows:

**Years Ending December 31**

| | |
|---|---:|
| 2022 | $ 14,807 |
| 2023 | 14,829 |
| 2024 | 9,746 |
| 2025 | 9,507 |
| 2026 | 8,855 |
| Thereafter | 32,298 |
| | $ 90,042 |

The components of intangible assets are summarized as follows:

| | 2021 | | |
|---|---:|---:|---:|
| | **Cost** | **Accumulated Amortization** | **Net** |
| Reacquired area development rights | $ 4,101 | $ (4,133) | $ (32) |
| Reacquired franchise rights | 52,217 | (27,595) | 24,622 |
| Favorable leases | 2,506 | (1,703) | 803 |
| | $58,824 | $(33,431) | $25,393 |

| | 2020 | | |
|---|---:|---:|---:|
| | **Cost** | **Accumulated Amortization** | **Net** |
| Reacquired area development rights | $ 3,977 | $ (3,966) | $ 11 |
| Reacquired franchise rights | 31,159 | (25,382) | 5,777 |
| Favorable leases | 2,186 | (1,509) | 677 |
| | $37,322 | $(30,857) | $ 6,465 |

| | 2019 | | |
|---|---:|---:|---:|
| | **Cost** | **Accumulated Amortization** | **Net** |
| Reacquired area development rights | $ 3,977 | $ (3,871) | $ 106 |
| Reacquired franchise rights | 31,455 | (22,117) | 9,338 |
| Favorable leases | 2,272 | (1,356) | 916 |
| | $37,704 | $(27,344) | $10,360 |

Amortization expense, excluding goodwill, deferred charges and financing fees, amounted to $3,224, $3,631, and $5,514, for the years ended December 31, 2021, 2020, and 2019, respectively.

As of December 31, 2021, the estimated future amortization expense is summarized in the table below as follows:

**Years Ending December 31**

| | |
|---|---:|
| 2022 | $ 6,242 |
| 2023 | 5,614 |
| 2024 | 4,493 |
| 2025 | 2,796 |
| 2026 | 2,022 |
| Thereafter | 4,226 |
| | $25,393 |

As of December 31, 2021, 2020, and 2019, the Company also had net unfavorable leases of $4,515, $469, and $587, respectively, which are included in deferred rent and other in the consolidated balance sheets.

## 8.  LONG-TERM DEBT

Long-term debt consists of the following:

| | December 31 | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Debt securitization: | | | |
| Series fixed notes | $597,000 | $415,700 | $407,000 |
| Capitalized net financing fees associated with debt | (13,250) | (6,842) | (8,752) |
| Credit facility: | | | |
| Note payable to financing company | - | 50,000 | - |
| Capitalized net financing fees associated with debt | - | (2,806) | - |
| PPP Term loan | - | 8,575 | - |
| | 583,750 | 464,627 | 398,248 |
| Less current maturities | - | 269 | - |
| | $583,750 | $464,358 | $398,248 |

As of December 31, 2021, 2020, and 2019, the Company capitalized net financing fees included in the current and long-term debt is as follows:

| | December 31 | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Capitalized net financing costs—current | $   - | $  - | $  - |
| Capitalized net financing costs—long-term | 13,250 | 9,648 | 8,752 |
| Total capitalized net financing costs | $13,250 | $9,648 | $8,752 |

Total amortization of debt issuance costs was $2,962, $2,308, and $1,909, for the years ended December 31, 2021, 2020, and 2019, respectively.

Principal maturities are as follows:

| Years Ending December 31 | |
|---|---:|
| 2022 | $ - |
| 2023 | - |
| 2024 | 397,000 |
| 2025 | - |
| 2026 | - |
| Thereafter | 200,000 |

**Securitized Financing Facility**—In June 2017, Five Guys Funding LLC. (the "Master Issuer"), a limited-purpose, bankruptcy-remote, wholly-owned indirect subsidiary of Five Guys Holding Inc. issued Series 2017-1 4.60% Fixed Rate Senior Secured Notes, Class A-2 (the "2017 Class A-2 Notes") with an initial principal amount of $400,000. In addition, the Master Issuer issued Series 2017 Variable Funding Senior Secured Notes, Class A-1 (the "2017 Variable Funding Notes"), which allowed for borrowing up to $25,000 on a revolving basis.  The 2017 Class A-2 Notes and 2017 Variable Funding Notes are collectively the "2017 Notes."

The 2017 Notes were each issued in a securitization transaction pursuant to which most of the Company's domestic revenue-generating assets, consisting principally of Company related restaurant assets and related lease agreements, franchise-related agreements, real estate assets, and intellectual property and license agreements for the use of intellectual property, are held by the Master Issuer and certain other limited-purpose, bankruptcy-remote, wholly-owned indirect subsidiaries of the Company that act as guarantors of the 2017 Notes and that have pledged substantially all of their assets to secure the 2017 Notes.

The 2017 Notes were issued pursuant to a base indenture and related supplemental indentures (collectively, the "Indenture") under which the Master Issuer may issue multiple series of notes. The legal final maturity date of the 2017 Class A-2 Notes is in July 2047, but it is anticipated that, unless earlier prepaid to the extent permitted under the Indenture, the 2017 Class A-2 Notes will be repaid by July 2024 (the "Anticipated Repayment Date").

In addition to the 2017 Notes, the Master Issuer issued Series 2021-1 2.493% Fixed Rate Senior Secured Notes, Class A-2 (the "2021 Class A-2 Notes") with an initial principal amount of $200,000. The Master Issuer also issued Series 2021 Variable Funding Senior Secured Notes, Class A-1 (the "2021 Variable Funding Notes"), which allows for borrowing up to $50,000 on a revolving basis. As of December 31, 2021, $7,997 is issued as a Letter of Credit. The remaining $42,003 is undrawn. The 2021 Class A-2 Notes and 2021 Variable Funding Notes are collectively the "2021 Notes."

Various events, including failure to maintain a minimum ratio of net cash flows to DSCR, may cause a rapid amortization event. Borrowings under the 2021 and 2017 Class A-2 Notes bear interest at fixed rates equal to 2.493% and 4.60%, respectively. If the 2021 and 2017 Class A-2 Notes are not repaid or refinanced prior to their respective Anticipated

Repayment Date, incremental interest will accrue. No principal payments are required if a specified leverage ratio, which is a measure of long-term debt, net of cash to earnings before interest, taxes, depreciation, and amortization, adjusted for certain items (as specified in the Indenture), is less than or equal to 5.0 to 1.0. Other events and transactions, such as certain asset sales and receipt of various insurance or indemnification proceeds, may trigger additional mandatory prepayments.

**Credit Facility**—In July 2020, Five Guys Holdings, Inc. (the "Borrower") entered into a $50,000 1st Lien Senior Secured Credit Facility (the "Credit Facility"). The term loan was set to mature in April 2024 and beared interest at a rate equal to the greater of 3-month LIBOR or 1% plus the percent per annum equal to the Applicable Margin of 9.00%. The interest rate as of December 31, 2020 was 10%.

The Company used the funds from the 2021 Notes to retire the outstanding $50,000 Credit Facility and the $25,000 2017 Variable Funding Notes in July 2021 and to fund ongoing operational needs. The 2017 Variable Funding Notes were derecognized as were the related capitalized debt issuance costs. The loss on extinguishment of debt of $3,441 is recorded as other income (expense) on the consolidated statements of operations and comprehensive loss.

**Paycheck Protection Program Term Loan**—In June 2020, the Company received a $8,575 term loan through the Paycheck Protection Program ("PPP") under the CARES Act. The PPP term loan was set to mature in June 2025 and beared interest at a rate of 1%. The full principal amount plus accrued interest was forgiven in December 2021. The gain on extinguishment of debt of $8,701 is recorded as other income (expense) on the consolidated statements of operations and comprehensive loss.

The Company was in compliance with its debt covenants related to its long-term debt as of December 31, 2021.

## 9.  FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy are described as follows:

**Level 1**—Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Company has the ability to access.

**Level 2**—Inputs to the valuation methodology include quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in inactive markets; inputs other than quoted prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data by correlation or other means.

**Level 3**—Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

The carrying amounts of cash equivalents, accounts receivable, accounts payable, and accrued expenses approximate the fair value due to the short-term maturity of these financial instruments. The carrying amounts of loans receivable and long-term debt approximate their fair value based upon current market interest rates on similar instruments.

**Assets Carried at Fair Value on a Recurring Basis**—The Company's assets and liabilities that are measured at fair value on a recurring basis for each hierarchy level are as follows:

| As of December 31, 2021 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets—corporate-owned life insurance | $ - | $ 10,544 | $ - | $ 10,544 |
| Total assets | $ - | $ 10,544 | $ - | $ 10,544 |
| Liabilities: | | | | |
| Embedded derivative—preferred stock | $ - | $ - | $ 302,406 | $ 302,406 |
| Deferred compensation liability | - | - | 131,995 | 131,995 |
| Corporate-owned life insurance | - | 12,117 | - | 12,117 |
| Total liabilities | $ - | $ 12,117 | $ 434,401 | $ 446,518 |
| **As of December 31, 2020** | | | | |
| Assets—corporate-owned life insurance | $ - | $ 7,995 | $ - | $ 7,995 |
| Total assets | $ - | $ 7,995 | $ - | $ 7,995 |
| Liabilities: | | | | |
| Embedded derivative—preferred stock | $ - | $ - | $ 176,093 | $ 176,093 |
| Embedded derivative—make whole premium | - | - | 2 | 2 |
| Deferred compensation liability | - | - | 100,758 | 100,758 |
| Corporate-owned life insurance | - | 9,059 | - | 9,059 |
| Total liabilities | $ - | $ 9,059 | $ 276,853 | $ 285,912 |
| **As of December 31, 2019** | | | | |
| Assets—corporate-owned life insurance | $ - | $ 6,423 | $ - | $ 6,423 |
| Total assets | $ - | $ 6,423 | $ - | $ 6,423 |
| Liabilities: | | | | |
| Embedded derivative—preferred stock | $ - | $ - | $ 119,683 | $ 119,683 |
| Embedded derivative—make whole premium | - | - | 6 | 6 |
| Deferred compensation liability | - | - | 112,384 | 112,384 |
| Corporate-owned life insurance | - | 7,092 | - | 7,092 |
| Total liabilities | $ - | $ 7,092 | $ 232,073 | $ 239,165 |

**Corporate-Owned Life Insurance**—In 2014, the Company established a nonqualified deferred compensation plan, which allows highly compensated employees to defer a portion of their base salary and variable compensation each plan year. The Company maintains a rabbi trust to fund obligations under the deferred compensation plan. Amounts in the rabbi

trust are invested in corporate-owned life insurance. These corporate-owned life insurance investments in the rabbi trust are carried at fair value using Level 2 inputs. As of December 31, 2021, 2020, and 2019, the fair value of the corporate-owned life insurance investments in the rabbi trust was $10,544, $7,995, and $6,423, respectively, which is included in long-term investments in the consolidated balance sheets. The associated liability of $12,117, $9,059, and $7,092, as of December 31, 2021, 2020, and 2019, respectively, is recorded within deferred rent and other in the consolidated balance sheets. The Company records investment gains and losses in other (expense) income in the consolidated statements of operations and comprehensive loss, along with the offsetting amount related to the increase or decrease in deferred compensation to reflect its exposure to liabilities for payment under the deferred plan. For the years ended December 31, 2021, 2020, and 2019, the Company recorded immaterial amounts of gains and losses on investments held in the rabbi trust.

**Embedded Derivative**—The Company has two types of embedded derivatives that are accounted separately as derivative contracts. They are (1) the conversion option that has been bifurcated from preferred stock and (2) the make whole premium in the Securitization Transaction. The fair value of the conversion option of the preferred stock was $302,406, $176,093, and $119,683, as of December 31, 2021, 2020, and 2019 respectively. The fair value of the conversion option of the make whole premium was $0, $2, and $6, as of December 31, 2021, 2020, and 2019, respectively. The change in fair value of the embedded derivative liabilities subsequent to the date of issuance, is recorded in the consolidated statements of operations and comprehensive loss as loss on embedded derivative.

The fair value of the Company, used to calculate the fair value of the conversion option, was determined with assistance from an independent third-party valuation specialist utilizing Level 3 inputs. The valuations of the Company were determined based on valuation methodologies and assumptions selected in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, Valuation of Privately Held Companies Equity Securities Issued as Compensation. In the absence of observable market data regarding the value of the Company's stock, the valuation of the Company and its common stock was estimated using multiple valuation approaches, primarily an income and market approach. The income approach is based on the present value of estimated future cash flows, and relies upon significant assumptions and estimates, including those related to the selected discount rate and forecasted revenues and expenses. The market approach is based on a comparison to observed fair values of comparable peer companies and recent market transactions, adjusted for the relative size and profitability of these peer companies relative to the Company.

**Assets Carried at Fair Value on a Nonrecurring Basis**—The Company may be required, from time to time, to measure certain assets at fair value on a nonrecurring basis. These adjustments to fair value usually result from the application of lower of cost or fair value accounting or write-downs of individual assets.

The net losses of the above assets resulting from nonrecurring fair value adjustments for the years ended December 31, 2021, 2020, and 2019, are as follows:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Assets—property and equipment—net long-lived assets grouped at the store level | $6,813 | $5,431 | $4,324 |
| Total net loss from nonrecurring measurements | $6,813 | $5,431 | $4,324 |

## 10. INCOME TAXES

The main impact of the CARES Act on the Company was the provision allowing net operating losses ("NOLs") from 2018, 2019, and 2020 to be carried back to up to five preceding tax years. As a result, the Company filed NOL carryback claims related to net operating losses generated in 2018 to tax years 2013 through 2015 requesting a $6,092 refund, of which $2,441 remained outstanding as of December 31, 2021.

Deferred income tax assets (liabilities), net, as presented in the consolidated balance sheets, consist of the following components:

|  | December 31 | | |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Deferred revenue and commissions | $ 5,181 | $ 5,892 | $ 6,448 |
| Deferred compensation | 27,330 | 20,906 | 23,909 |
| Goodwill and intangibles | 13,259 | 11,041 | 12,636 |
| Allowance for doubtful accounts | 212 | 277 | 258 |
| Deferred rent | 3,523 | 3,581 | 3,854 |
| Fixed-asset depreciation | (13,524) | (11,217) | (412) |
| Limitation on interest deduction | - | - | 389 |
| Non-qualified stock option | 1,780 | 1,004 | 886 |
| Accrued expenses | 1,440 | 2,938 | 855 |
| Gift card program | 1,209 | 917 | 618 |
| Other (263A UNICAP Adjustment) | (818) | (82) | (625) |
| Reserves | 1,616 | 1,630 | 1,581 |
| Net Operating Losses | 2,313 | 2,446 | 2,004 |
| Federal credit carryover | 3,799 | 1,716 | 1,328 |
| Valuation allowance on US tax asset | (47,320) | (41,049) | (53,729) |
| Foreign tax asset | 14,162 | 15,813 | 10,904 |
| Valuation allowance on foreign tax asset | (14,162) | (15,813) | (10,904) |
| Deferred tax asset—noncurrent | $ - | $ - | $ - |

The components of the provision for income taxes for the years ended December 31, 2021, 2020, and 2019, are as follows:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $      - | $(6,092) | $   - |
| State | 590 | 177 | 561 |
| Foreign | 566 | 503 | 13 |
| Total current | 1,156 | (5,412) | 574 |
| Deferred: |  |  |  |
| Federal | - | - | - |
| State | - | - | - |
| Total deferred | - | - | - |
| Total provision for income taxes | $ 1,156 | $(5,412) | $574 |

The Company assesses its tax position using the provisions of *ASC 740, Income Tax*, with respect to uncertain tax positions. In accordance with *ASC 740*, an uncertain tax position is assessed based on a more-likely-than-not threshold of being sustained. Should the tax position meet the more-likely-than-not threshold, an assessment is made as to the impact, and the associated tax provision is then recorded. For U.S. federal income tax purposes, the statute of limitations has expired for tax years prior to 2018. Additionally, the statute of limitations has generally expired for tax years prior to 2016 for various state jurisdictions. The Company is currently not under exam by any taxing jurisdiction.

Management assesses the available positive and negative evidence to estimate whether sufficient future taxable income will be generated to permit use of the existing deferred tax assets. A significant piece of objective negative evidence evaluated was the cumulative loss incurred over the three-year period ended December 31, 2021, 2020, and 2019. Such objective evidence limits the ability to consider other subjective evidence, such as our projections for future growth.

On the basis of this evaluation, as of December 31, 2021, 2020, and 2019, a valuation allowance of $61,482, $56,862, and $64,633 was recorded to fully offset the net deferred tax asset (liability), as the amount of the deferred tax asset that is more likely than not to be realized in 2021, 2020, and 2019, is $0 in each year. The amount of the deferred tax asset that is considered realizable could be adjusted if estimates of future taxable income during the carryforward period are reduced or increased, or if objective negative evidence in the form of cumulative losses is no longer present and additional weight is given to subjective evidence such as our projections for growth.

At December 31, 2021, the Company had approximately $5,876 in federal NOL carryforwards, after estimating that $0 will be utilized on its 2021 federal income tax return. The federal NOLs carry forward indefinitely, but future utilization is limited to 80 percent of taxable income. In addition, the Company has tax-effected state NOLs of approximately $1,079 as of December 31, 2021 after projected 2021 utilization in certain state jurisdictions in which it operates, which expire beginning in 2022.

Our effective tax rate for 2021 was approximately 1% tax expense as compared to an expected statutory tax benefit of 21%. The income tax expense differs from the tax benefit that would result from applying statutory rates to the loss before income taxes primarily because of the valuation allowance on our US deferred tax assets and the permanent difference of $26,526 resulting from the loss on our embedded derivative that is not deductible for income tax purposes.

Our effective tax rate for 2020 was approximately 7% tax benefit as compared to an expected statutory tax benefit of 21%. The income tax benefit differs from the tax benefit that would result from applying statutory rates to the loss before income taxes primarily because of the valuation allowance on our US deferred tax assets of $12,680 and the permanent difference of $11,846 resulting from the loss on our embedded derivative that is not deductible for income tax purposes.

Our effective tax rate for 2019 was approximately 1% tax expense as compared to an expected statutory tax benefit of 21%. The income tax expense differs from the tax benefit that would result from applying statutory rates to the loss before income taxes primarily because of the valuation allowance on our US deferred tax assets of $10,230 and the permanent difference of $8,727 resulting from the loss on our embedded derivative that is not deductible for income tax purposes.

## 11. COMMITMENTS AND CONTINGENCIES

**Operating Leases**—The Company leases principally all of its stores and its corporate headquarters. Most leases contain escalation clauses and require the Company to pay common area maintenance charges (including taxes and insurances). Some leases also have contingent rents based on store revenues.

Aggregate minimum future rental payments as of December 31, 2021, under all noncancelable operating leases are as follows:

| Years Ending December 31 | |
|---|---|
| 2022 | $ 68,138 |
| 2023 | 60,947 |
| 2024 | 52,802 |
| 2025 | 46,017 |
| 2026 | 36,026 |
| Thereafter | 62,353 |
| | $326,283 |

In connection with the Encore disposition (refer to Note 5), the Company retained secondary liability to landlords for rents and potential damages for 17 and 18 of the 49 stores disposed of, during the years ended December 31, 2021 and 2020, respectively. Encore retains primary responsibility for store rents and damages, but the Company was not released from liability under these leases. No payments were made by the Company on Encore's behalf during 2021 and 2020, nor were any contingent liabilities recorded due to the remote likelihood of future obligation under these leases.

**Capital Leases**—The Company leases some of the beverage dispenser machines in its restaurants and the corporate office, which have been accounted for as capital leases. In

addition, the Company signed a 20-year lease for one restaurant—which also has been accounted for as capital lease.

Aggregate minimum future rental payments at December 31, 2021 under all non-cancelable capital leases are approximately as follows:

| **Years Ending December 31** | |
|---|---|
| 2022 | $1,189 |
| 2023 | 909 |
| 2024 | 761 |
| 2025 | 625 |
| 2026 | 495 |
| Thereafter | 1,837 |
| | 5,816 |
| Less amounts representing interest (at 4.6%) | 1,777 |
| | 4,039 |
| Less current portion | 1,032 |
| | $3,007 |

Rent expense for the years ended December 31, 2021, 2020, and 2019 amounted to approximately $54,597, $55,296, and $54,222, respectively. Included in this amount is contingent rent of $407, $182, and $708, for the years ended December 31, 2021, 2020, and 2019, respectively.

**Other Commitments**—In 2005, the Company received back the rights to a certain development territory and in exchange committed to royalties based upon the sales of certain locations in perpetuity. Included in commission expense is $2,781, $2,674, and $2,572 for the years ended December 31, 2021, 2020, and 2019, respectively, related to this agreement.

In 2004, as part of a settlement agreement with a former consultant, the Company agreed to pay royalties in perpetuity based upon the number of franchises sold. In 2008, the agreement was amended so that future royalties are based on a percentage of average sales per restaurant multiplied by a predetermined number of stores. This predetermined number of stores increases between one and two stores per month depending on how many stores opened for the previous year up to a maximum of 225 stores. During 2010, the third party to this agreement became a stockholder of the Company. Included in commission expense is approximately $4,871, $3,992, and $3,993 for the years ended December 31, 2021, 2020, and 2019, respectively, related to this agreement. Included in related-party payables are accrued commission amounts as of December 31, 2021, 2020, and 2019, of $79, $54, and $102, respectively.

In 2013, the Company entered into a guaranty agreement with a third-party lender on behalf of a franchisee. As a result of the guarantee, the franchisee was able to obtain $720 in financing from the third-party lender. In the event of a default by the franchisee, the

Company, which has a collateralized interest in the underlying assets, is obligated to reimburse the third-party lender for the outstanding balance due as of the date of default.

**Deferred Compensation**—The Company previously entered into fully vested deferred compensation and death benefit agreements with certain current and former executives that provide payments each year in perpetuity to each executive (or his estate) based upon a percentage of revenues in such year. The Company records a liability for the present value of the future payments to such executives (based upon the trailing 12 months applicable percentage of revenues discounted at a risk-adjusted rate).

Please see below for relevant activity related to the deferred compensation agreements as of and for the years ending December 31, 2021, 2020, and 2019:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Beginning balance | $100,758 | $112,384 | $ 92,920 |
| Change in fair value[1] | 31,237 | (7,626) | 19,464 |
| Partial agreement purchase[2] | - | (4,000) | - |
| Ending Balance | $131,995 | $100,758 | $112,384 |
| Annual payments made under deferred comp plan[1] | $ 8,713 | $ 6,803 | $ 7,180 |
| Total compensation expense[3] | 39,950 | (823) | 26,644 |
| Accrued amounts due[4] | 2,591 | 1,812 | 1,888 |

[1] Recognized as General and administrative expense in the Consolidated statements of operations and comprehensive loss

[2] In March 2020 the Company settled a portion of the deferred compensation agreement for $4,000 which resulted in the reduction of the related liability

[3] Total compensation expense equals Change in fair value, plus expense related to annual payments made under the deferred compensation plan

[4] Included in Accrued expenses as of December 31, 2021, 2020, and 2019

The fully vested deferred compensation and death benefit agreements require cash settlement of these liabilities in the event of a change of control (as further defined in the agreements) using the following methodology: (i) divide the fair market value of the Company by its earnings before interest, taxes, depreciation, and amortization (EBITDA) as derived from the Company's federal income tax return filed for the prior year, and (ii) multiply the product of (i) by the larger of (a) the previous year's deferred compensation expense to such executives or (b) the annual average of the previous three years of deferred compensation expense to such executives.

**Purchase Obligations**—The Company enters into various purchase obligations in the ordinary course of business. Those that are binding primarily relate to amounts owed under contractor and subcontractor agreements, orders submitted for equipment for restaurants under construction, and commitments for food purchases.

**Vendor Agreements**—The Company maintains various agreements with its vendors in the ordinary course of business.

The Company has five distributors throughout the United States and Canada that provide the large majority of its food and paper goods. The Company has in turn contracted with multiple vendors to maintain adequate inventory at the warehouse locations of these distributers. The Company's agreements with these distributers contain minimum purchase amount targets based on price, delivery size, and number of deliveries per week.

The Company has an agreement with a major beverage maker to exclusively provide all sodas, teas, and bottled water to each Company-owned and franchise store. The agreement contains a system-wide commitment to purchase a minimum of 29.3 million gallons of product from the beverage maker. As of December 31, 2021, approximately 22.2 million gallons of beverages had been purchased under this agreement.

The Company maintains agreements with 19 North American bakeries and 18 international bakeries to produce and distribute bread goods to all Company-owned and franchise stores. The agreements do not contain any minimum purchase commitments and are cancelable upon 60 days' notice from the Company.

**Legal Matters**—The Company is involved in various legal matters as a matter of course. Management, after discussion with counsel, does not believe that the ultimate resolution of any of these matters will have a material adverse effect on the Company's cash flow, financial position or results of operations.

## 12. RETIREMENT PLAN

The Company maintains a 401(k) profit-sharing plan (the "Plan") for all eligible employees. Under the Plan, participants may contribute up to the maximum amount allowable per the Internal Revenue Code. The Company made matching contributions to the Plan of $1,308, $1,095, and $1,231, for the years ended December 31, 2021, 2020, and 2019, respectively.

## 13. RELATED-PARTY TRANSACTIONS

In addition to the related-party transactions detailed in Notes 11, 14, and 15, the Company had related-party transactions during the years ended December 31, 2021, 2020, and 2019, as discussed below.

In April and July 2021, the Company purchased $10,500 total of treasury stock from an officer and stockholder of the Company and from an entity that is a Company stockholder and is also owned by certain of our stockholders. In April 2019, the Company purchased $7,000 of treasury stock from an officer and stockholder of the Company.

The Company has a compensation agreement with seven of its officers (who are also common stockholders) based upon a percentage of achieved EBITDA. For the years ended December 31, 2021, 2020, and 2019, the related expense included in salaries was $39,804, $20,462, and $21,852, respectively. Included in accrued expenses as of December 31, 2021, 2020, and 2019, are fourth-quarter amounts due to such officers of $6,329, $1,242, and $1,632, respectively.

Included in related-party receivables as of December 31, 2021, 2020, and 2019, are $14,366, $9,546, and $9,675, respectively, due from a stockholder of the Company. The balance as of December 31, 2021 consists of three loans. One is a five-year amortizing loan with interest at 4.6% and monthly payments due of $26. A balloon payment of the remaining principal balance is due in April 2023. The second is a seven-year amortizing loan with interest at 4.6% and monthly payments due of $26. A balloon payment of the remaining principal balance is due in October 2024. The third is a one-year amortizing loan

with interest at 2.5%. The principal and interest are due in November 2022. There was $15, $0, and $0 accrued interest receivable as of December 31, 2021, 2020, and 2019, respectively. Interest income amounted to approximately $451, $332, and $449, for the years ended December 31, 2021, 2020, and 2019, respectively.

The Company has a services agreement with a preferred stockholder for advisory and consulting services. Fees under this agreement totaled $350 for each of the years ended December 31, 2021, 2020, and 2019. The preferred stockholder purchased franchise stores, becoming a franchisee in 2021. Included in related-party receivables were royalty, advertising, and bread receivables totaling $56 as of December 31, 2021. For the year ended December 31, 2021, royalty income was $124 and bread sales were $61 from these franchisee stores. Included in related-party payables is $10 for secret shopper reward payments as of December 31, 2021.

Included in related-party receivables as of December 31, 2021, 2020, and 2019, are $744, $647, and $526, respectively, due from the Company's joint venture with a large conglomerate in the United Kingdom. The receivables are related to the Company's management fee related to the joint venture, as well as amounts the Company spent on behalf of the joint venture that are reimbursable.

Beginning in 2013, an employee who is also a franchisee and stockholder received salary advances based on expected future commissions, which was deemed a loan. As of December 31, 2021, 2020, and 2019, the loan amount was $447, $708, and $455, respectively, and is included in stockholder loans in the stockholders' equity (deficit) section of the consolidated balance sheets. In 2019, this employee sold their territory and is no longer a franchisee. For the years ended December 31, 2021, 2020, and 2019, royalty income was $0, $0, and $70, respectively, and bread sales were $0, $0, and $93, respectively, from these franchisee stores.

Included in related-party receivables from a franchise partially owned by a stockholder of the Company were royalty, advertising, and bread receivables totaling $55, $69, and $78, as of December 31, 2021, 2020, and 2019, respectively. For the years ended December 31, 2021, 2020, and 2019, royalty income was $824, $816, and $806, respectively, and bread sales were $503, $494, and $522, respectively, from these franchisee stores. Included in related-party payables are $1, $7, and $3, for secret shopper reward payments as of December 31, 2021, 2020, and 2019, respectively.

The Company advanced funds to a franchisee who is also a related-party. The related-party receivable was $280, $302, and $321, as of December 31, 2021, 2020, and 2019, respectively. Interest income amounted to $13, $13, and $4, for the years ended December 31, 2021, 2020, and 2019, respectively.

Included in related-party receivables as of December 31, 2021, is a $170 loan granted to an employee. The loan is a five-year amortizing, interest only loan with interest at 4.6%. The principal is due December 2024.

## 14. PREFERRED STOCK

The Company issued its Series A and Series B preferred shares in September 2007 and June 2009, respectively. Such preferred shares may be redeemed by their holders after the seventh-year anniversary of their issuance, subject to voting requirements, for the greater of the original issue price per share or the amount that would be received by the holders of the preferred stock if all of the Company's assets were sold at their fair market value on a going-concern basis and the Company was then liquidated.

The preferred shares may, at the option of their holders, be converted at any time into shares of common stock at the series preferred conversion price (initially at the original issue price as adjusted from time to time in accordance with the amended and restated certificate of incorporation). Upon the closing of an underwritten public offering whereby the share price of common stock is at least three times the larger of the Series A or Series B conversion price and the gross cash proceeds to the Company are at least $40,000, each share of preferred stock will automatically be converted into shares of common stock.

Upon any liquidation of the Company, the preferred holders shall be entitled to be paid pro rata, before any payment to holders of any common stock, an amount per share of preferred stock equal to the original issue price (as adjusted for any stock dividends, combinations, splits, recapitalization, and the like), plus all declared and unpaid dividends on the preferred stock. Total liquidation preference is $30,000.

Dividends on preferred shares are cumulative and, if declared, are payable on preferred and common stock on a pro rata, as-if-converted basis.

The holders of preferred shares vote together with the holders of common shares as a single class. Each holder of preferred shares is entitled to the number of votes equal to the number of shares of common stock into which such shares of preferred stock could be converted. Holders of preferred stock, voting as a separate class, are also entitled to elect one member of Holdings' board of directors (the "Board"). Also, holders of preferred stock, voting as a separate class and having, in the aggregate, one vote, and the holders of the common stock, voting as a separate class and having, in the aggregate, one vote, are entitled to elect one member of the Board. The holders of common stock, voting together as a separate class, elect all remaining members of the Board.

In July 2009, the Company entered into a dividend distribution agreement with a preferred stockholder based upon achieved EBITDA. For the years ended December 31, 2021, 2020, and 2019, the amounts paid under this agreement along with other dividends were $4,010, $2,644, and $2,974, respectively.

## 15. STOCK OPTION

The Company's 2017 Stock Incentive Plan (the "Plan"), permits the grant of stock options to key employees and executives. In 2019 and 2021, the Plan was amended with stockholder approval, authorizing an additional 9,825 and 6,973 shares of Common Stock, respectively, to increase the number of shares available for issuance under the plan to 33,798. Shares delivered under the Plan are treasury shares. Option awards are generally granted with an exercise price equal to the Company's value of equity per share, as determined by an independent third-party valuation specialist.

The following summarizes stock option activity during 2021:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2021 | 21,512 | $ 0.75 | | |
| Granted | 7,851 | 1.43 | | |
| Exercised | (478) | 0.73 | | |
| Forfeited or expired | (96) | 0.73 | | |
| Outstanding at December 31, 2021 | 28,789 | $ 0.94 | 7.99 | $ 14,325 |
| Exercisable at December 31, 2021 | 28,789 | $ 0.94 | 7.99 | $ 14,325 |

The Company's current outstanding stock options have maximum contractual terms of 10 years, vesting immediately at the grant date or ratably over a period between two and nine years. Beginning in 2019, the Company engaged a third-party specialist, and prior to that used the Black-Scholes option pricing model, to determine the fair value of the options at the date of grant. The Company recorded stock option expense of $4,450, $581, and $2,302 in 2021, 2020, and 2019, respectively. The total intrinsic value of options exercised during the years ended December 31, 2021, 2020, and 2019, was $335, $0, and $0, respectively.

The weighted average grant date fair value of stock options of $0.57, $0.26, and $0.20 granted during 2021, 2020, and 2019, respectively, was determined using the following assumptions:

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Expected volatility | 44.6 % | 33.1 % | 33.1 % |
| Expected dividends | 0.0 % | 1.2 % | 1.2 % |
| Expected term (in years) | 5 | 5 | 5 |
| Risk-free interest rate | 0.74%-1.18% | 0.4 % | 1.7 % |

The expected volatility is based on the historical market price volatility of 15 of the Company's industry peers. The expected dividend yield is the average quarterly dividend distributions to common stockholders relative to the share price. The expected term is the weighted average of the length of time the grants are expected to be outstanding, calculated using the Simplified Method. The risk-free interest rate represents the U.S. Treasury zero-coupon bond yield correlating to the expected term of the options granted.

## 16. SUBSEQUENT EVENTS

In February 2022, the Company signed a letter of intent to purchase 107 stores from a franchisee for approximately $150,000. The Company completed the acquisition of 18 stores on March 1, 2022 for $31,030. The remaining stores are expected to close in three phases in May, June, and July 2022. The Company intends to raise approximately $200,000 additional funding through the existing securitization financing structure to fund the acquisition. In conjunction with this transaction, the Company intends to refinance its outstanding 2017 Class A-2 Notes.

* * * * * *

**THESE FINANCIAL STATEMENTS HAVE BEEN PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED AN OPINION WITH REGARD TO THEIR CONTENT OR FORM.**

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET - UNAUDITED**
**AS OF MARCH 31, 2022**

|  | **3/31/2022** |
|---|---|
| **ASSETS** | |
| CURRENT ASSETS: | |
| Cash and cash equivalents | $        148,240,271 |
| Restricted cash | 25,339,007 |
| Accounts receivable—net | 11,355,098 |
| Other receivables | 3,837,517 |
| Related-party receivable—current portion | 14,389,104 |
| Inventory | 4,886,672 |
| Prepaid expenses and other current assets | 15,732,929 |
| Prepaid taxes | 1,744,635 |
| Deferred commissions—current portion | 769,987 |
| Total current assets | 226,295,220 |
| PROPERTY AND EQUIPMENT—net | 118,433,477 |
| OTHER ASSETS: | |
| Finance lease assets | 3,170,221 |
| Operating lease assets | 239,404,655 |
| Security deposits & other | 5,903,929 |
| Long-term investments | 10,024,782 |
| Related-party receivables—net of current portion | 1,490,258 |
| Deferred commissions—net of current portion | 4,966,810 |
| Intangible assets—net | 26,458,862 |
| Goodwill | 112,236,014 |
| Total other assets | 403,655,531 |
| TOTAL | $        748,384,228 |

(Continued)

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET - UNAUDITED**
**AS OF MARCH 31, 2022**

|  | 3/31/2022 |
|---|---|
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| CURRENT LIABILITIES: | |
| Current maturities of long-term debt | $            - |
| Finance lease liabilities—current portion | 832,197 |
| Operating lease liabilities—current portion | 55,982,868 |
| Accounts payable | 11,736,795 |
| Embedded derivative liability | 302,406,129 |
| Accrued expenses and other current liabilities | 37,549,369 |
| Accrued payroll and related taxes | 37,262,947 |
| Related-party payables | 78,476 |
| Deferred revenue—current portion | 4,125,450 |
| Total current liabilities | 449,974,231 |
| OTHER LIABILITIES: | |
| Long-term debt—net of current maturities | 584,543,205 |
| Finance lease liabilities—net of current portion | 3,047,244 |
| Operating lease liabilities—net of current portion | 205,002,530 |
| Deferred revenue—net of current portion | 42,649,067 |
| Deferred compensation liability | 131,994,538 |
| Other liabilities | 12,851,697 |
| Total other liabilities | 980,088,281 |
| STOCKHOLDERS' DEFICIT: | |
| Preferred stock—series A—noncumulative convertible preferred ($15 million aggregate liquidation preference)—$.001 par value—107,000 shares authorized, issued, and outstanding | 107 |
| Preferred stock—series B—noncumulative convertible preferred ($15 million aggregate liquidation preference)—$.001 par value—84,863 shares authorized, issued, and outstanding | 85 |
| Common stock—$.001 par value—1,808,137 shares authorized (Class A—1,758,137, Class B—50,000); 934,820 shares issued; 901,739 shares outstanding | 935 |
| Treasury stock—33,081 shares outstanding | (26,403,041) |
| Additional paid-in capital | 9,442,979 |
| Accumulated deficit | (664,739,350) |
| Stockholder loans | (566,749) |
| Accumulated other comprehensive income | 586,750 |
| Total stockholders' deficit | (681,678,284) |
| TOTAL | $ 748,384,228 |

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF OPERATIONS AND INCOME – UNAUDITED**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**

|  | 3/31/2022 |
|---|---|
| REVENUE: | |
| Restaurant sales | $ 178,918,318 |
| Bakery sales | 14,962,665 |
| Royalty fees | 25,003,730 |
| Development fees | 555,426 |
| Franchise fees | 320,996 |
| Other revenue | 1,291,939 |
| Creative fund revenue | 7,675,739 |
| Total revenue | 228,728,813 |
| OPERATING EXPENSES: | |
| Cost of sales: | |
| Food, beverage, and shipping | 50,720,835 |
| Labor | 61,908,346 |
| Occupancy | 17,532,948 |
| Other operating costs | 38,827,566 |
| General and administrative | 45,179,960 |
| Creative fund expense | 9,104,967 |
| Total operating expenses | 223,274,622 |
| INCOME FROM OPERATIONS | 5,454,191 |
| OTHER INCOME (EXPENSE): | |
| Interest income | 143,042 |
| Interest expense | (5,984,395) |
| Gain on extinguishment of debt | - |
| Loss on embedded derivative | - |
| Other income (expense) | 55,214 |
| Total other expense | (5,786,139) |
| LOSS BEFORE INCOME TAX EXPENSE | (331,948) |
| INCOME TAX EXPENSE (BENEFIT): | |
| Total income tax expense (benefit) | 28,505 |
| NET LOSS | $ (360,453) |

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CASH FLOWS - UNAUDITED**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**

|  | 3/31/2022 |
|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |
| Net income (loss) | $    (360,453) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: |  |
| Depreciation and amortization | 13,545,012 |
| Amortization of debt issuance costs | 793,637 |
| Amortization of lease assets | 13,885,797 |
| Gain on extinguishment of debt | - |
| Impairment of long lived assets | - |
| Bad debt provision | 186,811 |
| Deferred income taxes (benefit) | - |
| Tax valuation allowance | - |
| Loss on property and equipment disposal | 143,354 |
| Loss on embedded derivative liability | - |
| Gain on sale of company-owned locations | - |
| Deferred compensation expense | (631,595) |
| Stock-based compensation | - |
| Changes in operating assets and liabilities: |  |
| Accounts receivable | 3,294,619 |
| Other receivables | (357,564) |
| Creative fund receivable | 1,768,800 |
| Inventory | (273,087) |
| Prepaid expenses and other current assets | (4,446,311) |
| Prepaid taxes | 269,757 |
| Long-term investments | 757,972 |
| Security deposits | 126,335 |
| Deferred commissions | 43,097 |
| Operating lease liabilities | (13,821,544) |
| Accounts payable | (7,484,918) |
| Accrued expenses and other current liabilities | 54,876 |
| Accrued payroll and related taxes | 428,362 |
| Deferred compensation liability | - |
| Deferred revenue | 691,996 |
| Other liabilities | (290,824) |
|  |  |
| Net cash provided by operating activities | 8,324,129 |
|  |  |
| CASH FLOWS FROM INVESTING ACTIVITIES: |  |
| Deferred compensation contributions | (331,704) |
| Deferred compensation distributions | 93,264 |
| Purchases of property and equipment | (5,863,273) |
| Proceeds from settlement of property insurance claims | 1,652 |
| Pre-purchase costs | (30,923) |
| Acquisitions of franchisee locations | (29,732,803) |
| Proceeds from sale of company-owned locations | - |
| Holdback settlements related to acquisitions | (23,102) |
| Holdback receipts related to dispositions | - |
| Advances to related parties | - |
| Collections of related party advances and other | 31,659 |
|  |  |
| Net cash used by investing activities | (35,855,230) |
|  |  |
|  | (Continued) |

**FIVE GUYS HOLDINGS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CASH FLOWS - UNAUDITED**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**

|  | 3/31/2022 |
|---|---|
| CASH FLOWS FROM FINANCING ACTIVITIES: | |
| Repayments of finance lease liabilities | $ (328,752) |
| Proceeds from line of credit | - |
| Repayment of line of credit | - |
| Proceeds from long-term debt | - |
| Repayment of long-term debt | - |
| Payment of deferred financing fees | - |
| Payment of debt extinguishment costs | - |
| Employee loans—stockholder advances | (119,692) |
| Employee loans—stockholder collections | - |
| Purchase of treasury stock | - |
| Distributions | - |
| Payments related to tax withholding for stock-based compensation | - |
| Net cash used by financing activities | (448,444) |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (27,979,545) |
| NET EFFECT OF EXCHANGE RATES ON CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (138,249) |
| CASH, CASH EQUIVALENTS, RESTRICTED CASH—Beginning | 201,697,072 |
| CASH AND CASH EQUIVALENTS RESTRICTED CASH—End | $ 173,579,278 |

**EXHIBIT B TO THE DISCLOSURE DOCUMENT**

**<u>DEVELOPMENT AGREEMENT</u>**



**FIVE GUYS FRANCHISOR, LLC**

**DEVELOPMENT AGREEMENT**

_____

**DEVELOPER**

_____

**EFFECTIVE DATE**

# **TABLE OF CONTENTS**

Page

I. GRANT .................................................................................................................. 1

II. FEE ....................................................................................................................... 2

III. SCHEDULE AND MANNER FOR EXERCISING DEVELOPMENT RIGHTS ........... 3

IV. PREREQUISITES TO OBTAINING FRANCHISES ...................................... 4

V. TERM .................................................................................................................. 5

VI. REPRESENTATION AND WARRANTIES OF DEVELOPER; DUTIES OF DEVELOPER ................................................................................................. 5

VII. DEFAULT AND TERMINATION ................................................................. 8

VIII. TRANSFER OF INTEREST ....................................................................... 11

IX. COVENANTS .............................................................................................. 15

X. INDEPENDENT CONTRACTOR AND INDEMNIFICATION .................... 17

XI. APPROVALS ............................................................................................... 19

XII. NON-WAIVER AND REMEDIES .............................................................. 19

XIII. NOTICES .................................................................................................... 20

XIV. SEVERABILITY AND CONSTRUCTION ................................................. 21

XV. ENTIRE AGREEMENT; APPLICABLE LAW; MEDIATION; ARBITRATION; LITIGATION ................................................................................................... 22

XVI. ACKNOWLEDGMENTS ............................................................................ 25

ATTACHMENTS:

A - GUARANTY OF CONTROLLING PRINCIPALS
B - STATEMENT OF OWNERSHIP INTERESTS AND DEVELOPER'S PRINCIPALS
C - DEVELOPMENT SCHEDULE
D - STATE SPECIFIC AMENDMENTS

**FIVE GUYS FRANCHISOR, LLC**

## DEVELOPMENT AGREEMENT

This Development Agreement (this "**Agreement**") is made and entered into by and between FIVE GUYS FRANCHISOR, LLC, a Delaware limited liability company ("**Franchisor**"), and _____ , a _____ *[corporation/limited liability company/partnership]* ("**Developer**"), on the date this Agreement is executed by Franchisor below (the "**Effective Date**").

**W I T N E S S E T H :**

**WHEREAS**, Franchisor and its affiliates, as the result of the expenditure of time, skill, effort and money have developed and own a distinctive system (the "**System**") relating to the establishment, development and operation of retail food service businesses that operate in buildings that display Franchisor's interior and exterior trade dress (each, a "**Restaurant**"), which specialize in dine-in and carry-out service of hamburgers, cheeseburgers, hot dogs, french fries, and other foods and accompaniments approved by Franchisor (the "**Products**") and which operate under Franchisor's System and the Marks (defined below), all of which Franchisor may periodically change, improve, and/or further develop;

**WHEREAS**, the distinguishing characteristics of the System include, without limitation, distinctive interior and exterior sign design and arrangement, décor, fixtures and furnishings; menus and recipes; quality and uniformity of products and services offered; standards, specifications, methods, techniques, procedures for operations, inventory and management; training and assistance; record keeping and reporting; and marketing and advertising; all of which may be changed, improved and further developed by Franchisor and/or its affiliates from time to time;

**WHEREAS**, Franchisor identifies the System and Restaurants by means of certain trade names, service marks, trademarks, emblems and indicia of origin, including, but not limited to, the marks "FIVE GUYS®", "FIVE GUYS FAMOUS BURGERS AND FRIES®", "FIVE GUYS BURGERS AND FRIES®" and such other proprietary marks as Franchisor may periodically designate in writing (collectively, the "**Marks**");

**WHEREAS**, Franchisor grants to qualified persons the opportunity to own and operate Restaurants offering and selling the Products as well as other products and services authorized and approved by Franchisor and utilizing Franchisor's System and Marks; and

**WHEREAS**, Developer wishes to obtain certain rights to develop Restaurants under Franchisor's System pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

**I.      GRANT**

A.      In reliance on the representations and warranties of Developer and its Controlling Principals (as defined in Section XIV.E.) hereunder, Franchisor hereby grants to Developer the right (and Developer hereby accepts the obligation), pursuant to the terms and conditions contained in this Agreement, to develop _____ (____) Restaurants in the geographic area described in Attachment C (the "**Territory**").  In this regard, the parties further agree that:

(1)      The Restaurants shall be developed by Developer pursuant to the development schedule set forth in Attachment C to this Agreement (the "**Development Schedule**");

(2)     Each Restaurant developed under this Agreement shall be established and operated pursuant to a separate FIVE GUYS® Franchise Agreement (each, a "**Franchise Agreement**") that shall be executed as provided in <u>Section III.</u> below; and

(3)     Each Restaurant developed under this Agreement shall be located in the Territory.

B.     Except as provided in this Agreement, and subject to Developer's and Controlling Principals' full compliance with this Agreement and any other agreement among Developer or any of its affiliates and Franchisor or any of its affiliates, Franchisor shall not establish or authorize any other person or entity, other than Developer, to establish a Restaurant within the Territory during the term of this Agreement.

C.     Notwithstanding the generality of the foregoing section, Franchisor and its affiliates retain all other rights, and therefore Franchisor and its affiliates shall have the right (among others) on any terms and conditions Franchisor deems advisable, and without granting Developer any rights therein, to:

(1)     Establish, and license others to establish, Restaurants and otherwise sell the food and beverage Products under the Marks at any location outside the Territory;

(2)     Establish, and license others to establish, Restaurants and otherwise sell food and beverage Products under the Marks in a Reserved Area (as defined below) at any location within or outside of the Territory. As used in this Agreement, a "**Reserved Area**" is defined as all airports, sporting arenas and stadiums, and United States Department of Defense locations, military installations and other federal government agencies (including, without limitation, Navy, Marine Corp, Army and Air Force bases and exchange service facilities); *provided, however,* the Franchisor agrees that (i) Developer may pursue, on a non-exclusive basis, any and all opportunities to operate a Restaurant in an airport, sporting arena, or stadium located within the geographic borders of the Territory, and (ii) in the event that Developer has secured all necessary permits and approvals from the necessary authorities to operate a Restaurant in an airport, sporting arena, or stadium, as applicable, located within the geographic borders of the Territory, Franchisor may approve of such location on the same terms and conditions as it would for a location outside of a Reserved Area. Any Restaurant developed by the Developer in an airport, sporting arena, or stadium pursuant to the foregoing shall be credited toward the Developer's obligations under the Development Schedule. The parties hereto agree that nothing in this <u>Section I.C.</u> shall in any way limit the Franchisor's right to operate, or license another party to operate, a Restaurant in a Reserved Area; and

(3)     Sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, any collateral products under the Marks (*e.g.*, pre-packaged food and beverage Products and FIVE GUYS® memorabilia) from any location to any purchaser by any method or channel of distribution (including, without limitation, the Internet, mail order, and/or retail locations whether located within or outside of the Territory), so long as such sales are not conducted from a Restaurant operated from a location inside the Territory.

D.     The parties hereto acknowledge and agree that this Agreement is not a Franchise Agreement (as defined in <u>Section III.</u> below) and does not grant to Developer any right or license to operate a Restaurant, distribute any goods or services, or any right to use or interest in the Marks.

## II.     FEE

A.     As consideration for the development rights granted herein, Developer shall pay to Franchisor a territorial development fee of _____ Dollars ($_____) (the "**Development Fee**"), representing payment of a development fee of Fifty Thousand Dollars ($50,000) per Restaurant to be developed hereunder.  The Development Fee shall be due upon the execution of this Agreement and shall be deemed fully earned by Franchisor upon receipt in consideration of the administrative and other

expenses incurred by Franchisor and for the development opportunities lost or deferred as a result of the rights granted to Developer herein.  The Development Fee shall not be refundable under any conditions or circumstances

B.      In addition to the Development Fee, a separate franchise fee of Twenty Five Thousand Dollars ($25,000) shall be due and payable to Franchisor for each Restaurant developed hereunder (each, a "**Franchise Fee**").  The initial Franchise Fee shall be paid upon the execution of a separate Franchise Agreement executed along with this Agreement.  Each Franchise Fee for the remaining _____ (__) Restaurants shall be due and payable immediately upon either (i) the execution of a lease or purchase agreement for the space in which the Restaurant shall operate, or (ii) ninety days (90) prior to the scheduled opening of the Restaurant, whichever occurs first. Franchise Fees are deemed earned upon payment thereof and shall not be refundable except as specified in the Franchise Agreement.

## III.    SCHEDULE AND MANNER FOR EXERCISING DEVELOPMENT RIGHTS

A.      Developer shall exercise the development rights granted hereunder only by entering into a separate Franchise Agreement with Franchisor for each Restaurant for which a development right is granted. Franchisor may, in its reasonable discretion, permit Developer to exercise such development rights through affiliated entities that are either wholly owned subsidiaries of Developer or commonly controlled entities with ownership determined by Developer, provided Developer first delivers timely notice of such affiliated entities to Franchisor for its review prior to signing the applicable Franchise Agreement. The Franchise Agreement to be executed for the first Restaurant to be developed hereunder shall be executed and delivered to Franchisor concurrently with the execution and delivery of this Agreement. All subsequent Restaurants developed under this Agreement shall be established and operated pursuant to the form of franchise agreement then being used by Franchisor for franchised Restaurants.  These franchise agreements shall also be included in the term "**Franchise Agreement**" for purposes of this Agreement.  The then-current form of Franchise Agreement may differ from the form executed and delivered with this Agreement; *provided, however*, that the material terms (including, without limitation, the fees, renewal rights, and termination provisions) of each Franchise Agreement shall be substantially similar to the Franchise Agreement executed and delivered with this Agreement.

B.      (1)      Acknowledging that time is of the essence, and subject to the requirements of Section IV., Developer agrees to exercise its development rights according to the Development Schedule.

(2)      (a)      Developer shall open each Restaurant developed hereunder and shall commence business in accordance with the time periods set forth in the Development Schedule; *provided, however,* Developer may, subject to Franchisor's approval, purchase from Franchisor an extension of a development period (each, a "**Time Extension**") as may be necessary to complete construction and commence operation of a Restaurant. Each Time Extension shall be purchased at a cost of Ten Thousand Dollars ($10,000) (the "**Time Extension Fee**"), and shall run for an additional ninety (90) day period commencing upon the expiration of the applicable development period, including any previous extensions thereof.  No more than two (2) Time Extensions of any development period shall be permitted.  If a Time Extension of a development period is granted by Franchisor, the "Opening Date" (as such term is used in the Franchise Agreement) of the Restaurant shall be extended accordingly.  No Time Extension of any development period shall affect the duration of any other development period or any of Developer's other development obligations hereunder.  If a Time Extension is requested for the final development period, the term of this Agreement shall be extended accordingly, and Developer shall have no further rights under this Agreement except as expressly provided in Sections VI. and VII. hereof.

(b)      In the event that Developer deems is necessary to request a Time Extension for a Restaurant, Developer must notify Franchisor of its request in writing at least sixty (60) days prior to the projected opening date for such Restaurant (an "**Extension Request**").  In an Extension Request, Developer shall include a description of the reasons for such failure to develop in a timely manner

and the expected date of completion of construction and opening.  Simultaneously with its delivery of an Extension Request, Developer shall pay the Time Extension Fee; *provided, however,* no Time Extension Fee shall be charged in cases where Developer can reasonably prove that such delay is directly related to Force Majeure (as defined below).

        (3)     Failure by Developer to adhere to the Development Schedule (including any Time Extensions thereof approved by Franchisor in writing) shall constitute a material event of default under this Agreement, except when such failure is the direct result of an act of God, strikes, lockouts, or other industrial disturbances, war, acts of terrorism, riot, epidemic, fire or other catastrophe or other forces reasonably beyond Developer's control (collectively, "**Force Majeure**").

        (4)     Following Developer's successful completion of the Development Schedule (including any Time Extensions thereof), Developer may make a request to Franchisor to develop and establish one or more additional Restaurants in the Territory (the "**New Restaurant(s)**").  The development and establishment of the New Restaurants shall be pursuant to agreements containing terms and conditions substantially similar to the terms and conditions then-currently offered by Franchisor for franchised Restaurants.

        (5)     For a period of five (5) years following Developer's successful completion of the Development Schedule (and provided Developer is and has been in compliance with this Agreement and each Franchise Agreement executed pursuant to this Agreement), if Franchisor or an affiliate of Franchisor seeks to develop, itself or through third party franchisees, any New Restaurants in the Territory, Franchisor shall first present Developer with written notice (the "**ROFR Notice**") of the bona fide terms and conditions of the proposed development.  Developer shall have a right of first refusal to develop the New Restaurants, in lieu of Franchisor, Franchisor's affiliate or third party franchisees, pursuant to the terms contained in the ROFR Notice.  Developer shall have thirty (30) days to notify Franchisor in writing of its intent to exercise the right to develop and/or establish the New Restaurants, to execute a development agreement and franchise agreement(s) for such New Restaurant(s) on the terms contained in the ROFR Notice, and to pay the initial fees due under the new development agreement and franchise agreement(s).  If Developer fails to respond to the notice within thirty (30) days, fails to pay the required fees, or otherwise fails to adhere to any requirements set forth in the ROFR Notice, Developer shall have no further right to develop, establish or operate the New Restaurants(s) pursuant to such terms, and Franchisor or an affiliate of Franchisor shall have the right to establish, or to license other third parties to establish, such New Restaurant(s) under the terms and conditions set forth in the ROFR Notice.  If Developer elects to exercise its right under this Section III.B.(5), Developer shall execute the development agreement, franchise agreement(s), and all other documents required by Franchisor within thirty (30) days of Developer's response to the ROFR Notice.

        (6)     If requested by Franchisor, Developer shall deliver to Franchisor an annual update regarding Developer's immediate development plans for the Territory for the then-current year (the "**Annual Development Plan**").  The Annual Development Plan shall include, without limitation, geographic and demographic details of the Territory, current Restaurant counts, and summaries of Developer's development strategy.  The forms required for Developer's completion of the Annual Development Plan shall at all times be located on, and downloadable from, Franchisor's extranet site (as such site is more fully described in the Manual).

## IV.    PREREQUISITES TO OBTAINING FRANCHISES

    A.     Developer understands and agrees that this Agreement does not confer upon Developer a right or franchise to operate any Restaurant but is rather intended by the parties to set forth the terms and conditions which, if fully satisfied by Developer, shall entitle Developer to obtain the right to operate Restaurants within the Territory.

B.      Each of the following conditions and approvals must have occurred or be obtained before the grant of the right by Franchisor to develop each Restaurant shall become effective.  Developer must meet each of the operational, financial, and legal conditions set forth below (collectively, the "**Conditions**") before such rights shall become effective:

(1)      Operational:  Developer shall be in compliance with the Development Schedule and each other provision of this Agreement.  Developer and each entity that is controlled by, controlling or under common control with Developer (collectively, "**Developer's Affiliate**") must be in material compliance with any and all other agreements to which Franchisor and/or its affiliates are a party (including, without limitation, the Franchise Agreements and any other development agreements).  Developer must be properly conducting the operation of its existing Restaurants, if any, and is capable of conducting the operation of the proposed Restaurant (a) in accordance with the terms and conditions of this Agreement, (b) in accordance with the provisions of the respective Franchise Agreements, and (c) in accordance with the standards, specifications, and procedures set forth and described in the "Manuals" (as such term is defined in the Franchise Agreement), as such Manuals may be amended from time to time, or otherwise in writing.

(2)      Financial:  Developer and Developer's Affiliates shall not then be in default, and for the twelve (12) month period preceding Developer's request for financial approval shall not have been in default, of any monetary obligations owed to Franchisor or its affiliates under any other agreement to which Franchisor and/or its affiliates are a party (including, without limitation, the Franchise Agreements and any other development agreements). Developer acknowledges and agrees that it is vital to Franchisor's interest that each of its franchisees is financially sound to avoid failure of a Restaurant and that such failure would adversely affect the reputation and good name of Franchisor and its system of franchisees.

(3)      Legal:  Developer must have submitted to Franchisor, in a timely manner and in accordance with all applicable federal and state franchise disclosure laws, all information and documents requested by Franchisor prior to and as a basis for the issuance of individual franchises or pursuant to any right granted to Developer by this Agreement or by any Franchise Agreement, and has taken such additional actions in connection therewith as may be reasonably requested in writing by Franchisor from time to time.

If Franchisor determines, in its reasonable discretion, that Developer and the Controlling Principals have met all of the Conditions described above, then Franchisor shall grant to Developer the right to develop such additional Restaurant pursuant to the Development Schedule.

## V.      TERM

Unless sooner terminated in accordance with this Agreement, the term of this Agreement and all rights granted by Franchisor under this Agreement shall expire on the date on which Developer successfully and in a timely manner has exercised all of the development rights and completed the development obligations under this Agreement in accordance with the Development Schedule (including, if applicable, any extension thereof under Section III.B.(3)).

## VI.      REPRESENTATION AND WARRANTIES OF DEVELOPER; DUTIES OF DEVELOPER

Developer and the Controlling Principals (as defined in Section XIV.E.), as applicable, make the following representations, warranties and covenants and accept the following obligations:

A.      If Developer is a corporation, limited liability company, partnership, or other form of legal entity other than an individual, Developer represents and warrants that:

(1)      Developer is duly organized and validly existing under the state law of its formation;

(2)     Developer is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(3)     Developer's corporate charter, operating agreement, or written partnership agreement shall at all times provide that the activities of Developer are confined exclusively to the development and operation of FIVE GUYS® Restaurants as contemplated hereunder, unless otherwise consented to by Franchisor in writing;

(4)     The execution of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by Developer and are (i) within Developer's corporate power if Developer is a corporation, (ii) permitted under the operating agreement if Developer is a limited liability company, or (iii) permitted under Developer's written partnership agreement if Developer is a partnership;

(5)     The ownership interests in Developer are accurately and completely described in <u>Attachment B</u> (attached hereto); and

(6)     Developer has provided Franchisor with the most recent financial statements of Developer, and such financial statements (i) present fairly the financial position of Developer as of the dates indicated therein, and (ii) have been certified as true, complete and correct and were been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and applied on a consistent basis.  Developer further represents to Franchisor that no material liabilities adverse claims, commitments or obligations of any nature exist as of the date of this Agreement (whether accrued, unliquidated, absolute, contingent or otherwise) which are not reflected as liabilities on the financial statements delivered to Franchisor.

B.     (1)     If Developer is a corporation, it shall comply with the following requirements throughout the term of this Agreement:

(a)     Upon Franchisor's request, Developer shall promptly furnish Franchisor with its articles of incorporation, bylaws, other governing documents, and any other documents Franchisor may reasonably request, together with any amendments thereto;

(b)     Developer shall maintain stop transfer instructions against the transfer on its records of any voting securities; and shall issue no certificates for voting securities upon the face of which the following printed legend does not legibly and conspicuously appear:

THE TRANSFER OF THIS STOCK IS SUBJECT TO THE TERMS AND CONDITIONS OF A FIVE GUYS® DEVELOPMENT AGREEMENT WITH FIVE GUYS FRANCHISOR, LLC.   REFERENCE IS MADE TO THE PROVISIONS OF SAID DEVELOPMENT AGREEMENT AND TO THE ARTICLES AND BYLAWS OF THIS CORPORATION.

(c)     Developer shall maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Developer and shall promptly furnish the list to Franchisor upon request; and

(d)     Such owners of a beneficial interest in the corporation, as Franchisor may designate from time to time, shall execute a guarantee of the performance of Developer's obligations under this Agreement in the form required by Franchisor.

(2)     If Developer is a partnership, limited liability company, or other non-corporate limited liability entity of any sort, then it shall comply with the following requirements throughout the term of this Agreement:

(a)     Upon Franchisor's request, Developer shall promptly furnish Franchisor with its partnership agreement, operating agreement, and/or organizational documents, as applicable, together with any amendments thereto and such other documents Franchisor may reasonably request;

(b)     Developer shall maintain stop transfer instructions against the transfer on its records of any voting securities; and shall issue no certificates for voting securities upon the face of which the following printed legend does not legibly and conspicuously appear:

> THE TRANSFER OF ANY EQUITY INTERESTS IN THIS COMPANY IS SUBJECT TO THE TERMS AND CONDITIONS OF A FIVE GUYS® DEVELOPMENT AGREEMENT WITH FIVE GUYS FRANCHISOR, LLC. REFERENCE IS MADE TO THE PROVISIONS OF SAID DEVELOPMENT AGREEMENT AND TO THE OPERATING AGREEMENT AND/OR PARTNERSHIP AGREEMENT, AS APPLICABLE, OF THIS COMPANY.

(c)     Developer shall prepare maintain a current list of all general and limited partners and/or members, as applicable, in Developer and shall promptly furnish the list to Franchisor upon request;

(d)     Such owners of a beneficial interest in the partnership, limited liability company, or other non-corporate limited liability entity, as Franchisor may designate from time to time, shall execute a guarantee of the performance of Developer's obligations under this Agreement in the form required by Franchisor.

C.     (1)     Upon the execution of this Agreement, Developer shall designate and retain an individual to assume primary responsibility for the operations of Developer (the "**Operating Principal**"). If Developer is an individual, Developer shall perform all obligations of the Operating Principal.  The Operating Principal shall, during the entire period he/she serves as such, meet and maintain the following qualifications:

(a)     The Operating Principal must maintain a direct or indirect majority ownership interest in the Developer.  Except as may otherwise be provided in this Agreement, the Operating Principal's interest in Developer shall be and shall remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options.

(b)     The Operating Principal shall devote substantial full time and best efforts to the supervision and conduct of the business contemplated by this Agreement.  Operating Principal shall execute this Agreement as one of the Controlling Principals, and shall be individually, jointly and severally bound by all obligations of Developer, the Operating Principal and the Controlling Principals hereunder.

(c)     The Operating Principal (and any such designee) shall meet Franchisor's reasonable standards and criteria for such individual, as set forth in the Manuals as defined herein or otherwise in writing by Franchisor.

(d)     If, during the term of this Agreement, the Operating Principal or any designee is not able to continue to serve in the capacity of Operating Principal or no longer qualifies to act as such in accordance with this Section, Developer shall promptly notify Franchisor and designate a replacement within sixty (60) days after the Operating Principal or such designee ceases to serve, such replacement being subject to the same qualifications and restrictions listed above.  Developer shall provide

for interim management of the activities contemplated under this Agreement until such replacement is so designated, such interim management to be conducted in accordance with this Agreement. Any failure to comply with the requirements of this Section VI.A.(2) shall be deemed a material event of default under this Agreement.

(2)     The Operating Principal may, at his/her option, and, subject to the approval of Franchisor, designate an individual to perform the duties and obligations of Operating Principal described herein; provided that the Operating Principal shall take all necessary action to ensure that such designee conducts and fulfills all of Operating Principal's obligations in accordance with the terms of this Agreement and Operating Principal shall remain fully responsible for such performance.

(3)     Developer shall comply with all requirements of federal, state and local laws, rules, regulations, and orders.

D.     Developer shall comply with all other requirements and perform such other obligations as provided hereunder. Developer and the Controlling Principals acknowledge and agree that the representations and warranties set forth above are continuing obligations of Developer and the Controlling Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. Developer shall fully cooperate with Franchisor in any efforts taken by Franchisor to verify Developer's compliance with such representations, warranties and covenants.

## VII.   DEFAULT AND TERMINATION

A.     Developer shall be deemed to be materially in default under this Agreement and all rights granted herein shall automatically terminate without notice to Developer:

(1)     if Developer becomes insolvent or makes a general assignment for the benefit of creditors or files a voluntary petition under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state or admits in writing its inability to pay its debts when due; or

(2)     if Developer is adjudicated bankrupt or insolvent in proceedings filed against Developer under any section or chapter of federal bankruptcy law or any similar law or statute of the United States or any state; or

(3)     if a bill in equity or other proceeding for the appointment of a receiver of Developer or other custodian for Developer's business or assets is filed and consented to by Developer, or if a receiver or other custodian (permanent or temporary) of Developer's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or

(4)     if proceedings for a composition with creditors under any state or federal law are instituted by or against Developer and such proceedings are not successfully challenged or otherwise dismissed within thirty (30) days after such filing; or

(5)     if a final judgment against Developer remains unsatisfied or of record for sixty (60) days or longer (unless supersedes bond is filed); or

(6)     if Developer is voluntarily dissolved or if Developer is involuntarily dissolved, and such dissolution is not cured within five (5) days of Developer's actual or constructive knowledge of such dissolution; or

(7)     if execution is levied against Developer's business or property; or

(8)      if suit to foreclose any lien or mortgage against the premises or equipment of any business operated hereunder or under any Franchise Agreement is instituted and not dismissed within sixty (60) days unless such is being contested in good faith; or

(9)      if the real or personal property of any business operated hereunder or under any Franchise Agreement shall be sold after levy by any sheriff, marshal or constable.

B.      Developer shall be deemed to be materially in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Developer any opportunity to cure the default except as provided below, effective immediately upon written notice to Developer, upon the occurrence of any of the following events of default:

(1)      If Developer fails to meets its obligations under the Development Schedule;

(2)      If Developer fails to execute each Franchise Agreement in accordance with Section III.A. (or any extension thereof approved by Franchisor in writing);

(3)      If Developer or any of the Controlling Principals is convicted of, or shall have entered a plea of nolo contendere to, a felony, a crime involving moral turpitude or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith or Franchisor's interests therein;

(4)      If a threat or danger to public health or safety results from the construction, maintenance or operation of any Restaurant developed under this Agreement, following twenty-four (24) hours' notice from Franchisor;

(5)      If Developer fails to designate a qualified replacement Operating Principal or designee appointed by Operating Principal within thirty (30) days after any initial or successor Operating Principal or designee ceases to serve as such, all as required under Section VI.A.(2)(e);

(6)      If Developer or any of the Controlling Principals breaches in any material respect any of the representations, warranties and covenants in Section VI.A.;

(7)      If Developer or any of the Controlling Principals transfers or attempts to transfer any rights or obligations under this Agreement or any interest in Developer to any third party without Franchisor's prior written consent or without offering Franchisor a right of first refusal with respect to such transfer, contrary to the terms of Section VIII.;

(8)      If Developer or any of the Controlling Principals fails to comply with the covenants in Section IX.A., IX.B. or IX.C., provided, however, no such breach shall exist if Developer has commenced reasonable efforts to cure such breach and continues to reasonably prosecute such cure;

(9)      If an approved transfer upon death or permanent disability is not effected within the time period and in the manner prescribed by Section VIII.E.;

(10)      If Developer misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or with the System or Franchisor's rights therein and does not cure such default within twenty-four (24) hours following notice from Franchisor;

(11)      If Developer or any of its affiliates fails, refuses or neglects promptly to pay when due any monetary obligation owing to Franchisor, or any of its affiliates or vendors, under this Agreement, any Franchise Agreement or any other agreement and does not cure such default within five (5) days

following notice from Franchisor (or such other cure period specified in such other agreement, unless no cure period is stated or such period is less than five (5) days, in which case the five (5) day cure period shall apply); and

(12)    If Developer or any Controlling Principal (or any person or entity affiliated with or controlled by Developer or any Controlling Principal) is determined by Franchisor to be either (i) repeatedly in default for failure to comply with the requirements of any Franchise Agreement, other development agreement, or other agreement to which Franchisor (or an affiliate of Franchisor) is a party (collectively, and as each may be amended from time to time, "**Other Agreements**"), whether or not such defaults are of the same or different nature and whether or not such defaults have been cured after notice by Franchisor, *or* (ii) in material default for failure to substantially comply with the requirements of any Other Agreement, Franchisor may terminate this Agreement by giving written notice of termination stating the nature of such default to Developer at least thirty (30) days prior to the effective date of such termination.

C.     Except as provided above in Section VII.B. above, if Developer fails to comply with any other term or condition imposed by this Agreement, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Developer at least thirty (30) days prior to the effective date of termination; *provided, however*, that Developer may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's reasonable satisfaction within the thirty (30) day period and by promptly providing proof thereof to Franchisor.  If any such default is not cured within the specified time, or such longer period as applicable law may require, subject to Section VII.D., Developer's rights under this Agreement shall terminate without further notice to Developer effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.

D.     Upon default by Developer under Section VII.B. or C., Franchisor may elect, in lieu of termination, to reduce or eliminate all or only certain rights of Developer under this Agreement (including, without limitation, a reduction of the area of territorial rights and/or the number of Restaurants which Developer may establish under the Development Schedule); and if Franchisor exercises said election, Franchisor shall not have waived its right to, in the case of future defaults, exercise all other rights and invoke all other provisions (including, without limitation, its option to terminate this Agreement) that are provided in law and/or set out under this Agreement.

E.     Upon termination or expiration of this Agreement, Developer shall have no right to establish or operate any Restaurants for which a Franchise Agreement has not been executed by Franchisor at the time of termination.  Thereafter, Franchisor and its affiliates shall be entitled to establish, and to license others to establish, Restaurants in the Territory (except as may be otherwise provided under any Franchise Agreement that has been executed between Franchisor and Developer).  Developer acknowledges the right of Franchisor under Section II.A. of this Agreement to retain any and all fees paid by Developer pursuant to the terms hereof.

F.     No default under this Agreement shall constitute a default under any Franchise Agreement between the parties hereto, unless the default is also a default under the terms of such Franchise Agreement.

G.     No right or remedy herein conferred upon or reserved to Franchisor is exclusive of any other right or remedy provided or permitted by law or in equity.

H.     Upon termination or expiration of this Agreement, Developer and the Controlling Principals shall comply with the restrictions on confidential information contained in Section IX.B. and the covenants against competition contained in Section IX.D.  Any other person required to execute similar covenants pursuant to Section IX.B.(2) or IX.I. shall also comply with such covenants.

## VIII.    TRANSFER OF INTEREST

A.     (1)     Franchisor shall have the right, without the need for Developer's consent, to assign, transfer or sell its rights under this Agreement to any person or other legal entity.  Upon such assignment and assumption, Franchisor shall be under no further obligation hereunder, except for accrued liabilities, if any.  Developer further agrees and affirms that Franchisor may go public; may engage in a private placement of some or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic and financial restructuring (collectively, and in each instance, a "**Permitted Transaction**").  With regard to any Permitted Transaction, Developer expressly waives any claims, demands or damages arising in connection therewith or related thereto including, without limitation, claims involving the loss of the Marks (or any variation thereof) and System and/or the loss of association with or identification of Five Guys Franchisor, LLC as Franchisor under this Agreement or any Other Agreement.

(2)     Developer agrees that Franchisor has the right, now and in the future, to engage in a Permitted Transaction involving an existing competitive or non-competitive franchise network, chain or any other business (in each instance, an "**Other Business**") regardless of the location of such Other Business' facilities, and to operate, franchise or license those businesses and/or facilities as FIVE GUYS® Restaurants following the closing of such Permitted Transaction in any location; *provided, however*, Franchisor represents that it shall not convert any Other Business facility into a FIVE GUYS® Restaurant if such facility is located within the Territory during the term of this Agreement, or within unreasonably close proximity to any Restaurant then-currently operated by Developer or any of its affiliates.

(3)     If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in the restaurant business or to offer or sell any products or services to Developer.

B.     (1)     Developer understands and acknowledges that the rights and duties set forth in this Agreement are personal to Developer, and that Franchisor has granted rights under this Agreement in reliance on the business skill, financial capacity and personal character of Developer and the Controlling Principals.  Accordingly, neither Developer nor any Controlling Principal, nor any successor or assign of Developer or any Controlling Principal, shall sell, assign (including but not limited to by operation of law, such as an assignment under bankruptcy or insolvency laws, in connection with a merger, divorce or otherwise), transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in this Agreement or in Developer or in any Controlling Principal that is an entity, in each case without the prior written consent of Franchisor.  Any purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement shall be null and void and shall constitute a material event of default under this Agreement.

(2)     Subject to the requirements of <u>Section VIII.D.</u> hereof, if Developer wishes to transfer all or part of its interest in this Agreement or if Developer or a Controlling Principal wishes to transfer any ownership interest in Developer or in a Controlling Principal that is an entity, then in each such case, the transferor and the proposed transferee shall apply to Franchisor for its consent. Franchisor shall not unreasonably withhold its consent to such a transfer; *provided, however*, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval to any such transfer:

(a)     All the accrued monetary obligations of Developer and its affiliates and all other outstanding obligations to Franchisor and its affiliates arising under this Agreement, any Franchise Agreement or other related agreement shall have been satisfied in a timely manner and Developer shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner;

FIVE GUYS – Development Agreement (2022)

(b)     Developer and its affiliates are not in material default of any provision of this Agreement or any Other Agreement at the time of transfer (and Developer shall have substantially and timely complied with all the terms and conditions of such agreements during the terms thereof);

(c)     The transferee, transferor, and their respective principals, as applicable, and shall have executed a general release, in a form reasonably satisfactory to Franchisor, of any and all prior claims against Franchisor and its affiliates, officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, prior claims arising under or related to this Agreement, any Franchise Agreement, and any Other Agreement signed in connection therewith and governed by federal, state or local laws, rules, regulations or orders;

(d)     The transferee shall demonstrate to Franchisor's reasonable satisfaction that transferee meets the criteria considered by Franchisor when reviewing a prospective developer's application for development rights, including, but not limited to, Franchisor's educational, managerial and business standards, transferee's good moral character, business reputation and credit rating, transferee's aptitude and ability to conduct the business contemplated hereunder (as may be evidenced by prior related business experience or otherwise), transferee's financial resources and capital for operation of the business, and the geographic proximity of other territories with respect to which transferee has been granted development rights or of other Restaurants operated by transferee, if any;

(e)     The transferee shall execute a Development Agreement having material terms (including, without limitation, terms regarding the fees, development territory, and development schedule) substantially similar in all material respects to this Agreement, together with such other ancillary agreements substantially similar to the forms attached hereto (and if the transferee is a corporation or partnership, transferee's shareholders, partners, or other investors, as applicable, shall also execute such agreements as transferee's principals, and guarantee the performance of all such obligations, covenants and agreements);

(f)     The transferor shall remain liable for all of the obligations to Franchisor in connection with this Agreement incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

(g)     Developer shall pay a transfer fee of Five Thousand Dollars ($5,000), to reimburse Franchisor for its reasonable internal and external costs and expenses associated with reviewing the application to transfer including, without limitation, legal and accounting fees; and

(h)     If transferee is a corporation, or limited liability company, or a partnership, transferee shall provide to Franchisor evidence satisfactory to Franchisor that the terms of Section V.A. have been satisfied and are true and correct on the date of transfer.

(3)     Developer acknowledges and agrees that each condition which must be met by the transferee is reasonable and necessary to ensure such transferee's full performance of the obligations hereunder.

C.     In the event the proposed transfer is from one or more individuals to a corporation or limited liability company formed solely for the convenience of ownership, Franchisor's consent may be conditioned upon any of the requirements in Section VIII.B.(2); *provided, however*, the requirements in Sections VIII.B.(2)(c), (d), (e) and (g) shall not apply so long as the individuals who originally signed this Agreement remain as the owner(s) of all of the capital stock of such entity.

D.     If Developer wishes to transfer any or all of its interest in this Agreement or if a Controlling Principal wishes to transfer a controlling ownership interest in Developer (in either instance, such

transferring party being referred to as the "**Seller**"), then such Seller shall first notify Franchisor in writing of each such intent by delivering to Franchisor a completed transfer application in such form as Franchisor may prescribe in the Manuals or otherwise in writing and which shall describe, among other things, the interest to be transferred and the consideration therefor (the "**Offer**"), and shall provide such additional information and documentation relating to the Offer as Franchisor may require. Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written Offer and copies of all documentation required by Franchisor, to send written notice to the Seller that Franchisor intends to purchase the Seller's interest on terms consistent with the material terms and conditions stipulated in the written Offer and on such forms and other reasonable and customary terms as Franchisor may prescribe (including, without limitation, the substitution of equivalent cash consideration for any form of payment stipulated in the Offer not comprised of cash). In the event that Franchisor elects to purchase the Seller's interest, closing on such purchase must occur within the latter of (a) thirty (30) days from the date of notice to the Seller of the election to purchase by Franchisor, (b) thirty (30) days from the date Franchisor receives or obtains all necessary documentation, permits and approvals, or (c) such other date as the parties agree upon in writing.

If Franchisor rejects or otherwise fails to purchase the Seller's interest in accordance with the foregoing, then Seller shall be free to pursue its intended transfer on terms and conditions identical to those stipulated in the Offer ("**Third Party Offer**"), subject to the requirements set forth in <u>Section VIII.</u> of this Agreement. The closing of any transaction involving a Third Party Offer shall be consummated no later than one hundred and eighty (180) days after the date on which the written Offer was first delivered to Franchisor. In the event a transaction involving a Third Party Offer is not closed within the foregoing time period, the proposed sale shall again be subject to Franchisor's right of first offer as described herein, unless such subsequent right is waived by Franchisor in writing. Any material change in the terms of any Third Party Offer prior to closing shall constitute a new Offer to Franchisor, and shall be subject to the same right of first offer restrictions set forth above. Failure or refusal of Franchisor to exercise the option afforded by this <u>Section VIII.D.</u> shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this <u>Section VIII.</u> relating to a proposed transfer. Failure of Developer or a Controlling Principal to comply with the provisions of this <u>Section VIII.D.</u> prior to the transfer of any interest in this Agreement or a controlling interest in Developer shall constitute a material event of default under this Agreement. Franchisor shall be entitled to assign any and all of its options in this Section to any other party, without the consent of Developer.

E.      (1)      Upon the death of Developer (if Developer is a natural person) or any Controlling Principal who has an interest in this Agreement or Developer (the "**Deceased**"), the executor, administrator or other personal representative of the Deceased shall transfer the Deceased's interest to either the beneficiary named in the Deceased's will or, if no such beneficiary has been designated, to the deceased's spouse, heirs, or other blood relatives through operation of law; *provided, however*, any such transferee(s) must be approved by Franchisor. If Franchisor, in its sole and absolute discretion, disapproves of such transferee(s), then such transferee(s) shall transfer the Deceased's interest to a third party transferee approved by Franchisor within twelve (12) months after the Deceased's death. If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor, which approval may not be unreasonably withheld or delayed. If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within twelve (12) months after the death of the Deceased.

(2)      Upon the permanent disability of Developer (if Developer is a natural person) or any Controlling Principal who has an interest in this Agreement or Developer, Franchisor may, in its reasonable discretion, require such interest to be transferred to a third party approved by Franchisor within six (6) months after notice to Developer. "**Permanent disability**" shall mean any physical, emotional or mental injury, illness or incapacity which would prevent a person from performing the obligations set forth in this Agreement or in the guaranty made part of this Agreement for at least ninety (90) consecutive days

unlikely.  Permanent disability shall be determined upon examination of the person by a licensed practicing physician approved by Franchisor; or if the person refuses to submit to an examination, then such person shall be automatically deemed permanently disabled as of the date of such refusal for the purpose of this <u>Section VIII.E</u>.  The costs of any examination required by this Section shall be paid by Franchisor.  For purposes of clarification, Developer (or its authorized representative) shall have the right to select the licensed physician for such examination. Franchisor only reserves the right to approve of the physician selected as Franchisor shall be paying the costs. Franchisor's approval of a physician Developer (or its authorized representative) selects shall not be unreasonably withheld, delayed, or conditioned.  Franchisor's review and approval process of the selected physician shall primarily include (i) whether the physician is in fact licensed to practice and is in good standing, and (ii) whether the costs charged by the physician are commensurate with the costs typically charged by other physicians in his/her field.

(3)    Upon the death or certification of permanent disability of Developer or any Controlling Principal, Developer or a representative of Developer must promptly notify Franchisor of such death or claim of permanent disability.  Any transfer upon death or certification of permanent disability shall be subject to the same terms and conditions as described in this <u>Section VIII.</u> for any inter vivos transfer.  If an interest is not transferred upon death or permanent disability as required in this <u>Section VIII.E.</u>, then such failure shall constitute a material event of default under this Agreement.

F.    Franchisor's consent to a transfer of any interest in Developer or in this Agreement described herein shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand material compliance with any of the terms of this Agreement by the transferee.

G.    Notwithstanding the provisions of this <u>Section VIII.</u> to the contrary, the Controlling Principals may freely transfer their ownership interests in Developer among themselves and the Franchisor's right of first offer described in <u>Section VIII.D.</u> shall be inapplicable with respect to such transfers so long as prior written notification and identification of the transferees is timely given to the Franchisor. In addition, the Controlling Principals may transfer their interests to their respective family members (or trusts created for the benefit of such family members) for estate planning purposes with Franchisor's prior written consent (which consent shall not be unreasonably withheld).

H.    Neither securities nor partnership interests in Developer shall be offered directly or indirectly in any public offering including, without limitation, any offering that requires registration under United States securities laws or similar laws of a foreign country or would require registration on any United States stock exchange or similar trading venue. Developer and the Controlling Principals agree and acknowledge that the restriction contained in this <u>Section VIII.H.</u> is reasonable, does not unduly restrain Developer's or the Controlling Principals' ability to affect a transfer under <u>Section VIII.B.(2)</u>, and materially benefits the System, Developer, and the Controlling Principals.

I.    In the event of any inconsistency between the terms of this <u>Section VIII.</u> and the corresponding terms of any Other Agreement signed by Developer, the Controlling Principals, and/or their respective affiliates, the terms of this <u>Section VIII.</u> shall prevail.

## IX.    COVENANTS

A.    Developer and the Operating Principal covenant that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Developer and the Operating Principal (and the approved designee for Operating Principal) shall devote reasonably sufficient (as determined in the sole discretion of Franchisor) time, energy and best efforts to the management and operation of the development activities contemplated under this Agreement.

B.      Developer and each of the Controlling Principals shall not, during the term of this Agreement and thereafter, communicate or divulge to, or use for the benefit of, any other person, persons, partnership, association or corporation and, following the termination or expiration of this Agreement, shall not use for their own benefit, any confidential information, knowledge, know-how or recipes concerning the methods of development and operation of the Restaurants which may be communicated to Developer or any of the Controlling Principals or of which they may be apprised under this Agreement, except in connection with the operation of Restaurants operating under Franchisor's Franchise Agreements. Developer and each of the Controlling Principals shall disclose such confidential information only to the Controlling Principals and Developer's personnel who must have access to it in connection with their employment with Developer.  Any and all information, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Developer in connection with this Agreement shall be deemed confidential for the purposes of this Agreement.  Neither Developer nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make the same available to any unauthorized person.  The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Developer and each of the Controlling Principals.

C.      Developer and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Developer and the Controlling Principals shall receive valuable training, trade secrets and confidential information which are beyond the present skills and experience of Developer and the Controlling Principals and Developer's managers and employees and that Developer has the right and the obligation, arising from this Agreement, to develop the Territory for the benefit of the System.  Developer and the Controlling Principals acknowledge that such specialized training, trade secrets and confidential information provide a competitive advantage and shall be valuable to them in the development and operation of the Restaurants and that gaining access to such specialized training, trade secrets and confidential information is, therefore, a primary reason for entering into this Agreement.  In consideration for such specialized training, trade secrets, confidential information and rights, Developer and the Controlling Principals covenant that with respect to Developer, during the term of this Agreement (or with respect to each of the Controlling Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of "Controlling Principals" as described in Section XIV.E. of this Agreement) except as otherwise approved in writing by Franchisor, which approval shall not be unreasonably withheld or delayed, neither Developer nor any of the Controlling Principals shall, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any person(s), partnership or corporation:

(1)      Divert, or attempt to divert, any business or customer of the business described hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(2)      Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist, or make loans to any restaurant brand that specializes in the service of primarily (individually or collectively) hamburgers, hot dogs, or french fries - or related iterations thereof (e.g., cheeseburgers) - and has locations operating in the United States or any other country, province, or geographic area in which the Marks have either been registered or where Franchisor and/or its affiliate have sought registration of the Marks (any such restaurant brand, a "**Competing Restaurant**"). For purposes of clarification, any restaurant brand that derives, or shall reasonably derive, twenty five percent (25%) or less of its annual revenue from the collective sale of hamburgers, hot dogs, and french fries (including related iterations thereof (e.g., cheeseburgers)) shall not be deemed a Competing Restaurant.  Additionally, so long as Developer and the Controlling Principals adhere to the confidentiality restrictions set forth in this Agreement and in each of the Other Agreements, the restrictions contained in this Section IX.C.(2) shall also not apply to any Competing Restaurant owned and operated by entities in which Developer or a

Controlling Principal owns only a nominal (i.e., ten percent (10%) or less), passive, and non-voting equity interest.

D.     With respect to Developer, and for a continuous uninterrupted period commencing upon the expiration or termination of, or transfer of all of Developer's interest in, this Agreement (or with respect to each of the Controlling Principals, commencing upon the earlier of:  (i) the expiration, termination of, or transfer of all of Developer's interest in this Agreement or (ii) the time such individual or entity ceases to satisfy the definition of "Controlling Principals" as described in Section XIV.E. of this Agreement), and continuing for two (2) years thereafter, except as otherwise approved in writing by Franchisor, neither Developer nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership or corporation:

(1)     Divert, or attempt to divert, any business or customer of the business described hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(2)     Own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist or make loans to, any Competing Restaurant, which business is, or is intended to be, located within the Territory or within a twenty-five (25) mile radius of the location of any Restaurant in existence or under construction at any given time during such period. So long as Developer and the Controlling Principals adhere to the confidentiality restrictions set forth in this Agreement and in each of the Other Agreements, the restrictions contained in this Section IX.D.(2) shall also not apply to any Competing Restaurant owned and operated by entities in which Developer or a Controlling Principal owns only a nominal (i.e., ten percent (10%) or less), passive, and non-voting equity interest.

E.     The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.  The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section IX. is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Developer and the Controlling Principals expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

F.     Developer and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its reasonable discretion, to reduce the scope of any covenant set forth in Section IX.B., or any portion thereof, without their consent, effective immediately upon notice to Developer; and Developer and the Controlling Principals agree that they shall immediately comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section XV.A.

G.     Developer and the Controlling Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section IX.  Developer and the Controlling Principals agree to pay all costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with the successful enforcement of this Section.

H.     Failure to comply with the requirements of this Section shall constitute a material event of default under this Agreement.  Developer and the Controlling Principals acknowledge that a violation of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Developer and the Controlling Principals accordingly consent to the issuance of an injunction prohibiting any conduct by Developer or the Controlling Principals in violation of the terms of this Section.

Developer and the Controlling Principals agree to pay all court costs and reasonable legal fees incurred by Franchisor in obtaining specific performance, injunctive relief or any other remedy available to Franchisor for any violation of the requirements of this Section.

## X.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.      The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that Developer shall be an independent contractor and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other for any purpose.

B.      During the term of this Agreement, Developer shall hold itself out to the public as an independent contractor conducting its development operations pursuant to development rights granted by Franchisor.  Developer agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place in any Restaurant established under any Franchise Agreement for the purposes hereunder, the content and form of which Franchisor reserves the right to specify in writing.

C.      Developer understands and agrees that nothing in this Agreement authorizes Developer or any of the Controlling Principals to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name and that Franchisor shall in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action, or for any act or omission of Developer or any of the Controlling Principals or any claim or judgment arising therefrom.

D.      (1)      Developer and each of the Controlling Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor and its affiliates, successors and assigns, their respective partners and affiliates, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, independent contractors, servants and employees of each of them ("**Indemnitees**") from all "losses and expenses" (as defined in Section X.D.(4)(b) below) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(a)      The infringement, alleged infringement, or any other violation or alleged violation by Developer or any of the Controlling Principals of any patent, mark, copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any rights to use the Marks, any copyrights or other proprietary information granted to Developer under an Franchise Agreement);

(b)      The violation, breach or asserted violation or breach by Developer or any of the Controlling Principals of any federal, state or local law, regulation, ruling, standard or directive, or any industry standard;

(c)      Libel, slander or any other form of defamation of Franchisor, the System, or any developer or franchisee under the System, by Developer or by any of the Controlling Principals;

(d)      The violation or breach by Developer or by any of the Controlling Principals of any warranty, representation, agreement or obligation in this Agreement or in any Franchise Agreement or other agreement between Developer or any of its affiliates and Franchisor or any of its affiliates, their respective partners, or the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of any of them; and

(e)      Acts, errors or omissions of Developer, any of Developer's affiliates and any of the Controlling Principals and the officers, directors, shareholders, partners, agents, independent contractors, servants, employees and representatives of Developer and its affiliates in connection with the performance of the development activities contemplated under this Agreement or the establishment and operation of any Restaurant pursuant to an Franchise Agreement.

(2)      Developer and each of the Controlling Principals agree to give Franchisor immediate notice of any such action, suit, proceeding, claim, demand, inquiry or investigation.  At the expense and risk of Developer and each of the Controlling Principals, Franchisor may elect to control (but under no circumstance is obligated to undertake), and associate counsel of its own choosing with respect to, the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation.  Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Developer and each of the Controlling Principals to indemnify the Indemnitees and to hold them harmless.

(3)      In order to protect persons or property or its reputation or goodwill, or the reputation or goodwill of others, Franchisor may, upon written notice to and written consent from the Developer (which consent shall not be unreasonably withheld, delayed, or conditioned), consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in Franchisor's reasonable judgment, there are reasonable grounds to believe that:

(a)      any of the acts or circumstances enumerated in Section X.D.(1) above has occurred; or

(b)      any act, error or omission as described in Section X.D.(1)(e) may result directly or indirectly in damage, injury or harm to any person or any property.

(4)      (a)      All losses and expenses incurred under this Section X. shall be chargeable to and paid by Developer or any of the Controlling Principals pursuant to its obligations of indemnity under this Section, regardless of any action, activity or defense undertaken by Franchisor or the subsequent success or failure of such action, activity or defense.

(b)      As used in this Section X., the phrase "**losses and expenses**" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, legal fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

(5)      The Developer and each of the Controlling Principals shall hold harmless and indemnify the Indemnitees for all losses and expenses which may arise out of any acts, errors or omissions of Developer, the Controlling Principals, Developer's affiliates, the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of Developer and its affiliates and any such third parties unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused by an Indemnitees' negligence or willful misconduct in a ruling issued by a third party arbitrator or a court with competent jurisdiction pursuant to the procedures set forth in Section XV.B. of this Agreement. For purposes of clarification, any finding by a third party arbitrator or a court with competent jurisdiction that the cause of causes of any of such liability is jointly or partly due to the negligence of both an Indemnitee, on one hand, as well as the Developer (or any affiliate) or any Controlling Principal, on the other hand, shall not relieve the Developer and/or any Controlling Principal from the pro rata share of their indemnification obligations as contemplated herein.

FIVE GUYS – Development Agreement (2022)

(6)     Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses to maintain a claim against Developer or any of the Controlling Principals.  Developer and each of the Controlling Principals agree that the failure to pursue such recovery or mitigate loss shall in no way reduce the amounts recoverable from Developer or any of the Controlling Principals by the Indemnitees.

(7)     For purposes of clarification, the maximum financial liability to Franchisor for any payment default by Developer or any Controlling Principal under this Agreement or any related guaranty shall be limited to One Hundred Thousand Dollars ($100,000) per Controlling Principal per Restaurant.

(8)     Developer and the Controlling Principals expressly agree that the terms of this Section X.D. shall survive the termination, expiration or transfer of this Agreement or any interest herein.

## XI.     APPROVALS

A.     Whenever this Agreement requires the prior approval or consent of Franchisor, Developer shall make a timely written request to Franchisor and such approval or consent shall be obtained in writing.

B.     By providing any waiver, approval, advice, consent or suggestion to Developer in connection with this Agreement (or by reason of any neglect, delay or denial of any request therefore), Franchisor makes no warranties or guarantees upon which Developer may rely and assumes no liability or obligation to Developer or any third party to which it would not otherwise be subject.

## XII.    NON-WAIVER AND REMEDIES

A.     No delay, waiver, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising out of any breach or default by Developer or the Controlling Principals under this Agreement shall constitute a waiver by Franchisor to enforce any such right, option, duty or power against Developer or the Controlling Principals, or as to a subsequent breach or default by Developer or the Controlling Principals.  Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Developer or the Controlling Principals of any terms, provisions, covenants or conditions of this Agreement.

B.     All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Developer or any of its affiliates and Franchisor or any of its affiliates.  The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time. The expiration, earlier termination or exercise of Franchisor's rights pursuant to Section VII. of this Agreement shall not discharge or release Developer or any of the Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement. Additionally, the non-prevailing party shall pay all court costs and reasonable attorneys' fees incurred by the prevailing party in obtaining any remedy available for any violation of this Agreement.

## XIII.   NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt

FIVE GUYS – Development Agreement (2022)

requested, first-class postage prepaid, or sent by electronic mail to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to Franchisor: | Five Guys Franchisor, LLC<br>10718 Richmond Highway<br>Lorton, Virginia 22079<br>Attention: Legal Department<br>Email: franchise@fiveguys.com |
| With a copy to: | Polsinelli PC<br>1401 Eye Street, NW, Suite 800<br>Washington, D.C. 20005<br>Attention: Diana Vilmenay, Esq.<br>Email: dvilmenay@polsinelli.com |
| Notices to Developer and<br>the Controlling Principals: | _____<br>_____<br>_____<br>Attention:_____<br>Email:_____ |

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile or electronic mail, upon transmission or, in the case of expedited delivery service or registered or certified mail, three (3) business days after the date and time of mailing. Business days for the purpose of this Agreement exclude Saturday, Sunday and the following national holidays:  New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

## XIV.    SEVERABILITY AND CONSTRUCTION

A.      Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term or provision is determined to be invalid and contrary to or in conflict with any existing or future law or regulation by a court or agency having valid jurisdiction, this shall not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms or provisions of this Agreement that may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties; the invalid portions, sections, parts, terms or provisions shall be deemed not to be part of this Agreement; and there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any law or regulation.

B.      Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Developer and Franchisor, its officers, directors and personnel and such of Developer's and Franchisor's respective successors and assigns as may be contemplated (and, as to Developer, authorized by Section VIII.) any rights or remedies under or as a result of this Agreement.

C.      All captions in this Agreement are intended solely for the convenience of the parties and shall not affect the meaning or construction of any provision of this Agreement.

D.      All references to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.  Without limiting the obligations individually

FIVE GUYS – Development Agreement (2022)

undertaken by the Controlling Principals under this Agreement, all acknowledgments, promises, covenants, agreements and obligations made or undertaken by Developer in this Agreement shall be deemed jointly and severally undertaken by all of the Controlling Principals.

E.    The term "**Controlling Principals**" shall include, collectively and individually, (i) Developer's spouse, if Developer is an individual, and (ii) all holders of ten (10%) percent or more of the total ownership interest in Developer or of any entity directly or indirectly controlling Developer, and (iii) any other person or entity controlling, controlled by or under common control with Developer. As used in this Section XIV.E., the terms "*control*" and "*controlling*" shall mean the power to influence the management decisions of the specified person and shall in any case be deemed to exist where such person holds ten (10%) percent or more of the total ownership interest in the Developer, serves on any board of directors or comparable body of the Developer, or acts as an officer, general partner or manager thereof. If Developer is operating as a legal entity as contemplated hereunder, the persons holding an interest in the capital stock of Developer shall each be listed on Attachment B.

F.    This Agreement may be executed in counterparts and each copy so executed shall be deemed an original.

G.    This Agreement shall not become effective until signed by the President, Chief Executive Officer, or Secretary of Franchisor.

H.    Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

I.    Notwithstanding anything in this Agreement to contrary, Developer and its officers, directors, shareholders, agents and representatives, may, in accordance with any applicable law including the federal Defend Trade Secrets Act, disclose Confidential Information, including Franchisor's trade secrets, (a) in confidence, to federal, state, or local government officials, or to an attorney of Developer, for the sole purpose of reporting or investigating a suspected violation of law; or (b) in a document filed in a lawsuit or other legal proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with any applicable law or create liability for disclosures expressly allowed by law.

## XV.   ENTIRE AGREEMENT; APPLICABLE LAW; MEDIATION; ARBITRATION; LITIGATION

A.    This Agreement, the documents referred to herein and the attachments hereto constitute the entire, full and complete agreement between Franchisor and Developer and the Controlling Principals concerning the subject matter hereof and shall supersede all prior related agreements between Franchisor and Developer and the Controlling Principals; provided, however, that nothing in this or any related agreement is intended to disclaim the representations made by Franchisor in the Disclosure Document that was furnished to Developer by Franchisor. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

B.    (1)    EXCEPT AS PROVIDED IN THIS AGREEMENT, FRANCHISOR, DEVELOPER AND THE CONTROLLING PRINCIPALS AGREE THAT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THE FRANCHISE, DEVELOPER'S DEVELOPMENT ACTIVITIES, ESTABLISHMENT OR OPERATION OF ANY

RESTAURANT UNDER THIS AGREEMENT (AND ANY AMENDMENTS THERETO) INCLUDING, BUT NOT LIMITED TO, ANY CLAIM BY DEVELOPER, OR ANY OF THE CONTROLLING PRINCIPALS, OR PERSONS CLAIMING ON BEHALF OF DEVELOPER OR THE CONTROLLING PRINCIPALS, CONCERNING THE ENTRY INTO, THE PERFORMANCE UNDER OR THE TERMINATION OF THE AGREEMENT, OR ANY OTHER AGREEMENT BETWEEN FRANCHISOR, OR ITS AFFILIATES, AND DEVELOPER, ANY CLAIM AGAINST A PAST OR PRESENT OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF FRANCHISOR, INCLUDING THOSE OCCURRING SUBSEQUENT TO THE TERMINATION OF THIS AGREEMENT, THAT CANNOT BE AMICABLY SETTLED AMONG THE PARTIES OR THROUGH MEDIATION SHALL, EXCEPT AS SPECIFICALLY SET FORTH HEREIN AND IN <u>SECTION XV.D.</u>, BE REFERRED TO ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AS AMENDED, EXCEPT THAT THE ARBITRATOR SHALL APPLY THE FEDERAL RULES OF EVIDENCE DURING THE CONDUCT OF THE HEARING SESSIONS WITH RESPECT TO THE ADMISSIBILITY OF EVIDENCE. IF SUCH RULES ARE IN ANY WAY CONTRARY TO OR IN CONFLICT WITH THIS AGREEMENT, THE TERMS OF THE AGREEMENT SHALL CONTROL. ONLY CLAIMS, CONTROVERSIES OR DISPUTES INVOLVING DEVELOPER AND THE CONTROLLING PRINCIPALS MAY BE BROUGHT HEREUNDER. NO CLAIM FOR OR ON BEHALF OF ANY OTHER DEVELOPER, FRANCHISEE OR SUPPLIER, OR CLASS, REPRESENTATIVE OR ASSOCIATION THEREOF, MAY BE BROUGHT BY DEVELOPER OR THE CONTROLLING PRINCIPALS HEREUNDER.

(2) THE PARTIES SHALL AGREE ON AN ARBITRATOR WITHIN FIFTEEN (15) DAYS OF THE FILING OF ARBITRATION. IF THE PARTIES CANNOT AGREE ON A SINGLE ARBITRATOR, FRANCHISOR AND DEVELOPER (OR CONTROLLING PRINCIPAL, AS APPLICABLE) SHALL EACH SELECT ONE (1) ARBITRATOR. IF THE PARTY UPON WHOM THE DEMAND FOR ARBITRATION IS SERVED FAILS TO SELECT AN ARBITRATOR WITHIN FIFTEEN (15) DAYS AFTER THE RECEIPT OF THE DEMAND FOR ARBITRATION, THEN THE ARBITRATOR SO DESIGNATED BY THE PARTY REQUESTING ARBITRATION SHALL ACT AS THE SOLE ARBITRATOR TO RESOLVE THE CONTROVERSY AT HAND. THE TWO ARBITRATORS DESIGNATED BY THE PARTIES SHALL SELECT A THIRD ARBITRATOR. IF THE TWO ARBITRATORS DESIGNATED BY THE PARTIES FAIL TO SELECT A THIRD ARBITRATOR WITHIN FIFTEEN (15) DAYS, THE THIRD ARBITRATOR SHALL BE SELECTED BY THE AMERICAN ARBITRATION ASSOCIATION OR ANY SUCCESSOR THERETO UPON APPLICATION BY EITHER PARTY. ALL OF THE ARBITRATORS SHALL BE EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND DEVELOPERS. THE ARBITRATION SHALL TAKE PLACE IN LORTON, VIRGINIA OR AT THE OFFICES OF THE AMERICAN ARBITRATION ASSOCIATION WHICH ARE NEAREST TO FRANCHISOR'S CORPORATE OFFICES. THE ARBITRATION SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS, AND NOT AS PART OF A CONSOLIDATED, COMMON, OR CLASS ACTION, AND DEVELOPER AND ITS CONTROLLING PRINCIPALS WAIVE ANY AND ALL RIGHTS TO PROCEED ON A CONSOLIDATED, COMMON, OR CLASS BASIS. DEVELOPER AGREES NOT TO SEEK JOINDER OF ANY OF DEVELOPER'S CLAIMS WITH THOSE OF ANY OTHER PARTY. THE AWARD OF THE ARBITRATORS SHALL BE FINAL AND JUDGMENT UPON THE AWARD RENDERED IN ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. THE COSTS AND EXPENSES OF ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. THE ARBITRATORS SHALL BE REQUIRED TO SUBMIT WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW WITHIN THIRTY (30) BUSINESS DAYS FOLLOWING THE FINAL HEARING SESSION OF THE ARBITRATION. THE ARBITRATION PROCEEDINGS AND ARBITRATION AWARD SHALL BE MAINTAINED BY THE PARTIES AS STRICTLY CONFIDENTIAL, EXCEPT AS IS OTHERWISE REQUIRED BY LAW OR COURT ORDER OR AS IS NECESSARY TO CONFIRM, VACATE, OR ENFORCE THE AWARD AND FOR DISCLOSURE IN CONFIDENCE TO THE PARTIES' RESPECTIVE ATTORNEYS AND

TAX ADVISORS. THE COSTS AND EXPENSES OF ARBITRATION, INCLUDING COMPENSATION AND EXPENSES OF THE ARBITRATORS, SHALL BE BORNE BY THE PARTIES AS THE ARBITRATORS DETERMINE.

(3) NOTWITHSTANDING THE ABOVE, THE FOLLOWING SHALL NOT BE SUBJECT TO ARBITRATION:

(i) DISPUTES AND CONTROVERSIES ARISING FROM THE SHERMAN ACT, THE CLAYTON ACT OR ANY OTHER FEDERAL OR STATE ANTITRUST LAW;

(ii) DISPUTES AND CONTROVERSIES BASED UPON OR ARISING UNDER THE LANHAM ACT, AS NOW OR HEREAFTER AMENDED, RELATING TO THE OWNERSHIP OR VALIDITY OF THE TRADEMARKS;

(iii) DISPUTES AND CONTROVERSIES RELATING TO ACTIONS TO OBTAIN POSSESSION OF THE PREMISES OF THE RESTAURANT UNDER LEASE OR SUBLEASE.

(4) IN PROCEEDING WITH ARBITRATION AND IN MAKING DETERMINATIONS HEREUNDER, THE ARBITRATORS SHALL NOT EXTEND, MODIFY OR SUSPEND ANY TERMS OF THIS AGREEMENT OR THE REASONABLE STANDARDS OF BUSINESS PERFORMANCE AND OPERATION ESTABLISHED BY FRANCHISOR IN GOOD FAITH. NOTICE OF OR REQUEST TO OR DEMAND FOR ARBITRATION SHALL NOT STAY, POSTPONE OR RESCIND THE EFFECTIVENESS OF ANY TERMINATION OF THIS AGREEMENT. THE ARBITRATORS SHALL APPLY VIRGINIA LAW AND THE TERMS OF THIS AGREEMENT IN REACHING THEIR DECISION.

C. WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH ARE NOT FINALLY RESOLVED THROUGH ARBITRATION AS OTHERWISE PROVIDED ABOVE, DEVELOPER AND THE CONTROLLING PRINCIPALS HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE JURISDICTION OF THE STATE COURTS OF FAIRFAX COUNTY, VIRGINIA AND THE FEDERAL DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA. DEVELOPER AND THE CONTROLLING PRINCIPALS HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. DEVELOPER AND THE CONTROLLING PRINCIPALS HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON ANY OF THEM IN ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY VIRGINIA OR FEDERAL LAW. DEVELOPER AND THE CONTROLLING PRINCIPALS FURTHER AGREE THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE FAIRFAX COUNTY, VIRGINIA; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, FRANCHISOR MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS RELATED TO THIS AGREEMENT OR THE RELATIONSHIP CREATED THEREBY, THIS AGREEMENT AND ANY SUCH RELATED CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS SHALL BE GOVERNED, ENFORCED, AND INTERPRETED UNDER VIRGINIA LAW (EXCEPT FOR VIRGINIA CHOICE OF LAW RULES).

D. DEVELOPER, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH IN SECTIONS XV.C. AND D. ABOVE PROVIDES EACH OF THE

PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT. EACH OF DEVELOPER, THE CONTROLLING PRINCIPALS AND FRANCHISOR FURTHER ACKNOWLEDGE THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT AND THAT EACH PARTY'S AGREEMENT REGARDING APPLICABLE STATE LAW AND CHOICE OF FORUM HAVE BEEN NEGOTIATED FOR IN GOOD FAITH AND ARE PART OF THE BENEFIT OF THE BARGAIN REFLECTED BY THIS AGREEMENT.

E. DEVELOPER, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE EXECUTION OF THIS AGREEMENT AND ACCEPTANCE OF THE TERMS BY THE PARTIES OCCURRED IN FAIRFAX COUNTY, VIRGINIA, AND FURTHER ACKNOWLEDGE THAT THE PERFORMANCE OF CERTAIN OBLIGATIONS OF DEVELOPER ARISING UNDER THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE PAYMENT OF MONIES DUE HEREUNDER, SHALL OCCUR IN FAIRFAX COUNTY, VIRGINIA.

F. DEVELOPER, THE CONTROLLING PRINCIPALS, AND THE FRANCHISOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OF ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST THE OTHER PARTY, AND THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREES THAT IN THE EVENT OF A DISPUTE, DEVELOPER AND THE PARTIES SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY EITHER. IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

## XVI.   ACKNOWLEDGMENTS

A. Developer acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that the success of this business venture involves substantial business risks and shall largely depend upon the ability of Developer. Franchisor expressly disclaims making, and Developer acknowledges that it has not received or relied on, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

Initials _____

B. Developer acknowledges that Developer has received, read and understands this Agreement and the related attachments and agreements and that Franchisor has afforded Developer sufficient time and opportunity to consult with advisors selected by Developer about the potential benefits and risks of entering into this Agreement.

Initials _____

FIVE GUYS – Development Agreement (2022)

C.      Developer acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least fourteen (14) calendar days prior to the date on which this Agreement was executed.

Initials _____

*** 

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties hereto have duty executed and delivered this Agreement on the day and year first above written.

**FRANCHISOR:**

**ATTEST:**

**FIVE GUYS FRANCHISOR, LLC**
a Delaware limited liability company

By:_____

Print Name:_____

By:_____

Name:_____

Title:_____

Date Accepted:_____

(The "**Effective Date**")

**DEVELOPER:**

_____

By:_____

Print Name:_____

By:_____

Name:_____

Title:_____

## ATTACHMENT A

## GUARANTY OF CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1)     Each has read the terms and conditions of the Development Agreement and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Development Agreement are in partial consideration for, and a condition to, the granting of the development rights in the Development Agreement, and that Franchisor would not have granted such rights without the execution of this guaranty and such undertakings by each of the undersigned;

(2)     Each is included in the term "Controlling Principals" as described in <u>Section XIV.E.</u> of the Development Agreement;

(3)     Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Development Agreement and is obligated to perform thereunder; and

(4)     Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Developer's obligations under the Development Agreement shall be punctually paid and performed.  Upon default by Developer or upon notice from Franchisor, each shall immediately make each payment and perform each obligation required of Developer under the Development Agreement.  Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Developer or settle, adjust or compromise any claims that Franchisor may have against Developer.  Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Developer, any default by Developer or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Developer.  Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Developer and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.  Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased shall be bound by the foregoing guaranty, but only for defaults and obligations under the Development Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

Additionally, with respect to the individual designated as Operating Principal, Operating Principal acknowledges that the undertakings by Operating Principal under this guaranty are made and given in partial consideration of, and as a condition to, Franchisor's grant of rights to develop Restaurants as described herein; Operating Principal individually, jointly and severally, makes all of the covenants, representations and agreements of Developer and Operating Principal set forth in the Development Agreement and is obligated to perform hereunder.

*[Signature Page Follows]*

**WITNESS:**                                      **CONTROLLING PRINCIPALS**:


By:_____                        _____
Print Name:_____                        *Name:_____


By:_____                        _____
Print Name:_____                        Name:_____


By:_____                        _____
Print Name:_____                        Name:_____


By:_____                        _____
Print Name:_____                        Name:_____


\* Denotes individual who is Developer's Operating Principal

## <u>ATTACHMENT B</u>

## <u>STATEMENT OF OWNERSHIP INTERESTS AND DEVELOPER'S PRINCIPALS</u>

A.      The following is a list of stockholders, partners or other investors in Developer, including all investors who own or hold a direct or indirect interest in Developer, and a description of the nature of their interest:

<u>Name</u>                                                     <u>Percentage of Ownership/Nature of Interest</u>

## ATTACHMENT C

### THE FIVE GUYS FRANCHISOR, LLC
### DEVELOPMENT SCHEDULE

The Agreement authorizes and obliges Developer to establish and operate _____ (__) FIVE GUYS® Restaurants pursuant to a Franchise Agreement for each Restaurant to be developed hereunder.

**Fees Paid Upon Signing:**

Upon the execution of the Development Agreement, Developer is paying _____ Dollars ($_____); and such amount represents a territorial development fee of Fifty Thousand Dollars ($50,000) for Restaurants located outside of Alaska, Hawaii and Puerto Rico and One Hundred Twenty-Five Thousand Dollars ($125,000) for Restaurants located within such jurisdictions; times the _____ (__) Restaurants to be developed hereunder.

**Development Schedule:**

1.  The first Restaurant is to be opened by _____, 20___;
2.  The second Restaurant is to be opened by _____, 20___; and
3.  The third Restaurant is to be opened by _____, 20___.

**Territory:**

The Territory referred to in Article I of the captioned agreement shall be:

_____
_____
_____
_____
_____

**IN WITNESS WHEREOF,** each party undersigned hereby acknowledge having read this Attachment understands and consents to be bound by all of its terms, and agrees that it shall become effective the ____ day of _____ 20___.

Attest

_____
(Developer)

By:_____          By:_____

Print Name:_____          Name:_____

                                     Title:_____


                                     **FIVE GUYS FRANCHISOR, LLC**


By:_____          By:_____

Print Name:_____          Name:_____

                                     Title:_____

**ATTACHMENT D**

**STATE SPECIFIC AMENDMENTS**

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF ALASKA

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

    a.    Section II.A. of the Development Agreement is amended to state that the Development Fee shall be Fifty Thousand Dollars ($50,000) per Restaurant to be located outside of the State of Alaska, and One Hundred Twenty-Five Thousand Dollars ($125,000) per Restaurant to be located in the State of Alaska.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF CALIFORNIA

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### CALIFORNIA LAW MODIFICATIONS

The California Department of Financial Protection and Innovation requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. CORPORATIONS CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq. To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    California Business and Professions Code Sections 20000 through 20043 provide rights to You concerning nonrenewal, termination, or transfer of the Agreement. The Federal Bankruptcy Code also provides rights to You concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws shall control.

    b.    If Developer is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the California Franchise Investment Law and the California Franchise Relations Act.

    c.    If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

    d.    If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

    e.    If the Agreement requires litigation, arbitration or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

    f.    If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

    g.    Section II. of this Agreement is amended to state that the Development Fee shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and the first Restaurant under the Development Agreement is open for business.

\*\*\*

### AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
### DEVELOPMENT AGREEMENT FOR THE STATE OF HAWAII

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### HAWAII LAW MODIFICATIONS

The Hawaii Department of Commerce and Consumer Affairs, Business Registration Division requires that certain provisions contained in franchise documents be amended to be consistent with Hawaii law. To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.   Section II.A. of the Development Agreement is amended to state that the Development Fee shall be Fifty Thousand Dollars ($50,000) per Restaurant to be located outside of the State of Hawaii, and One Hundred Twenty-Five Thousand Dollars ($125,000) per Restaurant to be located in the State of Hawaii.

b.   Section II. of this Agreement is amended to state that the Development Fee and all other initial payments Developer owes to Franchisor or any of its affiliates before Developer opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and Developer opens its Restaurant for business.

\*\*\*

### AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
### DEVELOPMENT AGREEMENT FOR THE STATE OF ILLINOIS

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### ILLINOIS LAW MODIFICATIONS

The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, 815 ILCS 705/1 et seq. (West 2010). To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.   815 ILCS 705/19 and 705/20 provide rights to You concerning nonrenewal and termination of this Agreement. If this Agreement contains a provision that is inconsistent with the Act, the Act shall control.

b.   If Developer is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule of order under the Act, such release shall exclude claims arising under the Illinois Franchise Disclosure Act, and such acknowledgments shall be void with respect to claims under the Act and are hereby deleted.

c.   If this Agreement requires litigation to be conducted in a forum other than the State of Illinois, the requirement is void, provided that a Franchise Agreement may provide for arbitration in a forum outside of Illinois.

d.   If this Agreement requires that it be governed by a state's law, other than the State of Illinois, to the extent that such law conflicts with Illinois law, Illinois law shall control.

e.   Section 41 of the Illinois Franchise Disclosure Act states that "Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act, or any other law of Illinois, is void." To the extent that any provision in this Agreement is inconsistent with Illinois law, Illinois law shall control.

f.   This Agreement is amended to comply with Section 27 of the Act to allow any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisor and Developer and Developer's operation of the Franchise brought by Developer against Franchisor shall be commenced within three (3) years from the occurrence of the facts giving rise to such claim or action, within one (1) year after the Developer becomes aware of the facts or circumstances indicating Developer may have a claim for relief, or ninety (90) days after delivery to Developer of a written notice disclosing the violation, or such claim or action shall be barred.

g.   Section II. of this Agreement is amended to state that the Development Fee shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and Developer opens its Restaurant for business.  The Illinois Attorney General has imposed this deferral requirement due to Franchisor's current financial condition.

*** 

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF MARYLAND

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

## MARYLAND LAW MODIFICATIONS

The Maryland Securities Division requires that certain provisions contained in franchise documents be amended to be consistent with Maryland law, including the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. §§ 14-201 - 14-233 (1998 Repl. Vol. & Supp. 2002).  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.   If Developer is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act, such release shall exclude claims arising under the Maryland Franchise Registration and Disclosure Law, and such acknowledgments shall be void with respect to claims under the Law.

b.   If this Agreement requires litigation to be conducted in a forum other than the State of Maryland, the requirement shall not be interpreted to limit any rights Developer may have under Sec. 14-216 (c)(25) of the Maryland Franchise Registration and Disclosure Law to bring suit in the state of Maryland.

c.   The general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

d.   This Agreement is hereby amended to reflect that any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

e.   Section 14-226 of the Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise.  If this Agreement requires prospective franchisees to disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Franchise Law, such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law resulting from the offer or sale of the franchise.

f.   Section II. of this Agreement is hereby amended to state that the Development Fee shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and Developer opens its Restaurant for business.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
DEVELOPMENT AGREEMENT AND DISCLOSURE DOCUMENT
FOR THE STATE OF MINNESOTA**

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

## MINNESOTA LAW MODIFICATIONS

The Commissioner of Commerce for the State of Minnesota requires that certain provisions contained in franchise documents be amended to be consistent with Minnesota Franchise Act, Minn. Stat. Section 80.01 et seq., and of the Rules and Regulations promulgated under the Act (collectively the "Franchise Act"). To the extent that the Agreement and Disclosure Document contain provisions that are inconsistent with the following, such provisions are hereby amended:

a.   The Minnesota Department of Commerce requires that Franchisor indemnify Minnesota franchisees against liability to third parties resulting from claims that the franchisees' use of the Intellectual Properties infringes trademark rights of the third party. If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

b.   Franchise Act, Sec. 80C.14, Subd. 4., requires, except in certain specified cases, that a franchisee be given written notice of a franchisor's intention not to renew 180 days prior to expiration of the franchise and that the franchisee be given sufficient opportunity to operate the franchise in order to enable the franchisee the opportunity to recover the fair market value of the franchise as a going concern. If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with such requirement of the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

c.   Franchise Act, Sec. 80C.14, Subd. 3., requires, except in certain specified cases that a franchisee be given 90 days' notice of termination (with 60 days to cure). If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with such requirement of the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

d.   If the Agreement and/or the Disclosure Document require(s) Developer to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Franchise Act, such release shall exclude claims arising under the Franchise Act, and such acknowledgments shall be void with respect to claims under the Act.

e.   If the Agreement and/or the Disclosure Document require(s) that it be governed by a state's law, other than the State of Minnesota, for litigation, arbitration or mediation, those provisions shall not in any way abrogate or reduce any rights of Developer as provided for in the Franchise Act, including the right to submit matters to the jurisdiction of the courts of Minnesota.

f.   To the extent Minnesota Rule 2860.4400J. prohibits a franchisor from requiring You to consent to the Franchisor obtaining injunctive relief, the Agreement is hereby revised to reflect that Franchisor may seek injunctive relief and that whether any bond be necessary be determined by the court.

g.      Section 80C.17 of the Act provides that no action may be commenced pursuant to that section more than three (3) years after the cause of action accrues.  No provision in the Agreement shall be construed to limit the time period for You to bring a claim under the Act.

h.      Section II of this Agreement is hereby amended to state that the Development Fee shall be due immediately after opening your FIVE GUYS® Restaurant.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF NEW YORK

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### NEW YORK LAW MODIFICATIONS

The New York Department of Law requires that certain provisions contained in franchise documents be amended to be consistent with New York law, including the General Business Law, Article 33, Sections 680 through 695 (1989).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.      If Developer is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the General Business Law, regulation, rule or order under the Law, such release shall exclude claims arising under the New York General Business Law, Article 33, Section 680 through 695 and the regulations promulgated thereunder, and such acknowledgments shall be void.  It is the intent of this provision that non-waiver provisions of Sections 687.4 and 687.5 of the General Business Law be satisfied.

b.      If the Agreement requires that it be governed by a state's law, other than the State of New York, the choice of law provision shall not be considered to waive any rights conferred upon the Licensee under the New York General Business Law, Article 33, Sections 680 through 695.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF NORTH DAKOTA

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### NORTH DAKOTA LAW MODIFICATIONS

1.      The North Dakota Securities Commissioner requires that certain provisions contained in franchise documents be amended to be consistent with North Dakota law, including the North Dakota Franchise Investment Law, North Dakota Century Code Annotated Chapter 51-19, Sections 51-19-01 through 51-19-17 (1993).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.      If Developer is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Law, or a rule or order under the Law, such release shall exclude claims arising under North Dakota Law, and such acknowledgments shall be void with respect to claims under the Law.

b.      Covenants not to compete during the term of and upon termination or expiration of the Agreement are enforceable only under certain conditions according to North Dakota Law. If the Agreement contains a covenant not to compete that is inconsistent with North Dakota Law, the covenant may be unenforceable.

c.      The Commissioner has held that requiring franchisees to consent to the jurisdiction of courts outside of North Dakota is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Law.  If the Agreement requires litigation to be conducted in a forum other than the State of North Dakota, the requirement is void with respect to claims under North Dakota Law.

d.      If the Agreement requires mediation or arbitration to be conducted in a forum other than the State of North Dakota, the requirement may be unenforceable under North Dakota Law. Arbitration involving a franchise purchased in the State of North Dakota must be held either in a location mutually agreed upon prior to the arbitration or if the parties cannot agree on a location, the location shall be determined by the arbitrator.

e.      If the Agreement requires payment of a termination penalty or liquidated damages, the requirement may be unenforceable under North Dakota Law.

f.      If the Agreement requires that a state's law other than the State of North Dakota govern it, to the extent that such law conflicts with the North Dakota Law, North Dakota Law shall control.

g.      The Commissioner has held that requiring franchisees to consent to a waiver of trial by jury or of exemplary or punitive damages is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Law.  If the Agreement requires consent to a waiver of trial by jury or waiver of exemplary or punitive damages, the requirement may be unenforceable under the North Dakota Law.

h.      If the Agreement requires consent to a limitation of claims, the requirement is void and the statute of limitations under the North Dakota Law shall apply.

i.      If the Agreement requires consent to payment of all costs and expenses incurred in the enforcement of the Agreement, the requirement is void.  The prevailing party in any such action is entitled to recover all costs and expenses, including reasonable attorneys' fees.

j.      Section II. of this Agreement is hereby amended to state that the Development Fee shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and Developer opens its Restaurant for business.

2.      Under North Dakota Law, Developer is not required to waive its rights.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC**
**<u>DEVELOPMENT AGREEMENT FOR THE COMMONWEALTH OF PUERTO RICO</u>**

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

a.      Section II.A. of the Development Agreement is amended to state that the Development Fee shall be Fifty Thousand Dollars ($50,000) per Restaurant to be located outside of the Commonwealth of Puerto Rico, and One Hundred Twenty-Five Thousand Dollars ($125,000) per Restaurant to be located in the Commonwealth of Puerto Rico.

***

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF RHODE ISLAND

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### RHODE ISLAND LAW MODIFICATIONS

The Rhode Island Securities Division requires that certain provisions contained in franchise documents be amended to be consistent with Rhode Island law, including the Franchise Investment Act, R.I. Gen. Law. ch. 395 Sec. 19-28.1-1 -19-28.1-34.  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    If this Agreement requires litigation to be conducted in a forum other than the State of Rhode Island, the requirement is void under Rhode Island Franchise Investment Act Sec. 19-28.1-14.

    b.    If this Agreement requires that it be governed by a state's law, other than the State of Rhode Island, to the extent that such law conflicts with Rhode Island Franchise Investment Act it is void under Sec. 19-28.1-14.

    c.    If Developer is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act, such release shall exclude claims arising under the Rhode Island Franchise Investment Act, and such acknowledgments shall be void with respect to claims under the Act.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE STATE OF SOUTH DAKOTA

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### SOUTH DAKOTA LAW MODIFICATIONS

The South Dakota Securities Regulation Office requires that certain provisions contained in franchise documents be amended to be consistent with South Dakota law, including the South Dakota Franchise Investment Act. To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    Section II.A. of this Agreement is hereby amended to state that the Development Fee shall be deferred until Franchisor satisfies all of its pre-opening obligations to Developer and Developer opens its first Restaurant for business.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## DEVELOPMENT AGREEMENT FOR THE COMMONWEALTH OF VIRGINIA

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**VIRGINIA LAW MODIFICATIONS**

The Virginia State Corporation Commission's Division of Securities requires that certain provisions contained in franchise documents be amended to be consistent with Virginia law, including the Virginia Retail Franchising Act.  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    Section II. of the Agreement is amended to state that the Virginia State Corporation Commission's Division of Securities and Retail Franchising requires Franchisor to defer payment of the Development Fee, initial Franchise Fee and all other initial payments Developer owes to Franchisor until Franchisor completes all of its pre-opening obligations under each Franchise Agreement.  Payment of the Development Fee will be due to Franchisor, on a pro-rata basis, on Franchisor's completion of its pre-opening obligations for each Restaurant opened under the Development Agreement.

**\*\*\***

**WASHINGTON AMENDMENT TO THE DEVELOPMENT AGREEMENT, DISCLOSURE ACKNOWLEDGMENT STATEMENT, AND RELATED AGREEMENTS FOR FIVE GUYS FRANCHISOR, LLC**

The Five Guys Franchisor, LLC Development Agreement (the "Agreement") between "Developer" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**WASHINGTON LAW MODIFICATIONS**

The Director of the Washington Department of Financial Institutions requires that certain provisions contained in franchise documents be amended to be consistent with Washington law, including the Washington Franchise Investment Protection Act, WA Rev. Code §§ 19.100.010 to 19.100.940 (1991).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    RCW 19.100.180 may supersede the development agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the development agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

    b.    A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

    c.    In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the development agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

    d.    In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

    e.    Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

    f.    Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount

that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the development agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

g.      RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the development agreement or elsewhere are void and unenforceable in Washington.

h.      Section II. of the Agreement is amended to state that the Washington Department of Financial Institutions, Securities Division requires Franchisor to defer payment of the Development Fee, initial Franchise Fee and all other initial payments Developer owes to Franchisor until Franchisor completes all of its pre-opening obligations under the Franchise Agreement, and Franchisee opens its first Restaurant.  Because Franchisor has material pre-opening obligations with respect to each franchised business Franchisee opens under the Development Agreement, the State of Washington shall require that the franchise fees be released proportionally with respect to each franchised business.  Payment of the Development Fee shall be due to Franchisor, on a pro-rata basis, on Franchisor's completion of its pre-opening obligations for each Restaurant opened under the Development Agreement.

***

Each provision of these Amendments shall be effective only to the extent that the jurisdictional requirements, with respect to each such provision, are met independent of these Amendments.  These Amendments shall have no force or effect if such jurisdictional requirements are not met.

**IN WITNESS WHEREOF**, each of the parties hereto has read and agrees to remain subject to the foregoing amendment, as applicable, and has executed the same by a duly authorized representative.

**FRANCHISOR:**

ATTEST:

**FIVE GUYS FRANCHISOR, LLC**
a Delaware limited liability company

By:_____        By:_____
Print Name:_____        Name:_____
                                            Title:_____

**DEVELOPER:**

_____

By:_____        By:_____
Print Name:_____        Name:_____
                                            Title:_____

**EXHIBIT C TO THE DISCLOSURE DOCUMENT**

**<u>FRANCHISE AGREEMENT</u>**



**FIVE GUYS FRANCHISOR, LLC**

**FRANCHISE AGREEMENT**

_____

**FRANCHISEE**

_____

**EFFECTIVE DATE**

# TABLE OF CONTENTS

I.      GRANT ................................................................................................................... 2

II.     SITE SELECTION, PLANS AND CONSTRUCTION ......................................... 3

III.    TERM AND RENEWAL ....................................................................................... 4

IV.     FEES ....................................................................................................................... 5

V.      FRANCHISOR'S OBLIGATIONS ....................................................................... 7

VI.     FRANCHISEE'S AGREEMENTS, REPRESENTATIONS, WARRANTIES AND COVENANTS .... 8

VII.    FRANCHISE OPERATIONS ............................................................................... 12

VIII.   ADVERTISING AND RELATED FEES .............................................................. 16

IX.     MARKS ................................................................................................................... 19

X.      CONFIDENTIALITY AND NON-COMPETITION COVENANTS ................... 21

XI.     BOOKS AND RECORDS ...................................................................................... 24

XII.    INSURANCE .......................................................................................................... 25

XIII.   DEBTS AND TAXES ............................................................................................. 27

XIV.    TRANSFER OF INTEREST .................................................................................. 28

XV.     INDEMNIFICATION ............................................................................................ 33

XVI.    RELATIONSHIP OF THE PARTIES .................................................................... 34

XVII.   TERMINATION ..................................................................................................... 35

XVIII.  POST-TERMINATION .......................................................................................... 37

XIX.    MISCELLANEOUS ............................................................................................... 40

XX.     ACKNOWLEDGMENTS ....................................................................................... 47

ATTACHMENTS

A -     GUARANTY OF CONTROLLING PRINCIPALS
B -     APPROVED LOCATION, AREA OF PRIMARY RESPONSIBILITY AND OPENING DATE
C -     COLLATERAL ASSIGNMENT OF LEASE
D -     STATEMENT OF OWNERSHIP INTERESTS AND FRANCHISEE'S PRINCIPALS
E -     ELECTRONIC TRANSFER AUTHORIZATIONS
F -     POWER OF ATTORNEY (TAX & TELEPHONE)
G -     STATE SPECIFIC AMENDMENTS
H -     FRANCHISEE DISCLOSURE ACKNOWLEDGMENT STATEMENT

**FIVE GUYS FRANCHISOR, LLC**

<u>**FRANCHISE AGREEMENT**</u>

      **THIS FRANCHISE AGREEMENT** (as amended, supplemented, or otherwise modified from time to time, this "**Agreement**") is made and entered into by and between FIVE GUYS FRANCHISOR, LLC, a Delaware limited liability company (together with its successors and assigns, the "**Franchisor**"), and _____, a _____ *[corporation/limited liability company/partnership]* (the "**Franchisee**"), on the date this Agreement is executed by Franchisor below (the "**Effective Date**").  Franchisor and Franchisee are, where relevant, each referred to in this Agreement individually as a "party" and collectively as the "parties".  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Development Agreement referenced below.

**W I T N E S S E T H :**

      **WHEREAS**, Franchisor and its affiliates, as the result of the expenditure of time, skill, effort and money have developed and own a distinctive System (as defined below) relating to the establishment, development and operation of retail food service businesses that operate in buildings that display Franchisor's interior and exterior trade dress (each, a "**Restaurant**"), which specialize in dine-in and carry-out service of hamburgers, cheeseburgers, hot dogs, french-fries, and other foods and accompaniments approved by Franchisor (the "**Products**") and which operate under Franchisor's System and the Marks (as defined below), all of which Franchisor may periodically change, improve, and/or further develop;

      **WHEREAS**, the distinguishing characteristics utilized by Franchisor in each FIVE GUYS® Restaurant include, without limitation, distinctive interior and exterior sign design and arrangement, décor, fixtures and furnishings; menus and recipes; quality and uniformity of Products and services offered; standards, specifications, methods, techniques, procedures for operations, inventory and management; training and assistance; record keeping and reporting; and marketing and promoting; all of which may be changed, improved and further developed by Franchisor and/or its affiliates from time to time (collectively, the "**System**");

      **WHEREAS**, Franchisor identifies the System and the FIVE GUYS® Restaurants by means of certain trade names, service marks, trademarks, emblems and indicia of origin, including, but not limited to, the marks "FIVE GUYS®", "FIVE GUYS FAMOUS BURGERS AND FRIES®", "FIVE GUYS BURGERS AND FRIES®" and such other proprietary marks as Franchisor may periodically designate in writing (collectively, the "**Marks**");

      **WHEREAS**, Franchisor grants to qualified persons the opportunity to own and operate FIVE GUYS® Restaurants offering and selling the Products as well as other products and services authorized and approved by Franchisor and utilizing Franchisor's System and Marks;

      **WHEREAS**, Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearance and service and the necessity of operating the Restaurant franchised hereunder in conformity with Franchisor's standards and specifications;

      **WHEREAS**, Franchisee desires to use the System in connection with the operation of a FIVE GUYS® Restaurant at the location specified in Attachment B hereto, and receive the training and other assistance provided by Franchisor in connection therewith; and

      **WHEREAS**, Franchisor and Franchisee (or its affiliate) are parties to that certain Development Agreement dated _____, 20___ (as amended or otherwise modified from time to time, the "**Development Agreement**"), under which Franchisee (or its affiliate) is committed to developing a certain number of FIVE GUYS® Restaurants within the exclusive development territory described therein; and

Franchisor and Franchisee are entering into this Agreement pursuant to the terms and conditions of the Development Agreement.

**NOW, THEREFORE**, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

## I.    GRANT

A.    In reliance on the representations and warranties of Franchisee and its "Controlling Principals" (as defined in Section XIX.R.) contained in this Agreement, Franchisor hereby grants to Franchisee the right, and Franchisee hereby accepts the obligation, all according to the terms and conditions in this Agreement, to establish and operate a FIVE GUYS® Restaurant (the "**Restaurant**") and to use, solely in connection therewith, the Marks and the System, as they may be changed, improved, and further developed from time to time, at the Approved Location (as defined below).

B.    The specific street address of the Restaurant location accepted by Franchisor is set forth in Attachment B (the "**Approved Location**"). This Agreement does not grant to Franchisee the right or license to operate the Restaurant (or to offer or sell any products or services described under this Agreement) at or from any location other than the Approved Location. Franchisee shall not relocate the Restaurant without the expressed prior written consent of Franchisor, which consent shall not be unreasonably withheld so long as (i) the Restaurant and Franchisee (together with any and all affiliates) are in operational good-standing with Franchisor, (ii) the proposed relocation site is in accordance with Franchisor's then-current site selection and construction standards, and (iii) Franchisee complies with all of Franchisor's conditions to relocation, including, without limitation, the payment of a relocation fee in the amount of Seven Thousand Five Hundred Dollars ($7,500) (the "**Relocation Fee**").

C.    If Franchisee is unable to continue the operation of the Restaurant at the Approved Location because of the occurrence of a force majeure event (as described in Section XVII.A.(3)(e)), then Franchisee may request approval of Franchisor to relocate the Restaurant to another location in the Primary Area of Responsibility, as such term is defined below. Any other request to relocate the Restaurant due to circumstances reasonably beyond the control of Franchisee (including, without limitation, the lack of profitability at a particular location) shall also be subject to the same procedures. If Franchisor elects to grant Franchisee the right to relocate the Restaurant, then Franchisee shall comply with the site selection and construction procedures set forth in Section II.

D.    Upon the execution of this Agreement, Franchisee shall be assigned the primary area of responsibility (the "**Primary Area of Responsibility**") described in Attachment B and attached hereto. Except as provided in this Agreement, and subject to Franchisee's and the Controlling Principals' full compliance with this Agreement and each Other Agreement (as defined in Section XVII.C. below), neither Franchisor nor any of its affiliates shall establish, or authorize any other person or entity to establish, a FIVE GUYS® Restaurant in the Primary Area of Responsibility during the term of this Agreement.

E.    Notwithstanding the generality of the foregoing section, Franchisor and its affiliates retain all other rights, and therefore Franchisor and its affiliates shall have the right, among others, on any terms and conditions Franchisor deems advisable, and without granting Franchisee any rights therein, to:

(1)    establish, and license others to establish, FIVE GUYS® Restaurants and otherwise sell the food and beverage Products under the Marks at any location outside the Primary Area of Responsibility; and

(2)    sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, any collateral products under the Marks (*e.g.*, pre-packaged food and beverage Products and FIVE GUYS® memorabilia) from any location to any purchaser by any method or channel of distribution (including, without limitation, the Internet, mail order, and/or retail locations whether located

within or outside of the Primary Area of Responsibility), so long as such sales are not conducted from a FIVE GUYS® Restaurant operated from a location inside the Primary Area of Responsibility.

## II.      SITE SELECTION, PLANS AND CONSTRUCTION

A.      Franchisee assumes all cost, liability, expense and responsibility for locating, obtaining and developing a site for the Restaurant and for constructing and equipping the Restaurant at such site. Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for the Restaurant unless the site is previously accepted by Franchisor as set forth below. Franchisee acknowledges that the location, selection, procurement and development of a site for the Restaurant is Franchisee's responsibility, and that Franchisor's approval of a prospective site and the rendering of assistance in the selection of a site does not constitute a representation, promise, warranty or guarantee, express or implied, by Franchisor that the Restaurant operated at that site shall be profitable or otherwise successful.

B.      (1)      Prior to acquiring by lease or purchase a site for the Restaurant, Franchisee shall locate a site for the Restaurant that satisfies the site selection guidelines provided to Franchisee by Franchisor pursuant to Section V.(1) and shall submit to Franchisor, in the form specified by Franchisor, a description of the site, including evidence satisfactory to Franchisor demonstrating that the site satisfies Franchisor's site selection guidelines, together with such other information and materials as Franchisor may reasonably require, including, but not limited to, a letter of intent or other evidence satisfactory to Franchisor which confirms Franchisee's favorable prospects for obtaining the site.  Franchisor shall have fifteen (15) days after receipt of all requested information and materials to respond to Franchisee's application for the proposed site with Franchisor's final decision on approval or disapproval of the proposed site, in its reasonable discretion, to be provided to Franchisee within thirty (30) days.  No site may be used for the location of the Restaurant unless it is first accepted in writing by Franchisor.

(2)      If Franchisee elects to purchase the premises for the Restaurant, Franchisee shall submit a copy of the proposed contract of sale to Franchisor for its written approval prior to its execution and shall furnish to Franchisor a copy of the executed contract of sale within ten (10) days after execution. If Franchisee occupies the premises of the Restaurant under a lease, Franchisee shall submit a copy of the lease to Franchisor for written approval prior to its execution and shall furnish to Franchisor a copy of the executed lease within ten (10) days after execution.  No lease for the Restaurant premises shall be accepted by Franchisor unless a Collateral Assignment of Lease, prepared by Franchisor and executed by Franchisor (or its designee), Franchisee and the lessor, in substantially the form attached as Attachment C, is attached to the lease and incorporated therein.

(3)      After a location for the Restaurant is accepted by Franchisor and acquired by Franchisee pursuant to this Agreement, the location shall be described in Attachment B.

C.      Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances or regulations or which may be necessary as a result of any restrictive covenants relating to the Restaurant premises.  Prior to beginning the construction of the Restaurant, Franchisee shall (i) obtain all permits, licenses and certifications required for the lawful construction or remodeling and operation of the Restaurant, and (ii) certify in writing to Franchisor that the insurance coverage specified in Section XII. is in full force and effect and that all required approvals, clearances, permits and certifications have been obtained.  Upon request, Franchisee shall provide to Franchisor additional copies of Franchisee's insurance policies or certificates of insurance and copies of all such approvals, clearances, permits and certifications.

D.      Franchisee must obtain any architectural, engineering and design services it deems necessary for the construction of the Restaurant at its own expense from an architectural design firm approved by Franchisor, which approval shall not be unreasonably withheld.  Franchisee shall adapt the Preliminary Design Package (as such term is defined in Section V.(3) below) for the construction of the

Restaurant provided to Franchisee by Franchisor in accordance with Section V.(3) as necessary for the construction of the Restaurant and shall submit such adapted plans to Franchisor for review. If Franchisor determines, in its reasonable discretion, that any such adapted plans are not consistent with the best interests of the System, Franchisor may prohibit the implementation of such plans, and in this event will notify Franchisee of any objection(s) within twenty (20) days of receiving such plans. If Franchisor fails to notify Franchisee of an objection to the plans within this time period, Franchisee may use such plans. If Franchisor objects to any such plans, it shall provide Franchisee with a reasonably detailed list of changes necessary to make the plans acceptable. Franchisor shall, upon a re-submission of the plans with such changes, notify Franchisee within ten (10) days of receiving the resubmitted plans whether the plans are acceptable. If Franchisor fails to notify Franchisee of any objection within such time period, Franchisee may then use the resubmitted plans. Franchisee acknowledges that Franchisor's review of any adapted plans relates only to compliance with the System and that acceptance by Franchisor of such plans does not constitute a representation, warranty, or guarantee, express or implied, by Franchisor that such plans are accurate, free of error concerning their design or structural application, or fully compliant with any applicable laws, codes, or regulations. Additionally, Franchisee further acknowledges that Franchisor may periodically review, revise, and/or otherwise supplement the adapted construction plans after acceptance and, in connection therewith, monitor the Restaurant's construction process to ensure compliance at all times with all FIVE GUYS® brand standards and specifications.

E.      Franchisee shall promptly commence and diligently pursue construction of the Restaurant. Commencement of construction shall be defined as the time at which any site work is initiated by or on behalf of Franchisee at the location accepted for the Restaurant. Site work includes, without limitation, paving of parking areas, installing outdoor lighting and sidewalks, extending utilities, demising of interior walls and demolishing of any existing premises. During the time of construction, Franchisee shall provide Franchisor with such periodic reports regarding the progress of the construction or remodeling as may be reasonably requested by Franchisor. In addition, Franchisor may make such on-site inspections as it may deem reasonably necessary to evaluate such progress. If requested, Franchisee shall notify Franchisor of the scheduled date for completion of construction no later than thirty (30) days prior to such date. Within a reasonable time after the date of completion of construction, Franchisor may, at its option, conduct an inspection of the completed Restaurant. Franchisee acknowledges and agrees that Franchisee shall not open the Restaurant for business without the written authorization of Franchisor and that authorization to open shall be conditioned upon Franchisee's strict compliance with this Agreement.

F.      Franchisee acknowledges that time is of the essence. Subject to Franchisee's compliance with the conditions stated herein, Franchisee shall open the Restaurant and commence business within the applicable timeline contained in the Development Agreement, unless Franchisee obtains an extension of such time period from Franchisor in writing. The date the Restaurant opens for business to the public is set forth in Attachment B (the "**Opening Date**"). Prior to the Opening Date, Franchisee shall complete all exterior and interior preparations for the Restaurant, including installation of equipment, fixtures, furnishings and signs, pursuant to the plans and specifications provided by Franchisor, and shall comply fully with all other pre-opening obligations, including, but not limited to, those obligations described in Sections VI.B. - G., to Franchisor's reasonable satisfaction. If Franchisee fails to comply with any of such obligations, Franchisor shall have the right to prohibit Franchisee from commencing business. Franchisee's failure to open the Restaurant and commence business in accordance with the foregoing shall be deemed a material event of default under this Agreement.

## III.    TERM AND RENEWAL

A.      Unless sooner terminated as provided in Section XVII. hereof, the term of this Agreement shall continue from the date stated on the first page hereof until the earlier of (i) ten (10) years from Opening Date or (ii) the expiration or termination of Franchisee's right to possess the Restaurant premises.

B.      Franchisee may, at its option, renew the rights under this Agreement for additional consecutive terms of ten (10) years each (provided that such renewal term shall automatically terminate

upon the expiration or termination of Franchisee's right to possess the Restaurant premises), subject to any or all of the following conditions which must, in Franchisor's sole discretion, be met prior to and at the time of renewal:

(1)     Franchisee shall give Franchisor written notice of its election to renew not less than seven (7) months nor more than twelve (12) months prior to the end of the initial term or renewal term, as applicable;

(2)     Franchisee shall, at its cost and expense, renovate and modernize the Restaurant premises as Franchisor may require, including, without limitation, the repair, replacement, and/or renovation, as determined by Franchisor, of any needed equipment (including, without limitation, kitchen equipment, office equipment, service area equipment, electronic point of sale systems, computer hardware, and software systems, collectively, the "**Equipment**"), signs, interior and exterior decor items, fixtures, furnishings, supplies and other products and materials required for the operation of the Restaurant as Franchisor may require to reflect the then-current standards and image of the System as contained in the Manuals (as defined in Section V.(4)) or otherwise provided in writing by Franchisor (collectively, the "**Remodeling Items**"). In addition, Franchisee shall acquire, at its cost and expense, any new or additional Remodeling Items reasonably required by Franchisor for Franchisee to offer and sell any new menu items from the Restaurant and/or provide the Restaurant's goods and services by alternative means in conformity with Franchisor's then-current standards;

(3)     Neither Franchisee nor any of its affiliates shall be in material default of any provision of this Agreement or any Other Agreement, and Franchisee shall have substantially and timely complied with all the terms and conditions of such agreements during the terms hereof and thereof, as applicable;

(4)     Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its affiliates under this Agreement and all Other Agreements at the time of any renewal, and shall have timely met those obligations throughout the terms hereof and thereof, as applicable;

(5)     Franchisee shall present satisfactory evidence that Franchisee has the right to remain in possession of the Restaurant premises or obtain Franchisor's approval of a new site for the operation of the Restaurant for the duration of the renewal term of this Agreement;

(6)     Franchisor, Franchisee and the Controlling Principals (as defined in Section XIX.R.) shall execute a general release, in a form reasonably satisfactory to Franchisor, of any and all claims against Franchisor, its affiliates, partners, officers, directors, shareholders, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any Other Agreement, and/or under any applicable federal, state or local laws, rules and regulations or orders;

(7)     Franchisee shall execute Franchisor's then-current form of franchise agreement, which agreement shall have material terms substantially similar in all material respects to this Agreement (i.e., the fees, protected territory, and renewal rights), together with such other ancillary agreements substantially similar to the forms attached hereto; and

(8)     Franchisee shall comply with Franchisor's then-current financial qualifications and training requirements.

## IV.     FEES

A.     In consideration for the rights granted hereunder, Franchisee shall pay Franchisor a franchise fee of Twenty-Five Thousand Dollars ($25,000) (the "**Franchise Fee**"). The Franchise Fee for each Restaurant shall be paid upon the execution of this Agreement, which execution shall occur at the

earlier of the signing of a lease for the Restaurant, the purchase of a site for the Restaurant or ninety (90) days prior to the scheduled opening date of the Restaurant. The Franchise Fee shall be deemed fully earned and non-refundable in consideration of the administrative and other expenses incurred by Franchisor in granting the franchise hereunder and for its lost or deferred opportunity to grant such franchise to any other party. If Franchisee is unable to obtain possession of an approved location for the Restaurant within six (6) months from the Effective Date, Franchisor shall have the right, but not the obligation, to terminate this Agreement and refund seventy-five percent (75%) of the Franchise Fee without interest. Prior to Franchisor providing any refund, Franchisee must demonstrate to Franchisor's satisfaction that Franchisee has made a good faith effort to obtain possession of an approved location for the Restaurant. Notwithstanding any understanding to the contrary, the foregoing refund provision shall not apply in instances where Franchisor or its affiliates have previously entered into a Franchise Agreement with Franchisee or any affiliate of Franchisee.

B.      (1)      During the term of this Agreement, Franchisee shall pay Franchisor a continuing weekly royalty fee equal to six percent (6%) of the Restaurant's "Gross Sales" (as such term is defined in Section IV.C. below) during the preceding week (the "**Royalty Fee**"). The Royalty Fee shall be due and payable each week (each, an "**Accounting Period**"), and the first such Accounting Period shall begin on the Opening Date and end on the following Sunday. As more fully described in Section IV.B.(3) below, the Royalty Fee shall be paid to Franchisor by electronic fund transfer on or before the Wednesday following the end of each Accounting Period, provided that such day is a Business Day. A "**Business Day**" means any day other than Saturday, Sunday or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas. If the date on which such payments would otherwise be due is not a Business Day, then payment shall be due on the next Business Day.

(2)      Upon the request of Franchisor, Franchisee agrees that it shall deliver the Royalty Fee payment to Franchisor together with a royalty report itemizing the Gross Sales for the preceding Accounting Period (each, a "**Royalty Report**") and any other reports required hereunder.

(3)      For purposes of Royalty Fee collection, Franchisee agrees that Franchisor shall have the right to withdraw such funds from Franchisee's designated bank account by electronic funds transfer ("**EFT**"). EFT withdrawals shall be drawn on the Wednesday of each week, and shall be in an amount equal to the Royalty Fee calculated by Franchisor for the prior week. Franchisor may process an EFT payment based on (a) information regarding Gross Sales for the preceding Accounting Period obtained by Franchisor in the manner contemplated by Section VII.E.(8) of this Agreement, or (b) the most recent Royalty Report provided to Franchisor by Franchisee. If a Royalty Report for the subject Accounting Period is subsequently requested and received by Franchisor and reflects that the actual amount of the Royalty Fee due was (i) more than the amount of the EFT processed by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (ii) less than the amount of the EFT by Franchisor, then Franchisor shall either return the excess amount to Franchisee, or credit the excess amount to the payment of Franchisee's future royalty obligations. Franchisee shall, upon execution of this Agreement or at any time thereafter at Franchisor's request, execute such documents or forms as Franchisor determines are necessary for Franchisor to process EFT payments. Should any EFT payment not be honored by Franchisee's bank for any reason, Franchisee agrees that it shall be responsible for that payment plus a service charge applied by the bank, if any. Franchisee further agrees that it shall at all times throughout the term of this Agreement maintain a minimum balance of Three Thousand Dollars ($3,000) in the Franchisee's bank account against which such EFT payments are to be drawn. If Royalty Fees are not received when due, interest may be charged by Franchisor in accordance with Section IV.B.(4) below. Upon written notice to Franchisee, Franchisee may be required to pay such Royalty Fees directly to Franchisor in lieu of EFT, at Franchisor's sole discretion. Any and all amounts due and payable by Franchisee to an affiliate of Franchisor for products and/or services rendered shall also be subject to payment by EFT (including, without limitation, payments to Five Guys Bakery, LLC for bread products received by Franchisee).

(4)     Franchisee shall not be entitled to withhold payments due to Franchisor under this Agreement on grounds of alleged non-performance by Franchisor hereunder.  Any payment or report not actually received by Franchisor on or before the date due shall be deemed overdue.  Time is of the essence with respect to all payments to be made by Franchisee to Franchisor.  All unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of (i) ten percent (10%) per annum, or (ii) the maximum rate allowed by applicable law.  Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall require the payment or permit the collection of interest in excess of the maximum rate allowed by applicable law.  If any excess of interest is provided for herein, or shall be adjudicated to be so provided in this Agreement, the provisions of this paragraph shall govern and prevail, and neither Franchisee nor its Controlling Principals shall be obligated to pay the excess amount of such interest.  If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts which may be due and owing hereunder, and if no such amounts are due and owing hereunder then such excess shall be repaid accordingly.

(5)     If the Royalty Fee or Royalty Reports required by Section IV.B.(2) are not received by Franchisor as required by this Section, Franchisee may be required to pay Franchisor, in addition to the overdue amount, a fee of Fifty Dollars ($50) per day for each day that the Royalty Fee is unpaid or the Royalty Report is not received.  This fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay the Royalty Fee and/or submit Royalty Reports in accordance with the terms of this Agreement.  If for any reason the fee of Fifty Dollars ($50) is deemed to be interest charged, required or permitted in excess of the maximum rate allowed by applicable law, any such excess shall be applied as a payment and reduction of any other amounts which may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid accordingly.

C.     As used in this Agreement, "**Gross Sales**" shall mean all revenue from the sale of all services and products and all other income of every kind and nature related to, derived from, or originating from the Restaurant, including, without limitation, income related to (i) catering and delivery activities, (ii) any sales or orders of Products or food preparation services of any kind provided from or related to the Restaurant, and (iii) all proceeds of any business interruption insurance policies, in each case whether for cash or credit, and regardless of collection in the case of credit; *provided, however*, that "Gross Sales" shall not include:

(1)     sales taxes or other taxes collected from customers by Franchisee and actually transmitted to the appropriate taxing authorities; or

(2)     proceeds from isolated sales of trade fixtures not constituting any part of Franchisee's products and services offered for resale at the Restaurant or having any material effect upon the ongoing operation of the Restaurant required under this Agreement.

# V.     FRANCHISOR'S OBLIGATIONS

Franchisor or its designee shall provide the following services described below with regard to the Restaurant:

(1)     Provide Franchisee with Franchisor's written site selection guidelines and provide such site selection assistance as Franchisor may deem advisable;

(2)     Provide Franchisee with such on-site evaluation as Franchisor may deem necessary on its own initiative or in response to Franchisee's reasonable request for site evaluation; *provided, however*, that Franchisor shall not provide an on-site evaluation for any proposed site prior to the receipt of all required information and materials concerning such site prepared pursuant to Section II.  Franchisor (or its designee)

shall provide at no additional charge to Franchisee one (1) on-site evaluation for the Restaurant if such evaluation is for the first Restaurant operated by Franchisee or its affiliate.  If this Agreement does not relate to the first FIVE GUYS® Restaurant operated by Franchisee or its affiliate, Franchisor reserves the right to charge a reasonable fee for such on-site evaluation based upon the reasonable expenses incurred by Franchisor (or its designee) in connection with such on-site evaluation, including, without limitation, the cost of travel, lodging, meals and wages (the "**Site Evaluation Fee**"). If additional on-site evaluations are deemed appropriate by Franchisor, or upon Franchisee's reasonable request, Franchisor reserves the right to charge the Site Evaluation Fee for each of such evaluations.

(3)     Provide Franchisee with the floor plan, the reflected ceiling plan, and the FIVE GUYS® brand standard construction guidelines for the Restaurant (collectively, the "**Preliminary Design Package**").  Franchisee shall independently, and at Franchisee's expense, have the Preliminary Design Package adapted for construction of the Restaurant in accordance with Section II.  Franchisor makes no representation, warranty, or guarantee, express or implied, that the Preliminary Design Package contains information that is fully accurate, free of error concerning their design or structural application, or fully compliant with any applicable laws, codes, or regulations.

(4)     Provide Franchisee with access to the training video series (the "**Videos**"), when and if such Videos become available, and the confidential operations manuals and such other written materials as Franchisor shall have developed for use in the System (as the same may be revised by Franchisor from time to time, the "**Manuals**"), as more fully described in Section X.A.

(5)     Make visits to the Restaurant and provide evaluations of the products sold and services rendered therein from time to time as reasonably determined by Franchisor, as more fully described in Section VII.E.(6).

(6)     Make available to Franchisee and the general public, including Franchisee's customers, certain merchandise identifying the System, such as FIVE GUYS® memorabilia, in sufficient amounts to meet customer demand.

(7)     Provide Franchisee with a list of approved suppliers as described in Section VII.D., from time to time as Franchisor deems appropriate.

(8)     Conduct an initial training program for Franchisee's Operating Principal, General Manager, and such other Restaurant personnel reasonably deemed appropriate by Franchisor, all in accordance with the provisions of Section VI.E.(1), (2) and (4).

(9)     If requested by Franchisee, provide five (5) days of on-site pre-opening and five (5) days of post-opening management assistance at the Restaurant (with neither period necessarily being consecutive days) in accordance with the provisions of Section VI.E.(3).

(10)     Establish and administer a creative fund and/or advertising cooperatives in accordance with Section VIII.

## VI.    FRANCHISEE'S    AGREEMENTS,    REPRESENTATIONS,    WARRANTIES    AND COVENANTS

A.     Franchisee (together with the Controlling Principals, if any) covenants and agrees that it shall make all commercially reasonable efforts to operate the Restaurant so as to achieve optimum sales.

B.     If Franchisee is a corporation, limited liability company, or partnership (in each case, an "**Entity**") Franchisee and the Controlling Principals represent, warrant and covenant that:

(1)     Franchisee is an Entity duly organized and validly existing under the state law of its formation;

(2)     Franchisee is an Entity duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(3)     Franchisee's corporate charter, operating agreement, or written partnership agreement, as applicable, shall at all times provide that the activities of Franchisee are confined exclusively to the operation of the Restaurant, unless otherwise consented to in writing by Franchisor;

(4)     The execution of this Agreement and the consummation of the transactions contemplated hereby (i) are permitted by the Entity's corporate power, operating agreement, or written partnership agreement, as applicable, and (ii) have been duly authorized by Franchisee;

(5)     Copies of the Entity's articles of incorporation, bylaws, operating agreement, partnership agreement, other governing documents (as applicable and including any amendments thereto, collectively, "**Charter Documents**") together with any other certificates, agreements, or other documents reasonably required by Franchisor shall be furnished to Franchisor prior to the execution of this Agreement;

(6)     The ownership interests in Franchisee are accurately and completely described in Attachment D and entirely consistent with the Charter Documents.  Further, Franchisee shall not undergo any change in ownership or otherwise restructure the Entity's equity interests without first complying with the restrictions of Section XIV.B.;

(7)     Franchisee agrees that all certificates representing interests in Franchisee, if any, shall conspicuously bear the following legend:

> "The interests represented by this certificate are subject to the restrictive transfer terms and conditions set forth in that certain Franchise Agreement by and between this company and FIVE GUYS FRANCHISOR, LLC, as supplemented and more fully described in such Franchise Agreement."

(8)     Upon request, Franchisee must provide Franchisor with its most recent financial statements. Such financial statements must present fairly the financial position of Franchisee, as well as the results of its operations and its cash flow for the years then ended. Franchisee agrees that at all times during the term of this Agreement, it shall maintain sufficient working capital to fulfill its obligations under this Agreement. Each of the financial statements mentioned above shall be certified as true, complete and correct and shall have been prepared in conformity with generally accepted accounting principles applied on a consistent basis.

(9)     No material liabilities, adverse claims, commitments or obligations of any nature exist as of the date of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise.

(10)     The Controlling Principals shall, jointly and severally, guarantee Franchisee's performance of all of Franchisee's obligations, covenants and agreements hereunder pursuant to the terms and conditions the "Guaranty of Controlling Principals" attached hereto as Attachment A (the "**Guaranty**"), and shall otherwise bind themselves to the terms of this Agreement as stated herein. For purposes of clarification, the maximum financial liability of a Controlling Principal to Franchisor for any payment default by Franchisee under this Agreement shall be limited to One Hundred Thousand Dollars ($100,000) per Controlling Principal; and

(11)     Franchisee and the Controlling Principals acknowledge and agree that the representations, warranties and covenants set forth above in Sections VI.B.(1) - (10) are continuing obligations of Franchisee and the Controlling Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement.  Franchisee and the Controlling Principals shall cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

C.      Upon the execution of this Agreement, Franchisee shall designate and retain an individual to serve as the Operating Principal of the Restaurant (the "**Operating Principal**").  If Franchisee is an individual, Franchisee shall perform all obligations of the Operating Principal.  The Operating Principal shall, during the entire period he or she serves as such, meet the following qualifications:

(1)     The Operating Principal must either serve as the General Manager (as defined in Section VI.D.) of the Restaurant or, subject to the approval of Franchisor, designate a qualified individual to serve as the General Manager (the "**Management Designee**").

(2)     The Operating Principal must maintain a substantial direct or indirect ownership interest in Franchisee.  Except as may otherwise be provided in this Agreement, the Operating Principal's interest in Franchisee shall be and shall remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options.

(3)     The Operating Principal or his Management Designee, if applicable, shall devote substantially all of their time and best efforts to the supervision and conduct of the Restaurant.  The Operating Principal shall execute this Agreement and the Guaranty as one of the Controlling Principals, and shall be individually, jointly and severally bound by all the obligations contained herein and therein.

(4)     The Operating Principal or his Management Designee, if applicable, shall meet Franchisor's reasonable standards and criteria for such individual, as set forth in the Manuals or otherwise in writing by Franchisor.

(5)     If, during the term of this Agreement, the Operating Principal or his Management Designee, if applicable, is not able to continue to serve in such capacity, or no longer qualifies to act as such in accordance with this Section VI.C., Franchisee shall promptly notify Franchisor and designate a replacement within sixty (60) days after the Operating Principal or such Management Designee ceases to serve or be so qualified, such replacement being subject to the same qualifications and restrictions listed above.  Franchisee shall provide for interim management of the activities contemplated under this Agreement until such replacement is so designated.  Any failure to comply with the requirements of this Section VI.C. shall be deemed a material event of default under this Agreement under Section XVII.A.(3)(p) hereof.

D.      Franchisee shall designate and retain at all times a general manager ("**General Manager**") to direct the operation and management of the Restaurant.  The General Manager shall be responsible for the daily operation of the Restaurant and may be one of the Controlling Principals. Notwithstanding any understanding to the contrary, the parties hereto acknowledge and agree that the General Manager shall, during the entire period he or she serves as General Manager for Franchisee, (i) solely be an employee of Franchisee serving under the direction of Franchisee (and, consequently, never deemed to be an employee or agent of Franchisor), and (ii) meet the following qualifications:

(1)     The General Manager shall satisfy Franchisor's educational and business experience criteria as set forth in the Manuals as defined herein or otherwise in writing by Franchisor;

(2)     The General Manager shall devote full time and best efforts to the supervision and management of the Restaurant;

(3)      The General Manager shall be an individual reasonably acceptable to Franchisor; and

(4)      The General Manager shall satisfy the training requirements set forth in Section VI.F.  If, during the term of this Agreement, the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section, Franchisee shall promptly notify Franchisor and designate a replacement within sixty (60) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above (including the completion of all training and obtaining all certifications required by Franchisor).  Franchisee shall provide for interim management of the Restaurant until such replacement is so designated, such interim management to be conducted in accordance with the terms of this Agreement.  Any failure to comply with the requirements of this Section VI.D. shall be deemed a material event of default under Section XVII.A.(3)(p) hereof.

E.      Franchisee agrees that it is necessary to the continued operation of the System and the Restaurant that Franchisee's Operating Principal and General Manager receive such training as Franchisor may require, and accordingly agrees as follows:

(1)      No later than thirty (30) days prior to the Opening Date of the Restaurant, Franchisee's Operating Principal, General Manager, and, if necessary, assistant manager shall attend and complete, to Franchisor's reasonable satisfaction, Franchisor's initial training program. Training of such persons shall be conducted by Franchisor or its designee at a Franchisor or designee-operated Restaurant or such other location designated by Franchisor.  Franchisor shall provide instructors and training materials for the initial training of the Operating Principal, General Manager and assistant manager at no additional charge to Franchisee. Franchisor shall have the right to charge a reasonable fee for such training of any additional managers or Restaurant personnel.

Franchisor shall determine, in its reasonable discretion, whether the Operating Principal and General Manager have satisfactorily completed the initial training program.  If the initial training program is not satisfactorily completed by the Operating Principal or General Manager, or if Franchisor in its reasonable business judgment based upon the performance of the Operating Principal or General Manager, determines that the training program cannot be satisfactorily completed by any such person, Franchisee shall designate a replacement to satisfactorily complete such training.  Any Operating Principal or General Manager subsequently designated by Franchisee shall also receive and complete such initial training.  Franchisor reserves the right to charge a reasonable fee for any initial training provided by Franchisor or its designee to any initial General Manager or any other Restaurant personnel for any Restaurant subsequently developed by Franchisee and otherwise for any initial training provided to a replacement or successor General Manager.  Franchisee shall be responsible for any and all expenses incurred by Franchisee or Franchisee's Operating Principal, General Manager and other Restaurant personnel in connection with any initial training program, including, without limitation, costs of travel, lodging, meals and wages.

(2)      Franchisee's Operating Principal, General Manager and such other Restaurant personnel as Franchisor shall designate shall attend such additional training programs and seminars as Franchisor or its designee may offer from time to time, if Franchisor requires such attendance.  For all such programs and seminars, Franchisor or its designee shall provide the instructors and training materials. Franchisee shall be responsible for any and all expenses incurred by Franchisee or its Operating Principal, General Manager and other Restaurant personnel in connection with such additional training, including, without limitation, costs of travel, lodging, meals, and wages.  Additionally, in the event that such additional training programs and seminars are requested by Franchisee and not deemed mandatory by Franchisor, Franchisor reserves the right to impose a reasonable fee for such additional training.

(3)      In connection with the opening of the Restaurant, Franchisor shall provide Franchisee with opening assistance by a trained representative of Franchisor or its designee.  The trainer shall provide on-site pre-opening and post-opening management and opening training, supervision, and

assistance to Franchisee for a period of five (5) days.  With respect to the opening assistance described above and any such assistance provided to a relocated Restaurant established by Franchisee pursuant to Sections I.B. or C. hereof, Franchisee may be required to pay Franchisor the per diem fee then being charged to franchisees generally for opening assistance, including, without limitation, payment of any expenses incurred by Franchisor's trainers (e.g., costs of travel, lodging, meals and wages) (collectively, the "**Per Diem**").  Notwithstanding the generality of the foregoing, if the Restaurant is the first FIVE GUYS® Restaurant developed by Franchisee (and no affiliate of Franchisee has developed a FIVE GUYS® Restaurant pursuant to the Development Agreement), Franchisee shall not be required to pay the Per Diem.

(4)     Upon the reasonable request of Franchisee, or as Franchisor shall deem appropriate, Franchisor shall, subject to the availability of personnel, provide Franchisee with additional trained representatives who shall provide on-site remedial training and assistance to the Restaurant's personnel.  For additional training and assistance requested by Franchisee, Franchisee may be required to pay the Per Diem.

F.     Franchisee shall comply with all requirements of federal, state and local laws, rules, regulations, and orders.

G.     Franchisee shall comply with all other requirements and perform such other obligations as provided hereunder.

## VII.     FRANCHISE OPERATIONS

A.     Franchisee understands the importance of maintaining uniformity among all of the FIVE GUYS® Restaurants and the importance of complying with all of Franchisor's standards and specifications relating to the operation of the Restaurant.

B.     Franchisee shall maintain the Restaurant in a high degree of sanitation, repair and condition, and in connection therewith shall make such additions, alterations, repairs and replacements to the Restaurant consistent with Franchisor's then-current standards and specifications and as may be required for that purpose, including such periodic repainting or replacement of obsolete signs, furnishings, fixtures, and equipment (including, without limitation, kitchen equipment, office equipment, service area equipment, electronic point of sale systems, computer hardware, and software systems, collectively, the "**Equipment**"), and décor as Franchisor may reasonably direct in order to maintain system wide integrity and uniformity.  Franchisee shall also obtain, at Franchisee's cost and expense, any new or additional Equipment, fixtures, supplies and other products and materials which may be reasonably required by Franchisor. Except as may be expressly provided in the Manuals, no alterations or improvements or changes of any kind in design, Equipment, signs, interior or exterior decor items, fixtures or furnishings shall be made in or about the Restaurant or its premises without the prior written approval of Franchisor.

C.     To assure the continued success of the Restaurant, Franchisee shall, upon the request of Franchisor, make other improvements to modernize the Restaurant premises, Equipment, signs, interior and exterior décor items, fixtures, furnishings, supplies and other products and materials required for the operation of the Restaurant to Franchisor's then-current standards and specifications.  Notwithstanding the above, Franchisee agrees that it shall make such capital improvements or modifications described in this Section VII.C. if so requested by Franchisor on or after the fifth (5th) anniversary of the Opening Date, or at such other time during the term of this Agreement that a majority of the Restaurants then operated by Franchisor or its affiliates have made or are utilizing best efforts to make such improvements or modifications.

D.     Franchisee shall comply with all of Franchisor's standards and specifications relating to the purchase of all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, Equipment and other products used or offered for sale at the Restaurant.  Except as provided in Sections VII.F. and VII.G. with respect to certain materials bearing the Marks and proprietary products, Franchisee

shall obtain such items from suppliers (including manufacturers, distributors and other sources) who (i) continue to demonstrate the ability to meet Franchisor's then-current standards and specifications, (ii) possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, (iii) have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and (iv) who have not thereafter been disapproved by Franchisor.  If Franchisee desires to purchase, lease or use any products or other items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval, or shall request the supplier itself to do so.  Franchisee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing.  A charge, not to exceed the reasonable cost of the inspection and the actual cost of the test, shall be paid by Franchisee or the supplier.  Franchisor reserves the right, at its option, to re-inspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria.  Nothing in the foregoing shall be construed to require Franchisor to approve or consider any particular supplier.

E.      To ensure that the highest degree of quality and service is maintained, Franchisee shall operate the Restaurant in strict conformity with such methods, standards and specifications of Franchisor set forth in the Manuals and as may from time to time otherwise be prescribed in writing.  In particular, Franchisee also agrees:

(1)      To sell or offer for sale all menu items, products and services required by Franchisor and in the method, manner, and style of distribution prescribed by Franchisor in the Manuals or otherwise in writing.  Franchisee agrees to comply with the terms of any such distribution program and in connection therewith to execute such documents or instruments that Franchisor may deem necessary to such program.

(2)      To (a) sell and offer for sale only the menu items, products and services that have been expressly approved for sale by Franchisor in the Manuals or otherwise in writing, (b) refrain from deviating from Franchisor's standards and specifications without Franchisor's prior written consent, and (c) discontinue selling and offering for sale any menu items, products or services which Franchisor may, in its sole discretion, disapprove in writing at any time.

(3)      To (a) maintain in sufficient supply and to use and sell at all times only such food and beverage items, ingredients, products, materials, supplies and paper goods that conform to Franchisor's standards and specifications, (b) prepare all menu items in accordance with Franchisor's recipes and procedures for preparation contained in the Manuals or other written directives, including, but not limited to, the prescribed measurements of ingredients, and (c) refrain from deviating from Franchisor's standards and specifications by the use or offer of non-conforming items or differing amounts of any items without Franchisor's prior written consent.

(4)      To permit Franchisor or its agents, during normal business hours, to remove a reasonable number of samples of food or non-food items from Franchisee's inventory or from the Restaurant, without payment therefor, in amounts reasonably necessary for testing by Franchisor or an independent laboratory to determine whether such samples meet Franchisor's then-current standards and specifications.  In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing.

(5)      To purchase or lease and install, at Franchisee's expense, all fixtures, furnishings, Equipment, décor items, signs, and related items as Franchisor may reasonably direct from time to time in the Manuals or otherwise in writing; and to refrain from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, furnishings, Equipment, décor items, signs, games, vending machines or other items not previously approved as meeting

Franchisor's standards and specifications. If any of the property described above is leased by Franchisee from a third party, such equipment lease shall be approved by Franchisor, in writing, prior to execution. Franchisor's approval shall be conditioned upon such equipment lease containing the collateral assignment rights of Franchisor.

(6)     To (a) grant Franchisor and its agents the right to enter upon the Restaurant premises during normal business hours for the purpose of conducting inspections, (b) cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request, and (c) upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, the obligation) to correct such deficiencies and charge Franchisee a reasonable fee for Franchisor's expenses in so acting, payable by Franchisee immediately upon demand.

(7)     To maintain a competent, conscientious, properly trained staff in numbers sufficient to promptly service customers, and to take such steps as are necessary to ensure that such employees preserve good customer relations and comply with such uniform/dress code requirements as Franchisor may prescribe.

(8)     To install and maintain the proper Equipment and telecommunications line(s) necessary, and in accordance with Franchisor's specifications, to permit Franchisor to access and retrieve by telecommunication any information stored on Franchisee's electronic point of sale system and related systems (thereby permitting Franchisor to inspect and electronically monitor information concerning the Restaurant's Gross Sales and such other information as may be contained or stored in such equipment and software). At all times during the term of this Agreement, Franchisee shall obtain and maintain continuous and reliable Internet access or other means of electronic communication, as specified by Franchisor from time to time. It shall be a material default under this Agreement if Franchisee fails to maintain such Equipment, lines, and communication methods in operation and accessible to Franchisor at all times throughout the term of this Agreement. Franchisor shall have access as provided herein at such times and in such manner as Franchisor shall from time to time specify.

(9)     To honor all credit, charge, courtesy or cash cards or other credit devices required or approved by Franchisor. Franchisee must obtain the written approval of Franchisor prior to honoring any previously unapproved credit, charge, courtesy or cash cards or other credit devices. Franchisee shall ensure that the Restaurant adheres to the standards applicable to electronic payments including PCI (Payment Card Industry) standards or any equivalent thereof. If required by Franchisor or by one of the credit card companies, Franchisee shall provide Franchisor with evidence of compliance with the applicable standards and provide, or make available, to Franchisor copies of any audit, scanning results or related documentation relating to such compliance. Any costs associated with an audit or to gain compliance with these standards (including any penalties) shall be borne by Franchisee. Franchisee shall immediately (in any event within twenty-four (24) hours) notify Franchisor if it suspects, or has been notified by any third party of, a possible security breach related to the cashless system (or related cashless data) used in the Restaurant.

(10)     To not issue gift certificates, coupons, scrip or other cash equivalent certificates or devices for use at the Restaurant without the prior written approval of Franchisor. Franchisee must accept all Franchisor issued or approved gift cards and/or certificates presented by customers for purchase of goods or services.

(11)     To obtain, at its sole expense, and maintain at all times during the term of this Agreement, such twenty-four (24)-hour monitored security system equipment and services as may from time to time be required by Franchisor for the protection of the Restaurant and the Franchisee's employees

and customers.  All security system equipment and services must meet the then current standards and specifications established by Franchisor.

F.     Franchisee acknowledges and agrees that Franchisor and/or its affiliates have and may continue to develop for use in the System certain Products which are prepared from confidential proprietary recipes and which are trade secrets of Franchisor (together, the "**Proprietary Products**").  Because of the importance of quality and uniformity of production and the significance of such Proprietary Products to the System, it is to the mutual benefit of the parties that Franchisor closely control the production and distribution of such Proprietary Products (including, without limitation, the bread Products).  Accordingly, Franchisee agrees that it shall purchase solely from Franchisor, or from a source designated by Franchisor, all of such Proprietary Products.  If requested by Franchisor, Franchisee further agrees to purchase from Franchisor or its affiliates for resale to Franchisee's customers certain merchandise identifying the System as Franchisor shall require, such as "FIVE GUYS®" memorabilia and promotional products, in amounts sufficient to satisfy Franchisee's customer demand.

G.     Franchisee shall require all signs, decorations, paper goods (including menus and all forms and stationery used in the franchised business), and other items which may be designated by Franchisor to bear the Marks in the form, color, location and manner prescribed by Franchisor.

H.     Franchisee shall process and handle all consumer complaints connected with or relating to the Restaurant, and shall promptly notify Franchisor by telephone and in writing of all of the following complaints: (i) food related illnesses, (ii) safety or health violations, (iii) claims exceeding One Hundred Dollars ($100.00), and (iv) any other material claims against or losses suffered by Franchisee.  Franchisee shall maintain for Franchisor's inspection any inspection reports affecting the Restaurant or Equipment located in the Restaurant during the term of this Agreement and for thirty (30) days after the expiration or earlier termination hereof.

I.     Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary to appoint Franchisor or its designee its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor or its designee, only upon the termination or expiration of this Agreement (as required under Section XVIII.N.):  (i) all rights to the telephone numbers of the Restaurant and any related and other business listings; and (ii) internet listings, domain names, internet Accounts, websites, listings with search engines, e-mail addresses or any other similar listing or usages related to the Restaurant, the System, and/or the Marks.  Franchisee agrees that it has no authority to and shall not establish any website or listing on the internet without the expressed written consent of Franchisor (including, without limitation, any internet presence on Facebook, Twitter, Instagram, Pinterest and other social media platforms, "**Social Media**") which consent may be denied without reason.

J.     In the event Franchisee sells any food, beverage, products, premiums, novelty items, clothing, souvenirs or performs any services that Franchisor has not prescribed, approved or authorized (in any instance, an "**Unapproved Product or Service**"), Franchisee shall, following notice from Franchisor: (i) immediately cease and desist offering or providing the Unapproved Product or Service, and (ii) pay to Franchisor, on demand, a prohibited product or service fine equal to Two Hundred Fifty Dollars ($250) per day for each day such Unapproved Product or Service was offered or provided by Franchisee.  The prohibited product or service fine shall be in addition to all other remedies available to Franchisor under this Agreement or at law.

K.     Franchisee shall sell, issue, and honor only those gift cards (together "**Gift Cards**") that have been prepared utilizing the standards provided by Franchisor in the Manuals or otherwise in writing. Franchisee shall fully honor all Gift Cards regardless of whether a Gift Card was issued by the Restaurant or another FIVE GUYS® Restaurant. Franchisee shall sell, issue, and redeem (without any offset against any Royalty Fees) Gift Cards in accordance with procedures and policies specified by Franchisor in the Manuals or otherwise in writing, including those relating to procedures by which Franchisee shall (i) request

reimbursement for Gift Cards issued by other FIVE GUYS® Restaurants, and (ii) make timely payments to Franchisor, other operators of FIVE GUYS® Restaurants, and/or third-party service providers for Gift Cards issued from the Restaurant that are later honored by a Restaurant owned or otherwise controlled by Franchisor's affiliate or another FIVE GUYS® Restaurant operator.  In connection with the foregoing, the administration of all Gift Card proceeds and reimbursements shall be controlled by Franchisor or its affiliates.

## VIII.    ADVERTISING AND RELATED FEES

Recognizing the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

A.      Franchisor may from time to time develop and create advertising and sales promotion programs designed to promote and enhance the collective success of all FIVE GUYS® Restaurants operating under the System.  Franchisee shall participate in all such advertising and sales promotion programs in accordance with the terms and conditions established by Franchisor for each program.  In all aspects of these programs, including, without limitation, the type, quantity, timing, placement and choice of media, market areas and advertising agencies, the standards and specifications established by Franchisor shall be final and binding upon Franchisee. Without limiting the generality of this Section VIII., Franchisor currently does not, nor does it permit Franchisee or any franchisee to, advertise or otherwise participate in any sales promotion activities for any FIVE GUYS® Restaurant outside of those efforts administered by Franchisor through the Creative Fund described below. Consequently, Franchisee shall not use, or cause any other party to use, the Marks (or any abbreviation or other name associated with Franchisor and/or the System) as part of any advertisement, commercial, or solicitation without first obtaining Franchisor's written consent.

B.      In addition to the ongoing Creative Fund contributions set forth herein, Franchisee may be required to spend, annually throughout the term of this Agreement, not less than two percent (2%) of the Gross Sales of the Restaurant on advertising for the Restaurant in its local area ("**Local Advertising**").  If required by Franchisor, Franchisee shall submit to Franchisor annually an advertising expenditure report accurately reflecting such expenditures for the preceding period on or before the 1st day of February following the end of each calendar year, provided that such day is a Business Day.  If that day is not a Business Day, then such report shall be due on the next Business Day.  In addition to the restrictions set forth below, costs and expenditures incurred by Franchisee in connection with any of the following shall not be included in Franchisee's expenditures on Local Advertising for purposes of this Section, unless approved in advance by Franchisor in writing:

(1)      Incentive programs for employees or agents of Franchisee (including the cost of honoring any coupons distributed in connection with such programs);

(2)      Research expenditures;

(3)      Food costs incurred in any promotion;

(4)      Salaries and expenses of any employees of Franchisee, including salaries or expenses for attendance at advertising meetings or activities;

(5)      Charitable, political or other contributions or donations;

(6)      In-store materials consisting of fixtures or equipment; and

(7)      Seminar and educational costs and expenses of employees of Franchisee.

C.    Franchisor shall administer a creative fund for the purpose of promoting and marketing the System on a regional or national basis (the "**Creative Fund**").  Franchisee agrees to contribute up to two percent (2.0%) of the Restaurant's weekly Gross Sales for each week to the Creative Fund (the "**Contributions**"), as Franchisor shall determine from time to time.  Such Contributions shall be paid to Franchisor by EFT on or before the Wednesday following each Accounting Period, provided that such day is a Business Day.  If that date is not a Business Day, then payment of the Contributions shall be due on the next Business Day.  Franchisor may, in its sole discretion, increase or reduce Franchisee's required Contribution to the Creative Fund and/or require Franchisee to allocate to the Creative Fund, all or any portion of Franchisee's required Contributions to a Cooperative as described in Section VIII.D. or expenditures for Local Advertising as described in Section VIII.B.  Upon the request of Franchisor, each Contribution to the Creative Fund shall be accompanied by a marketing report itemizing the Gross Sales for the preceding Accounting Period.

Franchisee agrees that the Creative Fund shall be maintained and administered by Franchisor or its designee as follows:

(1)    Franchisor shall direct all promotional programs and shall have sole discretion to approve or disapprove the creative concepts, materials and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Creative Fund is intended to maximize customer service, brand awareness, quality control, general public recognition and acceptance of the Marks (including, without limitation, maintenance and remediation efforts to prevent the potential devaluation of the Marks), and enhance the collective success of all FIVE GUYS® Restaurants operating under the System.  Franchisor shall, with respect to FIVE GUYS® Restaurants operated by Franchisor or any affiliate, submit Contributions to the Creative Fund generally on the same basis as Franchisee.  In administering the Creative Fund, Franchisor and its designees undertake no obligation to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's Contribution or to ensure that any particular franchisee benefits directly or pro rata from the promotional programs.

(2)    Franchisee agrees that the Creative Fund may be used to satisfy any and all costs of maintaining, administering, directing and preparing the Franchisor's secret-shopper program and/or all other internal or external marketing efforts (including, without limitation, the cost of preparing and conducting any franchisee conferences, general marketing campaigns, public relations activities, employing marketing agencies to assist therein, and costs of Franchisor's personnel and other departmental costs for marketing and quality control measures that are internally administered or prepared by Franchisor).  All Contributions to the Creative Fund shall be maintained in a separate account by Franchisor and may be used to defray any of Franchisor's general operating expenses, if any, as Franchisor may incur in activities reasonably related to the administration or direction of the Creative Fund programs for franchisees and the System.  The Creative Fund and its earnings shall not otherwise inure to the benefit of Franchisor.  The Creative Fund is operated primarily as a conduit for collecting the Contributions and expending them towards the marketing and promotional efforts outlined above. Notwithstanding the generality of the foregoing, any rebates or similar allowances duly owed and received by Franchisor as described in Section VIII.I. hereof and subsequently contributed to the Creative Fund shall be subject to the restrictions of this Section VIII.C. and shall not be subject to the Franchisor's discretionary allowance provided for under such Section VIII.H.

(3)    A statement of the operations of the Creative Fund shall be prepared annually by Franchisor and shall be made available to Franchisee upon request.

(4)    Although the Creative Fund is intended to be of perpetual duration, Franchisor may terminate the Creative Fund.  The Creative Fund shall not be terminated, however, until all monies in the Creative Fund have been expended as contemplated above or returned to contributing franchised businesses or those operated by Franchisor or any affiliate, without interest, on the basis of their respective contributions.

D.      Franchisee agrees that Franchisor shall have the right, in its reasonable discretion, to designate any geographic area in which two (2) or more FIVE GUYS® Restaurants are located as a region for purposes of establishing an advertising cooperative (each, a "**Cooperative**").  Each Cooperative shall be organized and governed in a form and manner, and shall commence operation on a date, determined in advance by Franchisor in its reasonable discretion.  Each Cooperative shall be organized for the exclusive purposes of administering advertising programs and developing, subject to Franchisor's approval pursuant to Section VIII.G., promotional materials for use by the members in Local Advertising.  If at the time of the execution of this Agreement a Cooperative has been established for a geographic area that encompasses the Restaurant, or if any such Cooperative is established during the term of this Agreement, Franchisee shall execute such documents as are required by Franchisor immediately upon the request of Franchisor and shall become a member of the Cooperative pursuant to the terms of those documents.  Franchisee shall participate in the Cooperative as follows:

(1)      Subject to Section VIII.C., Franchisee shall contribute to the Cooperative such amounts required by the documents governing the Cooperative; *provided, however*, Franchisee shall not be required to contribute more than one percent (1%) of Franchisee's Gross Sales during each Accounting Period to the Cooperative unless, subject to Franchisor's reasonable approval, the members of the Cooperative agree to the payment of a larger fee.  Any and all contributions to a Cooperative shall also be applied toward the satisfaction of the Franchisee's Local Advertising requirement set forth in Section VIII.B.;

(2)      Franchisee shall submit to the Cooperative and to Franchisor such statements and reports as may be required by Franchisor or by the Cooperative.  All contributions to the Cooperative shall be maintained and administered in accordance with the documents governing the Cooperative.  The Cooperative shall be operated solely as a conduit for the collection and expenditure of the Cooperative fees for the purposes outlined above; and

(3)      No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without the prior approval of Franchisor.  All such plans and materials shall be submitted to Franchisor in accordance with the procedure set forth in Section VIII.F.

E.      Regardless of whether Franchisor establishes a Creative Fund under Section VIII.C. and/or a Cooperative established under Section VIII.D. applicable to the Restaurant, the total required advertising contributions or payments by Franchisee under this Section VIII. to (i) the Creative Fund, (ii) the Cooperative, and (iii) the Local Advertising obligations, shall never exceed four percent (4%) of Franchisee's Gross Sales.

F.      All marketing and promotion by Franchisee in any medium shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals.  Franchisee shall obtain Franchisor's approval of all marketing and promotional plans and materials prior to use if such plans and materials have not been prepared by Franchisor or previously approved by Franchisor during the twelve (12) months prior to their proposed use.  Franchisee shall submit such unapproved plans and materials to Franchisor, and Franchisor shall approve or disapprove such plans and materials within fifteen (15) Business Days of Franchisor's receipt thereof, which approval shall not be unreasonably withheld.  Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor, and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.  Franchisee shall not advertise or use the Marks in any fashion on the internet, world wide web or via other means of advertising through telecommunication without the express written consent of Franchisor.  Franchisor has sole discretion and control over any Social Media presence using, displaying, or otherwise relating to the Marks.  Franchisor may use part of the Contributions collected pursuant to Section VIII.C. under this Agreement to pay, reimburse, or defray the costs associated with the development, maintenance, operation, and/or updates to its presence on Social Media.  Franchisor may elect, but is in no way required, to establish guidelines under which Franchisee may establish profiles or otherwise establish a presence on Social Media platforms

("**Social Media Guidelines**").  In such event, Franchisee must comply with the standards, protocols and restrictions proscribed by Franchisor in the Social Media Guidelines or otherwise in writing.

G.      With respect to the offer and sale of all menu and beverage Products, Franchisor may from time to time offer guidance with respect to the selling price for such goods, products and services.  Except with respect to maximum prices set forth below, Franchisee is in no way bound to adhere to any such recommended or suggested price.  Franchisee shall have the right to sell its products and provide services at any price that Franchisee may determine, except that Franchisor reserves the right to establish maximum prices for any given product or service nationwide or within an advertising market (as determined by Franchisor) to the extent such maximum prices are for a limited time only.  Franchisee shall not exceed any maximum price established by Franchisor, but at all times remains free to charge any price below the maximum established by Franchisor.  Franchisee shall execute any instruments or other writings required by Franchisor to facilitate the provision of such products and services.  If Franchisee elects to sell any or all of its Products at any price recommended by Franchisor, Franchisee acknowledges that Franchisor has made no guarantee or warranty that offering such Products at the recommended price shall enhance Franchisee's sales or profits.

H.      In the event that any volume discounts, rebates, allowances, or other similar discounts are received by the Franchisor from any manufacturer or other supplier designated by the Franchisor on account of purchases made by the Franchisor for its account or for the account of the Franchisee, or by the Franchisee directly for his/her own account, the Franchisor shall have the option of remitting same to the Creative Fund or retain the full amount of the said volume discounts, rebates, allowances, or other similar discounts.

I.      Franchisor, Franchisee, and the Controlling Principals recognize the potentially detrimental impact of unauthorized media interviews on the goodwill and public image of the System. Consequently, Franchisee and the Controlling Principals shall not, and shall take all steps necessary to cause each Franchisee Designee to not, engage in any interviews, discussions, photo opportunities, or similar conversations (in any such instance, an "**Interview**") with any media channel, media internet source, news publication, journalist, reporter, blogger, or similar media outlet (in any such instance, the "**Media**") wherein such Interview identifies, or reasonably could identify, the Franchisee, the Controlling Principals, the Franchisee Designees, or the Restaurant as being associated with the Marks and/or the System. The parties acknowledge and agree that full compliance with the foregoing Media restriction is of substantial importance to Franchisor, and any breach shall be deemed a material breach of this Agreement and each Other Agreement with no opportunity to cure.

## IX.   MARKS

A.      Franchisor grants Franchisee the right to use the Marks during the term of this Agreement solely at the Restaurant from its Approved Location and in accordance with the System and related standards and specifications.

B.      Franchisee expressly understands and acknowledges that:

(1)     As between Franchisor and Franchisee, Franchisor is the sole licensor and beneficial owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them.

(2)     Neither Franchisee nor any Controlling Principal shall take any action that would prejudice or interfere with the validity of Franchisor's rights with respect to the Marks.  Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Marks or any service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the System in accordance with the terms and conditions of this Agreement for the operation of the Restaurant from its Approved Location and in approved advertising related to the

Restaurant. Franchisee understands and agrees that the limited license to use the Marks granted hereby applies only to such Marks as are designated by Franchisor, and which are not subsequently designated by Franchisor as being withdrawn from use, together with those which may hereafter be designated by Franchisor in writing. Franchisee expressly understands and agrees that it is bound not to represent in any manner that it has acquired any ownership or equitable rights in any of the Marks by virtue of the limited license granted hereunder, or by virtue of Franchisee's use of any of the Marks.

(3)     Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Marks and the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Marks.

(4)     Franchisee shall not contest the validity of Franchisor's or any affiliate's interest in the Marks or assist others to contest the validity of or Franchisor's or any affiliate's interest in the Marks.

(5)     Franchisee acknowledges that any unauthorized use of the Marks shall constitute an infringement of Franchisor's rights in the Marks and a material event of default hereunder. Franchisee agrees that it shall provide Franchisor with all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor or its affiliate all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Marks.

(6)     If it becomes advisable at any time, in the discretion of Franchisor, to modify or discontinue use of any Mark and/or to adopt or use one or more additional or substitute proprietary marks, then Franchisee shall be obligated to comply with any such instruction by Franchisor.  Franchisor shall have no obligation in such event to reimburse Franchisee for its documented expenses of compliance. Franchisee waives any claim arising from or relating to any Mark change, modification or substitution. Franchisor shall not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any Mark addition, modification, substitution or discontinuation.  Franchisee covenants not to commence or join in any litigation or other proceeding against Franchisor for any of these expenses, losses or damages.

C.     With respect to Franchisee's limited licensed use of the Marks pursuant to this Agreement, Franchisee further agrees that:

(1)     Unless otherwise authorized or required by Franchisor, Franchisee shall operate the Restaurant only under the name "FIVE GUYS" and "FIVE GUYS BURGERS AND FRIES", each without prefix or suffix.  Franchisee shall not use the Marks, or any derivation thereof, as part of its corporate or other legal name, and shall obtain the Franchisor's approval of such corporate or other legal name prior to filing it with the applicable state authority.

(2)     During the term of this Agreement and any renewal hereof, Franchisee shall at all times identify itself as the independent owner and operator of the Restaurant in conjunction with any use of the Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Restaurant as Franchisor may designate in writing.

(3)     Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor or its affiliates.

(4)     Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

FIVE GUYS – Franchise Agreement (2022)

D.      Franchisee shall notify Franchisor immediately by telephone and thereafter in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, of any claim by any person of any rights in any Mark, and Franchisee and the Controlling Principals shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim.  Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates, of any settlement, litigation or Patent and Trademark Office or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Mark.  Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any affiliate in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Marks.  Franchisor shall indemnify Franchisee and hold it harmless from and against any and all claims, liabilities, costs, damages and reasonable expenses for which Franchisee is held liable in any proceeding arising out of Franchisee's use of any of the Marks (including settlement amounts), provided that the conduct of Franchisee and the Controlling Principals with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

E.      The right and license of the Marks granted hereunder to Franchisee is non-exclusive, and Franchisor and its affiliates have and retain the following rights, among others, subject only to the limitations of Section I.:

(1)      To grant other licenses for use of the Marks outside of the Primary Area of Responsibility;

(2)      To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to Franchisee; and

(3)      To engage, directly or indirectly, through its employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (a) the production, distribution, license and sale of products and services, and (b) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

## X.      CONFIDENTIALITY AND NON-COMPETITION COVENANTS

A.      (1)      To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under the Marks, Franchisee shall conduct its business in accordance with the Manuals, other written directives which Franchisor may issue to Franchisee from time to time, and any other manuals and materials created or approved by Franchisor for use in the operation of the Restaurant (collectively, the "**Confidential Information**").

(2)      Franchisee and the Controlling Principals shall, and shall cause the Operating Principal and General Manager to, at all times treat and maintain the Confidential Information as private and confidential in accordance with this Section X. Franchisee and the Controlling Principals shall divulge and make available such Confidential Information only to those employees of Franchisee that must have access to it in order to operate the Restaurant.  Franchisee and the Controlling Principals shall not at any time copy, duplicate, record or otherwise reproduce any of the materials comprising the Confidential Information, in whole or in part, or otherwise make the same available to any person other than those authorized above.

(3)     The Manuals and all other Confidential Information shall at all times remain the sole property of Franchisor, shall at all times be kept in a secure place on the Restaurant premises, and shall be returned to Franchisor immediately upon request or upon termination or expiration of this Agreement.

(4)     The Manuals and all other Confidential Information shall supplement and be deemed part of this Agreement.

(5)     Franchisor may from time to time revise the contents of the Manuals, the Videos, and/or any other materials containing Confidential Information and created or approved for use in the operation of the Restaurant.  Franchisee expressly agrees to comply with each new or changed standard promulgated by the Franchisor.  Franchisee shall remove and return to Franchisor all pages of the Manuals that have been replaced or updated by Franchisor, and shall return to Franchisor all Videos that are replaced with updated copies.

(6)     Franchisee shall at all times ensure that the Manuals are kept current and up to date.  In the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor on the extranet accessible by Franchisee shall control.

B.     (1)     Neither Franchisee nor any Controlling Principal shall, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation and, following the expiration or termination of this Agreement, they shall not use for their own benefit any Confidential Information, knowledge or know-how concerning the methods of operation of the Restaurant which may be communicated to them or of which they may be apprised in connection with the operation of the Restaurant under the terms of this Agreement.  Any and all information, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement shall be deemed Confidential Information for purposes of this Agreement.   The covenants in this Section X. shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

(2)     If Franchisee or the Controlling Principals develop any new concept, process product, recipe, or improvement in the operation or promotion of the Restaurant, Franchisee is required to promptly notify Franchisor and provide Franchisor with all necessary related information, without the benefit of compensation.  Franchisee and the Controlling Principals acknowledge that any such concept, process product, recipe, or improvement shall become the property of Franchisor, and Franchisor may use or disclose such information to other FIVE GUYS® franchisees or developers as it determines to be appropriate, also without the benefit of compensation.

C.     (1)     Franchisee and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Franchisee and the Controlling Principals shall receive valuable training, trade secrets and Confidential Information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the System which are beyond the present skills and experience of Franchisee and the Controlling Principals and Franchisee's managers and employees (collectively, "**Proprietary Information**").  Franchisee and the Controlling Principals agree that such Proprietary Information, which may or may not be considered "trade secrets" under prevailing judicial interpretations or statutes, is private, valuable, and constitutes "trade secrets" belonging to Franchisor and its affiliates.  Franchisee and the Controlling Principals agree that Franchisor and its affiliates derive independent economic value from the foregoing information not being generally known to, and not being readily ascertainable through proper means by, another person.  Franchisee and the Controlling Principals acknowledge and agree that they shall not acquire any interest in Proprietary Information, other than the right to use it as Franchisor specifies in operating the Restaurant during the term of this Agreement.  Franchisee and the Controlling Principals also agree that such Proprietary Information provides a competitive advantage and shall be valuable to them in the development and operation of the Restaurant, and that gaining access to such Proprietary Information is, therefore, a primary reason why such

persons are entering into this Agreement. In consideration for such Proprietary Information and related rights, Franchisee and the Controlling Principals covenant that during the term of this Agreement, except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership or corporation:

        (a)    Divert, or attempt to divert, any business or customer of the Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

        (b)    Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist, or make loans to any restaurant brand that specializes in the service of primarily (individually or collectively) hamburgers, hot dogs, or french fries - or related iterations thereof (e.g., cheeseburgers) - and has locations operating in the United States or any other country, province, or geographic area in which the Marks have either been registered or where Franchisor and/or its affiliate have sought registration of the Marks (any such restaurant brand, a "**Competing Restaurant**"). For purposes of clarification, any restaurant brand that derives, or shall reasonably derive, twenty five percent (25%) or less of its annual revenue from the collective sale of hamburgers, hot dogs, and french fries (including related iterations thereof (e.g., cheeseburgers)) shall not be deemed a Competing Restaurant. Additionally, so long as Franchisee and the Controlling Principals adhere to the confidentiality restrictions set forth in this Agreement and in each of the Other Agreements, the restrictions contained in this Section X.C.(1)(b) shall also not apply to any Competing Restaurant owned and operated by entities in which Franchisee or a Controlling Principal owns only a nominal (i.e., ten percent (10%) or less), passive, and non-voting equity interest.

        (2)    For a continuous, uninterrupted period commencing upon the expiration, termination, or transfer of all of Franchisee's interest in this Agreement (or, with respect to each of the Controlling Principals, the time such individual or entity ceases to satisfy the definition of  a "Controlling Principal" as described in Section XIX.R. of this Agreement) and continuing for two (2) years thereafter, neither Franchisee nor any of the Controlling Principals shall, directly or indirectly, for themselves, or through, on behalf of or in conjunction with any person, persons, or Entity:

        (a)    Divert, or attempt to divert, any business or customer of the Restaurant hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

        (b)    Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in any Entities, trusts, unincorporated associations or joint ventures), advise, assist or make loans to any Competing Restaurant which business is, or is intended to be, located within the Primary Area of Responsibility or within a twenty-five (25) mile radius of the location of any FIVE GUYS® Restaurant in existence or under construction at any given time during such period. So long as Franchisee and the Controlling Principals adhere to the confidentiality restrictions set forth in this Agreement and in each of the Other Agreements, the restrictions contained in this Section X.C.(2)(b) shall also not apply to any Competing Restaurant owned and operated by entities in which Franchisee or a Controlling Principal owns only a nominal (i.e., ten percent (10%) or less), passive, and non-voting equity interest.

        (3)    Franchisee agrees that the time periods contained in this Section X. will be tolled for any period during which Franchisee or any Controlling Principals is in breach of the covenants and any other period during which Franchisor seeks to enforce this Agreement.  The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.  The parties agree that each of the covenants herein shall

be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee and the Controlling Principals expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

(a)     Franchisee and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section X.C. in this Agreement, or any portion thereof, without their consent, effective immediately upon notice to Franchisee; and Franchisee and the Controlling Principals agree that they shall comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section XIX.B. hereof.

(b)     Franchisee and the Controlling Principals expressly agree that the existence of any claims they may have against Franchisor (arising from this Agreement or otherwise) shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.

(c)     Sections X.C.(1)(b) and (2)(c) shall not apply to ownership of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

D.     Franchisee and the Controlling Principals acknowledge that any failure to comply with the requirements of this Section shall constitute a material event of default under Section XVII. hereof.  Franchisee and the Controlling Principals acknowledge that a violation of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee and the Controlling Principals accordingly consent to the issuance of an injunction prohibiting any conduct by Franchisee or the Controlling Principals in violation of the terms of this Section.  Franchisee and the Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in connection with the enforcement of this Section, including payment of all costs and expenses for obtaining specific performance of, or injunctive relief against the violation of, the requirements of such Section.

## XI.   BOOKS AND RECORDS

A.     Franchisee shall maintain during the term of this Agreement, and shall preserve for at least three (3) years from the dates of their preparation, full, complete and accurate books, records and accounts (including, but not limited to, sales slips, coupons, purchase orders, payroll records, check stubs, bank statements, sales tax records and returns, cash receipts and disbursements, journals and ledgers, records of EFT transactions, and backup or archived records of information maintained on any computer system) in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manual or otherwise in writing.

B.     In addition to the remittance reports required by Sections IV. and VIII. hereof, Franchisee shall timely comply with the following reporting obligations upon request of Franchisor:

(1)     Franchisee shall, at its own expense, submit to Franchisor a profit and loss statement for the Restaurant in the form prescribed by Franchisor (a "**P&L Statement**") for the most recently concluded thirteen (13) four (4) week accounting period (the "**Statement Period**") within fifteen (15) days after the end of each Statement Period during the term hereof.  Each P&L Statement may be unaudited, but must be signed by Franchisee's treasurer or chief financial officer or comparable officer attesting that it is true, complete and correct;

(2)     Franchisee shall, at its own expense, provide Franchisor with a complete annual financial statement of the Restaurant which has been prepared by an independent certified public accountant

(an "**Annual Statement**") within ninety (90) days after the end of each fiscal year.  The Annual Statement shall accurately reflect the results of operations of the Restaurant during such fiscal year and may be unaudited; *provided, however*, that Franchisor reserves the right, pursuant to Section XI.C. hereof, to require that the Annual Statement be audited by an independent certified public accountant at Franchisee's cost and expense if an inspection discloses an understatement of two percent (2%) or more; and

(3)     Franchisee shall also submit to Franchisor, for review or auditing, such other forms, reports, records, information and data as Franchisor may reasonably designate and which pertain to the Restaurant, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in writing.

C.     Franchisor or its designees shall have the right to review, audit, examine and copy any or all of Franchisee's books and records relating to the Restaurant.  Franchisee shall make such books and records available to Franchisor or its designees immediately upon request.  If any required Royalty Fees to Franchisor are delinquent, or if an inspection should reveal that such payments have been understated in any Royalty Report, then Franchisee shall immediately pay Franchisor the amount overdue or understated upon demand with interest determined in accordance with the provisions of Section IV.B.(4).  If an inspection discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition, reimburse Franchisor for all costs and expenses connected with the inspection (including, without limitation, reasonable accounting and attorneys' fees).  These remedies shall be in addition to any other remedies Franchisor may have at law or in equity.

D.     Franchisee understands and agrees that the receipt or acceptance by Franchisor of any Royalty Reports furnished or Royalty Fees paid to Franchisor (or the cashing of any royalty checks or processing of any EFT payments) shall not preclude Franchisor from questioning the correctness thereof at any time and, in the event that any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified by the Franchisee and the appropriate payment shall be made by the Franchisee.

E.     Franchisee hereby authorizes (and agrees to execute any other documents deemed necessary to effect such authorization) all banks, financial institutions, businesses, suppliers, manufacturers, contractors, vendors and other persons or entities with which Franchisee does business to disclose to Franchisor any requested financial information in their possession relating to Franchisee or the Restaurant.  Franchisee authorizes Franchisor to disclose data from Franchisee's reports, if Franchisor determines, in its sole discretion, that such disclosure is necessary or advisable, which disclosure may include disclosure to prospective or existing franchisees or other third parties.

F.     Franchisee hereby appoints Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by Franchisee with any state and/or federal taxing authority pertaining to the Restaurant.  This power of attorney shall survive the expiration or termination of this Agreement.

## XII.   INSURANCE

A.     (1)     Upon execution of this Agreement, Franchisee shall procure at its own expense, and maintain in full force and effect at all times during the term of this Agreement, an insurance policy or policies protecting Franchisee and, separately, Franchisor (collectively with Franchisor's affiliates, successors and assigns, and their respective partners and the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of each of them, the "**Designees**") against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Restaurant.

(2)     Such policy or policies shall be written by a responsible carrier or carriers reasonably acceptable to Franchisor and shall include, at a minimum (except as additional coverages and

higher policy limits may reasonably be specified by Franchisor from time to time), in accordance with standards and specifications set forth in writing, the following:

(a)     Commercial general liability insurance, including property damage, personal injury, advertising injury, completed operations, products liability, and contracts liability in the amount of Two Million Dollars ($2,000,000) per occurrence and in the aggregate.

(b)     Property insurance providing coverage for "All Risks" of physical loss or damage and insuring, at a minimum, all perils insured under the ISO "Special Form Causes of Loss" form, in an amount equal to or greater than the full cost of replacement of the Restaurant premises and all other property in which Franchisee may have an interest with no coinsurance clause for the premises. The property insurance coverage described in the foregoing shall include coverage for business interruption in an amount sufficient to cover no less than twelve (12) months of the Restaurant's Gross Sales (or projected Gross Sales, as the case may be), and Franchisor reserves the right to require that such policy be extended to include coverage for earth movement, flood, wind and hail, and other perils as deemed necessary by Franchisor.

(c)     Crime insurance for employee dishonesty in the amount of Ten Thousand Dollars ($10,000) per occurrence.

(d)     Worker's compensation insurance in amounts provided by applicable law or, if permissible under applicable law, a legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to Franchisor, provided that Franchisee maintains an excess indemnity or "umbrella" policy covering employer's liability and/or a medical/disability policy covering medical expenses for on-the-job accidents, which policy or policies shall contain such coverage amounts as Franchisee and Franchisor shall mutually agree upon.

(e)     Commercial automobile liability insurance coverage for bodily injury and property damage for all owned, rented, leased, and/or hired vehicles used by the Franchisee in connection with the operation of the Restaurant in the amount of One Million Dollars ($1,000,000) per occurrence and in the aggregate.

(f)     Network security, media & cyber liability insurance covering acts, errors, omissions, breach of contract, and violation of any consumer protection laws arising out of Franchisee's operations or services with a limit of Two Million Dollars ($2,000,000) per occurrence and in the aggregate. Such coverage shall, at a minimum, include (i) contractual privacy coverage for data breach response and crisis management costs that would be incurred by Franchisor in the event of a data breach including legal and forensic expenses, notification costs, credit monitoring costs, and costs to operate a call center; and (ii) third party and first party coverage for loss or disclosure of any data, including personally identifiable information and payment card information, network security failure, violation of any consumer protection laws, unauthorized access and/or use or other intrusions, infringement of any intellectual property rights (except patent), unintentional breach of contract, negligence or breach of duty to use reasonable care, breach of any duty of confidentiality, invasion of privacy, or violations of any other legal protections for personal information, defamation, libel, slander, commercial disparagement, negligent transmission of computer virus, or use of computer networks in connection with denial of service attacks.

(g)     Employment practices liability coverage including endorsement for third-party claims in the amount of Two Million Dollars ($2,000,000) per occurrence and in the aggregate.

(h)     Such other insurance as may be required by the state or locality in which the Restaurant is located and operated.

(i)     Franchisee may, with the prior written consent of Franchisor, elect to have reasonable deductibles in connection with the coverage required under Sections XII.A(2)(a)-(h) hereof;

*provided, however*, neither Franchisor nor it Designees shall be responsible for any deductibles and/or waiting periods that may appear in Franchisee's policies.

(3)     In connection with any construction, renovation, refurbishment or remodeling of the Restaurant, Franchisee shall maintain Builder's Risk insurance or equivalent course of construction coverage on its property insurance  in  an amount sufficient to cover the contract value of the project plus any existing property (and such insurance shall be extended to provide "*delay in opening*" coverage, where available).

(4)     Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section XV of this Agreement.

(5)     All policies obtained and maintained by Franchisee shall (i) contain cross liability coverage and severability on interests language, (ii) include a waiver of subrogation in favor of Franchisor and its Designees (to the extent permitted by law), (iii) be primary and non-contributory with any and all coverages held by Franchisor and/or its Designees, and (iv) be issued by an insurance company rated at least 'A' 'VIII' in the most current edition of A.M. Best Guide.  Franchisee shall also cause Franchisor and its Designees to be included as additional insured under all above policies except worker's compensation insurance, and such policies shall expressly provide that any interest of Franchisor therein shall not be affected by any breach by Franchisee of any policy provisions. All such policies shall contain a provision that Franchisor and its Designees, although named as additional insured, shall nevertheless be entitled to recover under such policies on any loss occasioned to Franchisor or its servants, agents or employees by reason of the negligence of Franchisee or its servants, agents or employees.

(6)     Upon execution of this Agreement, and thereafter in accordance with Section IV. hereof and thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor the Certificates of Insurance and Endorsements evidencing the existence and continuation of proper coverage with limits not less than those required hereunder.  In addition, if requested by Franchisor, Franchisee shall deliver to Franchisor a copy of the insurance policy or policies required hereunder.  Further, all insurance policies required hereunder shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Franchisor in the event of a material alteration to or cancellation of the policies. In accordance with the foregoing, all delivered Certificates of Insurance and Endorsements evidencing the existence and continuation of proper coverage shall be sent electronically to insurance@fiveguys.com, and with hard copies to the following address upon request, or such other address(es) as Franchisor may designate from time to time:

FIVE GUYS FRANCHISOR, LLC
10718 Richmond Highway
Lorton, Virginia 22079
<u>Attention</u>: Risk Management Department

(7)     Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in writing, Franchisor shall have the right and authority, but not the obligation, to immediately procure such insurance and charge the same to Franchisee, which shall be payable by Franchisee immediately upon notice.  The foregoing remedies shall be in addition to any other remedies Franchisor may have at law or in equity.

## XIII.   DEBTS AND TAXES

A.     Franchisee shall promptly pay when due all Taxes (as defined below), levied or assessed, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the

franchised business under this Agreement.  Without limiting the provisions of Section XV., Franchisee shall be solely liable for the payment of all Taxes and shall indemnify Franchisor for the full amount of all such Taxes and for any liability (including penalties, interest and expenses) arising from or concerning the payment of Taxes actually owed by Franchisee.  If requested by Franchisor, Franchisee shall submit to Franchisor a copy of all tax filings sent to all applicable tax authorities within ten (10) Business Days.

B.      Each payment to Franchisor required under this Agreement shall be made free and clear and without deduction for any Taxes.  As used herein, the term "**Taxes**" means any present or future taxes, levies, imposts, duties or other charges of whatsoever nature, including any interest or penalties thereon, imposed by any government or political subdivision of such government on or relating to the operation of the Restaurant.

C.      In the event of any bona fide dispute as to Franchisee's liability for Taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the Tax or indebtedness in accordance with the procedures of the taxing authority or applicable law.  However, in no event shall Franchisee permit or otherwise cause a tax sale or seizure by levy of execution or similar writ or warrant or attachment by a creditor, to occur against the premises of the Restaurant or any improvements thereon.

D.      Franchisee shall comply with all federal, state and local laws, rules and regulations and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Restaurant, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, fire clearances, health permits, certificates of occupancy and any permits, certificates or licenses required by any environmental law, rule or regulation.

E.      Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit or proceeding and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the Restaurant.

## XIV.   TRANSFER OF INTEREST

A.      Franchisor shall have the right, without the need for Franchisee's consent, to assign, transfer and/or sell its rights under this Agreement to any person, partnership, corporation or other legal Entity, provided that the transferee agrees in writing to assume all obligations undertaken by Franchisor herein and Franchisee receives a statement from both Franchisor and its transferee to that effect.  Upon such assignment and assumption, Franchisor shall be under no further obligation hereunder, except for accrued liabilities, if any.  Franchisee further agrees and affirms that Franchisor may (i) go public, (ii) engage in a private placement of some or all of its securities, (iii) merge, acquire other corporations, or be acquired by another corporation, and/or (iv) undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring. Franchisee specifically waives any and all other claims, demands or damages arising from or related to the foregoing activities including, without limitation, any claim of divided loyalty, breach of fiduciary duty, fraud, breach of contract or breach of the implied covenant of good faith and fair dealing.

Franchisee further agrees that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities as FIVE GUYS® Restaurants operating under the Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of these facilities, *provided, however*, Franchisor agrees that it shall not convert any acquired facility located within the Primary Area of Responsibility, if any, into a FIVE GUYS® Restaurant.

If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in the restaurant business or to offer or sell any products or services to Franchisee.

FIVE GUYS – Franchise Agreement (2022)

B.      (1)      Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted rights under this Agreement in reliance on the business skill, financial capacity and personal character of Franchisee and the Controlling Principals.  Accordingly, neither Franchisee nor any Controlling Principal, nor any successor or assign of Franchisee or any Controlling Principal, shall sell, assign (including, without limitation, by operation of law due to an assignment under bankruptcy or insolvency laws, intestate succession, divorce or otherwise), transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in this Agreement, in the Restaurant (and/or all, or substantially all, of the Restaurant's material assets), in Franchisee or in any Controlling Principal that is an Entity, in each case without the prior written consent of Franchisor.  Any purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement shall be null and void and shall constitute a material event of default under this Agreement.

(2)      If Franchisee or a Controlling Principal wishes to (i) transfer all or part of its interest in this Agreement, the Restaurant, or all, or substantially all, of the Restaurant's material assets, or (ii) transfer any ownership interest in Franchisee or in a Controlling Principal that is an Entity, then in each such case (any or all of which are referred to in this Section XIV. as a "**Restricted Transfer**"), the transferor and the proposed transferee shall first apply to Franchisor for its consent and may concurrently request a waiver of Franchisor's rights under Section XIV.D. Without limiting its rights under Section XIV.D., Franchisor agrees that it shall not unreasonably withhold its consent to a Restricted Transfer.  Among other conditions, Franchisor may require any or all of the following as conditions to its approval:

(a)      All of the accrued monetary and other outstanding obligations of Franchisee (and any of its affiliates) to Franchisor (or any of its affiliates) arising under this Agreement or any other agreement shall have been satisfied in a timely manner and Franchisee shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner;

(b)      Franchisee and its affiliates shall not be in default of any provision of this Agreement or any Other Agreement at the time of the transaction;

(c)      Franchisor, the transferor and its principals (if applicable) shall execute a general release, in a form reasonably satisfactory to Franchisor, of any and all claims against Franchisor, its affiliates, and its Designees, including, without limitation, claims arising under this Agreement, any agreement directly or indirectly related to this Agreement, and all applicable laws;

(d)      The proposed transferee shall demonstrate to Franchisor's reasonable satisfaction that it meets the criteria considered by Franchisor when reviewing a prospective franchisee's application for a franchise, including, but not limited to, (i) Franchisor's educational, managerial and business standards, (ii) the proposed transferee's good moral character, business reputation and credit rating, (iii) transferee's aptitude and ability to properly operate the Restaurant (as may be evidenced by prior related business experience or otherwise), (iv) the proposed transferee's financial resources and capital for operation of the Restaurant, and (v) the geographic proximity and number of other Restaurants owned or operated by the proposed transferee;

(e)      The proposed transferee shall enter into a written agreement, in a form satisfactory to Franchisor, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements contained in this Agreement; and, if transferee is as Entity, the proposed transferee's shareholders, partners or other investors, as applicable, shall execute such other agreements as Franchisor requires in order to guarantee the performance of all such obligations, covenants and agreements;

(f)      The proposed transferee shall execute a Franchise Agreement having material terms substantially similar in all material respects to this Agreement (i.e., the fees, protected

territory, and renewal rights), together with such other ancillary agreements substantially similar to the forms attached hereto (and if the proposed transferee is an Entity, transferee's shareholders, partners, or other investors, as applicable, shall also execute such agreements as Franchisor requires in order to guarantee the performance of all such obligations, covenants and agreements);

(g)     The proposed transferee, at its expense, shall renovate, modernize and otherwise upgrade the Restaurant and conform it to the then-current standards and specifications of the System, and shall complete the upgrading and other requirements which conform to the system wide standards within the time period reasonably specified by Franchisor;

(h)     The transferor shall remain liable for all of the obligations to Franchisor in connection with the Restaurant incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

(i)     At the proposed transferee's expense, the transferee, the transferee's operating principal, general manager, as applicable, and/or any other applicable Restaurant personnel shall complete any training programs then in effect for franchisees of FIVE GUYS® Restaurants upon such terms and conditions as Franchisor may reasonably require;

(j)     Franchisee shall pay a transfer fee of Five Thousand Dollars ($5,000) to Franchisor for the transfer of this Agreement to cover the allocated costs of interdepartmental review and document preparation; and

(k)     If the proposed transferee is an Entity, the transferee shall make and shall be bound by any or all of the representations, warranties and covenants set forth at Section VI. as Franchisor requests.  Transferee shall provide to Franchisor evidence satisfactory to Franchisor that the terms of such Section have been satisfied and are true and correct on the date of transfer.

(3)     Franchisee shall not grant a security interest in the Restaurant or in any of Franchisee's assets at the Restaurant without Franchisor's prior written consent. For purposes of clarification, Franchisee acknowledges and agrees that in no event may this Agreement, the Development Agreement, or any Other Agreement signed in connection this Agreement or the Development Agreement be pledged as collateral or otherwise encumbered as security for any loan or other financial transaction to which Franchisee or a Controlling Principal is a party.

(4)     Franchisee acknowledges and agrees that each condition which must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

C.     In the event the proposed transfer is from one or more individuals to an Entity formed solely for the convenience of ownership, Franchisor's consent may be conditioned upon any of the requirements set forth at Section XIV.B.(2), except that the requirements set forth at Sections XIV.B.(2)(c), (d), (f), (g), (i), (j) and (k) shall not apply so long as each individual retains the same proportionate ownership interest in the Entity as he or she had prior to the transfer.

D.     If Franchisee or a Controlling Principal wishes to enter into a Restricted Transfer constituting a transfer all or part of its interest in this Agreement, the Restaurant, or all, or substantially all, of the Restaurant's material assets (such transferring party being referred to as the "**Seller**"), then such Seller shall first notify Franchisor in writing of its intent by delivering to Franchisor a completed transfer application in such form as Franchisor may prescribe in the Manuals or otherwise in writing and which shall describe, among other things, the interest to be transferred and the consideration therefor (the "**Transfer Notice**"), and shall provide such additional information and documentation relating to the contemplated Restricted Transfer as Franchisor may require. Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written Transfer Notice and copies of all other

documentation required by Franchisor, to send written notice to the Seller that Franchisor intends to purchase the Seller's interest on terms consistent with the material terms and conditions stipulated in the written Transfer Notice and on such forms and other reasonable and customary terms as Franchisor may prescribe (including, without limitation, the substitution of equivalent cash consideration for any form of payment stipulated in the Transfer Notice not comprised of cash).  In the event that Franchisor elects to purchase the Seller's interest, closing on such purchase must occur within the latter of (a) thirty (30) days from the date of notice to the Seller of the election to purchase by Franchisor, (b) thirty (30) days from the date Franchisor receives or obtains all necessary and requested documentation, permits, and approvals, or (c) such other date as the parties agree upon in writing.  If Franchisor rejects or otherwise fails to purchase the Seller's interest in accordance with the foregoing, then Seller shall be free to pursue its intended transfer on terms and conditions identical to those stipulated in the Transfer Notice (a "**Third Party Sale**"), subject to the requirements set forth in Section XIV.D. of this Agreement. The closing of any transaction involving a Third Party Sale shall be consummated no later than one hundred and eighty (180) days after the date on which the written Transfer Notice was first delivered to Franchisor.  In the event a transaction involving a Third Party Sale is not closed within the foregoing time period, the proposed sale shall again be subject to Franchisor's right of first offer as described herein, unless such subsequent right is waived by Franchisor in writing.  Any material change in the terms of any Third Party Sale prior to closing shall constitute a new offer to Franchisor, and shall be subject to the same right of first offer restrictions set forth above. Failure or refusal of Franchisor to exercise the option afforded by this Section XIV.D. shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section XIV.D. relating to a proposed transfer. Failure by Franchisee and/or Controlling Principal to comply with the provisions of this Section XIV.D. prior to the transfer of any interest in Franchisee or in this Agreement shall constitute a material event of default under this Agreement.  Franchisor shall be entitled to assign any and all of its options in this Section to any other party, without the consent of Franchisee.

E.       (1)       Upon the death of Franchisee (if Franchisee is a natural person) or any Controlling Principal (in each instance, the "**Deceased**"), the executor, administrator or other personal representative of the Deceased shall transfer such interest to a third party approved by Franchisor within twelve (12) months after the death, subject to the restrictions referenced in Section XIV.E.(3) below.  If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor.  If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within twelve (12) months after the death of the Deceased subject to the restrictions referenced in Section XIV.E.(3) below.

(2)       Upon the permanent disability of Franchisee (if Franchisee is a natural person) or any Controlling Principal (in each case, the "**Injured Person**"), Franchisor may, in its reasonable discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Section XIV. within six (6) months after notice to Franchisee.  "**Permanent disability**" shall mean any physical, emotional or mental injury, illness or incapacity which would reasonably prevent a person from performing the obligations set forth in this Agreement or in the guaranty made part of this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely.  Permanent disability shall be determined by a licensed practicing physician approved by both Franchisor and the Injured Person (or the Injured Person's surrogate in the event Franchisee is unable to make such a selection); *provided, however*, that if the Injured Person refuses to submit to an examination, then such person shall automatically be deemed permanently disabled as of the date of such refusal for the purpose of this Section XIV.E.  The costs of any examination required by this Section shall be paid by Franchisor. Approval of a physician selected by Franchisor or the Injured Person shall not be unreasonably withheld, delayed, or conditioned by the other party.  In addition, the review and approval process of the physician selected shall primarily include (i) whether the physician is in fact licensed to practice and is in good standing, and (ii) whether the costs charged by the physician are commensurate with the costs typically charged by other physicians in his/her field.

(3)     Upon the death or claim of permanent disability of Franchisee or any Controlling Principal, Franchisee or a representative of Franchisee must notify Franchisor of such death or claim of permanent disability within ten (10) days of its occurrence.  Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Section for any inter vivos transfer; *provided, however*, such transfers shall not be subject to the five thousand dollar ($5,000) transfer fee described in Section XIV.B.(2)(j). If an interest is not transferred upon death or permanent disability as required in this Section, then such failure shall constitute a material event of default under this Agreement.

F.     Franchisor's consent to a transfer of any interest described herein shall not constitute a waiver of any claims which Franchisor may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

G.     Notwithstanding the provisions contained in Section XIV.B. to the contrary, the Controlling Principals may freely transfer their ownership interests in Franchisee amongst themselves, so long as Franchisee provides Franchisor with thirty (30) days prior written notice of such transfer containing the names and percentages transferred. In addition, the Controlling Principals may transfer their interests to their respective family members (or trusts created for the benefit of such family members) for estate planning purposes with Franchisor's prior written consent (which consent shall not be unreasonably withheld).

H.     Neither securities nor partnership interests in Franchisee shall be offered directly or indirectly in any public offering including, without limitation, any offering that requires registration under United States securities laws or similar laws of a foreign country or would require registration on any United States stock exchange or similar trading venue. Franchisee and the Controlling Principals agree and acknowledge that the restriction contained in this Section XIV.H. is reasonable, does not unduly restrain Franchisee's or the Controlling Principals' ability to affect a Restricted Transfer, and materially benefits the System, Franchisee, and the Controlling Principals.

I.     In the event of any inconsistency between the terms of this Section XIV. and the corresponding terms of any Other Agreement signed by Franchisee, the Controlling Principals, and/or their respective affiliates, the terms of this Section XIV. shall prevail.

## XV.     INDEMNIFICATION

A.     Franchisee and each of the Controlling Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor and its Designees (collectively, the "**Indemnitees**"), from all "Losses and Expenses" (as defined in Section XV.D.(2) below) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(1)     The infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of the Controlling Principals of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any right to use the Marks, any copyrights or other proprietary information granted hereunder pursuant to Section X.);

(2)     The violation, breach or asserted violation or breach by Franchisee or any of the Controlling Principals of any federal, state or local law, regulation, ruling, standard or directive or any industry standard;

(3)     Libel, slander or any other form of defamation of Franchisor, the System or any developer or franchisee operating under the System, by Franchisee or by any of the Controlling Principals;

(4)     The violation or breach by Franchisee or by any of the Controlling Principals of any warranty, representation, agreement or obligation in this Agreement or in any Other Agreement; and

(5)     Acts, errors, or omissions of Franchisee, the Controlling Principals, and/or any of their respective affiliates, officers, directors, shareholders, partners, agents, representatives, independent contractors and employees (collectively, the "**Franchisee Designees**") in connection with the establishment and/or operation of the Restaurant.

B.      Franchisee and the Controlling Principals agree to give Franchisor prompt notice of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing (any such instance, an "**Action**").  At the expense and risk of Franchisee and the Controlling Principals, Franchisor may elect to assume (but under no circumstance is obligated to undertake) or select counsel of its own choosing with respect to the defense and/or settlement of any such Action filed against Franchisor.  Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Franchisee and each of the Controlling Principals to indemnify and hold harmless the Indemnitees.

C.      In order to protect the persons, property, and/or reputation or goodwill of Franchisor, its Designees and/or the System, Franchisor may, upon written notice to and written consent from the Franchisee (which consent shall not be unreasonably withheld, delayed, or conditioned), consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to an Action if, in Franchisor's reasonable judgment, there are reasonable grounds to believe that:

(1)     any of the acts or circumstances enumerated in Section XV.A.(1) - (4) above have occurred; or

(2)     any act, error, or omission as described in Section XV.A.(5) may result directly or indirectly in damage, injury, or harm to any person or any property.

D.      (1)     All Losses and Expenses incurred under this Section XV. shall be chargeable to and paid by Franchisee or the Controlling Principals pursuant to its indemnity obligations hereof, regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity, or defense.

(2)     As used in this Section XV., the phrase "**Losses and Expenses**" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, reasonable attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to the Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

E.      The Indemnitees do not assume any liability whatsoever for acts, errors, or omissions of any third party with whom Franchisee, the Controlling Principals, or any of the Franchisee Designees may contract, regardless of the purpose.  Franchisee and each of the Controlling Principals shall hold harmless and indemnify the Indemnitees for all Losses and Expenses which may arise out of any acts, errors or omissions of Franchisee, the Controlling Principals, or any of the Franchisee Designees and any such other third parties unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused by an Indemnitee's negligence or willful misconduct in a ruling determined by a third party arbitrator pursuant to the procedures set forth in Section XIX.G. of this Agreement. For purposes of clarification, any finding by a duly appointed third party arbitrator and/or a court with competent jurisdiction that the cause or causes of any such liability is jointly or partly due to the negligence of both an Indemnitee, on one hand, as well as the Franchisee (or any Franchisee Designee or any Controlling Principal), on the other hand, shall not relieve the Franchisee or any Controlling Principal from the pro rata share of their indemnification obligations as contemplated herein.

F.      Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee or any of the Controlling Principals.  Franchisee and the Controlling Principals agree that the failure to pursue such recovery or mitigate loss shall in no way reduce the amounts recoverable from Franchisee or any of the Controlling Principals by the Indemnitees.

G.      Franchisee and the Controlling Principals expressly agree that the terms of this Section XV. shall survive the termination, expiration or transfer of this Agreement or any interest herein.

## XVI.   RELATIONSHIP OF THE PARTIES

A.      The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other for any purpose.

B.      During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor conducting its Restaurant operations pursuant to the rights granted by Franchisor hereunder.  Franchisee agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place on the Restaurant premises established for the purposes hereunder and on all letterhead, business cards, forms, and as further described in the Manuals. Franchisor reserves the right to specify in writing the content and form of such notice.

C.      Franchisee understands and agrees that nothing in this Agreement authorizes Franchisee or any Controlling Principal to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and that Franchisor shall in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action, or for any act or omission of Franchisee or any of the Controlling Principals or any claim or judgment arising therefrom.

## XVII.  TERMINATION

A.      (1)     Franchisee acknowledges and agrees that (i) each of Franchisee's obligations described in this Agreement is a material and essential obligation of Franchisee, (ii) non-performance of such obligations shall adversely and substantially affect the Franchisor and the System, and (iii) the exercise by Franchisor of the rights and remedies set forth herein is appropriate and reasonable.

(2)     Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee or any Controlling Principal (i) shall become insolvent or makes a general assignment for the benefit of creditors, or (ii) files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof, or admits in writing its inability to pay its debts when due, or (iii) is adjudicated bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state, or (iv) is the subject of any bill in equity or other proceeding for the appointment of a receiver or other custodian for the business or assets of Franchisee or the Controlling Principal, or (v) has its assets or property, or any part thereof, are appointed to a receiver or other custodian (permanent or temporary) by any court of competent jurisdiction, (vi) has filed or instituted against it any proceedings for a composition with creditors under any state or federal law, or (vii) is subject to a final judgment which remains unsatisfied or of record for sixty (60) days or longer (unless supersedes bond is filed), (viii) is dissolved, (ix) has an execution levied against its business or property, or (x) is the subject of any suit to foreclose any lien or mortgage against the Restaurant premises or equipment (and such suit or lien is not dismissed within sixty (60) days), or (xi) if the real or personal property of Franchisee's Restaurant shall be sold after levy thereupon by any sheriff, marshal or constable.

FIVE GUYS – Franchise Agreement (2022)

(3)     Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, (except as stated below or otherwise required by law), effective immediately upon notice to Franchisee, upon the occurrence of any of the following events:

(a)     If Franchisee operates the Restaurant or otherwise sells any Products at any location other than the Approved Location;

(b)     If Franchisee fails to acquire an Approved Location for the Restaurant within the time and in the manner specified in Section II.;

(c)     If Franchisee fails to construct the Restaurant in accordance with the plans and specifications provided to Franchisee under Section V.(3);

(d)     If Franchisee fails to open the Restaurant for business as a FIVE GUYS® Restaurant within the period specified in Section II.H. hereof.

(e)     If Franchisee at any time abandons the Restaurant, loses the right to possession of the premises (e.g., through lease eviction or termination), or otherwise forfeits the right to do or transact business in the jurisdiction where the Restaurant is located; *provided, however*, that this provision shall not apply in cases of Force Majeure so long as Franchisee applies, within thirty (30) days after such event, for Franchisor's approval to relocate or reconstruct the premises (which approval shall not be unreasonably withheld) and Franchisee diligently pursues such reconstruction or relocation;

(f)     If Franchisee or any of the Controlling Principals is convicted of, has entered a plea of nolo contendere (no contest) to, or has otherwise entered into any plea bargain in connection with, a felony or any crime involving moral turpitude that Franchisor reasonably believes is likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interests therein;

(g)     If a threat or danger to public health or safety, as determined in writing by a governmental agency having jurisdiction over such matters, results from the construction, maintenance or operation of the Restaurant, and such public health or safety concern remains uncured for ten (10) days following Franchisee's actual or constructive knowledge;

(h)     If Franchisee fails to propose a qualified replacement or successor Operating Principal (or his Management Designee, as applicable) within the time required under Section VI.C.(5) hereof;

(i)     If Franchisee or any of the Controlling Principals transfers, or purports to transfer, any rights or obligations under this Agreement, any direct or indirect interest in Franchisee, or the Restaurant to any third party without Franchisor's prior written consent in violation of the terms of Section XIV. of this Agreement;

(j)     If Franchisee or any of its affiliates fails, refuses, or neglects to timely pay any monies owed to Franchisor, its affiliates, or its approved vendors when due and does not cure such default within five (5) days following notice from Franchisor;

(k)     If Franchisee or any of the Controlling Principals fails to comply with the covenants in Section X.C. hereof within thirty (30) days following notice from Franchisor;

(l)     If, contrary to the terms of Section X.B.(1) hereof, Franchisee or any Controlling Principal discloses or divulges any Confidential Information;

(m)     If a transfer upon death of the Deceased or Permanent Disability is not transferred in accordance with Section XIV.;

(n)     If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor;

(o)     If Franchisee breaches in any material respect any of the covenants in any material respect set forth in Section VI. or has falsely made any of the representations or warranties set forth in Section VI.;

(p)     If Franchisee fails to propose a qualified replacement or successor Operating Principal or General Manager within the time required under Sections VI.C.(5) and VI.D.(4), respectively following ten (10) days prior written notice;

(q)     If Franchisee fails to procure and maintain such insurance policies as required by Section XII. and Franchisee fails to cure such default within ten (10) days following notice from Franchisor;

(r)     If Franchisee misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein; *provided, however*, that Franchisee shall be entitled to notice of such event of default and shall have twenty-four (24) hours to cure such default;

(s)     If Franchisee or any Controlling Principal commits three (3) material events of default under this Agreement, within any twelve (12) month period, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by Franchisee after notice by Franchisor; or

(t)     If Franchisee, any Controlling Principal, and/or any Franchisee Designee conducts or otherwise participates in an unauthorized Interview in violation of the Media restrictions contained in Section VIII.I.

B.     Upon any default by Franchisee which is susceptible of being cured, Franchisor may terminate this Agreement by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination, unless a shorter period is set forth in a specific subsection of Section XVII.A.(3). However, Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's reasonable satisfaction within the thirty (30) day period and by promptly providing proof thereof to Franchisor.  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.  Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(1)     If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by Franchisor, or fails to carry out the terms of this Agreement in good faith.

(2)     If Franchisee fails to maintain or observe any of the standards, specifications or procedures prescribed by Franchisor in this Agreement or otherwise in writing.

(3)     If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement.

C.      If Franchisee or any Controlling Principal (or any person or entity affiliated with or controlled by Franchisee or any Controlling Principal) is determined by Franchisor to be either (i) repeatedly in default for failure to comply with the requirements of any other franchise agreement, development agreement, or other agreement to which Franchisor (or an affiliate of Franchisor) is a party (collectively, and as each may be amended from time to time, "**Other Agreements**"), whether or not such defaults are of the same or different nature and whether or not such defaults have been cured after notice by Franchisor, *or* (ii) in material default for failure to substantially comply with the requirements of any Other Agreement, Franchisor may terminate this Agreement by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination.

Any termination of this Agreement pursuant to this Section XVII.C. shall constitute an event of default under each of the Other Agreements, and Franchisor expressly reserves all rights and remedies available at law or equity including, without limitation, the right to terminate all of the rights and obligations of any and/or all of the Other Agreements. No right or remedy which Franchisor may have (including termination) is exclusive of any other right or remedy provided under law or equity and Franchisor may pursue any additional rights and/or remedies available.

## XVIII. POST-TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

A.      Franchisee shall immediately cease to operate the Restaurant, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present franchisee of Franchisor.

B.      Franchisee shall immediately and permanently (i) cease to use, in any manner whatsoever, any confidential methods, computer software, procedures, and techniques associated with the System at the Approved Location, and (ii) remove, within one (1) day of the termination or expiration of this Agreement, any and all exterior and interior signage from the Restaurant premises that contain or otherwise reference the Marks (including, without limitation, the "FIVE GUYS®", "FIVE GUYS FAMOUS BURGERS AND FRIES®", "FIVE GUYS BURGERS AND FRIES®" signage together with all other trademarks, service marks, and distinctive forms, slogans, signs, symbols, product labels, advertising materials, displays, stationery, forms, and any other articles or devices associated with the System), and shall immediately change all interior and, if applicable, exterior paint colors as reasonably needed to remove Franchisor's distinctive proprietary design items.

C.      Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "FIVE GUYS®" or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

D.      Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

E.      Franchisee and the Controlling Principals shall pay to Franchisor all sums, including, but not limited to, damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining any remedy available to Franchisor for any violation of this Agreement and, subsequent to the termination or expiration of this Agreement, in obtaining injunctive or other relief for the enforcement of any provisions of this Section XVIII.  These obligations shall give rise to and remain, until

paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, fixtures, and inventory owned by Franchisee and on the premises operated hereunder at the time of default.

F.      Franchisee shall immediately deliver to Franchisor all Manuals, software licensed by Franchisor, records, files, instructions, correspondence, all materials related to operating the Restaurant, including, without limitation, agreements, invoices, and any and all other materials relating to the operation of the Restaurant in Franchisee's possession or control, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law.

G.      Franchisee and the Controlling Principals shall comply with the restrictions on Confidential Information and non-competition contained in Section X. of this Agreement, and shall remain obligated to comply with the indemnification requirements contained in Section XV. of this Agreement.

H.      Upon execution of this Agreement, in partial consideration of the rights granted hereunder, Franchisee acknowledges and agrees that all right, title and interest in the signs and menu boards used at the Restaurant are hereby assigned to Franchisor, and that upon termination or expiration of this Agreement, neither Franchisee nor any lien holder of Franchisee shall have any further interest therein.

I.      If Franchisee operates the Restaurant under a lease for the Restaurant premises with a third party or, with respect to any lease for equipment used in the operation of the franchised business, then Franchisee shall, at Franchisor's option, assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises of the Restaurant or any equipment related thereto.  Franchisor may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement.  In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the Restaurant premises or does not have such option, Franchisee shall make such modifications or alterations to the Restaurant premises as are necessary to distinguish the appearance of the Restaurant from that of other FIVE GUYS® Restaurants operating under the System and shall make such specific additional changes as Franchisor may reasonably request (as more fully described in Section XVIII.B. hereof).  If Franchisee fails or refuses to comply with the foregoing requirements, Franchisor shall have the right to enter upon the Restaurant premises, without being guilty of trespass or any other crime or tort, to make or cause to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.  Notwithstanding the provisions of this Section XVIII.I. to the contrary, in the event the lease is assigned to Franchisor, Franchisor hereby indemnifies and hold harmless Franchisee and any guarantors under said lease, for any breach by Franchisor or its successors or assigns from any liability arising out of the lease for the Restaurant premises from and after the date of the assignment of the lease.  The right of Franchisor to assume Franchisee's lease may not be recorded against the real estate.  Any recording done must be subordinated to any SBA-financed loan and may not include any attornment language.

J.      (1)      Except as otherwise provided herein, Franchisor shall have the option, to be exercised within thirty (30) days after termination or expiration of this Agreement, to purchase from Franchisee any or all of the furnishings, Equipment, signs, fixtures, supplies, and inventory of Franchisee related to the operation of the Restaurant, at fair market value. Franchisor shall be purchasing Franchisee's assets only and shall be assuming no liabilities whatsoever, unless otherwise agreed to in writing by the parties.  If the parties cannot agree on the fair market value of the foregoing assets within thirty (30) days of Franchisor's exercise of its option, fair market value shall be determined by two (2) appraisers, with each party selecting one (1) independent and industry accredited appraiser, and the average of their reasonable determinations shall be binding.  In the event of such appraisals, each party shall bear its own legal and other costs and shall split the appraisal fees equally.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to offset (i) all fees for any such independent appraiser due from Franchisee, (ii) all amounts due from Franchisee to Franchisor or any of its affiliates, and (iii) any costs

incurred in connection with any escrow arrangement (including reasonable legal fees), against any payment therefor and shall pay the remaining amount in cash.

(2)    If Franchisee owns the Restaurant premises and decides to sell such premises, Franchisor may then, upon the termination or expiration of this Agreement and in addition to the rights described above, negotiate with Franchisee the purchase of the Restaurant premises including any building thereon, if applicable, for the fair market value of the land and building (together with any or all of the furnishings, Equipment, signs, fixtures, supplies and inventory therein) at fair market value. Franchisor shall purchase assets only and shall assume no liabilities whatsoever, unless otherwise agreed to in writing by the parties.  If the parties cannot agree on fair market value within thirty (30) days of Franchisor's notice to Franchisee of its intention to purchase as contemplated herein, fair market value shall be determined in accordance with appraisal procedure described in Section XVIII.J.(1) above. For purposes of clarification, nothing contained in this Section XVIII.J.(2) shall force Franchisee to sell the Restaurant premises, and/or the building(s) thereon, to the Franchisor if an acceptable purchase price cannot be reached.

(3)    With respect to the options described in Sections XVIII.J.(1) and (2), Franchisee shall deliver to Franchisor in a form satisfactory to Franchisor, such warranties, deeds, releases of lien, bills of sale, assignments and such other documents and instruments which Franchisor deems necessary in order to perfect Franchisor's title and possession in and to the properties being purchased or assigned and to meet the requirements of all tax and government authorities.  If, at the time of closing, Franchisee has not obtained all of these certificates and other documents, Franchisor may, in its sole discretion, place the purchase price in escrow pending issuance of any required certificates or documents.

(4)    The time for closing of the purchase and sale of the properties described in Sections XVIII.J.(1) and (2) shall be a date not later than thirty (30) days after the purchase price is determined by the parties or the determination of the appraisers, or such date Franchisor receives and obtains all necessary permits and approvals, whichever is later, unless the parties mutually agree to designate another date. Closing shall take place at Franchisor's corporate offices or at such other location as the parties may agree.

K.    Franchisor shall be entitled to assign any and all of its options in this Section to any other party, without the consent of Franchisee.

L.    Franchisee, at the option of Franchisor, shall assign to Franchisor or its designee all rights to the telephone numbers of the Restaurant and any business listings and execute all forms and documents required by Franchisor and any telephone company at any time to transfer such service and numbers to Franchisor or its designee.

## XIX.    MISCELLANEOUS

A.    Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt requested, first class postage prepaid, or sent by electronic mail to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:    Five Guys Franchisor, LLC
10718 Richmond Highway
Lorton, Virginia 22079
Attention: Legal Department
Email: franchise@fiveguys.com

With a copy to:                Polsinelli PC
                               1401 Eye Street, NW, Suite 800
                               Washington, D.C. 20005
                               Attention: Diana Vilmenay, Esq.
                               Email: dvilmenay@polsinelli.com


Notices to Franchisee and
the Controlling Principals:    _____

                               _____

                               _____
                               Attention:_____
                               Email:_____

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile or electronic mail, upon transmission or, in the case of expedited delivery service or registered or certified mail, three (3) Business Days after the date and time of mailing.

B.     This Agreement, the documents referred to herein, and the Attachments hereto, constitute the entire, full and complete agreement between Franchisor and Franchisee and the Controlling Principals concerning the subject matter hereof and shall supersede all prior related agreements between Franchisor and Franchisee and the Controlling Principals regarding the Restaurant; provided, however, that nothing in this or any related agreement is intended to disclaim the representations made by Franchisor in the Disclosure Document that was furnished to Franchisee by Franchisor.  Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

C.     No delay, waiver, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising out of any breach or default by Franchisee or the Controlling Principals under this Agreement shall constitute a waiver by Franchisor to enforce any such right, option, duty or power against Franchisee or the Controlling Principals, or as to a subsequent breach or default by Franchisee or the Controlling Principals.  Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee or the Controlling Principals of any terms, provisions, covenants or conditions of this Agreement.

D.     Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor, and such approval or consent shall be obtained in writing.

E.     Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

F.     If a Force Majeure event shall occur, then, in addition to payments required under Section XVII.A.(3)(e), Franchisee shall continue to be obligated to pay to Franchisor any and all amounts that it shall have duly become obligated to pay in accordance with the terms of this Agreement prior to the occurrence of any Force Majeure event and the Indemnitees shall continue to be indemnified and held harmless by Franchisee in accordance with Section XV.  Except as provided in Section XVII.A.(3)(e) and the immediately preceding sentence herein, none of the parties hereto shall be held liable for a failure to comply with any terms and conditions of this Agreement when such failure is caused by an event of Force Majeure.  Upon the occurrence of any event of the type referred to herein, the party affected thereby shall give prompt notice thereof to the other parties, together with a description of the event, the duration for which the party expects its ability to comply with the provisions of the Agreement to be affected thereby

and a plan for resuming operation under the Agreement, which the party shall promptly undertake and maintain with due diligence.  Such affected party shall be liable for failure to give timely notice only to the extent of damage actually caused.

G.  (1)  EXCEPT AS PROVIDED IN THIS AGREEMENT, FRANCHISOR, FRANCHISEE AND THE CONTROLLING PRINCIPALS AGREE THAT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THE FRANCHISE, FRANCHISEE'S ESTABLISHMENT OR OPERATION OF ANY RESTAURANT UNDER THIS AGREEMENT (AND ANY AMENDMENTS THERETO) INCLUDING, BUT NOT LIMITED TO, ANY CLAIM BY FRANCHISEE, OR ANY OF THE CONTROLLING PRINCIPALS, OR PERSONS CLAIMING ON BEHALF OF FRANCHISEE OR THE CONTROLLING PRINCIPALS, CONCERNING THE ENTRY INTO, THE PERFORMANCE UNDER OR THE TERMINATION OF THE AGREEMENT, OR ANY OTHER AGREEMENT BETWEEN FRANCHISOR, OR ITS AFFILIATES, AND FRANCHISEE, ANY CLAIM AGAINST A PAST OR PRESENT OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF FRANCHISOR, INCLUDING THOSE OCCURRING SUBSEQUENT TO THE TERMINATION OF THIS AGREEMENT, THAT CANNOT BE AMICABLY SETTLED AMONG THE PARTIES SHALL, EXCEPT AS SPECIFICALLY SET FORTH HEREIN AND IN SECTION XIX.I., BE REFERRED TO ARBITRATION, THE ARBITRATION SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS RULES, AS AMENDED, EXCEPT THAT THE ARBITRATOR SHALL APPLY THE FEDERAL RULES OF EVIDENCE DURING THE CONDUCT OF THE HEARING SESSIONS WITH RESPECT TO THE ADMISSIBILITY OF EVIDENCE.  IF SUCH RULES ARE IN ANY WAY CONTRARY TO OR IN CONFLICT WITH THIS AGREEMENT, THE TERMS OF THE AGREEMENT SHALL CONTROL. ONLY CLAIMS, CONTROVERSIES OR DISPUTES INVOLVING FRANCHISEE AND THE CONTROLLING PRINCIPALS MAY BE BROUGHT HEREUNDER.  NO CLAIM FOR OR ON BEHALF OF ANY OTHER FRANCHISEE OR SUPPLIER, OR CLASS, REPRESENTATIVE OR ASSOCIATION THEREOF, MAY BE BROUGHT BY FRANCHISEE OR THE CONTROLLING PRINCIPALS HEREUNDER.

(2)  THE PARTIES SHALL AGREE ON AN ARBITRATOR WITHIN FIFTEEN (15) DAYS OF THE FILING OF ARBITRATION.  IF THE PARTIES CANNOT AGREE ON A SINGLE ARBITRATOR, FRANCHISOR AND FRANCHISEE (OR CONTROLLING PRINCIPAL, AS APPLICABLE) SHALL EACH SELECT ONE (1) ARBITRATOR.  IF THE PARTY UPON WHOM THE DEMAND FOR ARBITRATION IS SERVED FAILS TO SELECT AN ARBITRATOR WITHIN FIFTEEN (15) DAYS AFTER THE RECEIPT OF THE DEMAND FOR ARBITRATION, THEN THE ARBITRATOR SO DESIGNATED BY THE PARTY REQUESTING ARBITRATION SHALL ACT AS THE SOLE ARBITRATOR TO RESOLVE THE CONTROVERSY AT HAND.   THE TWO ARBITRATORS DESIGNATED BY THE PARTIES SHALL SELECT A THIRD ARBITRATOR.  IF THE TWO ARBITRATORS DESIGNATED BY THE PARTIES FAIL TO SELECT A THIRD ARBITRATOR WITHIN FIFTEEN (15) DAYS, THE THIRD ARBITRATOR SHALL BE SELECTED BY THE AMERICAN ARBITRATION ASSOCIATION OR ANY SUCCESSOR THERETO, UPON APPLICATION BY EITHER PARTY. ALL OF THE ARBITRATORS SHALL BE EXPERIENCED IN THE ARBITRATION OF DISPUTES BETWEEN FRANCHISORS AND FRANCHISEES.  THE ARBITRATION SHALL TAKE PLACE IN THE CITY WHERE FRANCHISOR'S CORPORATE OFFICES ARE LOCATED OR AT THE OFFICES OF THE AMERICAN ARBITRATION ASSOCIATION NEAREST TO FRANCHISOR'S CORPORATE OFFICES.  THE ARBITRATION SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS, AND NOT AS PART OF A CONSOLIDATED, COMMON, OR CLASS ACTION, AND FRANCHISEE AND ITS CONTROLLING PRINCIPALS WAIVE ANY AND ALL RIGHTS TO PROCEED ON A CONSOLIDATED, COMMON, OR CLASS BASIS.  FRANCHISEE AGREES NOT TO SEEK JOINDER OF ANY OF FRANCHISEE'S CLAIMS WITH THOSE OF ANY OTHER PARTY.  THE AWARD OF THE ARBITRATORS SHALL BE FINAL AND JUDGMENT UPON THE AWARD RENDERED IN ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.  THE COSTS AND EXPENSES OF ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.  THE

ARBITRATORS SHALL BE REQUIRED TO SUBMIT WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW WITHIN THIRTY (30) DAYS FOLLOWING THE FINAL HEARING SESSION OF THE ARBITRATION.  THE ARBITRATION PROCEEDINGS AND ARBITRATION AWARD SHALL BE MAINTAINED BY THE PARTIES AS STRICTLY CONFIDENTIAL, EXCEPT AS IS OTHERWISE REQUIRED BY LAW OR COURT ORDER OR AS IS NECESSARY TO CONFIRM, VACATE, OR ENFORCE THE AWARD AND FOR DISCLOSURE IN CONFIDENCE TO THE PARTIES' RESPECTIVE ATTORNEYS AND TAX ADVISORS.  THE COSTS AND EXPENSES OF ARBITRATION, INCLUDING COMPENSATION AND EXPENSES OF THE ARBITRATORS, SHALL BE BORNE BY THE PARTIES AS THE ARBITRATORS DETERMINE.

(3)     NOTWITHSTANDING THE ABOVE, THE FOLLOWING SHALL NOT BE SUBJECT TO ARBITRATION:

(i)     DISPUTES AND CONTROVERSIES ARISING FROM THE SHERMAN ACT, THE CLAYTON ACT OR ANY OTHER FEDERAL OR STATE ANTITRUST LAW;

(ii)     DISPUTES AND CONTROVERSIES BASED UPON OR ARISING UNDER THE LANHAM ACT, AS NOW OR HEREAFTER AMENDED, RELATING TO THE OWNERSHIP OR VALIDITY OF THE TRADEMARKS;

(iii)     DISPUTES AND CONTROVERSIES RELATING TO ACTIONS TO OBTAIN POSSESSION OF THE PREMISES OF THE RESTAURANT UNDER LEASE OR SUBLEASE.

(4)     IF FRANCHISOR SHALL DESIRE TO SEEK SPECIFIC PERFORMANCE OR OTHER EXTRAORDINARY RELIEF INCLUDING, BUT NOT LIMITED TO, INJUNCTIVE RELIEF UNDER THIS AGREEMENT AND ANY AMENDMENTS THERETO, OR TO COLLECT MONIES DUE, THEN ANY SUCH ACTION SHALL NOT BE SUBJECT TO ARBITRATION AND FRANCHISOR SHALL HAVE THE RIGHT TO BRING SUCH ACTION AS DESCRIBED IN SECTION XIX.I.

(5)     IN PROCEEDING WITH ARBITRATION AND IN MAKING DETERMINATIONS HEREUNDER, THE ARBITRATORS SHALL NOT EXTEND, MODIFY OR SUSPEND ANY TERMS OF THIS AGREEMENT OR THE REASONABLE STANDARDS OF BUSINESS PERFORMANCE AND OPERATION ESTABLISHED BY FRANCHISOR IN GOOD FAITH.  NOTICE OF OR REQUEST TO OR DEMAND FOR ARBITRATION SHALL NOT STAY, POSTPONE OR RESCIND THE EFFECTIVENESS OF ANY TERMINATION OF THIS AGREEMENT.  THE ARBITRATORS SHALL APPLY VIRGINIA LAW AND THE TERMS OF THIS AGREEMENT IN REACHING THEIR DECISION.

H.     WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH ARE NOT FINALLY RESOLVED THROUGH ARBITRATION, OR AS OTHERWISE PROVIDED ABOVE, FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE JURISDICTION OF THE STATE COURTS OF FAIRFAX COUNTY, VIRGINIA AND THE FEDERAL DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA. FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON ANY OF THEM IN ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY VIRGINIA OR FEDERAL LAW.  FRANCHISEE AND THE CONTROLLING PRINCIPALS FURTHER AGREE THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE FAIRFAX COUNTY, VIRGINIA; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR

MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (3) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, FRANCHISOR MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS, RELATED TO THIS AGREEMENT OR THE RELATIONSHIP CREATED THEREBY, THIS AGREEMENT AND ANY SUCH RELATED CLAIMS, CONTROVERSIES, DISPUTES OR ACTIONS SHALL BE GOVERNED, ENFORCED AND INTERPRETED UNDER THE SUBSTANTIVE LAWS OF THE COMMONWEALTH OF VIRGINIA WITHOUT REGARD TO, AND WITOUT APPLYING, ITS CONFLICT OF LAWS RULES, EXCEPT THAT ANY VIRGINIA LAW REGULATING THE SALE OF FRANCHISES OR BUSINESS OPPORTUNITIES OR GOVERNING THE RELATIONSHIP OF A FRANCHISOR AND ITS FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS PARAGRAPH.

I.      FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH IN SECTION XIX.I. ABOVE PROVIDE EACH OF THE PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT. EACH OF FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR FURTHER ACKNOWLEDGE THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT AND THAT EACH PARTY'S AGREEMENT REGARDING APPLICABLE STATE LAW AND CHOICE OF FORUM HAVE BEEN NEGOTIATED FOR IN GOOD FAITH AND ARE PART OF THE BENEFIT OF THE BARGAIN REFLECTED BY THIS AGREEMENT.

J.      FRANCHISEE, THE CONTROLLING PRINCIPALS AND FRANCHISOR ACKNOWLEDGE THAT THE EXECUTION OF THIS AGREEMENT AND ACCEPTANCE OF THE TERMS BY THE PARTIES OCCURRED IN FAIRFAX COUNTY, VIRGINIA, AND FURTHER ACKNOWLEDGE THAT THE PERFORMANCE OF CERTAIN OBLIGATIONS OF FRANCHISEE ARISING UNDER THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE PAYMENT OF MONIES DUE HEREUNDER AND THE SATISFACTION OF CERTAIN TRAINING REQUIREMENTS OF FRANCHISOR, SHALL OCCUR IN FAIRFAX COUNTY, VIRGINIA.

K.      FRANCHISEE, ITS CONTROLLING PRINCIPALS AND THE FRANCHISOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST THE OTHER PARTY, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREE THAT IN THE EVENT OF A DISPUTE, EITHER PARTY SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT. IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

L.      This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

M.      The captions used in connection with the sections and subsections of this Agreement are inserted only for purpose of reference.  Such captions shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof nor shall such captions otherwise be given any legal effect.

N.      Any obligation of Franchisee or the Controlling Principals that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of Franchisee or the Controlling Principals therein, shall be deemed to survive such termination, expiration or transfer.

O.      Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable. If, for any reason, any portion, section, part, term or provision of this Agreement is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction over the parties hereto, this Agreement, and/or the Restaurant, then (i) such determination shall not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms or provisions of this Agreement that may remain otherwise intelligible (and the latter shall continue to be given full force and effect and bind the parties), (ii) the invalid portions, sections, parts, terms or provisions shall be deemed not to be part of this Agreement, and (iii) there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any applicable law or regulation.

P.      All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.  Without limiting the obligations individually undertaken by the Controlling Principals under this Agreement, all acknowledgments, promises, covenants, agreements and obligations made or undertaken by Franchisee in this Agreement shall be deemed, jointly and severally, undertaken by all of the Controlling Principals.

Q.      All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates.  The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time. The expiration or earlier termination of this Agreement, or exercise of Franchisor's rights pursuant to Section XVII. hereof, shall not discharge or release Franchisee or any of the Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

R.      The term "**Controlling Principals**" shall include, collectively and individually, (i) if Franchisee is an individual, Franchisee and the spouse of Franchisee, or (ii) if Franchisee is an Entity, all individuals directly or indirectly holding ten percent (10%) or more of the total ownership interests in Franchisee or of any Entity directly or indirectly controlling Franchisee.  As used in this Section XIX.R., the terms "*control*" and "*controlling*" shall mean the power to influence the management decisions of the specified person and shall in any case be deemed to exist where such person holds ten percent (10%) or more of the total ownership interest in the Franchisee, serves on any board of directors or comparable body of the Franchisee, or acts as an officer, general partner or manager thereof.  If Franchisee is operating as an Entity as contemplated hereunder, all individuals holding any interest in the Franchisee shall each be listed on Attachment D hereto.

S.      Each reference in this Agreement to a company or partnership shall be deemed to also refer to any other entity or organization similar thereto.  Each reference to the organizational documents, equity

owners, directors, and officers of a company in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability partnership or any other entity or organization similar thereto.

T.      Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors and personnel and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, authorized by Section XIV.), any rights or remedies under or as a result of this Agreement.

U.      This Agreement shall not become effective until signed by the authorized agent of Franchisor.

V.      Franchisee understands and agrees that the System must not remain static if it is to meet, without limitation, presently unforeseen changes in technology, competitive circumstances, demographics, populations, consumer trends, societal trends and other marketplace variables, and if it is to best serve the interests of Franchisor, Franchisee and all other franchisees.   Accordingly, Franchisee expressly understands and agrees that Franchisor may from time to time change the components of the System including, but not limited to, (i) altering the products, programs, services, methods, standards, forms, policies and procedures of that System; abandoning the System altogether in favor of another system in connection with a merger, acquisition, other business combination or for other reasons, (ii) adding to, deleting from or modifying those products, programs and services which Franchisee's Restaurant is authorized and required to offer, (iii) modifying or substituting entirely the building, premises, equipment, signage, trade dress, decor, color schemes and uniform specifications and all other unit construction, design, appearance and operation attributes which Franchisee is required to observe hereunder, and (iv) changing, improving, modifying or substituting the Marks.  Franchisee expressly agrees to comply with any such modifications, changes, additions, deletions, substitutions and alterations; *provided, however*, that such changes shall not materially and unreasonably increase Franchisee's obligations hereunder.

Franchisee shall accept, use and effectuate any such changes or modifications to, or substitution of, the System as if they were part of the System at the time that this Agreement was executed.

Franchisor shall not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any of the modifications contemplated hereby.  Franchisee hereby covenants not to commence or join in any litigation or other proceeding against Franchisor or any third party complaining of any such modifications or seeking expenses, losses or damages caused thereby.  Franchisee further expressly waives any claims, demands or damages arising from or related to the foregoing activities including, without limitation, any claim of breach of contract, breach of fiduciary duty, fraud, and/or breach of the implied covenant of good faith and fair dealing.

W.      Franchisee and each Controlling Principal agree to comply, and to assist to the fullest extent possible Franchisor's efforts to comply, with all Anti-Terrorism Laws (defined below).  In connection with such compliance, Franchisee and each Controlling Principal certify, represent, and warrant that none of their respective property or interests is subject to being blocked under, and that Franchisee and each Controlling Principal otherwise are not in violation of, any of the Anti-Terrorism Laws.  "**Anti-Terrorism Laws**" mean Executive Order 13224 issued by the President of the United States, the USA Patriot Act, and all other present and future United States federal, state, and local laws, ordinances, regulations, policies, lists, and all other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of any Anti-Terrorism Laws by Franchisee or any Controlling Principal, or any blocking of any assets of Franchisee or any Controlling Principal under any Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement.

X.      The parties hereto, together with their respective Designees and Franchisee Designees, acknowledge and agree that they each are committed to conducting business ethically and in full compliance

with all applicable laws and regulations, including, without limitation, the United States Foreign Corrupt Practices Act of 1977 (as amended, the "**FCPA**") and all such other laws of similar effect that prohibit bribery or other improper payments made to obtain a business advantage. In furtherance of the foregoing, Franchisee and each Controlling Principal, on behalf of themselves and each Franchisee Designee, agree to never take any action that could cause Franchisee or any Controlling Principal to be in violation of the FCPA.

       Y.      In order to prevent any interruption of the Restaurant operations which could cause harm to the Restaurant, thereby depreciating the value thereof, Franchisee authorizes Franchisor (who may, at its option, in the event that the Operating Principal is absent for any reason or is incapacitated by reason of illness or is otherwise unable, in the sole and reasonable judgment of Franchisor, to operate the Restaurant) to operate the Restaurant for an initial period of up to ninety (90) days (the "**Step-In Period**") without waiver of any other rights or remedies Franchisor may have under this Agreement. The Step-In Period may be renewed, at the sole discretion of Franchisor, for subsequent periods of ninety (90) days if deemed necessary by the Franchisor; *provided, however*, that (i) at the conclusion of each ninety (90) day period, as applicable, the  Franchisor shall reasonably evaluate and discuss with Franchisee the necessity of Franchisor's involvement in the direct operation of the Restaurant, and (ii) in no event shall the Franchisor operate the Restaurant for a total period greater than one (1) year without the expressed written consent of Franchisee. All monies from the operation of the Restaurant during the Step-In Period shall be kept in a separate account, and the expenses of the Restaurant, including reasonable compensation and expenses for Franchisor's representative(s), shall be charged to said account.  If, as herein provided, Franchisor temporarily operates the Restaurant for Franchisee, Franchisee agrees to indemnify and hold harmless Franchisor and any representative of Franchisor who may act hereunder, from any and all acts which Franchisor or its representatives may perform (excluding acts of gross negligence, recklessness, and/or intentional misconduct). Franchisee agrees to pay all of Franchisor's reasonable attorneys' fees and costs incurred as a consequence of Franchisor's exercise of its rights as contemplated hereunder.  Nothing contained herein shall prevent Franchisor from exercising any other right which it may have under this Agreement, including, without limitation, termination pursuant to Section XVII.

       Z.      Notwithstanding anything in this Agreement to contrary, Franchisee and its officers, directors, shareholders, agents and representatives, may, in accordance with any applicable law including the federal Defend Trade Secrets Act, disclose Confidential Information, including Franchisor's trade secrets, (a) in confidence, to federal, state, or local government officials, or to an attorney of Franchisee, for the sole purpose of reporting or investigating a suspected violation of law; or (b) in a document filed in a lawsuit or other legal proceeding, but only if the filing is made under seal and protected from public disclosure.  Nothing in this Agreement is intended to conflict with any applicable law or create liability for disclosures expressly allowed by law.

## XX.   ACKNOWLEDGMENTS

       A.      Franchisee acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that the success of this business venture involves substantial business risks and shall largely depend upon the ability of Franchisee.  Franchisor expressly disclaims making, and Franchisee acknowledges that it has not received or relied on, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

       Initials:        _____

B.      Franchisee acknowledges that Franchisee has received, read and understands this Agreement and the related Attachments and agreements and that Franchisor has afforded Franchisee sufficient time and opportunity to consult with advisors selected by Franchisee about the potential benefits and risks of entering into this Agreement.

Initials:            _____

C.      Franchisee acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least fourteen (14) calendar days prior to the date on which this Agreement was executed.

Initials:            _____

***

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed by its duly authorized representative as of the Effective Date written below.

<u>**FRANCHISOR:**</u>

**FIVE GUYS FRANCHISOR, LLC**
a Delaware limited liability company

ATTEST:

By:_____

Print Name:_____

By:_____

Name:_____

Title:_____

Accepted On:_____

(the "**Effective Date**")

<u>**FRANCHISEE:**</u>

_____

By:_____

Print Name:_____

By:_____

Name:_____

Title:_____

Date:_____

**ATTACHMENT A**

**GUARANTY OF CONTROLLING PRINCIPALS**

Each of the undersigned acknowledges and agrees as follows:

1.       Each has read the terms and conditions of the Franchise Agreement attached herewith and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to, the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

2.       Each is included in the term "*Controlling Principals*" as described in Section XIX.R. of the Franchise Agreement;

3.       Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

4.       Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement shall be punctually paid and performed.  Upon default by Franchisee or upon notice from Franchisor, each shall immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement.  Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee.  Each of the Controlling Principals waives all demand and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee.  Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.  Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased shall be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

Additionally, with respect to the individual designated as Operating Principal, Operating Principal acknowledges that the undertakings by Operating Principal under this guaranty are made and given in partial consideration of, and as a condition to, Franchisor's grant of rights to operate the Restaurant as described herein. The Operating Principal individually, jointly and severally, makes all of the covenants, representations and agreements of Franchisee and Operating Principal set forth in the Franchise Agreement and is obligated to perform hereunder.

\*\*\*

*(Signature Page Follows)*

**WITNESS:**                                    **CONTROLLING PRINCIPALS**:

By:_____                      _____

Print Name:_____                    *Name:_____


By:_____                      _____

Print Name:_____                    Name:_____


By:_____                      _____

Print Name:_____                    Name:_____


By:_____                      _____

Print Name:_____                    Name:_____


* Denotes individual who is Franchisee's Operating Principal

**ATTACHMENT B**

**APPROVED LOCATION,**
**AREA OF PRIMARY RESPONSIBILITY AND OPENING DATE**

1.      APPROVED LOCATION

Pursuant to Section I.B. of the Franchise Agreement, the Restaurant shall be located at the following Approved Location:

_____

_____

2.      AREA OF PRIMARY RESPONSIBILITY:

PURSUANT TO SECTION I.D. OF THE FRANCHISE AGREEMENT, THE PRIMARY AREA OF RESPONSIBILITY SHALL BE THE CONTIGUOUS PROPERTY CONTROLLED BY THE LANDLORD WITHIN WHICH THE RESTAURANT IS LOCATED, IF APPLICABLE. IF THE RESTAURANT IS NOT LOCATED WITHIN SUCH A CONTIGUOUS PROPERTY, THE PRIMARY AREA OF RESPONSIBILITY IS LIMITED TO THE APPROVED LOCATION DESCRIBED ABOVE.

3.      OPENING DATE:

_____

## ATTACHMENT C

## COLLATERAL ASSIGNMENT OF LEASE

**FOR VALUE RECEIVED**, the undersigned ("**Assignor**") assigns, transfers and sets over to FIVE GUYS FRANCHISOR, LLC, a Delaware limited liability company (together with its affiliates, "**Assignee**"), all of Assignor's right and title to and interest in that certain "Lease" governing the FIVE GUYS® located at _____ (the "**Lease**"). This assignment is for collateral purposes only and, except as specified in this document, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this assignment or the Lease unless and until (i) Assignee takes possession of the premises, (ii) the Lease demises according to the terms of this document, and (iii) Assignee expressly assumes Assignor's obligations under the Lease.

Assignor represents and warrants to Assignee that it has full power and authority to assign the Lease and that Assignor has not previously assigned or transferred and is not otherwise obligated to assign or transfer any of its interest in the Lease or the premises it demises.

Upon Assignor's default under the Lease or under the "Franchise Agreement" for the FIVE GUYS® Restaurant located on the premises governed by the Lease (the "**Franchise Agreement**"), the Assignee has the right to take possession of the premises the Lease demises and expel Assignor from the premises.  In that event, Assignor shall have no further rights, title to, or interest in the Lease but shall remain liable to Assignee for any past due rental payments or other charges Assignee is required to pay Lessor to effectuate the assignment this document contemplates.

Assignor agrees that it shall not suffer or permit any surrender, termination, amendment or modification of the Lease without Assignee's prior written consent.  Throughout the term of the Franchise Agreement, Assignor agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days before the last day upon which the option must be exercised, unless Assignee agrees otherwise in writing.  In the event Assignor fails to elect to extend or renew the Lease as required, Assignor appoints Assignee as its true and lawful attorney-in-fact with the authority to exercise the extension or renewal options of the Lease in the name, place and stead of Assignor for the sole purpose of effecting such extension or renewal.

ASSIGNEE:                                                    ASSIGNOR:

**FIVE GUYS FRANCHISOR, LLC**          _____

By:_____           By:_____

Name:_____           Name:_____

Title:_____          Title:_____

## CONSENT TO COLLATERAL ASSIGNMENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the Lease:

(a)     Agrees to notify Assignee in writing of and upon Assignor's failure to cure any default by Assignor under the Lease;

(b)     Agrees that Assignee shall have the right, but not the obligation, to cure any default by Assignor under the Lease within thirty (30) days after Assignee's receipt of notice of such default;

(c)     Consents to the attached Collateral Assignment and agrees that, in the event Assignee (i) elects to take possession of the premises following a default by Assignor, and (ii) confirms to Lessor in writing that it has assumed the Lease as tenant, Lessor shall fully recognize Assignee as the tenant under the Lease so long as Assignee agrees to cure any then-existing default by Assignor under the Lease within the thirty (30) day period noted in section (b) above; and

(d)     Agrees that Assignee may further assign the Lease to, or enter into a sublease with, a third-party person, firm or corporation who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Lessor (and upon such assignment, Assignee shall have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the premises the Lease demises as a FIVE GUYS® Restaurant).

Dated:_____                    LESSOR:

                                                 _____

                                                 By:_____
                                                 Name:_____
                                                 Title:_____
                                                 Date:_____

FIVE GUYS – Franchise Agreement (2022)

2

**ATTACHMENT D**

**STATEMENT OF OWNERSHIP INTERESTS AND FRANCHISEE'S PRINCIPALS**

The following is a list of all shareholders, partners or other investors in Franchisee, including all investors who own or hold a direct or indirect interest in Franchisee, and a description of the nature of their interest:

<u>Name</u>                                    <u>Percentage of Ownership/Nature of Interest</u>

**ATTACHMENT E**

**ELECTRONIC TRANSFER AUTHORIZATIONS**

## AUTHORIZATION TO HONOR ROYALTY AND CREATIVE FUND CHARGES DRAWN BY AND PAYABLE TO FIVE GUYS FRANCHISOR, LLC COMPANY ("COMPANY")

Depositor hereby authorizes and requests _____ (the "Bank") to initiate debit and credit entries to Depositor's ____ checking and ____ savings account (*select one*) indicated below drawn by and payable to the order of FIVE GUYS FRANCHISOR, LLC by Electronic Funds Transfer, provided there are sufficient funds in said account to pay the amount upon presentation.

Depositor agrees that the Bank's rights with respect to each such charge shall be the same as if it were a check drawn by the Bank and signed by Depositor. Depositor further agrees that if any such charge is dishonored, whether with or without cause and whether intentionally or inadvertently, the Bank shall be under no liability whatsoever.

Bank Name:_____

City:_____      State:_____      Zip Code:_____

Transit/ABA Number:_____      Account Number:_____

This authority is to remain in full force and effect until Company has received written notification from me (or either of us) of its termination in such time and in such manner to afford Company and Bank a responsible opportunity to act on such request.

Store Address:  (Please Print)

_____

_____

Depositor:  (Please Print Franchisee Name)

_____

_____

Date Signed

_____

_____

Signature(s) of Depositor, as Printed Above

Change of Bank Acct Numbers [ ]      Store # [_____]      Effective Date of Change [_____]

**Please attach a voided blank check, for purposes of setting up Bank and Transit Numbers.**

**AUTHORIZATION TO HONOR BREAD PAYMENT CHARGES DRAWN BY AND
PAYABLE TO FIVE GUYS BAKERY, LLC COMPANY ("COMPANY")**

     Depositor hereby authorizes and requests _____ (the "Bank") to initiate debit and credit entries to Depositor's _____ checking and _____ savings account (*select one*) indicated below drawn by and payable to the order of FIVE GUYS BAKERY, LLC by Electronic Funds Transfer, provided there are sufficient funds in said account to pay the amount upon presentation.

     Depositor agrees that the Bank's rights with respect to each such charge shall be the same as if it were a check drawn by the Bank and signed by Depositor.  Depositor further agrees that if any such charge is dishonored, whether with or without cause and whether intentionally or inadvertently, the Bank shall be under no liability whatsoever.

Bank Name: _____

City: _____     State: _____     Zip Code: _____

Transit/ABA Number: _____     Account Number: _____

     This authority is to remain in full force and effect until Company has received written notification from me (or either of us) of its termination in such time and in such manner to afford Company and Bank a responsible opportunity to act on such request.

Store Address:  (Please Print)

_____

_____

Depositor:  (Please Print Franchisee Name)

_____

_____

_____
Date Signed

_____

_____
Signature(s) of Depositor, as Printed Above

Change of Bank Acct Numbers ☐     Store # [_____]     Effective Date of Change [_____]

**Please attach a voided blank check, for purposes of setting up Bank and Transit Numbers.**

**ATTACHMENT F**

## POWER OF ATTORNEY

<u>Taxes and Telephone Nos.</u>

### **<u>IRREVOCABLE POWER OF ATTORNEY</u>**

STATE OF _____ )
                          )
COUNTY OF _____ )

### KNOW ALL MEN BY THESE PRESENTS

That _____ ("**Franchisee**"), a _____, does hereby irrevocably constitute and appoint FIVE GUYS FRANCHISOR, LLC, a Delaware limited liability company ("**Franchisor**"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purposes of (i) assigning to Franchisor all of Franchisee's right, title and interest in and to any and all telephone numbers of Franchisee's franchise and all related Yellow Pages, White Pages and other business listings, including, but not limited to, the execution and delivery of any Transfer of Service Agreement and any other transfer documentation required by the applicable telephone service company providing telephone services to Franchisee, and (ii) obtaining any and all returns, records, reports and other documentation relating to the payment of taxes filed by Franchisee with any state and/or federal taxing authority, including, but not limited to, the State Comptroller of the State of _____, and hereby granting unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no person, firm or corporation dealing with Franchisor shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of funds or property paid or delivered to Franchisor. Any person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Five Guys that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm or corporation acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Five Guys, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement attached hereto. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable power of attorney coupled with an interest. It is executed and delivered in the State of _____ and the laws of the State of _____ shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the _____ day of _____, 20____.

FRANCHISEE:

_____

By:_____
Name:_____
Title:_____

**ATTACHMENT G**

## <u>STATE SPECIFIC AMENDMENTS</u>

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT FOR THE STATE OF ALASKA

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

    a.    Section IV.B.(1) of this Agreement is amended to state that, if the Restaurant is located in the State of Alaska, the Royalty Fee shall be 8% of the Restaurant's Gross Sales during the preceding week.

*** 

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT FOR THE STATE OF CALIFORNIA

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

## CALIFORNIA LAW MODIFICATIONS

The California Department of Financial Protection and Innovation requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. CORPORATIONS CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq.  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    California Business and Professions Code Sections 20000 through 20043 provide rights to You concerning nonrenewal, termination, or transfer of the Agreement.  The Federal Bankruptcy Code also provides rights to You concerning termination of the Agreement upon certain bankruptcy-related events.  To the extent the Agreement contains a provision that is inconsistent with these laws, these laws shall control.

    b.    If Franchisee is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the California Franchise Investment Law and the California Franchise Relations Act.

    c.    If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

    d.    If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

    e.    If the Agreement requires litigation, arbitration or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

    f.    If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

    g.    Section IV. of this Agreement is amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor before Franchisee opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Franchisee and Franchisee is open for business.

***

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT FOR THE STATE OF HAWAII

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### HAWAII LAW MODIFICATIONS

The Hawaii Department of Commerce and Consumer Affairs, Business Registration Division requires that certain provisions contained in franchise documents be amended to be consistent with Hawaii law. To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.  Section IV.B.(1) of this Agreement is amended to state that, if the Restaurant is located in the State of Hawaii, the Royalty Fee shall be 8% of the Restaurant's Gross Sales during the preceding week.

b.  Section IV. of this Agreement is amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor or any of its affiliates before Franchisee opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Franchisee and Franchisee opens its Restaurant for business.

\*\*\*

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT FOR THE STATE OF ILLINOIS

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### ILLINOIS LAW MODIFICATIONS

The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, 815 ILCS 705/1 et seq. (West 2010). To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.  815 ILCS 705/19 and 705/20 provide rights to You concerning nonrenewal and termination of this Agreement. If this Agreement contains a provision that is inconsistent with the Act, the Act shall control.

b.  If Franchisee is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule of order under the Act, such release shall exclude claims arising under the Illinois Franchise Disclosure Act, and such acknowledgments shall be void with respect to claims under the Act and are hereby deleted.

c.  If this Agreement requires litigation to be conducted in a forum other than the State of Illinois, the requirement is void, provided that a Franchise Agreement may provide for arbitration in a forum outside of Illinois.

d.  If this Agreement requires that it be governed by a state's law, other than the State of Illinois, to the extent that such law conflicts with Illinois law, Illinois law shall control.

e.  Section 41 of the Illinois Franchise Disclosure Act states that "Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act, or any other law of Illinois, is void." To the extent that any provision in this Agreement is inconsistent with Illinois law, Illinois law shall control.

f.      This Agreement is amended to comply with Section 27 of the Act to allow any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisor and Franchisee and Franchisee's operation of the Franchise brought by Franchisee against Franchisor shall be commenced within three (3) years from the occurrence of the facts giving rise to such claim or action, within one (1) year after the Franchisee becomes aware of the facts or circumstances indicating Franchisee may have a claim for relief, or ninety (90) days after delivery to Franchisee of a written notice disclosing the violation, or such claim or action shall be barred.

g.      Section IV. of this Agreement is amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor before Franchisee opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Franchisee and Franchisee opens its Restaurant for business.  The Illinois Attorney General has imposed this deferral requirement due to Franchisor's current financial condition.

***

<strong>AMENDMENT TO FIVE GUYS FRANCHISOR, LLC<br>FRANCHISE AGREEMENT FOR THE STATE OF MARYLAND</strong>

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### MARYLAND LAW MODIFICATIONS

The Maryland Securities Division requires that certain provisions contained in franchise documents be amended to be consistent with Maryland law, including the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. §§ 14-201 - 14-233 (1998 Repl. Vol. & Supp. 2002).  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.      If Franchisee is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act, such release shall exclude claims arising under the Maryland Franchise Registration and Disclosure Law, and such acknowledgments shall be void with respect to claims under the Law.

b.      If this Agreement requires litigation to be conducted in a forum other than the State of Maryland, the requirement shall not be interpreted to limit any rights Franchisee may have under Sec. 14-216 (c)(25) of the Maryland Franchise Registration and Disclosure Law to bring suit in the state of Maryland.

c.      The general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

d.      This Agreement is hereby amended to reflect that any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

e.      Section 14-226 of the Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise.  If this Agreement requires prospective franchisees to disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Franchise Law, such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law resulting from the offer or sale of the franchise.

f.      Section IV. of this Agreement is amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor before Franchisee opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Franchisee and Franchisee opens its Restaurant for business.

**\*\*\***

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT AND DISCLOSURE DOCUMENT
## FOR THE STATE OF MINNESOTA

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### MINNESOTA LAW MODIFICATIONS

The Commissioner of Commerce for the State of Minnesota requires that certain provisions contained in franchise documents be amended to be consistent with Minnesota Franchise Act, Minn. Stat. Section 80.01 et seq., and of the Rules and Regulations promulgated under the Act (collectively the "Franchise Act"). To the extent that the Agreement and Disclosure Document contain provisions that are inconsistent with the following, such provisions are hereby amended:

a.      The Minnesota Department of Commerce requires that Franchisor indemnify Minnesota franchisees against liability to third parties resulting from claims that the franchisees' use of the Intellectual Properties infringes trademark rights of the third party. If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

b.      Franchise Act, Sec. 80C.14, Subd. 4., requires, except in certain specified cases, that a franchisee be given written notice of a franchisor's intention not to renew 180 days prior to expiration of the franchise and that the franchisee be given sufficient opportunity to operate the franchise in order to enable the franchisee the opportunity to recover the fair market value of the franchise as a going concern. If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with such requirement of the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

c.      Franchise Act, Sec. 80C.14, Subd. 3., requires, except in certain specified cases that a franchisee be given 90 days' notice of termination (with 60 days to cure). If the Agreement and/or the Disclosure Document contain(s) a provision that is inconsistent with such requirement of the Franchise Act, the provisions of the Agreement shall be superseded by the Act's requirements and shall have no force or effect.

d.      If the Agreement and/or the Disclosure Document require(s) Franchisee to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Franchise Act, such release shall exclude claims arising under the Franchise Act, and such acknowledgments shall be void with respect to claims under the Act.

e.      If the Agreement and/or the Disclosure Document require(s) that it be governed by a state's law, other than the State of Minnesota, for litigation, arbitration or mediation, those provisions shall not in any way abrogate or reduce any rights of Franchisee as provided for in the Franchise Act, including the right to submit matters to the jurisdiction of the courts of Minnesota.

f.      To the extent Minnesota Rule 2860.4400J. prohibits a franchisor from requiring You to consent to the Franchisor obtaining injunctive relief, the Agreement is hereby revised to

reflect that Franchisor may seek injunctive relief and that whether any bond be necessary be determined by the court.

g.      Section 80C.17 of the Act provides that no action may be commenced pursuant to that section more than three (3) years after the cause of action accrues.  No provision in the Agreement shall be construed to limit the time period for You to bring a claim under the Act.

h.      Section IV. of this Agreement is hereby amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor before Franchisee opens its Restaurant shall be due immediately after opening your FIVE GUYS® Restaurant.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC**
**FRANCHISE AGREEMENT FOR THE STATE OF NEW YORK**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**NEW YORK LAW MODIFICATIONS**

The New York Department of Law requires that certain provisions contained in franchise documents be amended to be consistent with New York law, including the General Business Law, Article 33, Sections 680 through 695 (1989).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.      If Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the General Business Law, regulation, rule or order under the Law, such release shall exclude claims arising under the New York General Business Law, Article 33, Section 680 through 695 and the regulations promulgated thereunder, and such acknowledgments shall be void.  It is the intent of this provision that non-waiver provisions of Sections 687.4 and 687.5 of the General Business Law be satisfied.

b.      If the Agreement requires that it be governed by a state's law, other than the State of New York, the choice of law provision shall not be considered to waive any rights conferred upon the Licensee under the New York General Business Law, Article 33, Sections 680 through 695.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC**
**FRANCHISE AGREEMENT FOR THE STATE OF NORTH DAKOTA**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**NORTH DAKOTA LAW MODIFICATIONS**

1.      The North Dakota Securities Commissioner requires that certain provisions contained in franchise documents be amended to be consistent with North Dakota law, including the North Dakota Franchise Investment Law, North Dakota Century Code Annotated Chapter 51-19, Sections 51-19-01 through 51-19-17 (1993).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.      If Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Law, or a rule or order under the Law, such release shall

exclude claims arising under North Dakota Law, and such acknowledgments shall be void with respect to claims under the Law.

b.  Covenants not to compete during the term of and upon termination or expiration of the Agreement are enforceable only under certain conditions according to North Dakota Law. If the Agreement contains a covenant not to compete that is inconsistent with North Dakota Law, the covenant may be unenforceable.

c.  The Commissioner has held that requiring franchisees to consent to the jurisdiction of courts outside of North Dakota is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Law.  If the Agreement requires litigation to be conducted in a forum other than the State of North Dakota, the requirement is void with respect to claims under North Dakota Law.

d.  If the Agreement requires mediation or arbitration to be conducted in a forum other than the State of North Dakota, the requirement may be unenforceable under North Dakota Law. Arbitration involving a franchise purchased in the State of North Dakota must be held either in a location mutually agreed upon prior to the arbitration or if the parties cannot agree on a location, the location shall be determined by the arbitrator.

e.  If the Agreement requires payment of a termination penalty or liquidated damages, the requirement may be unenforceable under North Dakota Law.

f.  If the Agreement requires that a state's law other than the State of North Dakota govern it, to the extent that such law conflicts with the North Dakota Law, North Dakota Law shall control.

g.  The Commissioner has held that requiring franchisees to consent to a waiver of trial by jury or of exemplary or punitive damages is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Law.  If the Agreement requires consent to a waiver of trial by jury or waiver of exemplary or punitive damages, the requirement may be unenforceable under the North Dakota Law.

h.  If the Agreement requires consent to a limitation of claims, the requirement is void and the statute of limitations under the North Dakota Law shall apply.

i.  If the Agreement requires consent to payment of all costs and expenses incurred in the enforcement of the Agreement, the requirement is void.  The prevailing party in any such action is entitled to recover all costs and expenses, including reasonable attorneys' fees.

j.  Section IV. of this Agreement is amended to state that the Franchise Fee and all other initial payments Franchisee owes to Franchisor before Franchisee opens its Restaurant shall be deferred until Franchisor satisfies all of its pre-opening obligations to Franchisee and Franchisee opens its Restaurant for business.

2.  Under North Dakota Law, Franchisee is not required to waive its rights.

*** 

## AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
## FRANCHISE AGREEMENT FOR THE COMMONWEALTH OF PUERTO RICO

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

a.  Section IV.B.(1) of this Agreement is amended to state that, if the Restaurant is located in the Commonwealth of Puerto Rico, the Royalty Fee shall be 8% of the Restaurant's Gross Sales during the preceding week.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
FRANCHISE AGREEMENT FOR THE STATE OF RHODE ISLAND**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**RHODE ISLAND LAW MODIFICATIONS**

The Rhode Island Securities Division requires that certain provisions contained in franchise documents be amended to be consistent with Rhode Island law, including the Franchise Investment Act, R.I. Gen. Law. ch. 395 Sec. 19-28.1-1 -19-28.1-34.  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    If this Agreement requires litigation to be conducted in a forum other than the State of Rhode Island, the requirement is void under Rhode Island Franchise Investment Act Sec. 19-28.1-14.

    b.    If this Agreement requires that it be governed by a state's law, other than the State of Rhode Island, to the extent that such law conflicts with Rhode Island Franchise Investment Act it is void under Sec. 19-28.1-14.

    c.    If Franchisee is required in this Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act, such release shall exclude claims arising under the Rhode Island Franchise Investment Act, and such acknowledgments shall be void with respect to claims under the Act.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
FRANCHISE AGREEMENT FOR THE STATE OF SOUTH DAKOTA**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**SOUTH DAKOTA LAW MODIFICATIONS**

The South Dakota Securities Regulation Office requires that certain provisions contained in franchise documents be amended to be consistent with South Dakota law, including the South Dakota Franchise Investment Act, S.D. Codified Laws §37-5B-5.  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.    Section IV. of the Agreement is amended to state that the South Dakota Securities Regulation, Division of Insurance requires Franchisor to defer payment of the initial franchise fee and all other initial payments Franchisee owes to Franchisor until Franchisor completes all of its pre-opening obligations under the Franchise Agreement.

***

**AMENDMENT TO FIVE GUYS FRANCHISOR, LLC
FRANCHISE AGREEMENT FOR THE COMMONWEALTH OF VIRGINIA**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**VIRGINIA LAW MODIFICATIONS**

The Virginia State Corporation Commission's Division of Securities requires that certain provisions contained in franchise documents be amended to be consistent with Virginia law, including the Virginia Retail Franchising Act.  To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

      a.    Section IV. of the Agreement is amended to state that the Virginia State Corporation Commission's Division of Securities and Retail Franchising requires Franchisor to defer payment of the initial franchise fee and all other initial payments Franchisee owes to Franchisor until Franchisor completes all of its pre-opening obligations under the Franchise Agreement.

***

**WASHINGTON AMENDMENT TO THE FRANCHISE AGREEMENT, DISCLOSURE ACKNOWLEDGMENT STATEMENT, AND RELATED AGREEMENTS
FOR FIVE GUYS FRANCHISOR, LLC**

The Five Guys Franchisor, LLC Franchise Agreement (the "Agreement") between "Franchisee" or "You" and FIVE GUYS FRANCHISOR, LLC ("Franchisor") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**WASHINGTON LAW MODIFICATIONS**

The Director of the Washington Department of Financial Institutions requires that certain provisions contained in franchise documents be amended to be consistent with Washington law, including the Washington Franchise Investment Protection Act, WA Rev. Code §§ 19.100.010 to 19.100.940 (1991).  To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

      a.    RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

      b.    A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

      c.    In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

      d.    In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

      e.    Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

f.    Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

g.    RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

h.    Section IV. of the Agreement is amended to state that the State of Washington has imposed a financial condition under which the initial franchise fees due shall be deferred until Franchisor has fulfilled its initial pre-opening obligations under the Franchise Agreement and the franchise is open for business.

\*\*\*

Each provision of these Amendments shall be effective only to the extent that the jurisdictional requirements, with respect to each such provision, are met independent of these Amendments.  These Amendments shall have no force or effect if such jurisdictional requirements are not met.

**IN WITNESS WHEREOF**, each of the parties hereto has read and agrees to remain subject to the foregoing amendment, as applicable, and has executed the same by a duly authorized representative.

**FRANCHISOR:**

ATTEST:

**FIVE GUYS FRANCHISOR, LLC**
a Delaware limited liability company

By:_____          By:_____
Print Name:_____          Name:_____
                                      Title:_____

**FRANCHISEE:**

_____

By:_____          By:_____
Print Name:_____          Name:_____
                                      Title:_____

FIVE GUYS – Franchise Agreement (2022)

## ATTACHMENT H

### FRANCHISEE DISCLOSURE ACKNOWLEDGMENT STATEMENT

As you know, FIVE GUYS FRANCHISOR, LLC (the "**Franchisor**") and you are preparing to enter into a franchise agreement (the "**Franchise Agreement**") for the establishment and operation of a FIVE GUYS® Restaurant (the "**Franchised Business**").  The purpose of this Questionnaire is to determine whether any statements or promises were made to you by employees or authorized representatives of the Franchisor, or by employees or authorized representatives of a broker acting on behalf of the Franchisor ("**Broker**") that have not been authorized, or that were not disclosed in the Disclosure Document or that may be untrue, inaccurate or misleading.  The Franchisor, through the use of this document, desires to ascertain (a) that the undersigned, individually and as a representative of any legal entity established to acquire the franchise rights, fully understands and comprehends that the purchase of a franchise is a business decision, complete with its associated risks, and (b) that you are not relying upon any oral statement, representations, promises or assurances during the negotiations for the purchase of the franchise which have not been authorized by Franchisor.

In the event that you are intending to purchase an existing Franchised Business from an existing Franchisee, you may have received information from the transferring Franchisee, who is not an employee or representative of the Franchisor.  The questions below do not apply to any communications that you had with the transferring Franchisee.  Please review each of the following questions and statements carefully and provide honest and complete responses to each.

1.      Are you seeking to enter into the Franchise Agreement in connection with a purchase or transfer of an existing Franchised Business from an existing Franchisee?

Yes _____        No _____

2.      I had my first face-to-face meeting with a Franchisor representative on _____, 20___.

3.      Have you received and personally reviewed the Franchise Agreement, each amendment, and/or related agreement provided to you?

Yes _____        No _____

4.      Do you understand all of the information contained in the Franchise Agreement, each amendment, and/or related agreement provided to you?

Yes _____        No _____

If no, what parts of the Franchise Agreement, any amendment, and/or related agreement do you not understand?  (Attach additional pages, if necessary.)

_____

_____

_____

_____

_____

Franchisee Initials: _____      Witness Initials: _____

5.      Have you received and personally reviewed the Franchisor's Disclosure Document that was provided to you?

Yes _____        No _____

6.      Did you sign a receipt for the Disclosure Document indicating the date you received it?

Yes _____        No _____

7.      Do you understand all of the information contained in the Disclosure Document and any state-specific addendum to the Disclosure Document?

Yes _____        No _____

If No, what parts of the Disclosure Document and/or addendum do you not understand?  (Attach additional pages, if necessary.)

_____

_____

_____

_____

_____

_____

8.      Have you discussed the benefits and risks of establishing and operating a Franchised Business with an attorney, accountant, or other professional advisor?

Yes _____        No _____

If No, do you wish to have more time to do so?

Yes _____        No _____

9.      Do you understand that the success or failure of your Franchised Business shall depend in large part upon your skills and abilities, competition from other businesses, interest rates, inflation, labor and supply costs, location, lease terms, your management capabilities and other economic, and business factors?

Yes _____        No _____

10.      Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement or promise concerning the actual or potential revenues, profits or operating costs of any particular Franchised Business operated by the Franchisor or its franchisees (or of any group of such businesses), that is contrary to or different from the information contained in the Disclosure Document?

Yes _____        No _____

11.      Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement or promise regarding the amount of money you may earn in operating the franchised business that is contrary to or different from the information contained in the Disclosure Document?

Yes _____        No _____

FIVE GUYS – Franchise Agreement (2022)

Franchisee Initials: _____     Witness Initials: _____

12.     Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement or promise concerning the total amount of revenue the Franchised Business shall generate, that is contrary to or different from the information contained in the Disclosure Document?

Yes _____        No _____

13.     Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement or promise regarding the costs you may incur in operating the Franchised Business that is contrary to or different from the information contained in the Disclosure Document?

Yes _____        No _____

14.     Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement or promise concerning the likelihood of success that you should or might expect to achieve from operating a Franchised Business?

Yes _____        No _____

15.     Has any employee of a Broker or other person speaking on behalf of the Franchisor made any statement, promise or agreement concerning the advertising, marketing, training, support service or assistance that the Franchisor shall furnish to you that is contrary to, or different from, the information contained in the Disclosure Document or franchise agreement?

Yes _____        No _____

16.     Have you entered into any binding agreement with the Franchisor concerning the purchase of this franchise before today?

Yes _____        No _____

17.     Have you paid any money to the Franchisor concerning the purchase of this franchise before today?

Yes _____        No _____

18.     Have you spoken to any other franchisee(s) of this system before deciding to purchase this franchise?  If so, who? _____
_____

If you have answered No to question 9, or Yes to any one of questions 10-17, please provide a full explanation of each answer in the following blank lines.  (Attach additional pages, if necessary, and refer to them below.)  If you have answered Yes to question 9, and No to each of questions 10-17, please leave the following lines blank.

_____
_____
_____
_____

I signed the Franchise Agreement and Amendment (if any) on _____, 20___, and acknowledge that no Agreement or Amendment is effective until signed and dated by the Franchisor.

Franchisee Initials: _____     Witness Initials: _____

Please understand that your responses to these questions are important to us and that we shall rely on them.  By signing this Questionnaire, you are representing that you have responded truthfully to the above questions.  In addition, by signing this Questionnaire, you also acknowledge that:

A.      You recognize and understand that business risks, which exist in connection with the purchase of any business, make the success or failure of the franchise subject to many variables, including among other things, your skills and abilities, the hours worked by you, competition, interest rates, the economy, inflation, franchise location, operation costs, lease terms and costs and the marketplace.  You hereby acknowledge your awareness of and willingness to undertake these business risks.

B.      Except as contained in the Disclosure Document, you acknowledge that you have not received any information from the Franchisor or any of its officers, employees or agents (including the Broker or any other broker) concerning actual, projected or forecasted franchise sales, profits or earnings. If you believe that you have received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the Disclosure Document, please describe those in the space provided below or write "None".

_____

_____

_____

C.      You further acknowledge that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the United States government has adopted, and in the future may adopt, other anti-terrorism measures (the "Anti-Terrorism Measures").   The Franchisor therefore requires certain certifications that the parties with whom it deals are not directly involved in terrorism.  For that reason, you hereby certify that neither you nor any of your employees, agents or representatives, nor any other person or entity associated with you, is:

(i)      a person or entity listed in the Annex to the Executive Order;

(ii)     a person or entity otherwise determined by the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism;

(iii)    a person or entity who assists, sponsors, or supports terrorists or acts of terrorism; or

(iv)    owned or controlled by terrorists or sponsors of terrorism.

You further covenant that neither you nor any of your employees, agents or representatives, nor any other person or entity associated with you, shall during the term of the Franchise Agreement become a person or entity described above or otherwise become a target of any Anti-Terrorism Measure.

Franchisee Initials: _____    Witness Initials: _____

Acknowledged this _____ day of _____, 20_____.

Sign here if you are taking the franchise as an

INDIVIDUAL

Sign here if you are taking the franchise as a
CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP

_____
Signature

_____
Print Name of Legal Entity

Print Name_____

By:_____
         Signature

_____
Signature

Print Name_____

Print Name_____

Title_____

_____
Signature

Print Name_____

_____
Signature

Print Name_____

Franchisee Initials: _____   Witness Initials: _____

**EXHIBIT D TO THE DISCLOSURE DOCUMENT**

**<u>LIST OF FRANCHISEES</u>**

**EXHIBIT D**

**LIST OF FRANCHISEES**
**(As of December 31, 2021)**

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **Alabama** | | |
| | GHG Gulf Coast, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 6860 Highway 90 (out parcel) Daphne, AL 36526 |
| | Decatur Burgers, Inc. (Kumar Patel) 2302 Old Ridge Rd. Huntsville, AL 35802 (256) 652-0001 | 1241 Point Mallard Pkwy., Ste. 103 Decatur, AL 35601 256-355-1286 |
| | Huntsville Burgers, Inc. (Kumar Patel) 2302 Old Ridge Rd. Huntsville, AL 35802 (256) 652-0001 | 2881 Florence Blvd. Florence, AL 35630 |
| | GHG Gulf Coast, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 3117 South McKenzie St. Foley, AL 36535 |
| | Huntsville Burgers, Inc. (Kumar Patel) 2302 Old Ridge Rd. Huntsville, AL 35802 (256) 652-0001 | 1395 Enterprise Way Huntsville, AL 35806 256-382 -3526 |
| | Huntsville Burgers, Inc. (Kumar Patel) 2302 Old Ridge Rd. Huntsville, AL 35802 (256) 652-0001 | 1221-A North Memorial Pkwy. Huntsville, AL 35811 |
| | Jones Valley Burgers, Inc. (Kumar Patel) 2302 Old Ridge Rd. Huntsville, AL 35802 (256) 652-0001 | 2724 Carl T. Jones Dr. Huntsville, AL 35806 256-382-3150 |
| | Life Capital, LLC (Brandon Butler) 6157 Airport Blvd., Ste. 850864 Mobile, AL 36685 (703) 597-4940 | 4663 Airport Blvd. Mobile, AL 36608 251-300-8425 |
| | Life Capital, LLC (Brandon Butler) 6157 Airport Blvd., Ste. 850864 Mobile, AL 36685 (703) 597-4940 | 5319 Highway 90, Ste. A Mobile, AL 36582 |
| | Life Capital, LLC (Brandon Butler) 6157 Airport Blvd., Ste. 850864 Mobile, AL 36685 (703) 597-4940 | 1225 Satchel Page Dr., Ste. E100 Mobile, AL 36606 251-378-8768 |
| **Arizona** | | |
| | AZ FGB Operations, LLC (Keith Bubb) c/o AZ BMS, LLC 9004 Ghost Mountain Ave. Las Vegas, NV 89129 (702) 610-7777 | 1800 S. Milton Ave., Ste. 300 Flagstaff, AZ 86001 |
| | AZ FGB Operations, LLC (Keith Bubb) c/o AZ BMS, LLC 9004 Ghost Mountain Ave. Las Vegas, NV 89129 (702) 610-7777 | 3455 Stockton Hill Rd. Kingman, AZ 86409 928-692-4415 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913)707-3504 or (913) 638-3542 | 7077 N. Thornydale Rd., Ste. 105 Marana, AZ 85741 |
| | AZ FGB Operations, LLC (Keith Bubb) c/o AZ BMS, LLC 9004 Ghost Mountain Ave. Las Vegas, NV 89129 (702) 610-7777 | 401 S. Beeline Hwy. Payson, AZ 85401 928-474-2716 |
| | AZ FGB Operations, LLC (Keith Bubb) c/o AZ BMS, LLC 9004 Ghost Mountain Ave. Las Vegas, NV 89129 (702) 610-7777 | 254 Lee Blvd., Ste. 100 Prescott, AZ 86303 |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913)707-3504 or (913) 638-3542 | 20784 E. Victoria Ln. Queen Creek, AZ 85142 480-534-5454 |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913) 707-3504 or (913) 638-3542 | 9484 E. 22nd St. Tucson, AZ 85710 520-751-3832 |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913) 707-3504 or (913) 638-3542 | 5566 E. Broadway Blvd., Ste. 100 Tucson, AZ 85711 |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913) 707-3504 or (913) 638-3542 | 2802 N. Campbell Ave. Tucson, AZ 85719 520-323-0590 |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce) 2430 E. Placita Sin Lujuria Tucson, AZ 85718 (913)707-3504 or (913) 638-3542 | 5331 S. Calle Santa Cruz Tucson, AZ 85706 520-294-1354 |
| | AZ FGB Operations, LLC (Keith Bubb) c/o AZ BMS, LLC 9004 Ghost Mountain Ave. Las Vegas, NV 89129 (702) 610-7777 | 1979 E. 16th St., Ste. 101 Yuma, AZ 85365 |
| **Arkansas** | | |
| | GHG AR, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 7110 Rogers Ave., Ste. 106 Ft. Smith, AR 72903 |
| | GHG AR, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 2100 Stadium Blvd. Jonesboro, AR 72401 |
| | GHG AR, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 13000 Chenal Pkwy., #100 Little Rock, AR 72223 501-225-1100 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | GHG AR, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 2923 Lakewood Village Dr.<br>North Little Rock, AR 72116<br>501-246-5295 |
| | GHG AR, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 2007 Promenade Blvd.<br>Rogers, AR 72758 |
| California | | |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 2254 South Shore Ctr.<br>Alameda, CA 94501<br>510-769-1788 |
| | Golden Gate Grills Inc. (James Khan and Billal Khan)<br>5220 Dolcetto Way<br>Salida, CA 95368<br>(510) 921-7485 | 190 Alamo Plaza<br>Alamo, CA 94507<br>925-362-3375 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 1000 El Camino Real<br>Belmont, CA 94002<br>650-610-0684 |
| | Golden Gate Grills Inc. (James Khan and Billal Khan)<br>5220 Dolcetto Way<br>Salida, CA 95368<br>(510) 921-7485 | 6660 Loan Tree Way, Ste. 8A<br>Brentwood, CA 94513-5370 |
| | 1450 Howard Avenue, Inc. (Rakesh Kumar, Jose Garzona)<br>555 Pilgrim Dr., Ste. A<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001 | Safeway Shopping Ctr.<br>203 Primrose Ave.<br>Burlingame, CA 94010 |
| | JAK Burgers, LLC (Karl Gittelman)<br>33721 Shannon Ln.<br>San Juan Capistrano, CA 92675<br>(949) 412-4129 | 48650 Seminole Dr.<br>Cabazon, CA  92230<br>951-922-0088 |
| | Bukit Inc. (Jay Denenberg)<br>14496 Nutwood Ln.<br>Saratoga, CA 95070<br>(408) 858-5441 | 1855 41st Ave.<br>Capitola, CA  95010<br>831-475-1948 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1840 Herndon Ave., Bldg. B, Ste. 105<br>Clovis, CA 93611<br>559-321-2002 |
| | Golden Gate Grills Inc. (James Khan and Billal Khan)<br>5220 Dolcetto Way<br>Salida, CA 95368<br>(510) 921-7485 | 5442 Ygnacio Valley Rd.<br>Concord, CA 94521 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 2690 Tuscany St.<br>Corona, CA 92881 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 4930 Dublin Blvd. #680<br>Dublin, CA 64568 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 9257 Laguna Springs Dr.<br>Elk Grove, CA 95624<br>916-478-9616 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1570 Gateway Blvd.<br>Fairfield, CA 94533 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 5442 Hazel Ave., Ste. 503<br>Fair Oaks, CA 95628<br>279-201-9665 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2750 East Bidwell St., #100<br>Folsom CA 95630<br>916-469-0001 |
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 15218 Summit Ave., Ste. A100<br>Fontana, CA 92336 |
| | M&J Holdings, LLC (Jerome Ma)<br>2567 Harmony Hill Dr.<br>Diamond Bar, CA 91765<br>(949) 232-8190 | 10540 Sierra Avenue<br>Fontana, CA 92337<br>951-751-6668 |
| | Rakesh Kumar, Sunil Kumar, Jose Garzona<br>817 Lurline Dr.<br>Foster City, CA 94405<br>(650) 868-4942 | 933 E. Hillsdale Blvd.<br>Foster City, CA 94404<br>650-235-9485 |
| | Rakesh Kumar, Sunil Kumar, Jose Garzona<br>817 Lurline Dr.<br>Foster City, CA 94405<br>(650) 868-4942 | 43810 Christy St.<br>Fremont, CA 94538<br>510-353-1331 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 7762 N. Blackstone Avenue<br>Fresno, CA 92591 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6623 Riverside Dr.<br>Fresno, CA 93722<br>559-650-0464 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | Fashion Fair Mall<br>645 East Shaw Ave.<br>Fresno, CA  93710<br>559-462-0626 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3074 E. Campus Pointe Dr.<br>Fresno, CA  93710<br>559-206-6730 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1693 West Lacey Blvd., Ste. A<br>Hanford, CA 93230<br>559-772-3344 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 19621 Hesperian Blvd.<br>Hayward, CA 94545<br>510-780-0661 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 28529 Hesperian Blvd.<br>Hayward, CA 94541 |
| | M&J Holdings, LLC (Jerome Ma)<br>2567 Harmony Hill Dr.<br>Diamond Bar, CA 91765<br>(949) 232-8190 | 12719 Main St.<br>Hesperia, CA 92344<br>760-995-7754 |
| | JAK Burgers, LLC (JoAnn Gittelman, Karl Gittelman)<br>33721 Shannon Ln.<br>San Juan Capistrano, CA 92675<br>949-412-4129 | 78-445 Hwy. 111<br>La Quinta, CA 92253<br>760-771-9300 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2640 Reynolds Ranch Pkwy.<br>Lodi, CA 95240<br>209-333-9750 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2140 Daniels St.<br>Manteca, CA 95337<br>918-527-0684 |
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 27774 Newport Rd., Ste. 103<br>Menifee, CA 92584<br>951-679-7111 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3572 G St.<br>Merced, CA 95340<br>209-205-4312 |
| | FG Hospitality, LLC (Jerome Ma)<br>2567 Harmony Hill Dr.<br>Diamond Bar, CA 91765<br>(949) 232-8190 | 6285 Pats Ranch Rd., Ste. A,<br>Mira Loma, CA 91752 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2199 Claribel Rd.<br>Modesto, CA 95357<br>209-205-4334 |
| | LJ International, Inc. (Jerome Ma and Lijun Li)<br>303 South San Dimas Ave.<br>San Dimas, CA 91773<br>Jerome Ma (949) 232-8190<br>Lijun Li (909) 506-9255 | 12515 Frederick St., A-3<br>Moreno Valley, CA 92553 |
| | Tripart Management II, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>1118 Chess Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 775 Cochrane Rd., Ste. 100<br>Morgan Hills, CA 95037 |
| | Tripart Management II, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>1118 Chess Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 2098 El Camino Real<br>Mountain View, CA 94040<br>650-962-1882 |
| | JAK Burgers, LLC (Karl Gittelman)<br>33721 Shannon Ln.<br>San Juan Capistrano, CA 92675<br>949-412-4129 | 5200 E. Ramon Rd., Ste. F2<br>Palm Springs, CA  92264<br>949-413-4128 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 401 Kenilworth Dr., Ste. 650<br>Petaluma, CA 95942<br>707-765-2255 |
| | Golden Gate Grills Inc. (James Khan and Billal Khan)<br>5220 Dolcetto Way<br>Salida, CA 95368<br>(510) 921-7485 | 2782 Pinole Valley Rd.<br>Pinole, CA 94564<br>510-223-6031 |
| | Golden Gate Grills Inc. (James Khan and Billal Khan)<br>5220 Dolcetto Way<br>Salida, CA 95368<br>(510) 921-7485 | 100 Crescent Dr., Unit 7A<br>Pleasant Hill, CA 94523<br>925-609-8400 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2310 Sunrise Blvd.<br>Rancho Cordova, CA 95670<br>916-625-4202 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 7945 Haven Ave.<br>Rancho Cucamonga, CA  91730 |
| | JAK Burgers, LLC (Karl Gittelman)<br>33721 Shannon Ln.<br>San Juan Capistrano, CA 92675<br>949-412-4129 | 71-800 Hwy. 111, Ste. 134A<br>Rancho Mirage, CA  92270 |
| | Keep Smile Trading USA, Inc. (Freedom Yang)<br>3320 Lenonis Blvd.<br>Vernon, CA 90058<br>(909) 556-5061; (323) 540-7738 | 961 Dana Dr., Ste. 150<br>Redding, CA  96003 |
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 10060 Alabama, Ste. A<br>Redlands, CA 92374 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 801 Middlefield Rd.<br>Redwood City, CA  94063 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8620 Sierra College Blvd., Ste. 150<br>Roseville, CA 95661 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4630 Natomas Blvd.<br>Sacramento, CA 95835<br>916-419-4109 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2625 Marconi Ave.<br>Sacramento, CA 95821<br>530-395-3802 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3660 Crocker Dr., Ste. 120<br>Sacramento, CA 95818<br>279-444-0767 |
| | Bukit Inc. (Jay Denenberg)<br>14496 Nutwood Ln.<br>Saratoga, CA 95070<br>(408) 858-5441 | 1742 North Main St.<br>Salinas, CA  93906 |
| | FG Hospitality, LLC (Jerome Ma)<br>2567 Harmony Hill Dr.<br>Diamond Bar, CA 91765<br>(949) 232-8190 | 525 E. Hospitality Ln., Ste. D<br>San Bernardino, CA  92408 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 1150 El Camino Real, #220<br>San Bruno, CA 94066 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 121 Curtner Ave.<br>San Jose, CA 95125<br>408-293-9800 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 5353 Almaden Expressway N60<br>San Jose, CA  95112 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 5205 Prospect Rd.<br>San Jose, CA 95129 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 5660 Cottle Rd.<br>San Jose, CA 95123<br>408-363-8200 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 4180 N 1st St., Ste. 50<br>San Jose, CA 95134 |
| | Tripart Management II, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>1118 Chess Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 1015 E. Brokaw Rd., Ste. 70<br>San Jose, CA 95131 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 1205 The Alameda, Ste. 10<br>San Jose, CA 95126<br>408-816-8230 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 2007 Camden Ave.<br>San Jose, CA 95124<br>408-429-8831 |
| | Tripart Management II, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>1118 Chess Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 438 North Capitol Ave.<br>San Jose, CA 95133<br>408-272-1122 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Bukit Inc. (Jay Denenberg)<br>14496 Nutwood Ln.<br>Saratoga, CA 95070<br>(408) 858-5441 | 915 Playa Ave.<br>Sand City, CA 93955<br>831-901-3823 |
| | Bukit Inc. (Jay Denenberg)<br>14496 Nutwood Ln.<br>Saratoga, CA 95070<br>(408) 858-5441 | 1101 Pacific Ave., Ste. A<br>Santa Cruz, CA 95060<br>831-600-8541 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | Mendocino Marketplace<br>2280 Mendocino Ave., Ste. B-5<br>Santa Rosa, CA 95403 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3640B Lake Tahoe Blvd.<br>South Lake Tahoe, CA 96150<br>530-494-9031 |
| | Tripart Management, Inc. (Rakesh Kumar, Sunil Kumar, Jose Garzona)<br>817 Lurline Dr.<br>Foster City, CA 94404<br>Rakesh Kumar (650) 868-4942<br>Jose Garzona (415) 309-3001<br>Sunil Kumar (415) 699-3220 | 2278 Westborough Blvd.<br>South San Francisco, CA 94080<br>650-244-9900 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 5633 Pacific Ave.<br>Stockton, CA 95207<br>209-473-9922 |
| | CA FGB Operations, LLC (Keith Bubb)<br>c/o AZ BMS, LLC<br>14730 East Crested Crown<br>Fountain Hills, AZ 85268<br>(408) 490-0908 | 116 E. El Camino Real<br>Sunnyvale, CA 94085<br>408-830-9100 |
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 40426 Winchester Rd.<br>Temecula, CA 92591<br>951-296-1955 |
| | Canadian Guys Burgers Limited (Joseph Dand and Mike Lipinski)<br>40426 Winchester Rd.<br>Temecula, CA 92591<br>Joseph Dand (403) 616-7156<br>Mike Lipinski (905) 380-1188 | 32195 Temecula Pkwy., Ste. 104<br>Temecula, CA 92592 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2970 W. Grant Line Rd.<br>Tracy, CA 95304 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1651 E. Monte Vista Ave., #102<br>Vacaville, CA 95688<br>707-447-1477 |
| | Encore FGBF California, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 768 Ikea Ct., Ste. 120<br>West Sacramento, CA 95605 |
| **Colorado** | | |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 9585 Ralston Rd.<br>Arvada, CO 80002<br>720-845-0045 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2300 S. Parker Rd.<br>Aurora, CO 80209<br>303-751-7449 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6710 Cornerstar Way, Unit C<br>Aurora, CO 80016<br>303-699-4100 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 23963 E. Prospect Ave.<br>Aurora, CO 80016<br>303-627-5440 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3751 N. Tower Rd.<br>Aurora, CO 80011<br>303-371-0314 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 14535 E. Alameda Ave., Ste. 310<br>Aurora, CO 80012<br>720-722-5303 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1855 29th St.<br>Boulder, CO 80301<br>303-440-3780 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 4480 @ 121st Ave.<br>Broomfield, CO 80020<br>720-887-5989 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 570 Zang St.<br>Broomfield, CO 80021<br>303-440-3780 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Jeffrey Parker<br>3578 Hartsel Dr., Ste. E-130<br>Colorado Springs, CO 80920<br>(719) 358-6069 | 34 E. Allen St., Ste. 100<br>Castle Rock, CO 80108 |
| | Jeffrey Parker<br>3578 Hartsel Dr., Ste. E-130<br>Colorado Springs, CO 80920<br>(719) 358-6069 | 7252 N. Academy Blvd. Ste. 120<br>Colorado Springs, CO 80920<br>719-264-6400 |
| | Jeffrey Parker<br>3578 Hartsel Dr., Ste. E-130<br>Colorado Springs, CO 80920<br>(719) 358-6069 | 3336 Cinema Point<br>Colorado Springs, CO 80922<br>719-380-4601 |
| | Jeffrey Parker<br>3578 Hartsel Dr., Ste. E-130<br>Colorado Springs, CO 80920<br>(719) 358-6069 | 1612 Nevada Ave.<br>Colorado Springs, CO 80906<br>719-633-8532 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2023 S. Colorado Blvd., Ste. A<br>Denver, CO 80210<br>303-758-7007 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8201 E. Northfield Blvd.<br>Denver, CO 80238<br>303-371-3483 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4989 S. Broadway, Ste A<br>Englewood, CO 80113<br>303-806-1111 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1335 West Elizabeth, #100<br>Fort Collins, CO 80521<br>970-797-2428 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | Front Range Village<br>2860 E. Harmony Rd, Ste. 140<br>Fort Collins, CO 80525<br>970-204-9140 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 4239 Centerplace Dr., Unit 1A<br>Greeley, CO 80634<br>970-515-5324 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8547 E. Arapahoe Rd.<br>Greenwood Village, CO 80112 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 9352 S. Colorado Blvd.<br>Highlands Ranch, CO 80126<br>303-470-0775 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 14630 West Colfax Ave.<br>Lakewood, CO 80401<br>303-278-3554 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 98 Wadsworth Blvd., Ste. 130<br>Lakewood, CO 80226<br>720-647-6200 |
| | Jeffrey Parker<br>3578 Hartsel Dr., Ste. E-130<br>Colorado Springs, CO 80920<br>(719) 358-6069 | 9992 Commons St.<br>Lonetree, CO 80124<br>303-925-1955 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1708 Main St., #300<br>Longmont, CO 80501<br>303-485-8924 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 14326 Lincoln Street<br>Thornton, CO 80023<br>720-644-9380 |
| | Encore FGBF Colorado, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3727 Wadsworth Blvd., Unit 126<br>Wheat Ridge, CO 80033<br>720-677-9500 |
| **Delaware** | | |
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 1249 Quintilio Dr.<br>Bear, DE 19701<br>302-832-7555 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 111 Garfield Pkwy.<br>Bethany Beach, DE 19930 |
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 136 Lantana Dr.<br>Hockessin, DE 19707<br>302-239-1250 |
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 216 Christiana Mall<br>Newark, DE 19702<br>302-565-0808 |
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 137 E. Main St.<br>Newark, DE 19711<br>302-533-5754 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 47A Rehoboth Ave.<br>Rehoboth Beach, DE 19971 |
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 2217 Concord Pkwy.<br>Wilmington, DE 19803 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Rockham 5G DE, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19341<br>(703) 869-8483 | 3234 B. Kirkwood Hwy.<br>Wilmington, DE 19808<br>302-998-2955 |
| **Florida** | | |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 229 E. Altamonte Dr., Ste. 1130<br>Altamonte Springs, FL 32701<br>407-478-6900 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 2240 NW 19th St.<br>Boca Raton, FL 34110<br>561-368-8384 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 12031 Bonita Beach Rd. SE, Ste. 170<br>Bonita Springs, FL 34135<br>239-221-8711 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 1950 Congress Ave., Ste. 110<br>Boynton Beach, FL 33426<br>561-369-4460 |
| | Sarasota Seven Burgers LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 8435 Cooper Creek Blvd.<br>Bradenton, FL 34201<br>941-358-7900 |
| | Sarasota Seven Burgers LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 6783 Manatee Ave. West<br>Bradenton, FL 34209<br>941-794-3700 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 13171 Cortez Blvd.<br>Brooksville, FL 34613<br>352-597-6887 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 1860 Pine Island Rd., Ste. 210<br>Cape Coral, FL 33991<br>239-242-0384 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 2612 Santa Barbara Blvd.<br>Cape Coral, FL 33914<br>239-242-6620 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 6240 W. Irlo Bronson Memorial Hwy 192<br>Celebration, FL 34747<br>407-566-8860 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Vista Interprises, LLC (John Nguyen and Anh Pham)<br>13201 Cartharpin Valley Dr.<br>Gainesville, VA 20155<br>(571) 261-5065 | 20505 US Hwy. 19<br>Clearwater, FL 33759<br>727-726-0100 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 1600 N. Hancock Rd.<br>Clermont, FL 34711<br>352-432-9473 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 2870 N. University Dr.<br>Coral Springs, FL 33065<br>754-529-8288 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 2470 International Speedway<br>Daytona Beach, FL 32114<br>386-258-7926 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 296 S. Federal Hwy.<br>Deerfield Beach, FL 33441<br>954-570-0375 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 571 Linton Blvd.<br>Delray Beach, FL 3444<br>561-2663162 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 23050 Via Villagio Pkwy., #105<br>Estero, FL 33928<br>239-948-7106 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 1816 Cordova Rd.<br>Ft. Lauderdale, FL 33316<br>954-358-5862 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 6365 N. Andrews Ave.<br>Ft. Lauderdale, FL 33309 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 3268 Forum Blvd., Ste. 207<br>Ft. Meyers, FL 33905<br>239-936-4169 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 12640 S. Cleveland Ave., Unit 201<br>Ft. Myers, FL 33907 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 16230 Summerlin Rd., #201<br>Ft. Meyers, FL 33908<br>293-267-2813 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 800 East Hallandale Beach Blvd.<br>Hallandale Beach, FL 33009<br>954-589-1281 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 2532 W. Indiantown Rd., #10<br>Jupiter, FL 33458 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 3621 Vineland Rd.<br>Kissimmee, FL 34746<br>407-479-6212 |
| | Vista Interprises, LLC (John Nguyen and Anh Pham)<br>13201 Cartharpin Valley Dr.<br>Gainesville, VA 20155<br>(571) 261-5065 | 10125 Ulmerton Rd., Ste. 1<br>Largo, FL 33771<br>727-238-8971 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 25599 Sierra Center Blvd.<br>Lutz, FL 33559<br>813-949-8088 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 500 E. Merritt Island CSWY<br>Merritt Island, FL 32952 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 19009 Hwy 441<br>Mount Dora, FL 32757 |
| | 54 FL LLC (Jeannie Schlesinger)<br>11983 N. Tamiami Trail, Ste. 157<br>Naples, FL 34110<br>(239) 207-2541 | 1410 Pine Ridge Rd.<br>Naples, FL<br>239-261-5603 |
| | 54 FL LLC (Jeannie Schlesinger)<br>11983 N. Tamiami Trail, Ste. 157<br>Naples, FL 34110<br>(239) 207-2541 | 13585 Tamiami Trails North<br>Naples, FL 34110<br>239-566-1200 |
| | 54 FL LLC (Jeannie Schlesinger)<br>11983 N. Tamiami Trail, Ste. 157<br>Naples, FL 34110<br>(239) 207-2541 | 7335 Radio Rd., Ste. 109<br>Naples, FL 34104<br>239-352-9820 |
| | 54 FL LLC (Jeannie Schlesinger)<br>11983 N. Tamiami Trail, Ste. 157<br>Naples, FL 34110<br>(239) 207-2541 | 7685 Colliers Blvd.<br>Naples, FL 34113<br>239-732-9502 |
| | 54 FL LLC (Jeannie Schlesinger)<br>11983 N. Tamiami Trail, Ste. 157<br>Naples, FL 34110<br>(239) 207-2541 | 7211 Vanderbilt Beach Rd. #17<br>Naples, FL 34119<br>239-331-4594 |
| | Sarasota Seven Burgers LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 17819 Tamiami Trail<br>North Port, FL 34287<br>941-423-1215 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 898 Saxon Blvd.<br>Orange City, FL 32763 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | Baldwin Park Village Center<br>4821 New Broad St.<br>Orlando, FL 32814<br>407-219-3366 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 8001 S. Orange Blossom Trail<br>Orlando, FL 32809<br>407-851-5299 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 4969 International Dr. (the Prime Outlets)<br>Orlando, FL<br>407-352-8362 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 551 N. Alafaya Trail<br>Orlando, FL 32828<br>321-235-5006 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 6125 S. Semoran Blvd.<br>Orlando, FL 32822<br>407-856-2992 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 2520 S. Orange Avenue<br>Orlando, FL 32806<br>407-648-7430 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 8324 International Dr.<br>Orlando, FL 32819<br>407-730-2339 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 8031 Turkey Lake Rd., Ste. 100<br>Orlando, FL 32819<br>407-930-1261 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 4698 Gardens Park Blvd.<br>Orlando, FL 32839<br>407-458-9567 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 11891 University Blvd.<br>Orlando FL 32817<br>407-440-3939 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 967 City Walk Ln.<br>Oviedo FL 32765<br>407-542-4602 |
| | GHG Gulf Coast, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 4796 Hwy. 90<br>Pace, FL 32571<br>850-889-4656 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 11320 Legacy Ave., Ste. 100<br>Legacy Place<br>Palm Beach Gardens, FL 33410<br>561-625-3888 |
| | Vista Interprises, LLC (John Nguyen and Anh Pham)<br>13201 Catharpin Valley Dr.<br>Gainesville, VA 20155<br>(571) 236-1214 | 300 East Lake Rd.<br>Palm Harbor, FL 34686<br>727-784-8965 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 11097 Pines Blvd.<br>Pembroke Pines, FL 33026<br>954-367-0167 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 15651 Pines Blvd.<br>Pembroke Pines, FL 33027<br>954-251-3048 |
| | GHG Gulf Coast, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1690 Airport Blvd.<br>Pensacola, FL 32504<br>850-484-5388 |
| | Vista Interprises, LLC (John Nguyen and Anh Pham)<br>13201 Catharpin Valley Dr.<br>Gainesville, VA 20155<br>(571) 236-1214 | 7056 US Hwy 19N & Park Blvd.<br>Pinellas Park, FL<br>727-526-7800 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | The Fountains<br>801 S. University Dr.<br>Plantation, FL 33324 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 1900 Tamiami Trail, Ste. 100<br>Port Charlotte, FL 33948<br>941-764-0088 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 1707 NW Port St. Lucie Blvd., #158<br>Port St. Lucie, FL 34986 |
| | M Assets, LLC (Dan Beaulieu)<br>9219 Blue Sage Rd.<br>Clinton, IL 61727<br>(502) 345-1200 | 379 Kings Hwy, Ste. #100<br>Punta Gorda, FL 33983<br>941-883-4946 |
| | Sarasota Seven Burgers LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 6593 S. Tamiami Trail<br>Sarasota, FL 34231 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Sarasota Seven Burgers LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 5354 Fruitville Road, Unit 8<br>Sarasota, FL 34232<br>941-342-0170 |
| | Flow Smart Five LLC (Greg Jones, James Garrettson and Patrick Donovan)<br>8245 Boone Blvd., Ste. 650<br>Vienna, VA 22182<br>(703) 421-9330 | 307 North Hwy. 27<br>Sebring, FL 33870<br>863-402-2093 |
| | Vista Interprises, LLC (John Nguyen and Anh Pham)*<br>13201 Cartharpin Valley Dr.<br>Gainesville, VA 20155<br>(571) 261-5065 | The Shoppes at Royale<br>1458 66th St. North<br>St. Petersburg, FL 33710<br>727-343-9600 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 2185 SE Federal Hwy.<br>Stuart, FL 34994<br>772-283-5454 |
| | Yukon Broward, LLC (Reas Kondraschow and Yanmei Gao)<br>6278 N. Federal Hwy., Ste. 284<br>Ft. Lauderdale, FL 33308<br>(908) 391-7827 | 13955 Sunrise Blvd.<br>Sunrise, FL 33323<br>754-200-6028 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm)<br>3685 North National Rd.<br>Columbus, IN 47201<br>George Estep - (812) 375-0140 | 17000 SR-54<br>Trinity, FL 34655<br>727-376-5885 |
| | Flow Smart Five LLC (Greg Jones, James Garrettson and Patrick Donovan)<br>8245 Boone Blvd., Ste. 650<br>Vienna, VA 22182<br>(703) 421-9330 | 1335 US Hwy. 1, Publix Center<br>Vero Beach, FL<br>772-299-4355 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 2230 Town Center Ave.<br>Viera, FL 32940<br>321-633-0033 |
| | MPR Development, LLC (Patrick Tracy, Thomas Tracy, Matt Tracy, Ryan Tracy)<br>128 Timberwalk Trail<br>Jupiter, FL 33458<br>Thomas Tracy (703) 283-3400<br>Matt Tracy (703) 216-2600<br>Pat Tracy (561) 846-2076<br>Ryan Tracy (703) 216-5723 | 10200 Forest Hill Blvd., Ste. 150<br>Wellington, FL 33414<br>561-790-7500 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | 225 Palm Bay Rd.<br>West Melbourne, FL 32904<br>321-409-9940 |
| | Bengel's Burgers, LLC (Charles Bengel)<br>5061 Polk Ave.<br>Alexandria, VA 22304<br>(703) 625-0064 | Winter Gardens Village<br>3107 Daniels Rd.<br>Winter Gardens, FL 34787<br>407-905-9811 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Gator Subs Vision LLC (George Estep and Scott Strahm) 3685 North National Rd. Columbus, IN 47201 George Estep - (812) 375-0140 | 5848 Red Bug Lake Rd. Winter Springs, FL 32708 407-636-8100 |
| | Gator Subs Vision LLC (George Estep and Scott Strahm) 3685 North National Rd. Columbus, IN 47201 George Estep - (812) 375-0140 | 7654 Gall Blvd. Zephrhills, FL 33541 |
| **Georgia** | | |
| | Buster's Resource Management, LLC (Grant Buster) 4744 32nd St. N Arlington, VA 22207 (571) 499-7761 | 6410 N. Point Pkwy. Alpharetta, GA 30022 770-346-0366 |
| | Atlanta's Best Burgers, LLC (Michael Melton) 1219 Towlston Rd. Great Falls, VA 22027 (703) 919-5289 | Atlanta Hartsfield Jackson International Airport Concourse C, Gate 43 404-763-6909 |
| | Atlanta's Best Burgers, LLC (Michael Melton) 1219 Towlston Rd. Great Falls, VA 22027 (703) 919-5289 | Atlanta Hartsfield Jackson International Airport Concourse D, Gate 11 404-684-0102 |
| | Uheri Group, LLC (Paul and Carl Fisher) Post Office Box 42307 Atlanta, GA 30311 (516) 384-9528 | 1253 Caroline St. Atlanta, GA 30310 404-688-6474 |
| | Uheri Group, LLC (Carl and Paul Fisher) 1253 Caroline St., Ste. E-100 Atlanta, GA 30307 (516) 384-9528, (404)734-8877 | 860 Peachtree Rd., Ste. A Atlanta, GA 30308 |
| | Jason Patel, Riteshbhai Patel, Jitenbhai Patel 2368 Calistoga Ct. Lawrenceville, GA 30043 (256) 810-8336 | 2805 Washington Rd., #402 Augusta, GA 30909 |
| | GPR Hospitality, LLC (James Richards) 7663 Harrier Hill Rd. Signal Mountain, TN 37377 (423) 605-1353 | 1303 Walnut Ave. Dalton, GA 30720 706-229-9147 |
| | Jason Patel, Riteshbhai Patel, Jitenbhai Patel 2368 Calistoga Ct. Lawrenceville, GA 30043 (256) 810-8336 | 4324 Washington Rd. Evans, GA 30809 |
| | GPR Hospitality, LLC (James Richards) 7663 Harrier Hill Rd. Signal Mountain, TN 37377 (423) 605-1353 | 1417 Dietz Rd. Fort Oglethorpe, GA 30736 706-419-8056 |
| | Jason Patel, Riteshbhai Patel, Jitenbhai Patel 2368 Calistoga Ct. Lawrenceville, GA 30043 (256) 810-8336 | 9602 Bentley Dr. Grovetown, GA 30813 706-305-9520 |
| | Five Star Burgers Lawrenceville Co. (Jason Patel) 2368 Calistoga Ct. Lawrenceville, GA 30043 (256) 810-8336 | 798 Lawrenceville Suwannee Rd. Lawrenceville, GA 30043 770-962-6882 |
| | Five Star Burgers Loganville Co. (Jason Patel) 2368 Calistoga Ct. Lawrenceville, GA 30043 (256) 810-8336 | 4018 Atlanta Hwy., #224 Loganville, GA 30052 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Five Star Burgers Lawrenceville Co. (Jason Patel)<br>2368 Calistoga Ct.<br>Lawrenceville, GA 30043<br>(256) 810-8336 | 1575 Scenic Hwy. South, #400<br>Snellville, GA 30078<br>470-246-5756 |
| | Buster's Resource Management, LLC (Grant Buster)<br>4744 32nd St. N<br>Arlington, VA 22207<br>(571) 499-7761 | 3105 Peachtree Pkwy., #100<br>Suwanee, GA 30024<br>770-945-4670 |
| | Five Star Burgers Tucker, Inc. (Jason Patel)<br>2368 Calistoga Ct.<br>Lawrenceville, GA 30043<br>(256) 810-8336 | 4306 Lawrenceville Hwy.<br>Tucker, GA 30084<br>770-496-9990 |
| **Hawaii** | | |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 98-1005 Moanalua Rd., #1101A<br>Aiea, HI 96701<br>808-488-4442 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 91-5431 Kapolei Pkwy.<br>Kapolei, HI 96707<br>808-628-4740 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 95-1249 Meheula Pkwy. #210<br>Mililani, HI 96789<br>808-312-3407 |
| **Idaho** | | |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 2541 S. 25th St.<br>Ammon, ID 83406<br>208-522-4448 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1587 N. Milwaukee St.<br>Boise, ID 83704<br>208-658-4930 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 321 S. 8th St.<br>Boise, ID 83702 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 2830 North Eagle Rd., #1<br>Meridian, ID 83646 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 235 W. Quinn Rd., Ste. 300<br>Pocatello, ID 83202<br>208-637-1000 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 179 West 2nd South<br>Rexburg, ID 83440<br>208-346-7205 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1485 E. Pole Line Rd.<br>Twin Falls, ID 83301<br>208-734-6200 |
| **Indiana** | | |
| | GHG Indiana, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1199 S. College Mall Rd.<br>Bloomington, IN 47404<br>812-336-4897 |
| | GHG Indiana, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 425 E. Kirkwood Ave.<br>Bloomington, IN 47401<br>812-336-3483 |
| | Celtic Group, Inc. (Mary Walsh, Patrick Walsh)<br>872 N. Brookshade Pkwy.<br>Alpharetta, GA 30004<br>(404) 307-2628 | 124 East Northfield Dr., Ste. H<br>Brownsburg, IN 46112<br>317-858-3012 |
| | Celtic Group, Inc. (Mary Walsh, Patrick Walsh)<br>872 N. Brookshade Pkwy.<br>Alpharetta, GA 30004<br>(404) 307-2628 | 2009-8 E. Greyhound Pass<br>Carmel, IN 46032<br>317-587-7474 |
| | GHG Indiana, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1675 N. National Road<br>Columbus, IN 47201<br>812-675-3788 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | Village Commons S/C Space 3A<br>5402 E. Indiana St.<br>Evansville, IN 47715 |
| | Celtic Group, Inc. (Mary Walsh, Patrick Walsh)<br>872 N. Brookshade Pkwy.<br>Alpharetta, GA 30004<br>(404) 307-2628 | 11670 Commercial Dr.<br>Fishers, IN 46038<br>317-596-8686 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 801 G1 Northcrest Shopping Center<br>Fort Wayne, IN 46805<br>260-484-2003 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 5830 West Jefferson Blvd.<br>Fort Wayne, IN 46804<br>260-436-6295 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 7815 S. US Hwy. 31<br>Indianapolis, IN 26227<br>317-881-0562 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 2902 W. 86th St.<br>Indianapolis, IN 46268<br>317-876-0811 |
| | IFGB, LLC (Larry Cooley)<br>3037 S. Prairie Point Dr.<br>Andover, KS 67002<br>(316) 304-3494 | 5305 East 82nd St.<br>Indianapolis, IN 46250<br>317-598-0013 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 9210 Rockville Rd., Ste. A<br>Indianapolis, IN 46234<br>317-271-7377 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 9808 E. Washington St.<br>Indianapolis, IN 46229<br>317-897-6752 |
| | IFGB, LLC (Larry Cooley)<br>8100 E. 22nd St. N, Bldg. 900<br>Wichita, KS 67226<br>(316) 304-3494, (316) 733-9752, (316) 682-3300 | 48 E. Washington St.<br>Indianapolis, IN 46204<br>317-220-8632 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 375-0140 | 1500 Veterans Pkwy.<br>Jeffersonville, IN 47130<br>812-913-4820 |
| | Central FG Burger Development, LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 375-0140 | 1620 East Blvd.<br>Kokomo, IN 46902<br>765-450-5201 |
| | Central FG Burger Development, LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 375-0140 | 210 S. Creasy Ln.<br>Lafayette, IN 4790<br>765-250-5946 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 5226 Franklin St.<br>Michigan City, IN 46360<br>219-878-5800 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 6501 Grape Rd.<br>Mishawaka, IN 46546<br>574-271-2400 |
| | Central FG Burger Development, LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 375-0140 | 3911 W. Bethel Ave.<br>Muncie, IN 47304<br>765-313-7567 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 8231 Calumet Ave.<br>Munster, IN 46321 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 343-3027 | 2221 State St.<br>New Albany, IN 47150<br>812-944-9958 |
| | Celtic Group, Inc. (Mary Walsh, Patrick Walsh)<br>872 N. Brookshade Pkwy.<br>Alpharetta, GA 30004<br>(404) 307-2628 | 13971 Town Center Blvd.<br>Noblesville, IN 46060<br>317-770-3636 |
| | Celtic Group, Inc. (Mary Walsh, Patrick Walsh)<br>872 N. Brookshade Pkwy.<br>Alpharetta, GA 30004<br>(404) 307-2628 | 2663 E. Main St.<br>Plainfield, IN 46168<br>317- 939-1600 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 1575 US Hwy 41<br>Schereville, IN 46375<br>219-864-5800 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 6050 US Hwy 6<br>Portage, IN 46368<br>219-764-1777 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 1233 Eddy St., #10<br>South Bend, IN 46617<br>574-234-1800 |
| | GHG Indiana, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 5399 S. US Hwy 41<br>Terre Haute, IN 47802<br>812-299-4897 |
| | DHW & Company (Donald Doan and Chris Wolf)<br>2145 N. Racine #1, Ste. 102<br>Chicago, IL 60614<br>(773) 562-9855; (773) 627-3443 | 2505 Laporte Ave., Ste. #171<br>Valparaiso, IN 46383<br>219-299-2230 |
| | Central FG Burger Development, LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 375-0140 | 135S. Chauncey Ave., Ste. 1-K<br>West Lafayette, IN 47906<br>765-743-3100 |
| **Kansas** | | |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 1843 Village West Pkwy., #135<br>Kansas City, KS 66111<br>913-334-4700 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 3930 Rainbow Blvd.<br>Kansas City, KS 66013 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 2040-B 31st St.<br>Lawrence, KS 66046 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 518 Tuttle Creek Blvd., Ste. 120<br>Manhattan, KS 66502<br>785-565-9000 |
| | KCFGB, LLC (Randy Brock)*<br>8900 State Line Rd., Ste. 415<br>Leawood, KS 66206<br>(816) 674-5290, (913) 385-0926 | 5922 Barkley St., Ste. 101<br>Mission, KS 66202<br>913-296-7560 |
| | KCFGB, LLC (Randy Brock)*<br>8900 State Line Rd., Ste. 415<br>Leawood, KS 66206<br>(816) 674-5290, (913) 385-0926 | 14965-67 W. 119th St.<br>Olathe, KS 66062<br>913-780-4987 |
| | KCFGB, LLC (Randy Brock)*<br>8900 State Line Rd., Ste. 415<br>Leawood, KS 66206<br>(816) 674-5290, (913) 385-0926 | 12025 Metcalf Ave.<br>Overland Park, KS 66213<br>913-345-1512 |
| | KCFGB, LLC (Randy Brock)*<br>8900 State Line Rd., Ste. 415<br>Leawood, KS 66206<br>(816) 674-5290, (913) 385-0926 | 11333 W. 95th St.<br>Overland Park, KS 66124<br>913-492-3423 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 3015 S. 9th St.<br>Salina, KS 67401<br>785-822-0675 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 1191 Wanamaker Rd., Ste. B<br>Topeka, KS 66604<br>785-273-1730 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Red Letter J, Inc. (Jeff Miller and Jay Miller)<br>2929 N. Rock Rd., Ste. 110<br>Wichita, KS 67226<br>(719) 229-4299; (267) 879-3893 | 2929 N. Rock Rd.<br>Wichita, KS 67226<br>316-440-4895 |
| | Red Letter J, Inc. (Jeff Miller and Jay Miller)<br>2929 N. Rock Rd., Ste. 110<br>Wichita, KS 67226<br>(719) 229-4299; (267) 879-3893 | 3807 N. Maize Rd.<br>Wichita, KS 67205<br>316-722-5489 |
| | Red Letter J, Inc. (Jeff Miller and Jay Miller)<br>2929 N. Rock Rd., Ste. 110<br>Wichita, KS 67226<br>(719) 229-4299; (267) 879-3893 | 1025 East Douglas Ave.<br>Wichita, KS 67202 |
| **Kentucky** | | |
| | KRNBLZ, LLC (Robert Picerne, Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100 | The Mall<br>7668 Mall Rd.<br>Florence, KY 41042 |
| | Barton Restaurant Group, LLC (Tyler Barton, Sharron Barton)<br>8365 Royal Troon Dr.<br>Duluth, GA 30097<br>(859) 913-1059 | 2467 Nicholasville Rd.<br>Lexington, KY 40503<br>859-260-1471 |
| | Barton Restaurant Group, LLC (Tyler Barton, Sharron Barton)<br>8365 Royal Troon Dr.<br>Duluth, GA 30097<br>(859) 913-1059 | Helmsdale Place<br>3090 Helmsdale Place<br>Lexington, KY 40509 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 343-3027 | 4116 Summit Plaza Dr.<br>Louisville, KY 40241<br>502-426-1702 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 343-3027 | 4226 Shelbyville Rd.<br>Louisville, KY 40207<br>502-891-8848 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 343-3027 | 4903 Outer Loop<br>Louisville, KY 40219<br>502-822-3702 |
| | 737 Ventures LLC (George Estep)<br>3685 North National Rd.<br>Columbus, IN 47201<br>(812) 343-3027 | 13303 Shelbyville Rd., Ste. 104<br>Louisville, KY 40223<br>502-244-1027 |
| | KRNBLZ, LLC (Robert Picerne, Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100 | Newport On The Levee<br>1 Levee Way<br>Newport, KY 41071 |
| | H4 Properties Inc. (DeWayne Henderson)<br>1216 Winslow Way<br>Paducah, KY 42001<br>(270) 210-4180 | 2660 Frederica St.<br>Owensboro, KY 42301<br>270-684-7888 |
| | H4 Properties Inc. (DeWayne Henderson)<br>1216 Winslow Way<br>Paducah, KY 42001<br>(270) 210-4180 | 5015 Hinkleville Rd.<br>Paducah, KY 42001<br>270-558-3949 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| Louisiana | | |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 2380 Town Center Blvd.<br>Baton Rouge, LA 70806<br>225-372-2586 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 3332 Highland Dr.<br>Baton Rouge, LA 70802 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 14965 Airline Hwy.<br>Baton Rouge, LA 70817<br>225-930-8563 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 70415 Hwy. 21<br>Covington, LA 70435 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 1930 Hammond Square Dr.<br>Hammond, LA 70403<br>985-261-1010 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 1212 Clearview Pkwy.<br>Harahan, LA 70123<br>504-733-5100 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 1523 Manhattan Blvd.<br>Harvey, LA 70058<br>504-609-2289 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 4302 Ambassador Caffery Pkwy., Ste. 100<br>Lafayette, LA 70508<br>337-534-0590 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 3100 Severn Ave.<br>Metairie, LA 70002<br>504-885-0880 |
| | GHG Gulf Coast, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 401 N. Carrollton Ave.<br>New Orleans, LA 70119 |
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)<br>18716 Hosmer Mill Rd.<br>Covington, LA 70435<br>(404) 790-8028 | 116 North Town Center Blvd.<br>Slidell, LA 70458<br>985-707-1103 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts) 18716 Hosmer Mill Rd. Covington, LA 70435 (404) 790-8028 | 210 N. Canal Blvd. Thibodaux, LA 70301 985-492-2525 |
| **Maine** | | |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 274 Western Ave. Augusta, ME 04330 207-512-4505 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 878 Stillwater Ave. Bangor, ME 04401 207-990-8900 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 6 Old Dogs Ln. Biddeford, ME 04005 207-805-5655 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 170 Bath Rd. Brunswick, ME 04011 207-406-4059 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 198 Maine Mall Rd. South Portland, ME 04106 207-747-0548 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 373 Main St. Waterville, ME 04901 207-313-5458 |
| **Maryland** | | |
| | For Next Brands, LLC 9504 Daniel Lewis Ln. Vienna, VA 22181 (703) 608-0143 | 1046 Annapolis Mall Annapolis, MD 21401 410-573-0581 |
| | Pyramid Enterprises, LLC (Stephen Perkins) 3804 Blackthorn St. Chevy Chase, MD 20815 (703) 919-2566 | 10414 Auto Park Dr. Bethesda, MD 20817 301-365-9300 |
| | Pyramid Enterprises, LLC (Stephen Perkins) 3804 Blackthorn St. Chevy Chase, MD 20815 (703) 919-2566 | 4829 Bethesda Ave. Bethesda, MD 20814 301-657-0007 |
| | Pyramid Enterprises, LLC (Stephen Perkins) 3804 Blackthorn St. Chevy Chase, MD 20815 (703) 919-2566 | Old Rolling Rd. California, MD 20619 301-863-6111 |
| | Michael McLaughlin 108 Solomans Ridge Ct. Millersville, MD 21108 (443) 618-9044 | 200 Abruzzi Dr., Ste. C Chester, MD 21619 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | T-Rex Enterprises, LLC (Todd Levitt)<br>21 Eldwick Ct.<br>Potomac, MD 20854<br>(301) 983-5617 | 12175 Clarksville Pike, Suite 205<br>Clarksville, MD 21029<br>443-542-0089 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham Elabbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Hicham Elabbassi: (703) 328-0007<br>Isalmou Boussaa: (703) 595-6785 | 7730 Old Branch Ave.<br>Clinton, MD 20735<br>301-856-5331 |
| | For Next Brands, LLC<br>9504 Daniel Lewis Ln.<br>Vienna, VA 22181<br>(703) 608-0143 | 1060 Crain Hwy.<br>Crofton, MD 21114<br>410-721-3585 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 1401 Merritt Blvd., Ste. J<br>Dundalk, MD 21222<br>410-285-0001 |
| | Pyramid Enterprises, LLC (Stephen Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | 10105 Ward Ave.<br>Dunkirk, MD 20754<br>301-327-5134 |
| | For Next Brands, LLC<br>9504 Daniel Lewis Ln.<br>Vienna, VA 22181<br>(703) 608-0143 | 3059 Solomons Island Rd.<br>Edgewater, MD 21037<br>410-956-8212 |
| | T-Rex Enterprises, LLC (Todd Levitt)<br>21 Eldwick Ct.<br>Potomac, MD 20854<br>(301) 983-5617 | 1311 Londontown Blvd.<br>Eldersburg, MD 21784<br>410-795-6850 |
| | Pyramid Enterprises, LLC (Stephen Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | 15784 Shady Grove Rd.<br>Gaithersburg, MD 20877<br>301-869-3711 |
| | Pyramid Enterprises, LLC (Stephen Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | 653 Center Point Way<br>Gaithersburg, MD 20878<br>301-926-9200 |
| | Pyramid Enterprises, LLC (Stephen Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | FirstField Shopping Center<br>507 Quince Orchard Road<br>Gaithersburg, MD 20878<br>240-912-6745 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 6711 Ritchie Hwy.<br>Glen Burnie, MD 21061<br>410-590-3933 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 7690 Dorchester Blvd.<br>Hanover, MD 21076<br>410-799-3933 |
| | Pyramid Enterprises, LLC (Stephen Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | 10510 Connecticut Ave.<br>Kensington, MD 20895<br>301-933-5400 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham Elabbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Hicham Elabbassi: (703) 328-0007<br>Isalmou Boussaa: (703) 595-6785 | 7 Shining Willow Wa<br>La Plata, MD 20646<br>301-392-9959 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | T-Rex Enterprises, LLC (Todd Levitt)<br>21 Eldwick Ct.<br>Potomac, MD 20854<br>(301) 983-5617 | 505 E. Ridgeville Blvd.<br>Mt. Airy, MD 21771 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 12641 Ocean Gateway, #118<br>Ocean City, MD 21842<br>410-213-1477 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 13601 Coastal Hwy.<br>Ocean City, MD 21842<br>410-250-1199 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham Elabbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Hicham Elabbassi: (703) 328-0007<br>Isalmou Boussaa: (703) 595-6785 | 6017 Oxon Hill Rd., Unit H<br>Oxon Hill, MD 20745<br>240-253-2501 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 4131 Mountain Rd.<br>Pasadena, MD 21122<br>410-255-0050 |
| | Pyramid Enterprises, LLC (Steve Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD  20815<br>(703) 919-2566, (202) 478-8649 | 9812 Falls Rd., Ste. 107<br>Potomac, MD 20854 |
| | Pyramid Enterprises, LLC (Steve Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | Solomans Island Rd. and Stoakley Rd.<br>Prince Frederick, MD 20678<br>443-486-4200 |
| | Pyramid Enterprises, LLC (Steve Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | 130 Gibbs St.<br>Rockville, MD 20850<br>301-762-3500 |
| | Pyramid Enterprises, LLC (Steve Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD  20815<br>(703) 919-2566, (202) 478-8649 | 12238 Rockville Pike<br>Rockville, MD 20852 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 1311 Salisbury Blvd.<br>Salisbury, MD 21804<br>410-742-0202 |
| | Michael McLaughlin<br>108 Solomans Ridge Ct.<br>Millersville, MD 21108<br>(443) 618-9044 | 2408-A N. Salisbury Blvd.<br>Salisbury, MD 21801<br>410-546-7707 |
| | For Next Brands, LLC<br>9504 Daniel Lewis Ln.<br>Vienna, VA 22181<br>(703) 608-0143 | Severna Park Marketplace<br>549 Governor Ritchie Hwy.<br>Severna Park, MD 21146 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham Elabbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Hicham Elabbassi: (703) 328-0007<br>Isalmou Boussaa: (703) 595-6785 | 3235-B Plaza Way<br>Waldorf, MD 20602<br>301-932-4344 |
| | T-Rex Enterprises, LLC (Todd Levitt)<br>21 Eldwick Ct.<br>Potomac, MD 20854<br>(301) 983-5617 | 596 Jermor Ln.<br>Westminster, MD 21157<br>410-751-9969 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **Massachusetts** | | |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 263 Huntington Ave.<br>Boston, MA 02115<br>617-572-2074 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1223 Commonwealth Ave.<br>Boston, MA 02134<br>617-208-6283 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 58 Summer St.<br>Boston, MA 02110 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 30-E Forbes Ave.<br>Braintree, MA 02184 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 27 Westgate Dr.<br>Brockton, MA 02301<br>774-381-7921 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | Middlesex Commons<br>43 Middlesex Turnpike<br>Burlington, MA 08103 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | Mall at 95 Washington St., #206<br>Canton, MA 02021<br>781-828-4204 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 90 Drum Hill Rd.<br>Chelmsford, MA 01824<br>978-454-4555 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | Mystic Mall<br>158 Everett Ave.<br>Chelsea, MA 02150 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 474 B Memorial Dr.<br>Chicopee, MA 01020<br>413-331-2227 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 170 Providence Hwy.<br>Dedham, MA 02026<br>981-326-1158 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 450 Williams Canning Blvd. Fall River, MA 02721 508-567-6425 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani) c/o Encore Restaurants, LLC 5005 LBJ Freeway, Ste. 1200 Dallas, TX 75244 (214) 259-7004 | Patriot Place 1 Patriot Place Foxborough, MA 02035 508-203-9441 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson) 125 West Burton Ave., Ste. 2 Salt Lake City, UT 84115 (801) 231-6101 | 341 Cochituate Rd. Framingham, MA 01701 508-879-7500 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani) c/o Encore Restaurants, LLC 5005 LBJ Freeway, Ste. 1200 Dallas, TX 75244 (214) 259-7004 | 268 B Franklin Village Dr. Franklin, MA 02038 508-320-3911 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)* 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 335 Russell St. Hadley, MA 01035 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 1207 Washington St., Ste. 50 Hanover, MA 02339 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 89 Plaistow Rd. Haverhill, MA 01830 978-361-2696 |
| | BLMT Ventures, LLC (Mike Baldwin and Tom Baldwin) 15 Pheasant Ln. Menands, NY 12204 (203) 913-0778 | 769 Lyannough Rd. Hyannis, MA 02601 508-771-1939 508-775-0648 (fax) |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring) 2502 Jarratt Ave. Austin, TX 78703 Greg Vasey: (315) 292-8283 Jack Goehring: (703) 867-8222 | 886 Merriam Ave. Leominster, MA 01453 978-751-8925 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson) 125 West Burton Ave., Ste. 2 Salt Lake City, UT 84115 (801) 231-6101 | 197 K-1 Boston Post Rd. Marlborough, MA 01752 508-281-4855 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson) 125 West Burton Ave., Ste. 2 Salt Lake City, UT 84115 (801) 231-6101 | 65 Station Landing Medford, MA 02155 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani) c/o Encore Restaurants, LLC 5005 LBJ Freeway, Ste. 1200 Dallas, TX 75244 (214) 259-7004 | 9 Medway Rd., Unit 9A Milford, MA 01757 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 841 Worcester Rd.<br>Natick, MA<br>508-650-5100 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 215 Needham St.<br>Newton, MA 02464<br>617-332-5555 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 115 Turnpike St.<br>North Andover, MA 01845<br>978-655-8380 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 85-D Faunce Corner Mall Rd.<br>North Dartmouth, MA 02747<br>508-858-5030 |
| | G.F. Vasey Holdings, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 227 Andover St.<br>Peabody, MA 01960 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 660 Merrill Rd.<br>Pittsfield, MA 01201 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 51 Commerce Way<br>Plymouth, MA 02360<br>774-283-4057 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 250 Hancock Street<br>Quincy, MA 02169<br>617-481-8635 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 7 Warren St., Unit 12<br>Randolph, MA 02368<br>781-963-0600 |
| | G.F. Vasey Holdings, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 180 Main St.<br>Saugus, MA 01906 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1080 Fall River Ave.<br>Seekonk, MA 02771<br>508-336-5577 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 20-7 Boston Turnpike<br>Shrewsbury, MA 01545 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 68 Washington St.<br>South Attleboro, MA 02703<br>508-915-6177 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 109 Main St.<br>Stoneham, MA 02180 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 26 Galaxy Pass<br>Sutton, MA 01590<br>508-917-8555 |
| | G.F. Vasey Holdings, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 980 Paradise Rd.<br>Swampscott, MA 01907<br>781-595-1300 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 573 GAR Hwy.<br>Swansea, MA 02777 |
| | Encore FGBF Massachusetts, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 104 East Providence Hwy.<br>Walpole, MA 02081<br>508-660-9850 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1030 Main St.<br>Waltham, MA 02451<br>781-647-0555 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 20 Rosebrook Place, #3<br>Wareham, MA 02571<br>508-273-7156 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 437 E. Main St.<br>Westfield, MA 01085 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | Westford Valley Marketplace<br>10 Cornerstone Square<br>Westford, MA 01886 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1286 Riverside St.<br>West Springfield, MA 01085 |
| | Mass 5G LLC (Jeffrey Howes and Corbin Robertson)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 535 Lincoln St., #13<br>Worcester, MA 01605<br>508-853-2000 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|-------|---------------------------|-------------------|
| **Minnesota** | | |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 6415 Labeaux Ave, NE, Ste. C-110<br>Albertville, MN 55301<br>763-497-1399 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 14658 Cedar Ave.<br>Apple Valley, MN 55124<br>651-333-9268 |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 14023 Edgewood Dr., N Suite D<br>Baxter, MN 56425<br>218-829-0453 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 1404 County Rd. 42 West<br>Burnsville, MN 55337<br>952-406-8673 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 12475 Riverdale Blvd. NW<br>Coon Rapids, MN 55433<br>763-208-1106 |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 1600 Miller Truck Hwy.<br>Duluth, MN 55811<br>218-729-9860 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 12900 Technology Dr., Ste. 190<br>Eden Prairie, MN 55344<br>952-942-1111 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 3871 Gallagher Dr.<br>Edina, MN 55435<br>952-893-5489 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 525 Blake Rd. N<br>Hopkins, MN 55343<br>952-479-7849 |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 1920 Adam St.<br>Mankato, MN 56001 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 7814 Main St. N.<br>Maple Grove, MN 55369<br>763-425-5489 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 2300 Hennepin Ave.<br>Minneapolis, MN 55409 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 555 Nicollet Mall<br>Minneapolis, MN 55402<br>612-208-1812 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 4105 Vinewood Ln.<br>North Plymouth, MN 55442 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 8360 3rd St. N.<br>Oakdale, MN 55128 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 1844 66th Street, Suite 100<br>Richfield, MN 55423<br>612-339-3733 |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 2800 41st St. NW<br>Rochester, MN 55901<br>507-288-1464 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 8090 Old Carriage Ct., Ste. C<br>Shakopee, MN 55379<br>952-452-8131 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 1021 Red Fox Rd.<br>Shoreview, MN 55126 |
| | Credo, LLC (Kristopher Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 4144 2nd St. S.<br>St. Cloud, MN, 56301<br>320-217-2413 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault) 707 Osterman Ave. P.O. Box 27 Deerfield, IL 60015 Scott Lesser: (847) 946-7666 Ryan Dussault: (612) 964-2290 | 5699 West 16th St. St. Louis Park, MN 55416 763-432-0874 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault) 707 Osterman Ave. P.O. Box 27 Deerfield, IL 60015 Scott Lesser: (847) 946-7666 Ryan Dussault: (612) 964-2290 | 2026 Ford Pkwy. St. Paul, MN 55116 651-528-6078 |
| **Mississippi** | | |
| | GHG Gulf Coast, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 3840 Promenade Pkwy., Ste. N-1 D'Iberville, MS 39540 228-392-3390 |
| | GHG Gulf Coast, LLC (Bill Gellert) 173 Whippoorwill Rd. Hillsdale, NY 12529 (914) 643-2180 | 10495 Hwy. 49 Gulfport, MS 39503 228-832-2212 |
| **Missouri** | | |
| | KCFGB, LLC (Randy Brock)* 8100 E. 22nd St. N Wichita, KS 67226 (316) 304-3494 | 144 Cedar Tree Dr., Ste. 172 Belton, MO 64012 |
| | KCFGB, LLC (Randy Brock)* 8100 E. 22nd St. N Wichita, KS 67226 (316) 304-3494 | 1202 NE Coronado Dr. Blue Springs, MO 64014 816-229-3700 |
| | Jeff Offutt 2000 Forum Blvd. #4 Columbia, MO 65203 (573) 489-5642, (573) 445-0015 | Stadium Shops 211 North Stadium, Ste. 103 Columbia, MO 62203 |
| | Jeff Offutt 2000 Forum Blvd. #4 Columbia, MO 65203 (573) 489-5642, (573) 445-0015 | 2703 E. Broadway Bluffs, Ste. 240 Columbia, MO 65201 |
| | KCFGB, LLC (Randy Brock)* 8100 E. 22nd St. N Wichita, KS 67226 (316) 304-3494 | 4140 S. Noland Rd. Independence, MO 64055 816-886-0098 |
| | Jeff Offutt 2000 Forum Blvd. #4 Columbia, MO 65203 (573) 489-5642, (573) 445-0015 | 1801 S. Range Line Rd. Joplin, MO 64801 417-206-4000 |
| | RWT 31st, LLC (David and Mary Richey, Dustin and Kathy Walker) 1907 Quail Run Lawrence, KS 66047 (785) 840-9161 | 8952 NW Skyview Ave. Kansas City, MO 64154 816-584-9090 |
| | KCFGB, LLC (Randy Brock)* 8100 E. 22nd St. N Wichita, KS 67226 (316) 304-3494 | 8600 Ward Pkwy. Kansas City, MO 64114 816-333-4897 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | KCFGB, LLC (Randy Brock)*<br>8100 E. 22nd St. N<br>Wichita, KS 67226<br>(316) 304-3494 | 5223 NE Antioch<br>Kansas City, MO 64119<br>816-453-4141 |
| | KCFGB, LLC (Randy Brock)*<br>8100 E. 22nd St. N<br>Wichita, KS 67226<br>(316) 304-3494 | 614 NE M29<br>Lees Summit, MO 64086<br>816-525-2582 |
| | KCFGB, LLC (Randy Brock)*<br>8100 E. 22nd St. N<br>Wichita, KS 67226<br>(316) 304-3494 | 118 N. Conister Dr., Ste. H<br>Liberty, MO 64068<br>816-792-0511 |
| | Jeff Offutt<br>2000 Forum Blvd. #4<br>Columbia, MO 65203 | Battlefield Mall<br>101 Battlefield Mall, Ste. H08E<br>Springfield, MO 65804 |
| | Jeff Offutt<br>2000 Forum Blvd. #4<br>Columbia, MO 65203<br>(573) 489-5642, (573) 445-0015 | Town and Country Shopping Center<br>2711-A North Kansas Expressway<br>Springfield, MO 65803<br>417-864-3694 |
| | RWT, LLC (David and Mary Richey)<br>1907 Quail Run<br>Lawrence, KS 66047<br>(785) 840-9161 | 3700 Frederick Blvd., Ste. A<br>St. Joseph, MO 64506<br>816-233-9500 |
| **Montana** | | |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 1020 Shiloh Crossing Blvd., Ste. 4<br>Billings, MT 59102<br>406-601-1066 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 2855 N. 19th Ave., Ste. M<br>Bozeman, MT 59718<br>406-586-9395 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 2104 10th Ave. South<br>Great Falls, MT 59405<br>406-952-0133 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 2415 Hwy. 93, #3<br>Kalispell, MT 59901<br>406-752-4567 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 820 E. Broadway<br>Missoula, MT 59801<br>406-830-3262 |
| **Nebraska** | | |
| | Lowell Circle Investments, LLC (Ryan Funke)<br>4201 Lowell Circle<br>Lincoln, NE 68502<br>(402) 297-1531 | 2525 Pine Lake Rd., Ste. 207<br>Lincoln, NE 68512<br>402-423-4009 |
| | Lowell Circle Investments, LLC (Ryan Funke)<br>4201 Lowell Circle<br>Lincoln, NE 68502<br>(402) 297-1531 | 6200 O St.<br>Lincoln, NE 68510<br>402-488-0580 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Lowell Circle Investments, LLC (Ryan Funke)<br>4201 Lowell Circle<br>Lincoln, NE 68502<br>(402) 297-1531 | 697 132nd St.<br>Omaha, NE 68154<br>402-496-5366 |
| | Lowell Circle Investments, LLC (Ryan Funke)<br>4201 Lowell Circle<br>Lincoln, NE 68502<br>(402) 297-1531 | 7345 Dodge St.<br>Omaha, NE 68114<br>402-393-5200 |
| | Lowell Circle Investments, LLC (Ryan Funke)<br>4201 Lowell Circle<br>Lincoln, NE 68502<br>(402) 297-1531 | 8540 71st St.<br>Papillion, NE 68133<br>402-596-0000 |
| **Nevada** | | |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 10271 S. Eastern, Ste. 101<br>Henderson, NV 89052 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 1321 West Sunset Rd.<br>Henderson, NV 89014<br>702-816-4100 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 9484 Flamingo Rd., Ste. 180<br>Las Vegas, NV 89147 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 7580 South Las Vegas Blvd., Ste. 120<br>Las Vegas, NV 89123 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 7290 W. Lake Mead Blvd.<br>Las Vegas, NV 89128 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | UNLV<br>4065 South Maryland Pkwy.<br>Las Vegas, NV 89119 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 10965 Lavender Hills Dr., Ste. 150<br>Las Vegas, NV 89135<br>702-786-6000 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 2520 E. Craig St., #110<br>North Las Vegas, NV 89030 |
| | RMR5 Nevada, LLC (Russel Rosenblum)<br>15 Echo Park Ln.<br>Las Vegas, NV 89135<br>(801) 231-6101 | 6395 McCarran, Ste. 400<br>Reno, NV 89509<br>775-737-4544 |
| **New Hampshire** | | |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 56 Fort Eddy Rd.<br>Concord, NH 03301<br>603-856-8107 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 61 Crystal Dr.<br>Derry, NH 03038<br>603-818-8290 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 15 Webb Place<br>Dover, NH 03820 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 363 Winchester St.<br>Keene, NH 03431 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 1111 South Willow St.<br>Manchester, NH 03820<br>603-836-5657 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 341 Amherst St.<br>Nashua, NH 03063<br>603-589-7881 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 258 Daniel Webster Hwy.<br>Nashua, NH 03060<br>603-897-0025 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 1390 Lafayette Rd.<br>Portsmouth, NH 03801<br>603-427-8931 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 291 South Broadway<br>Salem, NH 03079<br>603-824-6945 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 380 Lafayette Rd.<br>Seabrook, NH 03874<br>603-814-1235 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | 120 Laconia Road, Suite 510<br>Tilton, NH 03276<br>603-729-0054 |
| | Four Cousins Burgers & Fries of NH, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180; (518) 325-9717 | Upper Valley Plaza<br>250 Plainfield Rd.<br>West Lebanon, NH 03784 |
| **New Jersey** | | |
| | Rockham 5G NJ, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 720 Whitehorse Pkwy.<br>Absecon, NJ 08201<br>609-641-5558 |
| | Rockham Hudson LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | Bayonne Crossing<br>301 Bayonne Crossing Way<br>Bayonne, NJ 07002 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 588 Route 70<br>Brick, NJ 08723<br>732-262-4040 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Rockham 5G NJ, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 1650 Kings Hwy. N.<br>Cherry Hill, NJ 08034<br>856-795-1455 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 233 US 206<br>Chester, NJ 07930<br>908-888-2121 |
| | Marlton 5G Inc. (Cha Chung and Shin Chung)<br>2017 Queen Anne Rd.<br>Cherry Hill, NJ 08003<br>(856) 465-6476 | 1341 Fairview Blvd., Ste. G<br>Delran, NJ 08075<br>856-544-3238 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 3056 Rt 10, Ste. C-10<br>Denville, NJ 07834<br>913-366-0655 |
| | Rockham 5G NJ, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 2000 Clements Bridge Rd., A-100<br>Deptford, NJ 08096<br>856-845-5489 |
| | Rockham NNJ, LLC (Drew Smith)<br>1406 Walnut St.<br>Coatesville, PA 19320<br>(703) 869-8483 | 50 Racetrack Rd.<br>East Brunswick, NJ 08816<br>732-254-8888 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 240 State Rt. 10<br>East Hanover, NJ 07936 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | 54 Route 17 N.<br>East Rutherford, NJ 07073<br>201-507-5550 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | 300 Paterson Plank Rd.<br>East Rutherford, NJ 07073<br>551-217-7702 |
| | Sunbeam Ewing, Inc. (Vijay Padodara)*<br>2817 River Willow Dr.<br>Furlong, PA 18925<br>(908) 251-3083 | 540 US Highway 130<br>East Windsor, NJ  08520<br>609-301-8348 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | 45 River Rd.<br>Edgewater, NJ 07020<br>201-482-4614 |
| | Sunbeam Ewing, Inc. (Vijay Padodara)*<br>2817 River Willow Dr.<br>Furlong, PA 18925<br>(908) 251-3083 | 7 Scotch Rd.<br>Ewing, NJ 08628<br>609-882-7999 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | 450 Hackensack Ave.<br>Hackensack, NJ 07601<br>201-343-5489 |
| | Rockham Hudson LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 701 Frank E. Rogers Blvd.<br>Harrison, NJ 07029 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Sunbeam Ewing, Inc. (Vijay Padodara)*<br>2817 River Willow Dr.<br>Furlong, PA 18925<br>(908) 251-3083 | 415 Amwell Rd.<br>Hillsborough, NJ 08844 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 4220 Route 9<br>Howell, NJ 07731<br>732-364-6805 |
| | Rockham Hudson LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 23 University Place Blvd., 1st Floor<br>Jersey City, NJ 07305 |
| | Rockham Hudson LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 286 Washington Blvd.<br>Jersey City, NJ 07302<br>201-433-6700 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 233-237 Main St.<br>Madison, NJ 07940<br>973-660-0055 |
| | Marlton 5G Inc. (Cha Chung and Shin Chung)<br>2017 Queen Anne Rd.<br>Cherry Hill, NJ 08003<br>(856) 465-6476 | 161 Route 73 S.<br>Marlton, NJ 08053 |
| | Sunbeam Ewing, Inc. (Vijay Padodara)*<br>2817 River Willow Dr.<br>Furlong, PA 18925<br>(908) 251-3083 | Clover Square<br>3100 Quakerbridge Rd.<br>Mercerville, NJ 08619 |
| | Marlton 5G Inc. (Cha Chung and Shin Chung)<br>2017 Queen Ann Rd.<br>Cherry Hill, NJ 08003<br>(856) 465-6476 | 1650 Nixon Dr.<br>Moorestown, NJ 08057<br>(856) 866-0200 |
| | Rockham Hudson LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 2100 88th St.<br>North Bergen, NJ 07047<br>201-662-7800 |
| | Rockham NNJ, LLC (Drew Smith)<br>1406 Walnut St.<br>Coatesville, PA 19320<br>(703) 869-8483 | 507 Shoppers Blvd.<br>North Brunswick, NJ 08902<br>732-246-1060 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 1610 Route 23<br>North Wayne, NJ 07470<br>973-633-0055 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 2301 Route 66<br>Ocean Township, NJ 07712<br>732-493-0505 |
| | Rockham NNJ, LLC (Drew Smith)<br>1406 Walnut St.<br>Coatesville, PA 19320<br>(703) 869-8483 | 1114 Rt. 9 S.<br>Old Bridge, NJ 08857<br>732-707-4500 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | 1 Garden State Plaza<br>Paramus, NJ 07652<br>201-845-3333 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Rockham NNJ, LLC (Drew Smith)<br>1406 Walnut St.<br>Coatesville, PA 19320<br>(703) 869-8483 | 15 Schalks Crossing Rd., #104<br>Plainsboro, NJ 08536<br>609-799-2222 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | Ramsey Square<br>1300 SR-17 North<br>Ramsey, NJ 07446 |
| | Rockham 5G NJ, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 3151-A Route 95<br>Rio Grande, NJ 08242<br>609-465-9555 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 367 Mount Hope Ave.<br>Rockaway, NJ 07866<br>973-989-5555 |
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 461 NJ-10 East<br>Roxbury Township, NJ 07852<br>973-617-1855 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 747 Broad St.<br>Shrewsbury, NJ 07702<br>732-530-1230 |
| | Rockham 5G NJ, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 493 Cross Keys Rd.<br>Sicklerville, NJ 08081<br>856-875-5558 |
| | Marlton 5G Inc. (Cha Chung and Shin Chung)<br>2017 Queen Ann Rd.<br>Cherry Hill, NJ 08003<br>(856) 465-6476 | 127 G Route 130<br>South Cinnaminson, NJ 08077<br>856-829-5200 |
| | Rockham NNJ, LLC (Drew Smith)<br>1406 Walnut St.<br>Coatesville, PA 19320<br>(703) 869-8483 | 5020 Hadley Center Dr.<br>South Plainfield, NJ 07080<br>908-754-3334 |
| | Four Cousins Burgers & Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | Route 22/Springfield<br>201 US Rt 22<br>Springfield, NJ 07081 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | The Orchards at Dover<br>1311 Route 37 East<br>Toms River, NJ 08753<br>732-349-3600 |
| | Sheridan Group (Edward Sheridan and Patrick Sheridan)<br>77 Knollwood Rd.<br>Short Hills, NJ 07078<br>(973) 467-4634 | Milburn Mall<br>2933 Vauxhall Rd.<br>Vauxhall, NJ 07088<br>908-688-8877 |
| | Rockham MO, LLC (Drew Smith)<br>Post Office Box 1437<br>Exton, PA 19343<br>(703) 869-8483 | 1902 Rt 35<br>Wall, NJ 07719<br>732-359-7550 |
| | Sunbeam Ewing, Inc. (Vijay Padodara)*<br>2817 River Willow Dr.<br>Furlong, PA 18925<br>(908) 251-3083 | US Hwy 22 & Bonnie Burn Rd.<br>Watchung, NJ 07069<br>908-490-0370 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | ZG Burgers LLC (Hengwei Zhao, Yanmei Gao)<br>115 Lands End Rd.<br>Wilmington, DE 19807<br>(302) 740-7424 | 57 Rt. 23<br>Wayne, NJ  07470<br>973-837-8258 |
| | Four Cousins Burgers & Fries of NJ, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 21 East Broad St.<br>Westfield, NJ 07090<br>908-232-2499 |
| **New York** | | |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 1512 Western Ave.<br>Albany, NY 12203<br>518-452-6066 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 131 Colonie Center, Space 328<br>Albany, NY 12205 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 8248 Transit Rd.<br>Amherst, NY 14221 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1551 Niagara Falls Blvd.<br>Amherst, NY 14228<br>716-424-0129 |
| | Four Cousins Burgers and Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 45 Merrick Rd.<br>Amityville, NY 11701<br>631-691-6800 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 4885 New York 30<br>Amsterdam, NY 12010<br>518-212-5924 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 4 Kelch Dr.<br>Ballston Spa, NY 12020<br>518-289-5645 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 4234 Veterans Memorial Dr.<br>Batavia, NY 14020<br>585-344-8400 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1701 Sunrise Hwy.<br>Bay Shore, NY 11706<br>631-666-0518 |
| | Shami International, LLC (Michael Hoover)<br>254-21 Horace Harding Expressway<br>Little Neck, NY 11362<br>(703) 405-6749 | 210-33A 26th Ave.<br>Bayside, NY 11360<br>718-225-7600 |
| | Eat Burgers, LLC (Gregory Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11791<br>(516) 650-8418 | 581 Hutchinson River Pkwy.<br>Bronx, NY 10465<br>929-324-6301 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 284 7th Ave.<br>Brooklyn, NY 11215<br>718-499-9380 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | Metro Tech Center<br>2 Metro Tech Center<br>Brooklyn, NY 11201 |
| | Eat Burgers, LLC (Gregory Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11791<br>(516) 650-8418 | 1628 Shore Pkwy.<br>Brooklyn, NY 11214<br>718-372-0150 |
| | Eat Burgers, LLC (Gregory Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11791<br>(516) 650-8418 | 2159 Ralph Ave.<br>Brooklyn, NY 11234<br>718-209-0109 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 2636 Delaware Ave.<br>Buffalo, NY 14216<br>716-240-9190 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | Galleria Mall<br>TH106 Walden Galleria<br>Cheektowaga, NY 14225 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 7 Southside Dr.<br>Clifton Park, NY 12065<br>518-371-2147 |
| | Four Cousins Burgers & Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180, (518) 325-9717 | Commack Corners Shopping Center<br>6500 Jericho Turnpike<br>Commack, NY 11725 |
| | Four Cousins Burgers and Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1942 Deer Park Ave.<br>Deer Park, NY 11729<br>631-243-4447 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 4900 Transit Rd., Ste. 900<br>Depew, NY 14043<br>716-668-2972<br>716-668-2973 (fax) |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 3179 Erie Blvd.<br>Dewitt, NY 13214 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 950 County Rd., Rt. 64 Suite 110<br>Elmira, NY 14903 |
| | Four Cousins Burgers and Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 2263 Broadhollow Rd.<br>Farmingdale, NY 11735<br>631-773-5430 |
| | Four Cousins Burgers & Fries of NY, LLC, (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180, (518) 325-9717 | 1166 Main St.<br>Fishkill, NY 12524 |
| | Eat Burgers, LLC (Greg Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11793<br>516-650-8418 | 6122 188th St.<br>Fresh Meadows, NY 11365<br>718-264-1818 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Eat Burgers, LLC (Gregory Slayton, Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11791<br>(516) 650-8418 | 7325 Woodhaven Blvd.<br>Glendale, NY 11385<br>718-943-3483 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 241 Route 9 West<br>Glenmont, NY 12077<br>518-432-8271 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 262 Saratoga Rd.<br>Glenville, NY 12302<br>518-952-7170 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1948 W. Ridge Rd.<br>Greece, NY 14626<br>585-730-7922 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 3860 McKinley Pkwy.<br>Hamburg, NY 14075 |
| | Four Cousins Burgers and Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 600 Veterans Memorial Hwy.<br>Hauppauge, NY 11788<br>631-265-0335 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1100 Jefferson Rd.<br>Henrietta, NY<br>585-272-1811 |
| | Four Cousins Burgers and Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 110 Huntington Shopping Center<br>Huntington Station, NY 11746<br>631-271-4144 |
| | RSVT Holding, LLC (Tejraj Hada)*<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 222 Elmira Rd., Ste. A<br>Ithaca, NY 14850<br>607-256-2565 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1202 Ulster Ave.<br>Kingston, NY 12401<br>845-336-8592 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 318 E. Fairmount Ave., Ste. 200A<br>Lakewood, NY 14750<br>716-763-8890 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 602 New Loudon Rd.<br>Latham, NY 12110<br>518-785-0423 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 3810 Route 31<br>Liverpool, NY 13090<br>315-715-4485 |
| | Shami International, LLC (Michael Hoover)<br>254-55 Horace Harding Expressway<br>Little Neck, NY 11362<br>(703) 405-6749 | 254-55 Horace Harding Expressway<br>Little Neck, NY 11362<br>718-631-2100 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 5716 S Transit Rd., Ste. 50<br>Lockport, NY 14094<br>716-433-3254 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 36 West 48th St.<br>Manhattan, NY 10036<br>212-997-1270 |
| | Four Cousins Burgers & Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180, (518) 325-9717 | Route 211 East<br>469 Route 211 East<br>Middletown, NY 10940 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | Cortland Town Center<br>3121 E. Main St.<br>Mohegan Lake, NY 10547 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 360 North Bedford Rd.<br>Mount Kisco, NY 10549<br>914-229-3353 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 23 Rockland Center<br>Nanuet, NY 10954<br>845-623-1863 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1279 Route 300, Suite C<br>Newburgh, NY 12550<br>845-567-4315 |
| | AR Burgers LLC (Atul Singh)<br>446 Kent Ave., Apt. 4B<br>Brooklyn, NY 11249<br>(267) 205-4341 | 4666 Commercial Dr.<br>New Hartford, NY 13413<br>315-736-4897 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 43 W. 55th St.<br>New York, NY 10019<br>212-459-9600 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 56 W. 14th St.<br>New York, NY 10011<br>212-675-2229 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 296 Bleecker St.<br>New York, NY 10014<br>212-367-9200 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 2847 Broadway<br>New York, NY 10025 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 690 Third Ave.<br>New York, NY 10017<br>646-783-5060 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 343 7th Ave.<br>New York, NY 10001 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 316 W. 34th St.<br>New York, NY 10022<br>212-564-6115 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | Times Square<br>253 W. 42nd St.<br>New York City, NY 10036 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 148 Madison Ave.<br>New York, NY 10016<br>212-564-6117 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1008 6th Ave.<br>New York, NY 10018<br>646-290-6120 |
| | FGNY Holding, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 80 Maiden Ln.<br>New York, NY 10038<br>646-760-9202 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1785 Military Rd.<br>Niagara Falls, NY 14304<br>716-297-7500<br>716-297-7600 (fax) |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 5006 State Hwy. 23 (Southside Mall)<br>Oneonta, NY 13820<br>607-386-4128 |
| | Westchester Burgers, LLC (Greg Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11792<br>Greg Slayton: (516) 650-8418, (516) 922-4624 | 2 Penn St.<br>Pelham Manor, NY 10803 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 418 State Route 3<br>Plattsburgh, NY 12901<br>518-561-2156 |
| | Four Cousins Burgers & Fries of LI, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180, (518) 325-9717 | 5120 Nesconset Hwy.<br>Port Jefferson Station, NY 11776 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 79 Market St.<br>Potsdam, NY 13676<br>315-274-0263 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 2507 South Rd. #104<br>Poughkeepsie, NY 12601<br>845-462-0388 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 735 Upper Glen St.<br>Queensbury, NY 12144<br>518-432-8271 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 600 North Greenbrush Rd.<br>Rensselaer, NY 12144<br>518-285-4704 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 1881 Monroe Ave.<br>Rochester, NY 14618<br>585-385-4778 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 3057 Route 50<br>Saratoga Springs, NY 12866<br>518-583-3135 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | Balltown Rd.<br>Mohawk Common Mall<br>Schenectady, NY 12304<br>518-346-5728 |
| | Four Cousins Burgers and Fries of NY, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | Independent Plaza<br>202 Middle Country Rd.<br>Selden, NY 11784<br>631-736-0537 |
| | Eat Burgers, LLC (Greg Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11792<br>Greg Slayton: (516) 650-8418, (516) 922-4624 | 2865 Richmond Ave.<br>Staten Island, NY 10314 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 3439 W. Genesee St.<br>Syracuse, NY 13219<br>315-299-7027 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 727 South Crouse<br>Syracuse NY 13210<br>315-913-3911 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 756 Horatio St.<br>Utica, NY 13502<br>315-733-0349 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | 4700 Vestal Pkwy.<br>Vestal, NY 13850<br>607-770-7005 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 405 Commerce Dr.<br>Victor, NY 14564<br>585-398-3031 |
| | RSVT Holding, LLC (Tejraj Hada)<br>600 North Greenbush Rd.<br>Rensselaer, NY 12144<br>(518) 488-4060 | Watertown City Center<br>1290 Arsenal Rd.<br>Watertown, NY 13601 |
| | FGNYW, LLC (Andrew Stern and John Rigos)<br>56 W. 22nd St., 2nd Floor<br>New York, NY 10010<br>(212) 505-5861 | 927 Holt Rd.<br>Webster, NY 14580 |
| | Westchester Burgers, LLC (Greg Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11792<br>Greg Slayton: (516) 650-8418, (516) 922-4624 | 240 Main St.<br>White Plains, NY 10601 |
| | Westchester Burgers, LLC (Greg Slayton and Paul Slayton)<br>3 Ann Dr.<br>Syosset, NY 11792<br>Greg Slayton: (516) 650-8418, (516) 922-4624 | 2500 Central Park Ave.<br>Yonkers, NY 10710<br>914-793-3483 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **North Carolina** | | |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 1075 Pine Plaza Dr.<br>Apex, NC 27523<br>919-616-0011 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 1838 Hendersonville Rd.<br>Asheville, NC 28803 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 182 Merrimon Ave., Ste. 60<br>Asheville, NC 28801<br>828-210-2800 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | Shops @ Shadowline<br>1435 Blowing Rock Rd., Ste. A<br>Boone, NC 28607 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #42<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 1121 Parkside Main St.<br>Cary, NC 27519<br>919-380-0450 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 9820 Rea Rd.<br>Charlotte, NC 28277<br>704-752-0110 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 2810 South Blvd., Unit A<br>Charlotte, NC 28205 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 8020 Providence Rd., #600<br>Charlotte, NC 28777<br>704-752-0110 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 12820 York Rd.<br>Charlotte, NC 28278<br>704-587-9204 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 4400 Sharon Rd.<br>Charlotte, NC 28211<br>704-366-0525 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 1326 Central Ave.<br>Charlotte, NC 28205<br>980-299-8636 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 1421 Concord Pkwy N.<br>Concord, NC 28025<br>704-706-2630 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 17078 Nat Bynum Ln., Ste. 1<br>Cornelius, NC 28031<br>704-997-9766 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 5332 McFarland Dr., Ste. 110<br>Durham, NC 27707 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 150 Cabela Dr.<br>Garner, NC 27529<br>919-772-7338 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 2212 Franklin Blvd.<br>Gastonia, NC 28052<br>980-320-8033 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 600 Greenville Rd., Ste. D<br>Greenville, NC 27858<br>252-364-2838 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>810-599-7632 | 1520 Hwy 70 SE<br>Hickory, NC 28602<br>828-855-3235 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | Torrance Village Shopping Center<br>9826 Gilead Rd., Ste. C-106<br>Huntersville, NC 28078<br>704-992-2033 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 408 Western Blvd., #103<br>Jacksonville, NC 285 |
| | Doughball, LLC (Thomas Ferguson)<br>322 Colington Dr.<br>Kill Devil Hills, NC 27948<br>(267) 441-0631 | 1203 S. Croatan Hwy.<br>Kill Devil Hills, NC 27948<br>252-255-0006 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 1018 Shoppes at Midway Dr.<br>Knightdale, NC 27545<br>919-266-6664 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 2028 Olde Regent Way<br>Leland, NC 28451<br>910-833-1997 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 2304 Matthews Township Pkwy., Ste. 101<br>Matthews, NC 28105 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 2833 West Hwy. 74<br>Monroe, NC 28110<br>704-225-1960 |
| | Stein 5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 654 River Hwy.<br>Mooresville, NC 28117<br>704-799-7500 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 5136 US Hwy. 70 West B6<br>Morehead City, NC 28557 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 412 Main at North Hills St.<br>Raleigh, NC 27609<br>919-787-7772 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 8107 Creedmoor Rd.<br>Raleigh, NC 27613<br>919-844-7057 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 5501 Capital Blvd., Ste. 106<br>Raleigh, NC 27616<br>984-232-0547 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 6801 Parker Farm Dr.<br>Wilmington, NC 28405<br>910-256-9069 |
| **North Dakota** | | |
| | BNF, LLC (Dave Glaser and Brad Bender)<br>3801 Lockport St., Ste. 3<br>Bismarck, ND 58503<br>(701) 226-4015, (612) 387-6201 | 1001 Interstate Ave.<br>Bismarck, ND 58503<br>701-751-4286 |
| | BNF, LLC (Dave Glaser and Brad Bender)<br>3801 Lockport St., Ste. 3<br>Bismarck, ND 58503<br>(701) 226-4015, (612) 387-6201 | 5050 Timber Pkwy S., #132<br>Fargo, ND 58104 |
| | BNF, LLC (Dave Glaser and Brad Bender)<br>3801 Lockport St., Ste. 3<br>Bismarck, ND 58503<br>(701) 226-4015, (612) 387-6201 | 4328 13th Ave. S<br>Fargo, ND 58103<br>701-532-2552 |
| | BNF, LLC (Dave Glaser and Brad Bender)<br>3801 Lockport St., Ste. 3<br>Bismarck, ND 58503<br>(701) 226-4015, (612) 387-6201 | 3221 32nd Ave. S., Ste. 400<br>Grand Forks, ND 58201 |
| | BNF, LLC (Dave Glaser and Brad Bender)<br>3801 Lockport St., Ste. 3<br>Bismarck, ND 58503<br>(701) 226-4015, (612) 387-6201 | 3300 16th St. SW<br>Minot, ND 58701<br>701-837-5555 |
| **Ohio** | | |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 3863 Medina Rd.<br>Akron, OH 44333<br>330-665-5551 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 284 E. Exchange St.<br>Akron, OH 44304<br>234-571-5022 |
| | EDM Restaurant Ventures, LLC ((Edward Reese)<br>1419 Boardman-Canfield Rd., Ste. 500<br>Boardman, OH 44512<br>(330) 726-5790 | 107 S. Canfield-Niles Rd., Ste. A<br>Austintown, OH 44515 |
| | French Creek Burgers, LLC (Maureen and Randolph Androsik)<br>28421 West Oakland<br>Bay Village, OH 44140<br>(216) 798-2881 | 36050-A Detroit Rd.<br>Avon, OH 44011<br>440-937-GUYS |
| | EDM Restaurant Ventures, LLC ((Edward Reese)<br>1419 Boardman-Canfield Rd., Ste. 500<br>Boardman, OH 44512<br>(330) 726-5790 | 7322 Market St.<br>Boardman, OH 44512<br>330-629-8038 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 3659 Stone Creek Blvd., Ste. C<br>Cincinnati, OH 45251<br>513-245-1530 |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 830 Eastgate South Dr.<br>Cincinnati, OH 45245 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 3273 Steelyard Dr.<br>Cleveland, OH 44109 |
| | EDM Restaurant Ventures, LLC ((Edward Reese)<br>1419 Boardman-Canfield Rd., Ste. 500<br>Boardman, OH 44512<br>(330) 726-5790 | 2170 Millenium Blvd., #1<br>Courtland, OH 44410<br>330-372-0232 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 753 Howe Ave.<br>Cuyahoga Falls, OH 44221<br>330-920-9444 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 3100 Westgate<br>Fairview Park, OH 44126<br>440-333-5570 |
| | Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono, Anthony Robinson)<br>15645 Blue Skies St.<br>Livonia, MI 48154<br>David MacDonald: (734) 536-1187 | 1800 Tiffin Ave.<br>Findlay, OH 45840 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 790 Arlington Ridge<br>Green, OH 44312<br>234-571-4273 |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 609 Ring Rd.<br>Harrison, OH 45030<br>513-715-1181 |
| | EDM Restaurant Ventures, LLC ((Edward Reese)<br>1419 Boardman-Canfield Rd., Ste. 500<br>Boardman, OH 44512<br>(330) 726-5790 | 2393 Niles Cortland Rd.<br>Howland, OH 44484<br>330-989-5162 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 623 E. Main St.<br>Kent, OH 44240<br>330-673-6666 |
| | Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono, Anthony Robinson)<br>15645 Blue Skies St.<br>Livonia, MI 48154<br>David MacDonald: (734) 536-1187 | 3292 Elida Rd.<br>Lima, OH 45801 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 994 N. Lexington Spring Rd., Ste. 160<br>Mansfield, OH 44906<br>419-709-8102 |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 9540 S. Mason Montgomery Rd.<br>Mason, OH 40540<br>513-204-5900 |
| | Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono, Anthony Robinson)<br>15645 Blue Skies St.<br>Livonia, MI 48154<br>David MacDonald: (734) 536-1187 | 1395 Conant St., Ste. C<br>Maumee, OH 43537<br>419-893-3400 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 1271 SOM Center Rd.<br>Mayfield Heights, OH 44124<br>440-442-6700 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 4184 Pearl Rd.<br>Medina, OH 44256<br>330-723-3333 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 9180 Mentor Ave.<br>Mentor, OH 44060<br>440-205-1750 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 17695 Bagley Rd.<br>Middleburg Heights, OH 44130<br>440-239-7880 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 6652 Strip Ave. NW<br>North Canton, OH 44720 |
| | French Creek Burgers, LLC (Maureen and Randolph Androsik)<br>28421 West Oakland<br>Bay Village, OH 44140<br>(216) 798-2881 | 25999 Lorain Rd.<br>North Olmstead, OH 44070<br>440-716-6000 |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 2743 Edmondson Rd.<br>Norwood, OH 45209<br>513-351-5274 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 8249 W. Ridgewood Dr.<br>Parma, OH 44129<br>440-842-0095 |
| | Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono, Anthony Robinson)<br>15645 Blue Skies St.<br>Livonia, MI 48154<br>David MacDonald: (734) 536-1187 | 10090 Olde US 20<br>Rossford, OH 43460 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | French Creek Burgers, LLC (Maureen and Randolph Androsik)<br>28421 West Oakland<br>Bay Village, OH 44140<br>(216) 798-2881 | 4317 Milan Rd.<br>Sandusky, OH 4480 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 13971 Cedar Rd.<br>South Euclid, OH 44118 |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418 | 810 Kemper Rd.<br>Springdale, OH 75246 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | Strongsville Town Center<br>15163 Pearl Rd.<br>Strongsville, OH 44136 |
| | Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono, Anthony Robinson)<br>15645 Blue Skies St.<br>Livonia, MI 48154<br>David MacDonald: (734) 536-1187 | 3305 W. Central Ave.<br>Toledo, OH 43606<br>419-464-0000 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 4025 Richmond Rd., Unit H<br>Warrensville Heights, OH 44122<br>216-360-8888 |
| | French Creek Burgers, LLC (Maureen and Randolph Androsik)<br>28421 West Oakland<br>Bay Village, OH 44140<br>(216) 798-2881 | 30297 Detroit Rd.<br>Westlake, OH 44145<br>440-716-6000 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 4299 Burbank Rd.<br>Wooster, OH 44691<br>330-345-1111 |
| **Oklahoma** | | |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1442 East Hillside Dr.<br>Broken Arrow, OK 74012<br>918-355-9142 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1540 E. 2nd St., Ste. C2-2<br>Edmond, OK 73034<br>405-279-9990 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4334 E. Owen Garriott<br>Enid, OK 73703<br>580-307-6484 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3405 NW Cache Rd.<br>Lawton, OK 73505<br>580-350-3723 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 631 SW 19th St., Ste. 101<br>Moore, OK 73160<br>405-794-5559 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1401 24th Ave., NW<br>Norman, OK 73109<br>405-321-4871 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | Rockwell NW Shopping Center<br>6900 NW Expressway<br>Oklahoma City, OK 73132 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | Quail Springs Marketplace<br>2300 W. Memorial Rd.<br>Oklahoma City, OK 73120<br>405-753-4554 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6304 SW 3rd St.<br>Oklahoma City, OK 78128<br>918-527-0684 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 611 N. Perkins Rd., Ste. B<br>Stillwater, OK 74075<br>405-500-2025 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | Riverside Market<br>9635 Riverside Pkwy.<br>Tulsa, OK 74137<br>918-296-5509 |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 10025 S. Memorial Dr.<br>Tulsa, OK 74114<br>539-215-5588 |
| **Oregon** | | |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 2606 SW Cedar Hills Blvd.<br>Beaverton, OR<br>503-430-8748 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 14700 SW Murray Scholls Dr.<br>Beaverton, OR 97007 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 222 N. Emerson, Ste. 120<br>Bend, OR 97701<br>541-797-7787 |
| | CLRM, Inc. (Ryan Coady)<br>1575 NE 237th Ave.<br>Wood Village, OR 97060<br>(480) 225-2364 | 845 NW 9th St.<br>Corvallis, OR 97330<br>541-230-1891 |
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 495 West 7th Ave.<br>Eugene, OR 97401 |
| | PDX Burgers and Fries Inc. (Jason Marble)<br>953 West Witt Ave.<br>San Tan Valley, AZ 85140<br>(480) 569-8908 | 2595 SE Burnside Rd.<br>Gresham, OR 97080 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 8963 SW 82nd Ave.<br>Happy Valley, OR 97086<br>503-777-5160 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 17105 SE Sunnyside Dr., #134<br>Happy Valley, OR 97086<br>503-305-6410 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 2341 NW 185th St.<br>Hillsboro, OR 97123 |
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 1421 Center Dr., Ste. #105<br>Medford, OR  97501<br>541-816-4232 |
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 20 Rossanley Dr.<br>Medford, OR  97501<br>458-225-9947 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 15121 SE McLoughlin Blvd.<br>Milwaukie, OR 97267 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 19574 Molalla Ave.<br>Oregon City, OR 97045<br>503-657-6049 |
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 1500 NW Mulholland Dr. #101<br>Roseburg, OR 97470<br>541-671-2449 |
| | CLRM, Inc. (Ryan Coady)<br>1575 NE 237th Ave.<br>Wood Village, OR 97060<br>(480) 225-2364 | 2323 Lancaster Dr. NE<br>Salem, OR 97305<br>503-990-8828 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | CLRM, Inc. (Ryan Coady)<br>1575 NE 237th Ave.<br>Wood Village, OR 97060<br>(480) 225-2364 | Vista Place<br>2990 Commercial Blvd.<br>Salem, OR 97302 |
| | Southern Oregon Burgers and Fries, LLC (Mel Garges and Kristy Zakour)<br>90730 Marcola Rd.<br>Springfield, OR 97478<br>(541) 968-0544 | 3266 Gateway St.<br>Springfield, OR 97477 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 7005 SW Nyberg St.<br>Tualatin, OR 97062<br>503-612-3000 |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544 | 2050 8th Ave.<br>West Linn, OR 97068<br>503-594-0812 |
| Pennsylvania | | |
| | GB-Altoona, LLC (Saleh Mohamadi)<br>14080 Sullyfield Circle, Ste. J<br>Chantilly, VA 20151<br>(703) 310-8211 | 3420 Pleasant Valley Blvd., Ste. B<br>Altoona, PA 16602<br>814-944-2001 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 77 E. City Line Ave.<br>Bala Cynwyd, PA 19004<br>610-949-9005 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 160 Millers Run Rd.<br>Bridgeville, PA 15017<br>412-914-2070 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 2053 Sprout Rd.<br>Broomall, PA 19008<br>610-359-8155 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 200 W. Ridge Pike<br>Conshohocken, PA 19428<br>610-825-5557 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 77 E. City Line Ave.<br>Bala Cynwyd, PA 19004<br>610-949-9005 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 1082 E. Lancaster Ave.<br>Downingtown, PA 19335<br>610-873-2692 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 125 East Street Rd.<br>Feasterville, PA 19053<br>215-354-9055 |
| | Great Burger-Johnstown, LLC (Jerome Fink and Saleh Mohamadi)<br>14080 Sullyfield Circle, Ste. J<br>Chantilly, VA 20151<br>(703) 310-8211 | 145 Town Center Dr.<br>Johnstown, PA 15904<br>814-262-7872 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 160 N. Gulph Rd.<br>King of Prussia, PA 19406<br>610-265-7755 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 2424 Lincoln Hwy.<br>Langhorne, PA 19497<br>267-358-5995 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 1075 W. Baltimore Pike<br>Media, PA 19063<br>484-444-2420 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 73845 Northern Pike<br>Monroeville, PA 15146<br>412-373-7711 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 1527 Chestnut St.<br>Philadelphia, PA 19102<br>215-972-1375 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 2552 Grant Ave., #200<br>Philadelphia, PA 19114<br>215-677-3155 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 1717 North 12th St., Ste. 2<br>Philadelphia PA  19122<br>215-763-5489 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 1029 Freeport Rd.<br>Pittsburgh, PA 15238<br>412-781-5590 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 324 McHolme Dr.<br>Pittsburgh, PA 15275<br>412-788-5777 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 117 Bouquet St.<br>Pittsburgh, PA 15213<br>412-802-7100 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 3 PPG Pl.<br>Pittsburgh, PA 15222<br>412-227-0206 |
| | Wholesome Enterprises, LLC (Raji Sankar & Randhir Sethi)<br>3369 Altherson Dr.<br>Pittsburgh, PA 15102<br>(724) 518-0967 | 5207 Liberty Ave., Ste. 101<br>Pittsburgh, PA 15224<br>412-918-1276 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 254 N. West End<br>Quakertown, PA 18951<br>215-536-0555 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Great Burger, State College LLC (Jerome Fink and Saleh Mohamadi)<br>14080 Sullyfield Circle, Ste. J<br>Chantilly, VA 20151<br>(703) 310-8211 | 226 W. College Ave.<br>State College, PA 16801<br>814-238-3066 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | 864 W. Street Rd.<br>Warminster, PA 18974<br>215-443-5489 |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483 | Gateway Shopping Center<br>253 E. Swedesford Rd.<br>Wayne, PA<br>610-964-0214 |
| **Rhode Island** | | |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 1450 Hartford Ave.<br>Johnston, RI 02919<br>401-214-5050 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | Lincoln Mall<br>622 George Washington Hwy.<br>Lincoln, RI 02865 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 600 Kingstown Rd.<br>Wakefield, RI 02879<br>401-284-2395<br>401-284-2678 (fax) |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 300 Quaker Ln.<br>Warwick, RI 02886<br>401-828-3100 |
| | Hyde Park Burgers, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarratt Ave.<br>Austin, TX 78703<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 63 Airport Rd.<br>Warwick, RI 02889<br>401-921-8469 |
| **South Carolina** | | |
| | Jason Patel, Riteshbhai Patel and Jitenbhai Patel<br>1615 Ball Ground Hwy.<br>Canton, GA 30114<br>(256) 810-8336 | 1909 A Whiskey Rd.<br>Aiken, SC 29803<br>803-649-9949 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 3501 Clemson Blvd.<br>Anderson, SC 29621<br>864-716-0466 |
| | 2FOR5 King St LLC<br>c/o Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 364 King St.<br>Charleston, SC 29485<br>843-577-9912 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 4959 Centre Point Dr. North<br>Charleston, SC 29418<br>843-744-0659 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 931 Senate St.<br>Columbia, SC 29201<br>803-799-0441 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 285 Columbiana Dr.<br>Columbia, SC 29212<br>803-407-6443 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 4751 Forest Dr.<br>Columbia, SC 29206<br>803-787-3178 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | Clemson Rd.<br>Columbia, SC 29229 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 128 Rolling Hills Circle, Unit A<br>Easley, SC  29640 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 1940 Hoffmeyer Rd.<br>Florence, SC 29501<br>843-667-6207 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 1175 Woods Crossing Rd.<br>Greenville, SC 29607<br>864-297-0019 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 3935 Pelham Rd.<br>Greenville, SC 29615<br>864-288-3950 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 3281 N. Pleasantburg Rd.<br>Greenville, SC 29606<br>864-232-9740 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 1488 W. Wade Hampton Blvd.<br>Greer, SC 29650<br>864-848-5422 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 5135 Sunset Blvd.<br>Lexington, SC 29072<br>803-356-1007 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 1795 US Hwy. 17 North<br>Mount Pleasant, SC 29464<br>843-881-4550 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 8715 US Hwy 17 Bypass S<br>Myrtle Beach, SC 29575<br>843-444-2254 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 1772 Pine Island Rd.<br>Myrtle Beach, SC 28577<br>843-839-9973 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 10835 Kings Rd.<br>Myrtle Beach, SC 29572<br>843-839-9078 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 9500 Dorchester Rd.<br>North Charleston, SC 29485<br>843-875-8035<br>843-875-8036 (fax) |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 7250 Rivers Ave.<br>North Charleston, SC 29406<br>843-203-6916 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | Surfwood Plaza Shopping Center<br>202 Hwy 17 North<br>North Myrtle Beach, SC<br>843-281-1090 |
| | Princess Street Partners, LLC (Rick Fisher)<br>200 N. Washington St., Unit #320760<br>Alexandria, VA 22320<br>(703) 566-5821 | 1460 Meeting Blvd., Ste. 101<br>Rock Hill, SC 29730<br>803-980-5800 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 13450 Clemson Blvd.<br>Seneca, SC 29627<br>864-722-5357 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 3908 Grandview Dr.<br>Simpsonville, SC 29680 |
| | Griff Ventures, Inc. (Kevin Griffith)<br>151 Tandem Dr.<br>Greer, SC 29650<br>(864) 704-9886 | 1623 John B White Sr. Blvd., Suite B<br>Spartanburg, SC 29301<br>864-308-8222 |
| | Quintet Acquisitions LLC (Jonathan Kelly)<br>123 East Franklin St., #423<br>Chapel Hill, NC 27514<br>(919) 525-8825 | 1209 N. Main St.<br>Summerville, SC 29485<br>843-821-4204 |
| | Stein5, LLC (Christine Steiner)<br>127 Heathland Ln.<br>Mooresville, NC 28117<br>(810) 599-7632 | 1261 Broad St.<br>Sumter, SC 29150<br>803-905-5100 |
| **South Dakota** | | |
| | Murray 5G Inc. (Dan Murray)<br>211 S. Mable Ave.<br>Sioux Falls, SD 57103<br>(605) 645-6624 | 1329 Eglin, Ste. 100<br>Rapid City, SD 57701<br>605-342-4897 |
| | Murray 5G Inc. (Dan Murray)<br>211 S. Mable Ave.<br>Sioux Falls, SD 57103<br>(605) 645-6624 | 4200 S. Louise Ave.<br>Sioux Falls, SD 57106<br>605-271-7579 |
| | Murray 5G Inc. (Dan Murray)<br>211 S. Mable Ave.<br>Sioux Falls, SD 57103<br>(605) 645-6624 | 121 S. Minnesota Ave.<br>Sioux Falls, SD 57104<br>605-275-4897 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **Tennessee** | | |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 208 Hamilton Crossing Dr.<br>Alcoa, TN 37701<br>865-982-1200 |
| | GHG Southwest, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | Stage Centre<br>6600 Stage Rd., Ste. 138<br>Bartlett, TN 38135 |
| | Blue Ridge 5, LLC (Jeffrey Steiner, Christine Steiner, & Joseph Custer)<br>127 Heathland Lane<br>Mooresville, NC 28117<br>(810) 599-7632 | 412 Pinnacle Pkwy., Ste. 209<br>Bristol, TN 37620<br>423-742-6800 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | Hamilton Village<br>2020 Gunbarrel Rd.<br>Chattanooga, TN 37421<br>423-664-3500 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 401 Broad St., Ste. 101<br>Chattanooga, TN 37402 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 124 Stuart Rd.<br>Cleveland, TN 37312<br>423-476-4878 |
| | GHG Southwest, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 3574 Houston Levee<br>Collierville, TN 38028<br>901-316-5593 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 1265 Interstate Dr., Ste. 211<br>Cookeville, TN 38501<br>931-559-4897 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 815 Pkwy.<br>Gatlinburg, TN 29420 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 261 Indian Lake Blvd.<br>Hendersonville, TN 37075<br>615-822-6062 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 4013 Lebanon Pike<br>Hermitage, TN 37076<br>615-988-2659 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 5110 Hixson Pike<br>Hixson, TN 37343<br>423-870-7772 |
| | GHG Southwest, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | Shoppes @ The Columns<br>1245 Vann Dr.<br>Jackson, TN 38305 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Blue Ridge 5, LLC (Jeffrey Steiner, Christine Steiner, & Joseph Custer)<br>127 Heathland Lane<br>Mooresville, NC 28117<br>(810) 599-7632 | 1914 North Roan St.<br>Johnson City, TN 37601<br>423-262-0402 |
| | Blue Ridge 5, LLC (Jeffrey Steiner, Christine Steiner, & Joseph Custer)<br>127 Heathland Lane<br>Mooresville, NC 28117<br>(810) 599-7632 | 1708 E. Stone Dr.<br>Kingsport, TN 37660<br>423-378-7806 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 10922 Parkside Dr.<br>Knoxville, TN 37923<br>865-675-4897 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | Northshore Town Center<br>Northshore Dr. & Town Center Blvd.<br>Knoxville, TN 37922 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 234 Brookview Center #101<br>Knoxville, TN 37919<br>865-602-7700 |
| | GHG Southwest, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 1315 Ridgeway Rd.<br>Memphis, TN 38119 |
| | GHG Southwest, LLC (Bill Gellert)<br>173 Whippoorwill Rd.<br>Hillsdale, NY 12529<br>(914) 643-2180 | 2100 Union Ave.<br>Memphis, TN 38104<br>901-552-4017 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 300 Pleasant Grove<br>Mt. Juliet, TN 37122<br>615-758-8566 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 536 N. Thompson Ln.<br>Murfreesboro, TN 37129<br>615-439-6047 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 2526 Pkwy.<br>Pigeon Forge, TN 37863<br>865-453-1445 |
| | FGTENN, LLC (Laurie Lowe, Ned Scherer and Calvert Simmons)<br>1410 Spring Hill Rd.<br>McLean, VA 22102<br>(703) 919-8397 | 7531 Barnett Way<br>Powell, TN 37849<br>865-938-2007 |
| | GPR Hospitality, LLC (James Richards)<br>7663 Harrier Hill Rd.<br>Signal Mountain, TN 37377<br>(423) 605-1253 | 311 Sam Ridley Pkwy.<br>Smyra, TN 37167<br>615-459-3220 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **Texas** | | |
| | Senovia Foods North, LLC (Albert Carrillo, Jr.)<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 2313 South Georgia St., Space 37<br>Amarillo, TX 79109<br>806-398-0582 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4245 S. Cooper St., Ste. 151<br>Arlington, TX 76015<br>817-468-6033 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 10000 Research Blvd., #142<br>Austin, TX 78759<br>512-338-0300 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4301 W. William Cannon Dr. E., #200<br>Austin, TX 78749<br>512-358-0774 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3400 E. Hebron Pkwy., Ste. 100<br>Carrollton, TX 78249<br>972-248-6043 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 398 FM 1382 E, Ste. A<br>Cedar Hill, TX 75104<br>972-637-1000 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 711 University Dr. E, Unit 100<br>College Station, TX 77840<br>979-703-1530 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 507 I-45 N, St.e D<br>Conroe, TX 77304<br>936-474-4110 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 5425 South Padre Island Dr., Ste. 137<br>Corpus Christi, TX 78411<br>361-993-5552 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 25845 Hwy. 290<br>Cypress, TX 77429<br>281-758-4855 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 28920 Hwy. 290<br>Cypress, TX 77433<br>832-653-2390 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 13350 Dallas Pkwy, Ste. 975<br>Dallas, TX 75240<br>972-239-8470 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1715 South Loop 288, Unit 110<br>Denton, TX 76201<br>940-382-2900 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6450 Desert Blvd., Bldg. H<br>El Paso, TX 79912<br>915-349-6836 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8889 Gateway West Blvd.<br>El Paso, TX 79925<br>915-633-1669 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1327 George Dieter Dr.<br>El Paso, TX 79936<br>915-590-6700 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 655 Sunland Park Dr.<br>El Paso, TX 79912<br>915-581-2415 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2701 Hwy. 121, Ste. 100<br>Euless, TX 76039<br>817-358-3558 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 9180 N. Freeway<br>Ft. Worth, TX 76177<br>817-750-1030 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 313 Houston St.<br>Ft. Worth, TX 76102<br>817-348-9623 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 4833 S. Hulen St.<br>Ft. Worth, TX 76132<br>817-263-8900 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1201 West University Ave., Ste. 110<br>Georgetown, TX 78628<br>512-591-0671 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 201 East Central Texas Exp., Ste. 1440<br>Harker Heights, TX 76548<br>254-690-0023 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6927 FM 1960 at Cutten Rd.<br>Houston, TX 77069<br>281-880-5555 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 14303 E. Sam Houston Pkwy. N<br>Houston, TX 77044<br>832-230-1478 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1150 N. Fry Rd., Ste. A<br>Houston, TX 77084<br>281-647-6555 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 9762 Katy Fwy., Ste. 100<br>Houston, TX 77055<br>713-468-4280 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8505 S. Main St., Unit 380<br>Houston, TX 77025<br>713-662-2075 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1715 Post Oak Blvd.<br>Houston, TX 77056<br>713-960-1525 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2902 N. Shepard Dr.<br>Houston, TX 77008<br>713-864-6555 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3939 Washington Ave., Unit 600<br>Houston, TX 77007<br>713-426-5558 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | Royal Oaks Center<br>11700 Westheimer Rd.<br>Houston, TX 77077 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 7405 FM 1960 Rd. E<br>Humble, TX 77346<br>281-359-0555 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1304 W. Pipeline Rd.<br>Hurst, TX 76053<br>817-284-0763 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6440 N. MacArthur Blvd., Ste. 110<br>Irving, TX 75039<br>972-409-7230 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 151 Evans Dr., Ste. 113<br>Kyle, TX 78640<br>512-268-0200 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 1615 West FM 646<br>League City, TX 77573<br>281-534-6726 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 859 Hwy. 121, Ste. C<br>Lewisville, TX 75067<br>972-315-8601 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8222 Agora Pkwy., Ste. 124<br>Live Oak, TX 78154<br>210-566-6428 |
| | Senovia Foods North, LLC (Albert Carrillo, Jr.)<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 4410 19th St., #100<br>Lubbock, TX 79407<br>806-771-4897 |
| | Senovia Foods North, LLC (Albert Carrillo, Jr.)<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 6076 Marsha Sharp Freeway<br>Lubbock, TX 79407<br>806-771-4897 |
| | Senovia Foods North, LLC (Albert Carrillo, Jr.)<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 4406 114th St., Ste. 300<br>Lubbock, TX 79424<br>806-701-2080 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 6619 FM 1488, Ste. 201<br>Magnolia, TX 77354 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3701 Expressway 83<br>McAllen, TX 78503<br>956-630-5554 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3530 West University Dr.<br>McKinney, TX 75071<br>214-856-5245 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1725 N. Town E. Blvd., Ste. 210<br>Mesquite, TX 75150<br>972-681-1039 |
| | Albert Carrillo, Jr.<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 2816 W. Loop 250 N., Ste. 300<br>Midland, TX 79705<br>432-699-2036 |
| | The Houston Guys LLC, (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 6215 Highway #6, Ste. 100<br>Missouri City, TX 77459 |
| | The Houston Guys, LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 1760 Nasa Pkwy.<br>Nassau Bay, TX 77058<br>832-864-3495 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 195 Creekside Crossing<br>New Braunfels, TX 78130<br>830-620-9655 |
| | The Houston Guys, LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 11971 North Grand Pkwy., Ste. 100<br>New Caney, TX 77357<br>281-577-4012 |
| | Albert Carrillo, Jr.<br>1604 Shell Ave.<br>Midland, TX 79705<br>(626) 890-9560 | 4101 East 42nd St., Bldg N, Unit 131<br>Odessa, TX 79762 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 10645 Broadway St., Ste. #120<br>Pearland, TX 77584 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 2424 FM 685, Ste. 200<br>Pflugerville, TX 78660<br>737-209-0154 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1201 E. Spring Creek Pkwy., Ste. 110<br>Plano, TX 75074<br>972-422-4223 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8240 Preston Rd., Ste. 190<br>Plano, TX 75024<br>469-362-7070 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1035 East I-30, Ste. 105<br>Rockwall, TX 75087<br>972-722-0957 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 3107 South I-35, Ste. 750<br>Round Rock, TX 78664<br>512-246-7193 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 260 East Basse Road<br>San Antonio, TX 78209<br>210-822-6200 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 5215 DeZavala Rd.<br>San Antonio, TX 78249<br>210-641-2595 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 1321 N. Loop 1604 E.<br>San Antonio, TX 78232<br>210-402-7305 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 8603 State Hwy. 151, Ste. 208<br>San Antonio, TX 78245<br>210-543-2700 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 20811 Hwy. 281 N<br>San Antonio, TX 78258<br>210-370-9256 |
| | Encore FGBF Texas, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004 | 6630 Spring Stuebner Rd.<br>Spring, TX 77389<br>832-761-5186 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | 15810 SW Freeway, #100<br>Sugarland, TX 77478<br>281-277-7755 |
| | The Houston Guys LLC (John Hooff and Eugene Hooff)<br>2107 Forest Hill Rd.<br>Alexandria, VA 22307<br>John Hooff: (703) 585-6284, (703) 329-3354<br>Eugene Hooff: (404) 550-2147 | Baybrook Sq.<br>1333 West Bay Area Blvd. #300<br>Webster, TX 77598 |
| Utah | | |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 209 N State St., Ste. B<br>American Fork, UT 84003 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 235 N. 500 W.<br>Bountiful, UT 84010<br>801-292-3002 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 487 E. 12300 S.<br>Draper, UT 84020<br>801-571-5027 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 2065 N. Harris Dr.<br>Layton, UT 84040<br>801-773-8945 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 3601 N. Digital Dr., Ste. B<br>Lehi, UT 84043<br>385-336-8382 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1077 N. Main St., Ste. 120<br>Logan, UT 84341<br>435-753-7445 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1082 E. Ft. Union Blvd.<br>Midvale, UT 84047<br>801-565-8100 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 2325 Washington Blvd.<br>Ogden, UT 84424 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1051 S. 750 E.<br>Orem, UT 84097<br>801-765-7556 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1626 Uinta Way, Suite B-1<br>Park City, UT 84098<br>435-571-0911 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 12570 Rhetski Lane, Ste. 103<br>Riverton, UT 84065 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 10391 S. State St.<br>Sandy, UT 84070<br>801-523-7440 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 3200 E. 3300 S.<br>Salt Lake City, UT 84109<br>801-484-2480 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 529 E. 1000 N.<br>Spanish Fork, UT 84660<br>801-798-7878 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1279 E. 100 S.<br>St. George, UT 84790<br>435-673-7337 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1716 W. 5400 S.<br>Taylorsville, UT 84118<br>385-237-4111 |
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | Jordan Landing<br>7168 S. Plaza Center Dr.<br>West Jordan, UT 84084 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | MeisterGuys, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 2917 South Glen Eagles, Ste. 4<br>West Valley, UT 84128<br>801-963-8003 |
| **Vermont** | | |
| | G.F. Vasey Holdings, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarrett Ave.<br>Austin, TX 79705<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | 5 N. Main St.<br>Rutland, VT 05701<br>802-417-2752 |
| | G.F. Vasey (Holdings, LLC (Greg Vasey and Jack Goehring)<br>2502 Jarrett Ave.<br>Austin, TX 79705<br>Greg Vasey: (315) 292-8283<br>Jack Goehring: (703) 867-8222 | The Gateway<br>580 Shelburne Rd., Ste. 11<br>South Burlington, VT 05401 |
| **Virginia** | | |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 201 Connor Dr.<br>Charlottesville, VA 22911<br>434-963-4897 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 1119 Emmet St.<br>Charlottesville, VA 22905<br>434-975-4897 |
| | Atlanta's Best Burgers, LLC (Michael Melton)<br>1219 Towlston Rd.<br>Great Falls, VA 22066<br>(703) 919-5289 | Dulles International Airport<br>Concourse B<br>Dulles, VA 20166<br>703-572-5125 |
| | Marion Sadler<br>Post Office Box 871<br>Emporia, VA 23847<br>(434) 594-4907 | 916 W. Atlantic<br>Sadler Travel Plaza<br>Emporia, VA 23847<br>434-348-3483 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 145 Riverton Commons Plaza<br>Front Royal, VA 22630<br>540-749-2750 |
| | Robert and Larry Bowers<br>3260 Kirkham Rd.<br>Columbus, OH 43221<br>Robert Bowers: (614) 557-2211<br>Larry Bowers: (330) 340-1536 | 10841 West Broad St.<br>Glen Allen, VA 23058<br>804-967-0001 |
| | Robert and Larry Bowers<br>3260 Kirkham Rd.<br>Columbus, OH 43221<br>Robert Bowers: (614) 557-2211<br>Larry Bowers: (330) 340-1536 | 12210 West Broad St.<br>Henrico, VA 23233<br>804-505-3136 |
| | Pyramid Enterprises, LLC (Steve Perkins)<br>3804 Blackthorn St.<br>Chevy Chase, MD 20815<br>(703) 919-2566 | King George Gateway<br>16398-B Consumer Row<br>King George, VA 22485<br>540-644-9055 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Retail Store Investment, LLC (Khadija Dinath)<br>23 Hidden Key Pl.<br>St. Catherine's, ON Canada L2M 7H5<br>(289) 214-2812 | 12421 Chattanooga Plaza<br>Midlothian, VA 23112<br>804-763-6002 |
| | Robert and Larry Bowers<br>3260 Kirkham Rd.<br>Columbus, OH 43221<br>Robert Bowers: (614) 557-2211<br>Larry Bowers: (330) 340-1536 | 1601 Willow Lawn Dr.<br>Richmond, VA 23230<br>804-282-5595 |
| | Retail Store Investment, LLC (Khadija Dinath)<br>23 Hidden Key Pl.<br>St. Catherine's, ON Canada L2M 7H5<br>(289) 214-2812 | 7017 B&C Forest Hills Ave.<br>Richmond, VA 23225<br>804-303-0972 |
| | Marion Sadler<br>Post Office Box 871<br>Emporia, VA 23847<br>(434) 594-4907 | 1015 East Atlantic St.<br>South Hill, VA 23970<br>434-584-3483 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 1365 Berryville Ave.<br>Winchester, VA 22601<br>540-542-0011 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 579 Adams St.<br>Winchester, VA 22601<br>540-542-0072 |
| Washington | | |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 1301 W. Bakerview Rd.<br>Bellingham, WA 98226<br>360-734-8300 |
| | Seattle Burgers, Inc. (Amjad Iraqi)<br>8094 Cottonwood Ct.<br>Seminole, FL 33776<br>(206) 595-0492 | 1111 228th St. SE<br>Bothell, WA 98021<br>425-489-8555 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 1870 Marketplace Dr.<br>Burlington, WA 98233<br>360-757-8677 |
| | Nabil Asad<br>6043 Gholson Bridge Ct.<br>Manassas, VA 20112<br>(571) 436-1441 | 1928 South Commons, Ste. B-1<br>Federal Way, WA 98003<br>253-839-1425 |
| | Nabil Asad<br>6043 Gholson Bridge Ct.<br>Manassas, VA 20112<br>(571) 436-1441 | 755 NW Gilman Blvd.<br>Issaquah, WA 98077<br>425-392-3005 |
| | Seattle Burgers, Inc. (Amjad Iraqi)<br>8094 Cottonwood Ct.<br>Seminole, FL 33776<br>(206) 595-0492 | 1120 NE 124th St.<br>Kirkland, WA 98034<br>425-814-3256 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller) c/o Miller Investment Management, LP 100 Front St., Ste 1500 West Conshohocken, PA 19428 (610) 834-9820 x144 | Lakewood Towne Center 5605 Lakewood Towne Center Blvd. Lakewood, WA 98499 253-582-4897 |
| | Seattle Burgers, Inc. (Amjad Iraqi) 8094 Cottonwood Ct. Seminole, FL 33776 (206) 595-0492 | 2902 164th St. SW Lynnwood, WA 98087 425-787-6400 |
| | Seattle Burgers, Inc. (Amjad Iraqi) 8094 Cottonwood Ct. Seminole, FL 33776 (206) 595-0492 | 19620 Highway 99, Ste. 101 Lynnwood, WA 98036 425-670-9915 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller) c/o Miller Investment Management, LP 100 Front St., Ste 1500 West Conshohocken, PA 19428 (610) 834-9820 x144 | 2707 171st Place NE, #104 Marysville, WA 98271 360-652-8707 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller) c/o Miller Investment Management, LP 100 Front St., Ste 1500 West Conshohocken, PA 19428 (610) 834-9820 x144 | 14650 N. Kelsey St. Monroe, WA 98272 360-805-4919 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller) c/o Miller Investment Management, LP 100 Front St., Ste 1500 West Conshohocken, PA 19428 (610) 834-9820 x144 | 1200 Cooper Point SW, Ste. 800 Olympia, WA 98502 360-943-9497 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller) c/o Miller Investment Management, LP 100 Front St., Ste 1500 West Conshohocken, PA 19428 (610) 834-9820 x144 | 1002 N. Meridian St. Puyallup, WA 98371 253-446-6183 |
| | Nabil Asad 6043 Gholson Bridge Ct. Manassas, VA 20112 (571) 436-1441 | 2010 148th Ave., NE, Ste. 100 Redmond, WA 98052 |
| | Seattle Burgers, Inc. (Amjad Iraqi) 8094 Cottonwood Ct. Seminole, FL 33776 (206) 595-0492 | 17124 Redmond Way Redmond, WA 98052 425-406-8949 |
| | Nabil Asad 6043 Gholson Bridge Ct. Manassas, VA 20112 (571) 436-1441 | 910 10th Place Renton, WA 98055 425-228-2286 |
| | Montana Burgers Inc. (Patrick Carls) 2808 Carla Jo Ln. Missoula, MT 59803 (509) 991-9663 | 2671 Queensgate Dr. Richland, WA 99352 509-222-1120 |
| | Seattle Burgers, Inc. (Amjad Iraqi) 8094 Cottonwood Ct. Seminole, FL 33776 (206) 595-0492 | 311 NE 103rd St. Seattle, WA 98125 206-729-5028 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Seattle Burgers, Inc. (Amjad Iraqi)<br>8094 Cottonwood Ct.<br>Seminole, FL 33776<br>(206) 595-0492 | 1500 NW Market St.<br>Seattle, WA 98017<br>206-257-4709 |
| | Seattle Burgers, Inc. (Amjad Iraqi)<br>8094 Cottonwood Ct.<br>Seminole, FL 33776<br>(206) 595-0492 | 10061 Kitsap Mall Blvd. NW<br>Silverdale, WA 98383<br>360-286-2413 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 9502 N. Newport Hwy.<br>Spokane, WA 99218<br>509-928-2921 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 10 N. Sullivan Rd.<br>Spokane Valley, WA 99216<br>509-927-2840 |
| | Bighorn Five Guys Acquisitions, LLC (Clayton Parrett and H. Scott Miller)<br>c/o Miller Investment  Management, LP<br>100 Front St., Ste 1500<br>West Conshohocken, PA 19428<br>(610) 834-9820 x144 | 4027 Tacoma Mall Blvd., Ste. A<br>Tacoma, WA 98409<br>253-475-0117 |
| | Nabil Asad<br>6043 Gholson Bridge Ct.<br>Manassas, VA 20112<br>(571) 436-1441 | 17100 Southcenter Pkwy., Ste. 112<br>Tukwila, WA 98188<br>425-221-0081 |
| | Pacific Burgers, Inc. (Jeffrey Marble)<br>320 N. Main St., Ste. 203<br>Gresham, OR 97030<br>(253) 961-7047 | 310 NE 78th St.<br>Vancouver, WA 98665<br>360-574-2810 |
| | Northwest Burgers & Fries, Inc. (Bill Marble)<br>11774 Pinedale Road<br>Moorpark, CA 93021<br>(818) 399-3544 | 19171 SE Mill Plain Blvd., #109<br>Vancouver, WA 98683<br>360-260-5585 |
| | Northwest Burgers & Fries, Inc. (Bill Marble)<br>11774 Pinedale Road<br>Moorpark, CA 93021<br>(818) 399-3544 | 8440 Vancouver Mall Dr., Ste. 110<br>Vancouver, WA 98662<br>360-719-2181 |
| | Montana Burgers Inc. (Patrick Carls)<br>2808 Carla Jo Ln.<br>Missoula, MT 59803<br>(509) 991-9663 | 1901 S. 1st St., Ste. #100<br>Yakima, WA 98902<br>509-469-4958 |
| **West Virginia** | | |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 880 Foxcroft Ave.<br>Martinsburg, WV 25401<br>304-901-5248 |
| | GB-Morgantown, LLC (Saleh Mohamadi)<br>14080 Sullyfield Circle, Ste. J<br>Chantilly, VA 20151<br>(703) 310-8211 | Suncrest Town Center<br>1000 Town Center Dr.<br>Morgantown, WV 26505<br>304-212-5723 |
| | H&I Burgers LLC (Isalmou Boussaa, Hicham El Abbassi)<br>2110 Ivy Stone Pl.<br>Woodbridge, VA 22191<br>Isalmou Boussaa: (703) 595-6785<br>Hicham El Abbassi: (703) 328-0007 | 38 Joshua Freeman Blvd., #107<br>Ransom, WV 25438<br>304-724-7739 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| **Wisconsin** | | |
| | Credo, LLC (Kristopher Humphries, William Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 1300 Great Wolf Dr.<br>Baraboo, WI 53913<br>608-678-2729 |
| | Credo, LLC (Kristopher Humphries, William Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 4800 Golf Rd.<br>Eau Claire, WI 54701<br>715-514-1744 |
| | Credo, LLC (Kristopher Humphries, William Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 3497 Spyglass Hill Dr.<br>Green Bay, WI 54311<br>920-494-5489 |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)<br>707 Osterman Ave.<br>P.O. Box 27<br>Deerfield, IL 60015<br>Scott Lesser: (847) 946-7666<br>Ryan Dussault: (612) 964-2290 | 2181 Badger Dr.<br>Hudson, WI 54016<br>715-338-3670 |
| | Credo, LLC (Kristopher Humphries, William Humphries)<br>3890 Lone Cedar Ln.<br>Chaska, MN 55318<br>(612) 281-7271 | 1301 Starling Ln.<br>Wausau, WI 54401<br>715-841-0415 |
| **Wyoming** | | |
| | Wyoming 5G, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 5040 East 2nd St., Ste. 7<br>Casper, WY 82609<br>307-472-0102 |
| | Wyoming 5G, LLC (Jeff Howes)<br>125 West Burton Ave., Ste. 2<br>Salt Lake City, UT 84115<br>(801) 231-6101 | 1400 Dell Range Blvd., Unit #85<br>Cheyenne, WY 82009<br>307-634-2543 |
| **INTERNATIONAL: CANADA** | | |
| **Province of Alberta** | | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 130 Sierra Springs Dr.<br>Building E, Ste. 105<br>Airdrie, AB T4B 3G6<br>403-948-1816 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 8650 112 Ave., NW #1103<br>Calgary, AB T3R 0R<br>403-374-1226 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 305-5155 130 Ave. #305<br>Calgary, AB T2Z 0N3<br>403-252-0887 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 7337 Macleod Trail SE<br>Calgary, AB T2G 5J7<br>403-252-2224 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 33 Heritage Meadows Way<br>Calgary, AB T2H3B3<br>403-252-3375 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2618 32nd St. NE<br>Calgary, AB T1Y 7L8<br>403-291-5697 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 296 Shawville Blvd., Unit #110<br>Calgary, AB T2Y 3S4<br>587-534-0487 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 4112 University Ave. NW<br>Calgary, AB T3B 6K3<br>403-282-3248 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | Currents of Windermere<br>6222 Currents Dr. NW<br>Edmonton, AB T6W 0L8<br>780-438-4450 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | South Edmonton Commons<br>10161 13th Ave. NW<br>Edmonton, AB T6N 0B6<br>780-436-9885 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | Capilano Mall<br>5015 101 Ave., NW, Unit 110<br>Edmonton, AB T6A 0A2<br>587-754-6077 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 15420 37th St. NW<br>Edmonton, AB T5Y 0S5<br>780-371-8668 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 11222 103rd Ave.<br>Grande Prairie, AB T8V 7H1<br>780-402-7016 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 3705 Mayor Magrath Dr. S., Unit #10<br>Lethbridge, AB T1K 8A8<br>403-380-2202 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 109-2011 Strachan Rd.<br>Medicine Hat, AB 1B-064<br>403-527-5022 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2030 50th Ave., Unit #101<br>Red Deer, AB T2Y 3A2<br>403-358-3236 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | Sherwood Park<br>993 Fir St., Unit 60<br>Sherwood Park, AB T8A 4M2<br>780-416-7710 |
| **Province of British Columbia** | | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 8249 Eagle Landing Pkwy., Unit 714<br>Chilliwack, BC V2P 7K6<br>604-793-2290 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | Fremont Village<br>130-2015 Hawkins St.<br>Port Coquitlam, BC V3B 0G6<br>604-472-9780 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 3070-11666 Steveston Hwy.<br>Richmond, BC V7E 2J3<br>604-829-3826 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1201 72nd Ave., Unit 125<br>Surrey, BC V3W 2M1<br>237-757-7329 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2285 160th St., Unit F8 & F9<br>Surrey, BC V3S 9NS<br>604-531-7829 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 635 Robson St.<br>Vancouver, BC V6B 5J3<br>801-576-2702 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2002 Park Royal St. #510<br>West Vancouver, BC<br>604-925-3483 |
| **Province of Manitoba** | | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1575 Regent Ave.<br>Winnipeg, MB R2C 3B5<br>204-661-5555 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2425 Pembina Hwy.<br>Winnipeg, MB R3T 2H4<br>204-261-5555 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 3380 Portage Ave.<br>Winnipeg, MB R3G 0Z1<br>204-832-5555 |
| **Province of Newfoundland** | | |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 48 Kenmount Rd.<br>St Johns, NFLD 1AB 3P9<br>709-702-9555 |
| **Province of Nova Scotia** | | |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 1630 Argyle St.<br>Halifax, NS B3J 0E9<br>902-593-0315 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 212 Chain Lake Dr.<br>Halifax, NS B3S 1C5 |
| **Province of Ontario** | | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | Durham Centre<br>130 Kingston Rd. East<br>Ajax, ON L1Z 1E5<br>905-428-6262 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 66 Quarry Edge Dr.<br>Brampton, ON L6V 4K2<br>905-456-8787 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 777 Guelph Line<br>Burlington, ON L7R 3N2<br>905-613-9898 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 148 North Queen St., Unit 5/6<br>Etobicoke, ON M9C 1A8<br>416-234-9292 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 20 Clair Rd. West, Unit 9<br>Guelph, ON, N1L0A8<br>519-767-9090 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 18265 Yonge St. East, Unit #9<br>Gwillimbury, ON L9N 0A2<br>905-895-0505 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1807 Stone Hill Church Rd. East<br>Unit 6009<br>Hamilton, ON L8J 0B4<br>905-561-2223 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 770 Gardiners Rd.<br>Kingston, ON K7M 3X9<br>613-384-8855 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1703 Richmond St., Unit 117A<br>London, ON N5X 3Y2<br>519-660-0008 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 3987 Highway #7 East, Unit 6<br>Markham, ON L3R 5M6<br>905-944-8555 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2116 Burnhamthorpe Rd. West<br>Unit #45<br>Mississauga, ON L5M 4Z5<br>905-608-8484 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1510 Dundas St. East, C6-Unit 11<br>Mississauga, ON L4X 1L4<br>905-273-9993 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 6045 Mavis Rd., Unit 3<br>Mississauga, ON L5R 4G6<br>905-507-4141<br>905-507-1661 (fax) |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 1181 Greenbank Rd.<br>Bldg. C, Unit 0205<br>Nepean, ON K2J 4Y6<br>613-823-0093 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 518 Centennial Pkwy. North, Unit E4<br>North Hamilton, ON L8E 0G2<br>905-664-8558 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 4841 Yonge St., Ste. 118<br>North York, ON M2N 5X2<br>647-496-1847 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 3732 Innes Rd., Unit 4<br>Orleans, ON K1W 0C8<br>613-824-6270 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | South Oshawa<br>575 Laval Dr.<br>Building G, Unit 1<br>Oshawa, ON L1J 0B5<br>905-728-8803 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 525 Industrial Blvd., Unit 1<br>Ottawa, ON K1G 3S2<br>613-562-8009 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 324 West Hunt Club Rd.<br>Ottawa, ON K2E 1A6<br>613-730-5555 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 810 Warden Ave., Unit C<br>Scarborough, ON M1L 4W1<br>416-755-5757 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1041 Wellington Rd., Unit C1<br>South London, ON  N6E 1W4<br>519-690-2828 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 5517 Hazeldean Rd., Bldg. C2<br>Unit 6<br>Stittsville, ON K2S OP5<br>613-836-1800 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1400 The Kingsway<br>Sudbury, ON P3B 0A3<br>705-524-9696 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 865 York Mills Rd.<br>Toronto, ON M3B 1Y6<br>647-347-4510 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 329 Yonge St.<br>Toronto, ON M5H 3C6<br>416-591-0404 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 85 Laird Dr.<br>Toronto, ON M4G 3T8<br>416-429-4141 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 70 Weston Rd., Unit 101<br>Toronto, ON M6N 0A7<br>416-762-8778 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 100 King St. W., Space 93<br>Toronto, ON M5X 1A9<br>416-861-9900 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 3582 Major Mackenzie Dr. West<br>Vaughan, ON L4H 3T6<br>905-303-2366 |

| STATE | FRANCHISEE NAME & ADDRESS | ADDRESS OF STORES |
|---|---|---|
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 650 Division Rd., Unit 101<br>Windsor, ON N8X 0A8<br>519-972-6262 |
| **Province of Quebec** | | |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 1371 Boulevard Michel Bohec, Ste. D5<br>Blainville, QC J7C 0M4<br>450-933-5078 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 8840 Boulevard Leduc, Ste. 50<br>Brossard, QC J4Y-OG4<br>450-462-2333 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 3530 Boulevard des Sources<br>Dollard Des Ormeaux, QC H9B 1Z9<br>514-683-4545 |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880 | 468 Rue McGill<br>Montreal, QC H2Y 2H1<br>514-507-2560 |
| **Province of Saskatchewan** | | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 4666 Gordon Rd.<br>Regina, SK S4W 0B7<br>306-352-5545 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 2531 Quance St.<br>Regina, SK S4V 0B7<br>306-352-5545 |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639 | 1840 8th St. East<br>Saskatoon, SK S7H 0T6<br>306-373-5555 |

**\*Indicates a developer that is no longer in the system as of the Issuance Date.**

### LIST OF FRANCHISEES/DEVELOPERS
### WITH RESTAURANTS NOT YET OPERATIONAL
### (As of December 31, 2021)

DEV-0005D
Life Capital, LLC (Brandon Butler)
6157 Airport Boulevard, Suite 850864
Mobile, AL 36685
(713) 876-7800
(1 Restaurant to be developed)

DEV-0204E
CA FGB Operations, LLC (Keith Bubb)
14730 East Crested Crown
Fountain Hills, AZ 85268
(408) 490-0908
(4 Restaurants to be developed)

DEV-0211B
Bukit Inc. (Jay Denenberg)
14496 Nutwood Lane
Saratoga, CA 95070
(408) 858-5441
(4 Restaurants to be developed)

DEV-0215C/0222D
Canadian Guys Burgers Limited (Joseph Dand, Mike
Lipinski)
40426 Winchester Road
Temecula, CA 92591
(403) 616-7156, (905) 380-1188
(11 Restaurants to be developed)

DEV-0184B
East Bay Burgers, Inc. (James Khan)
5220 Dolcetto Way
Salida, CA 95368
(510) 921-7485
(5 Restaurants to be developed)]

DEV-0222C
FG Hospitality, LLC (Jerome Ma)
2567 Harmony Hill Drive
Diamond Bar, CA 91765
(949) 232-8190
(4 Restaurants to be developed)

DEV-0194C
Golden Gate Grills Inc. (James Khan, Billal Khan)
5220 Dolcetto Way
Salida, CA 95368
(510) 921-7485
(9 Restaurants to be developed)

DEV-0179
JAK Burgers, LLC (Karl and JoAnn Gittelman)
78-447 Highway 111
La Quinta CA 92253
(949) 412-4129, (949) 412-4128
(1 Restaurant to be developed)

DEV-0216C
Keep Smile Trading USA, Inc. (Freedom Yang)
3320 Leonis Boulevard
Vernon, CA 90058
(909) 556-5061
(2 Restaurants to be developed)

DEV-0215B
M&J Holdings, LLC (Jerome Ma)
2567 Harmony Hill Drive
Diamond Bar, CA 91765
(949) 232-8190
(2 Restaurants to be developed)

DEV-0134
Northwest Burgers and Fries, Inc. (William Marble)
11774 Pinedale Road
Moorpark, CA 93021
(818) 399-3544
(4 Restaurants to be developed)

DEV-0184/0217B
Tripart Management, Inc. (Rakesh Kumar, Sunil
Kumar, Jose Garzona)
817 Lurline Drive
Foster City, CA 94405
(650) 868-4942, (415) 309-3001
(3 Restaurants to be developed)

DEV-0204D
Tripart Management II, Inc. (Rakesh Kumar, Sunil
Kumar, Jose Garzona)
817 Lurline Drive
Foster City, CA 94405
(650) 868-4942, (415) 309-3001
(4 Restaurants to be developed)

DEV-0143
MP & JP Holdings, LLC (Jeffrey Parker)
3578 Hartsel Drive, Ste. E-130
Colorado Springs, CO 80920
(719) 358-6069
(7 Restaurants to be developed)

DEV-0085B
ZG Burgers LLC (Hengwei Zhao and Yanmei Gao)
115 Lands End Road
Wilmington, DE 19807
(302) 740-7424
(1 Restaurant to be developed)

DEV-0163
KRNBLZ, LLC (Joseph Carroll)
247 North Westmont Drive
Altamonte Springs, FL 32714
(407) 529-7100
(6 Restaurants to be developed)

DEV-0063C
Yukon Broward, LLC (Reas Kondraschow, Yanmei Gao)
6278 N. Federal Highway, Suite 284
Ft. Lauderdale, FL 33308
(908) 391-7827
(29 Restaurants to be developed)

DEV-0079
Flowsmart LLC (Pat Donovan, Greg Jones and Jim Garrettson)
311 First Avenue
Indialantic, FL 32903
(703) 421-9330, (703) 447-0467
(2 Restaurants to be developed)

DEV-0078/0078B
Bengel's Burgers, LLC (Charles Bengel and Brandon Bengel)
643 W. Michigan Street
Orlando, FL 32805
(703) 751-7776, (703) 625-0064
(7 Restaurants to be developed)

DEV-0062
MPR Development, LLC (Thomas Tracy and Pat Tracy)
42 Marina Gardens Drive
Palm Beach Gardens, FL 33410
(561) 630-6810
(10 Restaurants to be developed)

DEV-0152B/0162B
Seattle Burgers, Inc. (Amjad "Joe" Iraqi)
8094 Cottonwood Court
Seminole, FL 33776
(206) 595-0492
(6 Restaurants to be developed)

DEV-0056
Uheri Group, LLC (Paul and Carl Fisher)
Post Office Box 42307
Atlanta, GA 30311
(516) 384-9528
(3 Restaurants to be developed)

DEV-0071B/0116B
Jason Patel, Ritesh Patel, Jiten Patel
1615 Ball Ground Highway
Canton, GA 30114
(256) 810-8336
(4 Restaurants to be developed)

DEV-0124
Barton Restaurant Group, LLC (Tyler and Sharron Barton)
8365 Royal Troon Drive
Duluth, GA 30097
(859) 913-1059
(3 Restaurants to be developed)

DEV-0115
M Assets, LLC (Dan Beaulieu)
9219 Blue Sage Road
Clinton, IL 61727
(502) 345-1200
(1 Restaurant to be developed)

DEV-0130B
737 Ventures LLC (George Estep)
3683 North National Road
Columbus, IN 47201
(812) 375-0140
(4 Restaurants to be developed)

DEV-0186B
Central FG Burger Development, LLC (George Estep)
3685 North National Road
Columbus, IN 47201
(812) 375-0140
(1 Restaurant to be developed)

DEV-0076B/0088B
Gator Subs Vision LLC (George Estep)
3683 North National Road
Columbus, IN 47201
(812) 375-0140
(9 Restaurants to be developed)

DEV-0106B
Sarasota Seven Burgers, LLC (George Estep)
3683 North National Road
Columbus, IN 47201
(812) 375-0140
(5 Restaurants to be developed)

DEV-0100
IFGB, LLC (Larry Cooley)
3037 S. Prairie Point Drive
Andover, KS 67002
(316) 304-3494
(4 Restaurants to be developed)

DEV-0178
D & J Holdings, LLC (Jeffrey Noyce, Douglas Vaughn)
10335 South Hollis Lane
Olathe, KS 66061
(913) 707-3504 (Jeff), (913) 638-3542 (Doug)
(2 Restaurants to be developed)

DEV-0100B
KCFGB, LLC (Randy Brock)
8100 E. 22nd Street N, Bldg. 900
Wichita, KS 67226
(816) 674-5290
(6 Restaurants to be developed)

DEV-0175D
H4 Properties Inc. (DeWayne Henderson)
1216 Winslow Way
Paducah, KY 42001
(270) 210-4180
(3 Restaurants to be developed)

DEV-0176
Bayou's Best Burgers, LLC (William Jacob, Andrew Mitts)
324 E. Lockwood Street
Covington, LA 70433
(404) 790-8028
(4 Restaurants to be developed)

DEV-0142/0224
G.F. Vasey Holdings, LLC (Gregory Vasey, Roger Vasey and Sandra Vasey)
4 Ringgold Street
Boston, MA 02118
Gregory Vasey: (315) 292-8283, (312) 861-0487
(7 Restaurants to be developed)

DEV-0168
Famous Burger Group, LLC (David MacDonald, Branden Yono, Jason Yono and Anthony Robinson)
15645 Blue Skies Street
Livonia, MI 48154
(248) 939-3666
(2 Restaurants to be developed)

DEV-0151
B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault)
6533 Cherokee Trail
Edina, MN 55439
(847) 943-9533
(3 Restaurants to be developed)

DEV-0129B/0154B
Credo, LLC (Kristopher Humphries and William Humphries)
3890 Lone Cedar Lane
Chaska, MN 55318
(612) 281-7271
(2 Restaurant to be developed)]]

DEV-0198
Jeff Offutt
2000 Forum Blvd, Suite #4
Columbia, MO 65203
(573) 445-0015
(4 Restaurants to be developed)

DEV-0147B
MID-MO Burgers, LLC (Jeff Offutt)
2000 Forum Blvd, Suite #4
Columbia, MO 65203
(573) 445-0015
(1 Restaurant to be developed)

DEV-0170
Montana Burgers, Inc. (Patrick Carls)
2808 Carla Jo Lane
Missoula, MT 59803
(509) 991-9663
(3 Restaurants to be developed)

DEV-0188B
AZ FGB Operations, LLC (Keith Bubb)
9004 Ghost Mountain Avenue
Las Vegas, NV 89129
(702) 610-7777
(2 Restaurants to be developed)

DEV-0145
DHW & Company (Donald Doan, Chris Wolf)
2620 Regatta Drive, Suite 102
Las Vegas, NV 89128
(703) 405-6749 (Hoover), (773) 562-9855 (Doan)
(5 Restaurants to be developed)

DEV-0121
Marlton 5G, Inc. (Cha Chung)
2017 Queen Ann Rd.
Cherry Hills, NJ 08003
(856) 465-6476
(1 Restaurant to be developed)

DEV-0081B
Bergen S&S Enterprise LLC (Edward Sheridan and Patrick Sheridan)
77 Knollwood Road
Short Hills, NJ 07078
Edward Sheridan: (973) 467-4634, (973) 951-6111
(3 Restaurants to be developed)

DEV-0091B
Rockham MO, LLC (Drew Smith)
Post Office Box 1437
Exton, PA 19341
(703) 869-8483
(4 Restaurants to be developed)

DEV-0120
Four Cousins Burgers and Fries of LI, LLC
(William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(1 Restaurants to be developed)

DEV-0136B
Four Cousins Burgers & Fries of NH, LLC
(William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(3 Restaurants to be developed)

DEV-0110
Four Cousins Burgers and Fries of NJ, LLC
(William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12429
(914) 643-2180
(3 Restaurants to be developed)

DEV-0111
Four Cousins Burgers and Fries of NY, LLC
(William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(10 Restaurants to be developed)

DEV-0174B
GHG AR LLC (William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(1 Restaurant to be developed)

DEV-0160C/0219B/0221B
GHG Gulf Coast, LLC (William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(7 Restaurants to be developed)

DEV-0193B
GHG Indiana, LLC (William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(1 Restaurant to be developed)

DEV-0220B
GHG Southwest, LLC (William Gellert)
173 Whippoorwill Road
Hillsdale, NY 12529
(914) 643-2180
(4 Restaurants to be developed)

DEV-0087
Shami International, LLC (Michael Hoover and Shaheen Mahmud)
254-55 Horace Harding Expressway
Little Neck, NY 11362
(703) 405-6749
(1 Restaurant to be developed)

DEV-0142B
Thomas Baldwin, Jr.
15 Pheasant Lane
Menands, NY 12204
(518) 426-0015
(2 Restaurants to be developed)

DEV-0092B/0114
FGNY Holding, LLC (Andrew Stern, John Rigos)
56 W. 22nd Street, 2nd Floor
New York, NY 10010
(212) 505-5861
(18 Restaurants to be developed)

DEV-0139B
FGNYW, LLC (Andrew Stern, John Rigos)
56 W. 22nd Street, 2nd Floor
New York, NY 10010
(212) 505-5861
(6 Restaurants to be developed)

DEV-0202/0203
Koeppel LP (Caleb Koeppel)
733 Park Avenue, 3rd Floor
New York, NY 10021
(917) 733-3880
(14 Restaurants to be developed)

DEV-0019/0161C
RSVT Holding, LLC (Tejraj Hada)
29 Windsor Court
Slingerlands, NY 12159
(518) 488-4060
(3 Restaurants to be developed)

DEV-0123
Eat Burgers, LLC (Gregory and Paul Slayton)
3 Ann Drive
Syosset, NY 11791
(516) 650-8418
(2 Restaurants to be developed)

DEV-0208
Westchester Burgers LLC (Gregory and Paul Slayton)
3 Ann Drive
Syosset, NY 11791
(516) 650-8418
(6 Restaurants to be developed)

DEV-0038B/0048C
Quintet Acquisitions LLC (Jonathan Kelly)
123 East Franklin Street, #423
Chapel Hill, NC 27514
(919) 525-8825
(4 Restaurants to be developed)

DEV-0028B
Doughball, LLC (Thomas Ferguson)
322 Colington Drive
Kill Devil Hills, NC 27948
(267) 441-0631
(3 Restaurants to be developed)

DEV-0058F
Stein5, LLC (Christine Steiner)
127 Heathland Lane
Mooresville, NC 28117
(810) 599-7632
(8 Restaurants to be developed)

DEV-0189D
BNF, LLC (David Glaser, Brad Bender)
3801 Lockport Street, Suite 3
Bismarck, ND 58503
(701) 226-4015, (612) 387-6201
(1 Restaurant to be developed)

DEV-0105
French Creek Burgers, LLC (Androsik)
28421 West Oakland
Bay Village, OH 44140
(440) 668-6313
(1 Restaurant to be developed)

DEV-0098B
EDM Restaurant Ventures, LLC (Edward Reese)
1419 Boardman-Canfield Road, Suite 500
Boardman, OH 44512
(330) 565-0496
(1 Restaurant to be developed)

DEV-0044D
Robert Bowers and Larry Bowers
3260 Kirkham Road
Columbus, OH 43221
(614) 557-2211
(2 Restaurants to be developed)

DEV-0195
CLRM Inc. (Ryan Coady)
1575 NE 237th Avenue
Wood Village, OR 97060
(480) 225-2364
(6 Restaurants to be developed)

DEV-0068D
Rockham NJJ, LLC (Drew Smith)
1406 Walnut Street
Coatesville, PA 19320
(703) 869-8483
(1 Restaurant to be developed)

DEV-0052B
Rockham 5G NJ, LLP (Drew Smith)
Post Office Box 1437
Exton, PA 19341
(703) 869-8483
(2 Restaurants to be developed)

DEV-0052/0052C
Rockham 5G PA, LP (Drew Smith)
Post Office Box 1437
Exton, PA 19341
(703) 869-8483
(7 Restaurants to be developed)

DEV-0095B/101B
Sunbeam Ewing, Inc., (Vijay Padodara)
2817 River Willow Drive
Furlong, PA 18925
(908) 251-3083
(3 Restaurants to be developed)

DEV-0191C/0199C/0226B
Big Horn Five Guys Acquisitions, LLC (Clayton Parrett
and H. Scott  Miller)
c/o Miller Investment Management, LP
100 Front Street, Suite 1500
West Conshohocken, PA 19428
(610) 834-9820 x144
(12 Restaurants to be developed)

DEV-0018
Griff Ventures, Inc. (Donald and Kevin Griffith)
Post Office Box 25639
Greenville, SC 29616
(804) 338-3742
(1 Restaurant to be developed)

DEV-0167B
Murray 5G, Inc. (Dan Murray)
211 S. Mable Avenue
Sioux Falls, SD 57103
(605) 645-6624
(1 Restaurant to be developed)

DEV-0112
GPR Hospitality, LLC (James Richards)
7663 Harrier Hill Road
Signal Mountain, TN 37377
(423) 605-1253
(1 Restaurant to be developed)

DEV-0133B/0157B/0159B/0164B
Hyde Park Burgers, LLC (Gregory Vasey, Jody Goehring)
2502 Jarratt Avenue
Austin, TX 78703
Gregory Vasey: (315) 292-8283, (312) 861-0487
(15 Restaurants to be developed)

DEV-0122C
Encore FGBF Colorado, LLC (Bharat Sangani)
5005 LBJ Freeway, Suite 1200
Dallas, TX 75244
(214) 259-7004
(11 Restaurants to be developed)

DEV-0118B
Encore FGBF Massachusetts, LLC (Bharat Sangani)
5005 LBJ Freeway, Suite 1200
Dallas, TX 75244
(214) 259-7004
(2 Restaurants to be developed)

DEV-0228
Encore FGBF Texas, LLC (Bharat Sangani)
5005 LBJ Freeway, Suite 1200
Dallas, TX 75244
(214) 259-7004
(68 Restaurants to be developed)

DEV-0171D
Albert Carrillo, Jr.
1604 Shell Avenue
Midland, TX 79705
(626) 890-9560
(2 Restaurants to be developed)

DEV-0171E
Senovia Foods North, LLC (Albert Carrillo, Jr.)
1604 Shell Avenue
Midland, TX 79705
(626) 890-9560
(1 Restaurant to be developed)

DEV-0144B
Mass 5G LLC (Jeffrey Howes, Corbin Robertson)
125 West Burton Avenue, Suite 2
Salt Lake City, UT 84115
(801) 231-6101
(6 Restaurants to be developed)

DEV-0140
MeisterGuys, LLC (Jeffrey Howes)
125 West Burton Avenue, Suite 2
Salt Lake City, UT 84115
(801) 231-6101
(5 Restaurants to be developed)

DEV-0181C
Wyoming 5G, LLC (Jeffrey Howes)
125 West Burton Avenue, Suite 2
Salt Lake City, UT 84115
(801) 231-6101
(1 Restaurant to be developed)

DEV-0182B/0183B/0200C/0201C/0207C/0210
Five Star North America Rights, LP (Darven Erickson, Robert Baxter, Blair Walker)
912 West Baxter Drive, Suite 250
South Jordan, UT 84095
Darven Erickson: (801) 576-2703
Robert Baxter: (801) 518-7777
Blair Walker: (801) 949-1940
(50 Restaurants to be developed)

DEV-0126
The Houston Guys, LLC (John and Eugene Hooff)
2107 Forest Hill Road
Alexandria, VA 22307
(703) 585-6284
(2 Restaurants to be developed)

DEV-0096B
4Hastings, LLC (Marion Sadler)
517 N. Main Street
Emporia, VA 23847
(434) 594-4907
(1 Restaurant to be developed)

DEV-0103
Vista Interprises, LLC (John Nguyen and Anh Pham)
13201 Catharpin Valley Drive
Gainesville, VA 20155
(571) 236-1214
(6 Restaurants to be developed)

DEV-0066
Atlanta's Best Burgers, LLC (Michael Melton)
1219 Towlston Road
Great Falls, VA 22066
(703) 757-5473, (703) 919-5289
(6 Restaurants to be developed)

DEV-0007B
Buster's Resource Management, LLC (Grant Buster)
19058 Boyer Fields Place
Leesburg, VA 20176
(703) 723-8406
(2 Restaurants to be developed)

DEV-0152
Evergreen Burgers, LLC (Nabil Asad)
6043 Gholson Bridge Court
Manassas, VA 20112
(571) 436-1441
(10 Restaurants to be developed)

DEV-0223C
RMR5 Nevada, LLC (Russell Rosenblum)
11654 Plaza America Drive
Reston, VA 20190
(703) 930-0758
(1 Restaurant to be developed)

**EXHIBIT E TO THE DISCLOSURE DOCUMENT**

**LIST OF FRANCHISEES WHO HAVE LEFT THE SYSTEM**

## LIST OF FRANCHISEES WHO HAVE LEFT THE SYSTEM
### (As of December 31, 2021)

| STATE | FRANCHISEE |
|---|---|
| **Alabama** | |
| | Gold Valley Development, LLC (Terry Neal Starling)<br>3760 Sixes Rd., Ste. 126-117<br>Canton, Georgia 30114<br>404-543-4904<br>(5 Restaurants reacquired) |
| | Jubilee Restaurant Group, LLC (Seth Hargett and Daniel Harlin)<br>3333 New Hyde Park Rd., #301<br>New Hyde Park, NY 11042<br>251-648-8159<br>(2 Restaurants transferred) |
| **Arizona** | |
| | D & J Holdings, LLC (Douglas Vaughn and Jeffrey Noyce)<br>2430 E. Placita Sin Lujuria<br>Tucson, AZ 85718<br>(913)707-3504 or (913) 638-3542<br>(1 Restaurant closed) |
| **Arkansas** | |
| | FGARK, LLC (Laurie Lowe, Cal Simmons and Ned Scherer)<br>1410 Spring Hill Rd., Ste. 400<br>McLean, VA 22102<br>(703) 836-4616<br>(5 Restaurants transferred) |
| **California** | |
| | Ocean Guys, Inc. (Malav Patel and Jayesh Parikh)<br>12929 Pierce Rd.<br>Saratoga, CA 95070<br>(408) 218-2548<br>(1 Restaurant transferred) |
| **Colorado** | |
| | BurgersRock, LLC (Robin Karst)<br>PO Box 270007<br>Fort Collins, CO 80527<br>(571) 723-1780<br>(7 Restaurants transferred) |
| **Florida** | |
| | E. Miles Prentice, III<br>Eaton & Van Winkle LLP<br>3 Park Ave., 16th Floor<br>New York, New York 10016<br>(1 Restaurant reacquired) |
| | Jubilee Restaurant Group, LLC (Seth Hargett, Daniel Harlin)<br>3333 New Hyde Park Rd., #301<br>New Hyde Park, NY 11042<br>251-648-8159<br>(2 Restaurants transferred) |
| **Hawaii** | |
| | Manufactured Homes, LLC (Schneider)<br>21 9th Ave.<br>Kirkland, WA 98033<br>(425) 864-3910<br>(3 Restaurants transferred) |

| STATE | FRANCHISEE |
|---|---|
| **Illinois** | |
| | BAC Illinois Holdings, LLC (David Pittaway, Michael Abrams and Brian Adelman) |
| | 2535 Endsleigh Dr. |
| | Bloomfield, MI 48301 |
| | David Pittaway: (917) 612-8687 |
| | Michael Abrams: (248) 885-1520 |
| | Brian Adelman: (248) 909-9887 |
| | (2 Restaurants reacquired) |
| **Indiana** | |
| | Paul and Carol Gillard |
| | 4653 Hawks Way |
| | Bloomington, IN 47401 |
| | 812-345-2966 |
| | (4 Restaurants transferred) |
| **Kansas** | |
| | Red Letter J, Inc. (Jeff Miller and Jay Miller) |
| | 2929 N. Rock Rd., Ste. 110 |
| | Wichita, KS 67226 |
| | (719) 229-4299; (267) 879-3893 |
| | (1 Restaurant closed) |
| **Louisiana** | |
| | Jubilee Restaurant Group, LLC (Seth Hargett, Daniel Harlin) |
| | 3333 New Hyde Park Rd., #301 |
| | New Hyde Park, NY 11042 |
| | 251-648-8159 |
| | (1 Restaurant transferred) |
| **Michigan** | |
| | BAC Holdings, LLC (David Pittaway, Michael Abrams and Brian Adelman) |
| | 2535 Endsleigh Dr. |
| | Bloomfield, MI 48301 |
| | David Pittaway: (917) 612-8687 |
| | Michael Abrams: (248) 885-1520 |
| | Brian Adelman: (248) 909-9887 |
| | (1 Restaurant closed and 31 Restaurants reacquired) |
| **Minnesota** | |
| | B & B of Minnesota, LLC (Scott Lesser, Ryan Dussault) |
| | 707 Osterman Ave. |
| | P.O. Box 27 |
| | Deerfield, IL 60015 |
| | Scott Lesser: (847) 946-7666 |
| | Ryan Dussault: (612) 964-2290 |
| | (1 Restaurant closed) |
| **Mississippi** | |
| | Jubilee Restaurant Group, LLC (Seth Hargett, Daniel Harlin) |
| | 3333 New Hyde Park Rd., #301 |
| | New Hyde Park, NY 11042 |
| | 251-648-8159 |
| | (2 Restaurants transferred) |
| **New Jersey** | |
| | Franchise Kings LLC (Phil Surico) |
| | 9 Mallard Rd. |
| | Mahwah, NJ 07430 |
| | (201) 788-4440, (201) 684-0976 |
| | (5 Restaurants transferred) |

| STATE | FRANCHISEE |
|---|---|
| **New York** | |
| | Burger Bandit, LLC (Thomas Pierog, Helen Pierog)<br>35 Hudson River Rd.<br>Saugerties, NY 12477<br>(845) 853-5878<br>(1 Restaurant transferred) |
| | ROC N Burgers LLC (Steven Christensen)<br>5330 Main St., Ste. 200<br>Williamsville, NY 14221<br>(973) 901-8899, (215) 280-9958, (973) 726-4498<br>(15 Restaurants transferred) |
| **North Carolina** | |
| | Michael Ruffer<br>1109 Lyrac Ct.<br>Oakton, VA 22124<br>(571) 283-7809<br>(8 Restaurants transferred) |
| **Ohio** | |
| | DFG Corporate LLC (Randall Gunlock)<br>1057 Miamisburg-Centerville Rd.<br>Dayton, OH 45459<br>(937) 428-5463<br>(6 Restaurants reacquired) |
| | KRNBLZ, LLC (Joseph Carroll)<br>247 North Westmonte Dr.<br>Altamonte Springs, FL 32714<br>(407) 529-7100, (407) 772-0200, (407) 444-0418<br>(1 Restaurant closed) |
| **Oklahoma** | |
| | Encore FGBF Oklahoma, LLC (Bharat Sangani)<br>c/o Encore Restaurants, LLC<br>5005 LBJ Freeway, Ste. 1200<br>Dallas, TX 75244<br>(214) 259-7004<br>(1 Restaurant closed) |
| **Oregon** | |
| | Northwest Burgers and Fries Inc. (Bill Marble)<br>11774 Pinedale Rd.<br>Moorpark, CA 93021<br>(818) 399-3544<br>(1 Restaurant transferred) |
| **Pennsylvania** | |
| | Rockham 5G PA, LLC (Drew Smith)<br>P.O. Box 1437<br>Exton, PA 19344<br>(703) 869-8483<br>(1 Restaurant closed) |
| **Tennessee** | |
| | Jubilee Restaurant Group, LLC (Seth Hargett, Daniel Harlin)<br>3333 New Hyde Park Rd., #301<br>New Hyde Park, NY 11042<br>251-648-8159<br>(5 Restaurants transferred) |

| STATE | FRANCHISEE |
|---|---|
| **Texas** | |
| | The Houston Guys LLC (John Hooff and Eugene Hooff) |
| | 2107 Forest Hill Rd. |
| | Alexandria, VA 22307 |
| | John Hooff: (703) 585-6284, (703) 329-3354 |
| | Eugene Hooff: (404) 550-2147 |
| | (1 Restaurant closed) |
| | Encore FGBF Texas, LLC (Bharat Sangani) |
| | c/o Encore Restaurants, LLC |
| | 5005 LBJ Freeway, Ste. 1200 |
| | Dallas, TX 75244 |
| | (214) 259-7004 |
| | (1 Restaurant closed) |
| **Vermont** | |
| | G.F. Vasey Holdings, LLC (Greg Vasey and Jack Goehring) |
| | 2502 Jarrett Ave. |
| | Austin, TX 79705 |
| | Greg Vasey: (315) 292-8283 |
| | Jack Goehring: (703) 867-8222 |
| | (1 Restaurant closed) |
| **Virginia** | |
| | William McKechnie |
| | 36 Old Farm Rd. |
| | Charlottesville, VA 22903 |
| | (434) 906-5787 |
| | (2 Restaurants transferred) |
| **Washington** | |
| | Manufactured Homes, LLC (Amannda Schneider) |
| | 21 9th Ave. |
| | Kirkland, WA 98033 |
| | (425) 864-391 |
| | (8 Restaurants transferred) |
| | Northwest Burgers and Fries Inc. (Bill Marble) |
| | 11774 Pinedale Rd. |
| | Moorpark, CA 93021 |
| | (818) 399-3544 |
| | (1 Restaurant transferred) |
| | Pacific Sliders, LLC (William and Lisa Barnett) |
| | 101 Augusta Ln. |
| | Pasco, WA 99301 |
| | (727) 599-4466 |
| | (4 Restaurants transferred) |
| **Wyoming** | |
| | Five Star North America Rights, LP (Darven Erickson) |
| | 912 West Baxter Dr., Ste. 250 |
| | South Jordan, UT 84095 |
| | (801) 330-2639 |
| | (2 Restaurants transferred) |

| STATE | FRANCHISEE |
|---|---|
| **Canada** | |
| | Five Star North America Rights, LP (Darven Erickson)<br>912 West Baxter Dr., Ste. 250<br>South Jordan, UT 84095<br>(801) 330-2639<br>(3 Restaurants closed) |
| | Koeppel LP (Caleb Koeppel)<br>733 Park Ave.<br>New York, NY 10021-5046<br>(917) 733-3880<br>(1 Restaurant closed) |

**EXHIBIT F TO THE DISCLOSURE DOCUMENT**

**TABLE OF CONTENTS OF OPERATIONS MANUAL**

# FIVE GUYS®

KITCHEN OPERATIONS ...................................................................................................11

1.1 MORNING PREP .........................................................................................................12

1.1.1 COOKING BACON ....................................................................................................12

1.1.2 COOKING GRILLED MUSHROOMS .........................................................................14

1.1.3 COOKING GRILLED ONIONS ..................................................................................16

1.1.4 LETTUCE PREP ......................................................................................................18

1.1.5 TOMATO PREP .......................................................................................................20

1.1.6 ONION PREP ..........................................................................................................21

1.1.7 POTATO PREP ........................................................................................................23

1.1.7.1 POTATO PREP WITH POWERSOAK ....................................................................25

1.1.8 MEAT PREP ............................................................................................................28

1.1.9 HOT DOG PREP ......................................................................................................31

1.1.10 CHEESE PREP ......................................................................................................32

1.1.11 GREEN PEPPER PREP .........................................................................................33

1.1.12 JALAPEÑO PREP ..................................................................................................34

1.1.13 PICKLE PREP .......................................................................................................36

1.1.14 ICED TEA PREP ....................................................................................................36

1.1.15 LEMON PREP ........................................................................................................38

1.1.16 STRAWBERRY MARINADE PREP .........................................................................39

1.1.17 BANANA MARINADE PREP ...................................................................................40

1.1.18 SALTED CARAMEL PREP .....................................................................................41

1.1.19 POUTINE SAUCE PREP........................................................................................42

1.1.19.1 POUTINE CHEESE PREP ..................................................................................43

1.1.20 PROPER LABELING .............................................................................................43

1.1.21 ANTI-MICROBIAL FRUIT AND VEGETABLE TREATMENT (AFVT – PRODUCE WASH)............................................................................................................................44

1.2 DRESSING.................................................................................................................45

1.3 OTHER SANDWICHES...............................................................................................49

1.3.1 BUNLESS BURGER .................................................................................................49

1.3.2 VEGGIE SANDWICH ...............................................................................................52

1.3.3 GRILLED CHEESE ..................................................................................................53

# FIVE GUYS®

1.3.4 BLT SANDWICH ........................................................................54

1.3.5 COOKING A HOT DOG .............................................................55

1.3.6 BREAKFAST SANDWICH ..........................................................57

1.4 COOKING A BURGER ...................................................................59

1.5 COOKING FRIES ..........................................................................63

1.5.1 ASSEMBLING FIVE GUYS POUTINE ........................................68

1.6 CONDUCTING A FRY CALIBRATION ............................................68

1.6.1 CONDUCTING AN AFTERNOON FRY CALIBRATION .................71

1.6.2 PREPPING AND COOKING A FIVE GUYS® FRY F.A.Q. ..............72

1.7 QUALITY CONTROL ......................................................................74

1.8 MILKSHAKE TRAINING GUIDE ......................................................76

1.9 CUSTOMER SERVICE ...................................................................83

1.9.1 LINE MANAGEMENT AT THE REGISTER....................................83

1.9.2 CURBSIDE OPERATIONS .........................................................88

1.9.3 STORE ENERGY ......................................................................90

1.9.3 CUSTOMER COMPLAINT ACTION PLAN ...................................91

1.9.3.1 CUSTOMER INCIDENTS AND INJURIES .................................92

1.9.3.2 COMPENSATION CARD PROGRAM (US ONLY).........................92

1.9.4 CUSTOMER SERVICE PRINCIPLES FOR CUSTOMERS WITH DISABILITIES ........93

1.10 DINING ROOM RESPONSIBILITIES ............................................95

1.10.1 FREESTYLE DAILY CLEANING ................................................97

1.10.2 FREESTYLE TISSUE ...............................................................97

1.11 SHIFT CHANGES ........................................................................98

1.11.1 DISHWASHING ........................................................................99

1.12 CLOSING ...................................................................................100

1.12.1 CLEANING THE GRILL ...........................................................101

1.12.2 CLEANING THE DRESSING STATION......................................103

1.12.3 CLEANING THE FRYERS ........................................................105

1.12.4 CLEANING THE FLOORS ........................................................108

1.12.5 CLEANING THE PREP SINK.....................................................109

1.13 FIVE GUYS® ORGANIZATION ....................................................109

FIVE GUYS 2022 FDD

# FIVE GUYS®

1.13.1 DINING ROOM ..................................................................................................110

1.13.2 KITCHEN ........................................................................................................112

1.13.3 PREP AREA ....................................................................................................115

1.13.4 WALK-IN .........................................................................................................116

1.13.5 OFFICE ...........................................................................................................117

1.13.6 STORAGE ABOVE SINKS ..............................................................................117

1.13.7 REQUIRED SMALLWARES LIST ...................................................................117

1.13.8 ADDITIONAL REQUIRED BACK UP SUPPLIES ...........................................119

FIVE GUYS® STANDARDS...........................................................................................120

2.1 FIVE GUYS® UNIFORM ...........................................................................................121

2.2 STORE HOURS .........................................................................................................122

2.3 HOLIDAY HOURS ......................................................................................................122

2.4 APPROVED MUSIC SELECTIONS ...........................................................................123

MANAGER RESPONSIBILITIES....................................................................................124

3.1 BEFORE A SHIFT ......................................................................................................125

3.2 ORDERING AND RECEIVING PRODUCT.................................................................125

3.3 IN THE KITCHEN.......................................................................................................126

3.4 COUNTING DOWN THE DRAWERS.........................................................................127

3.5 SCHEDULING.............................................................................................................128

FOOD SAFETY AUDITING PROGRAM .........................................................................129

4.1.1 COMPLIANCEMATE FAQ ................................................................................134

4.1.2 COMPLIANCEMATE TROUBLSHOOTING ....................................................135

FOOD SAFETY AND SANITATION GUIDELINES.........................................................136

5.1 HOW CONTAMINATION HAPPENS ..........................................................................137

5.1.1 BIOLOGICAL CONTAMINATION ....................................................................137

5.1.1.1 SEND SUPER SICK EMPLOYEES HOME NOW...........................................137

5.1.1.2 BACTERIA ......................................................................................................138

5.1.1.3 VIRUSES .........................................................................................................139

5.1.1.4 PARASITES .....................................................................................................139

5.1.1.5 FUNGI .............................................................................................................140

5.1.1.6 TOXINS ...........................................................................................................140

# FIVE GUYS®

5.1.2 CHEMICAL CONTAMINANTS ................................................................140

5.1.3 PHYSICAL CONTAMINANTS.................................................................141

5.1.4 FOOD ALLERGENS ..............................................................................141

5.2 FOODBORNE ILLNESS OUTBREAKS .....................................................143

5.2.1 DELIBERATE CONTAMINATION OF FOOD............................................143

5.2.2 RESPONDING TO A FOODBORNE ILLNESS OUTBREAK ......................143

5.3 SANITARY STAFF....................................................................................143

5.3.1 UNIFORMS ...........................................................................................143

5.3.2 NAILS....................................................................................................144

5.3.3 PROPER HAND-WASHING....................................................................144

5.3.4 CHANGING GLOVES ............................................................................145

5.3.5 TEMPERATURE SCREENING ...............................................................145

5.3.6 HANDLING ILLNESS AT WORK ............................................................146

5.3.7 HANDLING INJURIES AT WORK ...........................................................146

5.4 DELIVERIES AND STORAGE ..................................................................146

5.4.1 DELIVERIES .........................................................................................146

5.4.2 STORAGE.............................................................................................147

5.5 PREP, COOKING, AND SERVING ............................................................148

5.5.1 PREVENTING CROSS-CONTAMINATION..............................................148

5.5.2 AVOIDING TIME-TEMPERATURE ABUSE .............................................149

5.5.3 HANDLING AN ORDER WITH AN ALLERGEN CONCERN .....................150

5.6 CLEANING AND SANITIZING ..................................................................150

5.6.1 SANITIZER EFFECTIVENESS ...............................................................151

5.6.2 DISHWASHING SINK VS. HAND SINK VS. PREP SINK .........................151

5.7 FACILITIES, EQUIPMENT, AND PEST MANAGEMENT.............................152

5.7.1 PLUMBING ...........................................................................................152

5.7.2 LIGHTING .............................................................................................152

5.7.3 FLOORING, WALLS, AND CEILINGS.....................................................152

5.7.4 VENTILATION........................................................................................153

5.7.5 GARBAGE AREAS AND CONTAINERS..................................................153

5.7.6 MAINTAINING PATIOS ..........................................................................153

# FIVE GUYS®

**5.7.7 PEST PREVENTION**.................................................................153

**5.7.8 SOP/BEST PRACTICE PEST CONTROL**.......................................154

**5.8 HACCP PLANS**.......................................................................155

**NEW STORE OPENING & STORE REFRESH** ..........................................157

**6.1 FIVE STEP PROCESS FOR NEW STORES**....................................158

**6.2 TRAINING PLAN** ..................................................................159

**6.2.1 MODIFIED TRAINING PLAN** .................................................164

**6.3 STORE REFRESH TRAINING PLAN** ...........................................167

**6.4 STORE OPENING TIPS** ..........................................................170

**6.5 BUILDING AND CONSTRUCTION** ..............................................170

**EQUIPMENT MAINTENANCE** ............................................................171

**7.1 CHANGING THE OIL IN THE FRYERS** .......................................172

**7.2 PITCO FRYERS** ....................................................................173

**7.3 FRYMASTER FRYERS AND TROUBLESHOOTING** ...........................174

**7.4 HOOD MAINTENACE AND TROUBLESHOOTING**............................175

**STORE FINANCIALS**.......................................................................178

**8.1 STORE FINANCIALS**..............................................................179

**MARKETING MANUAL**.....................................................................181

**9.1 FIVE GUYS® MARKETING STRATEGY** ......................................182

**9.2 CREATIVE FUND CONTRIBUTION** ............................................182

**9.3 ADVERTISING** .....................................................................183

**9.4 COUPONS AND DISCOUNTS AND FOOD GIVEAWAYS**......................183

**9.5 LOGOS** ..............................................................................183

**9.6 SIGNAGE, DISPLAY, AND PRINT MATERIALS**.............................184

**9.7 GIFTS CARDS** .....................................................................186

**9.8 PROMOTIONAL PHOTOS AND FOOD SHOTS**...............................187

**9.9 SUPPORTING THE FIVE GUYS® BRAND:  OUR SECRET SHOPPERS & SECRET SHOPPER PROGRAM** ...........................................................188

**9.10 PUBLIC RELATIONS AND SOCIAL MEDIA** ................................190

**9.11 CRISIS MANAGEMENT**.........................................................191

**9.12 KEY RESOURCES AND CONTACTS** .........................................191

# FIVE GUYS®

PURCHASING ..................................................................................................194

10.1 PURCHASING INITIATIVE ......................................................................195

10.2 SUPPLY CHAIN AND CONTROLS ..........................................................195

DEVELOPMENT ..............................................................................................196

11.1 SITE SELECTION AND APPROVAL PROCESS .......................................197

11.1.1 DEMOGRAPHIC PARAMETERS ...........................................................197

11.1.2 SITE REQUIREMENTS ..........................................................................197

11.1.3 GENERAL OBLIGATIONS .....................................................................198

11.1.4 FORMS ..................................................................................................199

11.1.5 SITE APPROVAL PROCESS (CONDUCTED BY FIVE GUYS REAL ESTATE MANAGER) .......................................................................................................199

11.2 RELOCATION ..........................................................................................199

11.2.1 FORMS AND AGREEMENTS .................................................................199

11.2.2 PROCESS ..............................................................................................200

11.2.3 PRICING ................................................................................................200

11.3 ANNUAL DEVELOPMENT UPDATE .........................................................200

11.3.1 FORMS ..................................................................................................200

11.3.2 PROCEDURE .........................................................................................201

INFORMATION TECHNOLOGY ........................................................................202

12.1 PERSONAL INFORMATION SECURITY AND POS COMPLIANCE ...........203

12.2 PCI COMPLIANCE ...................................................................................203

INSURANCE ....................................................................................................204

13.1 INSURANCE ............................................................................................205

13.2 INSURANCE REQUIREMENTS ...............................................................205

13.3 PROOF OF INSURANCE .........................................................................207

TRANSFERS AND RENEWALS .......................................................................208

14.1 TRANSFERS ............................................................................................209

14.1.1 FORMS AND AGREEMENTS .................................................................209

14.1.2 PROCESS ..............................................................................................209

14.1.3 PRICING ................................................................................................211

14.2 RENEWALS .............................................................................................211

# FIVE GUYS®

**14.2.1 PROCESS**................................................................................................................**211**

**Total pages     212**

**EXHIBIT G TO THE DISCLOSURE DOCUMENT**

**STATE SPECIFIC ADDENDA TO THE DISCLOSURE DOCUMENT**

**ADDENDUM TO FIVE GUYS FRANCHISOR, LLC
DISCLOSURE DOCUMENT
<u>FOR THE STATE OF CALIFORNIA</u>**

1.   Item 3 is amended to reflect that:

Neither we nor any person or broker identified in Item 2 of the Disclosure Document is subject to any current effective order of any national securities association or national securities exchange as defined in the Securities Exchange Act of 1934, U.S.C.A. 78a et seq., suspending or expelling such persons from membership is such association or exchange.

2.   Item 5 is amended by the addition of the following statements:

The Department of Financial Protection and Innovation requires that the franchisor defer collection of all initial fees from California franchisees until the franchisor has completed all of its pre-opening obligations and the franchisee is open for business.

3.   Item 17 is amended by the addition of the following statements:

California Business and Professions Code Sections 20000 through 20043 provide rights to you concerning termination, nonrenewal, or transfer of a franchise.  If the Franchise Agreement or Development Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement and Development Agreement provide for termination upon bankruptcy.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.).

The Franchise Agreement and Development Agreement contain covenants not to compete that extend beyond expiration or termination of the Agreements.  These provisions may not be enforceable under California law.

The California Corporations Code, Section 31125, requires that we give you a disclosure document, approved by the Department of Financial Protection and Innovation, before we solicit a proposed material modification of an existing franchise.

If the Franchise Agreement or Development Agreement contains a liquidated damages clause, under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

The Franchise Agreement and Development Agreement require the application of the laws and forum of Virginia.  This provision may be unenforceable under California Law.

The Franchise Agreement and Development Agreement require binding arbitration.  The arbitration will occur in Virginia with the costs being borne by the franchisee and franchisor.  Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5 Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California

The Franchise Agreement and Development Agreement require you to sign a general release of claims if you renew or transfer your franchise.  California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of that law or any rule or order is void.  Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Sections 31000 through 31516).  California Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 through 20043).

4.   THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

5.      OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION.  ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION AT www.dfpi.ca.gov.

**ADDENDUM TO FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**<u>FOR THE STATE OF HAWAII</u>**

1.      Items 5 and 7 are amended to state that the initial franchise fee and all other initial payments you owe to us under the Franchise Agreement and Development Agreement will be deferred until we satisfy all of our pre-opening obligations to you and your first Restaurant has opened for business.

**ADDENDUM TO FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF ILLINOIS**

1.      Items 5 and 7 are amended to state that the initial franchise fee and all other initial payments you owe to us under the Franchise Agreement and Development Agreement will be deferred until we satisfy all of our pre-opening obligations to you and your first Restaurant has opened for business.  This deferral is imposed by the Illinois Office of the Attorney General due to our financial condition.

2.      The State Cover Page and Item 17 of this Disclosure Document are amended by adding the following:

> In accordance with Illinois law 815 ILCS 705/4 and Section 200.608 of the Administrative Rules (14 Ill.Adm.Code §200.608), any provision in the Franchise Agreement/Development Agreement that designates jurisdiction or venue in a forum outside Illinois is void with respect to any action which is otherwise enforceable in Illinois, except that the Franchise Agreement/Development Agreement may provide for arbitration outside Illinois.  In addition, Illinois law will govern the Franchise Agreement/Development Agreement.

> Illinois Franchise Disclosure Act Sections 19 and 20 (815 ILCS 705/19, 20) (the "Act") provide rights to you concerning nonrenewal and termination of the Franchise Agreement/Development Agreement.  If the Franchise Agreement/Development Agreement contains a provision that is inconsistent with the Act, the Act will control.

> Section 41 of the Act states that "Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act, or any other law of Illinois, is void."  To the extent that any provision in the Franchise Agreement/Development Agreement is inconsistent with Illinois law, Illinois law will control.

**ADDENDUM TO THE FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF MARYLAND**

1.       Item 5 is amended to state that the initial franchise fee and all other initial payments you owe to us before you open your Restaurant will be deferred until we satisfy all of our pre-opening obligations to you and you open your Restaurant for business.

2.       Item 17 is amended to include the following paragraph:

A general release required as a condition of renewal, sale and/or assignment/transfer will not apply to any liability under the Maryland Franchise Registration and Disclosure Law. This may affect the enforceability of certain provisions in the Franchise Agreement relating to renewal, sale, assignment or transfer of the Franchise Agreement.

3.       Item 17, under the Summary column of part (h), is amended to include the following sentence:

A provision in the Franchise Agreement that provides for termination on your bankruptcy may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101 et seq.).

4.       Item 17, under the Summary column of part (v), is modified to include the words ", except you may sue in Maryland for any claims arising under the Maryland Franchise Registration and Disclosure Law."

5.       Item 17 is amended to state that any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

6.       The Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise.  Any disclaimer regarding the occurrence and/or acknowledgment of the non-occurrence of acts that would constitute a violation of the Franchise Law in order to purchase the franchise are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.  Accordingly, the Franchise Disclosure Acknowledgement Statement is amended to comply with this provision by stating that such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**ADDENDUM TO THE FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF MINNESOTA**

1.      Items 5 and 7 are amended to state that the initial franchise fee and all other initial payments you owe to us under the Franchise Agreement and Development Agreement will be deferred until we satisfy all of our pre-opening obligations to you and your first Restaurant has opened for business.

**ADDENDUM TO FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF NEW YORK**

1.      The following information is added to the cover page of the Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE.  CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION.  REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT.  IF YOU LEARN THAT ANYTHING IN THIS FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK 10271. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT.  HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.      Item 3, "Litigation" is hereby amended by deleting the last paragraph in that Item and replacing it with the following language:

"Except as described in this Item:

Neither we, any predecessor, any person identified in Item 2 above, nor any affiliate offering franchises under our principal trademark has pending any administrative, criminal, material civil action (or a significant number of civil actions irrespective of materiality), or arbitration action alleging a violation of any franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices or comparable allegations.

Neither we, any predecessor, any person identified in Item 2 above, nor any affiliate offering franchises under our principal trademark has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

Neither we, any predecessor, any person identified in Item 2 above, nor any affiliate offering franchises under our principal trademark has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the ten-year period immediately preceding the date of this Disclosure Document, has been convicted of a misdemeanor or pleaded nolo contendere to a misdemeanor charge or been held liable in an arbitration proceeding or a civil action by final judgment or been the subject of a material complaint or other legal or arbitration proceeding if such misdemeanor conviction or charge or civil action, complaint or other legal proceeding involved a violation of any franchise, anti-fraud or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, misappropriation of property or comparable allegations.

Neither we, any predecessor, any person identified in Item 2 above, nor any affiliate offering franchises under our principal trademark is subject to any currently effective injunctive or restrictive order or decree relating to franchises or under any Federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law as a result of a concluded or pending action or proceeding brought by a public agency, is subject to any currently effective order of any

national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent."

3.     Item 4, "Bankruptcy", is hereby deleted in its entirety and the following language substituted in lieu thereof:

"Neither we nor any affiliate or predecessor or current officer or general partner have during the 10 year period immediately before the date of this Disclosure Document (a) filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the Bankruptcy Code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code, during or within 1 year after the officer or general partner of Five Guys Enterprises, LLC, held this position with the company or partnership."

4.     Item 5, "Initial Franchise Fees," is hereby amended by adding the following sentence to the end thereof:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.     Item 17, "Renewal, Termination, Transfer and Dispute Resolution", is supplemented, under the categories entitled "Requirements for franchisee to renew or extend", "Termination by franchisee", "Assignment of contract by Franchisor", "Conditions for franchisor approval of transfer", "Choice of forum, and "Choice of Law" respectively, by the following language that will be deemed an integral part thereof:

The following is added to Items 17(c) and 17(m):

Any general release required under the Franchise Agreement/Development Agreement shall be limited by the following, "all rights arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied."

The following replaces Item 17(d):

Notwithstanding any rights you may have in the Franchise Agreement/Development Agreement permitting you to terminate the Agreement, you may also have additional rights under applicable law to terminate the Franchise Agreement/Development Agreement.

The following is added to Item 17(j):

No assignment will be made except to an assignee who, in our opinion, is willing and able to assume our obligations under the Franchise Agreement/Development Agreement.

The following is added to Items 17(v) and 17(w):

The Franchise Agreement/Development Agreement requires the application of Virginia Law; however, the choice of law provision should not be considered a waiver of any right conferred upon

the franchisor or upon the franchisee/developer by the General Business Law of the State of New York, Art. 33.

6.    As to any state law described in this Addendum that declares void or unenforceable any provision contained in the Franchise Agreement/Development Agreement, Franchisor reserves the right to challenge the enforceability of the state law by, among other things, bringing an appropriate legal action or by raising the claim in a legal action or arbitration that you have initiated.

**ADDENDUM TO THE FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**<u>FOR THE STATE OF NORTH DAKOTA</u>**

1.      Items 5 and 7 are amended to state that the initial franchise fee and all other initial payments you owe to us under the Franchise Agreement and Development Agreement will be deferred until we satisfy all of our pre-opening obligations to you and your first Restaurant has opened for business.

**ADDENDUM TO THE FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF SOUTH DAKOTA**

1.      Items 5 and 7 are amended to state that the initial franchise fee and all other initial payments you owe to us under the Franchise Agreement and Development Agreement will be deferred until we satisfy all of our pre-opening obligations to you and your first Restaurant has opened for business.

**ADDENDUM TO FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**
**FOR THE STATE OF VIRGINIA**

1.      Item 5 is amended to state that the Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the initial franchise fee and all other initial payments you owe to us until we complete all of our pre-opening obligations under the Franchise Agreement.

2.      In recognition of the restrictions contained in Section 13.1-564 of the Virginia Retail Franchising Act, Item 17(h) of the Franchise Disclosure Document for use in the Commonwealth of Virginia will be amended as follows:

> Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause.  If any ground for default or termination stated in the Franchise Agreement or Development Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

> Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to use undue influence to induce a franchisee to surrender any right given to him under the franchise. If any provision of the Franchise Agreement or Development Agreement involves the use of undue influence by the franchisor to induce a franchisee to surrender any rights given to him under the franchise, that provision may not be enforceable.

3.      **Estimated Initial Investment.** The franchisee will be required to make an estimated initial investment ranging from $306,200 to $716,250.  This amount exceeds the franchisor's parent's net worth as of December 31, 2020, which is ($510,947,000).

**WASHINGTON ADDENDUM TO THE FIVE GUYS FRANCHISOR, LLC**
**DISCLOSURE DOCUMENT**

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

RCW 19.100.180 may supersede the franchise agreement and area development agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement and area development agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement or area development agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement and area development agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement and area development agreement or elsewhere are void and unenforceable in Washington.

The franchisor may use the services of franchise brokers to assist it in selling franchises.  A franchise broker represents the franchisor and is paid a fee for referring prospects to the franchisor and/or selling the franchise.  Do not rely only on the information provided by a franchise broker about a franchise.  Do your own investigation by contacting the franchisor's current and former franchisees to ask them about their experience with the franchisor.

Items 5 is amended to state that the State of Washington has imposed a financial condition under which the initial franchise fees due will be deferred until we have fulfilled our initial pre-opening obligations under the Franchise Agreement and the franchise is open for business.  Because we have

material pre-opening obligations with respect to each franchised business you open under the Development Agreement, the State of Washington will require that the franchise fees be released proportionally with respect to each franchised business.

On August 20, 2018, to resolve an investigation by the Washington Attorney General and without admitting any liability, we entered into an Assurance of Discontinuance ("AOD") with the State of Washington (No. 18-2-20767-3SEA), in which we agreed, among other things, to remove from our form franchise agreement and not to enforce a provision that restricts a franchisee from soliciting and/or hiring our employees and the employees of our other franchisees (generally, a "no-poach provision"). No-poach provisions were common in franchise agreements throughout the restaurant and other industries and prompted a broad multi-industry investigation by the Washington Attorney General. As of the date of this Franchise Disclosure Document, the Washington Attorney General has entered into similar AODs with over 200 other franchisors.

**ATTACHMENT A TO THE DISCLOSURE DOCUMENT**

**STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS**

## STATE ADMINISTRATORS

**CALIFORNIA**
Department of Financial Protection and Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013
(213) 576-7500 Toll Free (866) 275-2677

**HAWAII**
Business Registration Division
Department of Commerce and Consumer Affairs
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

**ILLINOIS**
Chief, Franchise Division
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-4465

**INDIANA**
Secretary of State
Franchise Section, Securities Division
302 West Washington, Room E-111
Indianapolis, Indiana 46204
(317) 232-6681

**MARYLAND**
Office of the Attorney General
Division of Securities
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**MICHIGAN**
Office of the Attorney General
Consumer Protection Division, Franchise Section
G. Mennen Williams Building, 1st Floor
525 Ottawa Street
Lansing, Michigan 48913
(517) 373-7117

**MINNESOTA**
Franchise Examiner
Department of Commerce
85 7th Place East, Suite 280
St. Paul, Minnesota 55101
(651) 539-1600

**NEBRASKA**
Nebraska Department of Banking and Finance
1200 N. Street, P.O. Box 95006
Lincoln, Nebraska 68509-5006
(402) 471-3445

**NEW YORK**
New York State Department of Law
Bureau of Investor Protection and Securities
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8211

**NORTH DAKOTA**
North Dakota Securities Department
600 East Boulevard Avenue
State Capitol Fifth Floor, Dept. 414
Bismarck, North Dakota 58505-0510
(701) 328-4712

**OREGON**
Department of Consumer and Business Services
Division of Finance and Corporate Securities
Labor and Industries Building
Salem, Oregon 97310
(503) 378-4387

**RHODE ISLAND**
Director of Business Regulation
Division of Securities
1511 Pontiac Avenue
John O. Pastore Complex – Building 69-1
Cranston, Rhode Island 02920
(401) 462-9500

**SOUTH DAKOTA**
Director of Division of Insurance
Securities Regulation
124 South Euclid Avenue, Suite 104
Pierre, South Dakota 57501
(605) 773-3563

**TEXAS**
Secretary of State, Statutory Document Section
P.O. Box 12887
Austin, Texas 78711
(512) 463-5705

**UTAH**
Division of Consumer Protection
Utah Department of Commerce
160 East Three Hundred South
Salt Lake City, Utah 84145
(801) 530-6601

**VIRGINIA**
Chief Examiner, State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street, 9th Floor
Richmond, Virginia 23219
(804) 371-9051

**WASHINGTON**
Department of Financial Institutions
Securities Division
150 Israel Road, S.W.
Tumwater, Washington 98504
(360) 902-8760

**WISCONSIN**
Franchise Administrator
Securities and Franchise Registration
Wisconsin Securities Commission
4822 Madison Yards Way, North Tower
Madison, Wisconsin 53705
(608) 266-1064

## AGENTS FOR SERVICE OF PROCESS

**CALIFORNIA**
Commissioner of Financial Protection and Innovation
320 West 4th Street, Suite 750
Los Angeles, California 90013
(213) 576-7500 Toll Free (866) 275-2677

**HAWAII**
Commissioner of Securities
Department of Commerce and Consumer Affairs
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

**ILLINOIS**
Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-4465

**INDIANA**
Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6531

**MARYLAND**
Securities Commissioner
Office of the Attorney General
Maryland Division of Securities
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**MICHIGAN**
Michigan Department of Attorney General
Consumer Protection Division
G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 48933
 (517) 241-6470

**MINNESOTA**
Commissioner of Commerce
85 7th Place East, Suite 280
St. Paul, Minnesota 55101
(651) 539-1600

**NEW YORK**
New York Department of State
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, New York 12231-0001
(518) 473-2492

**NORTH DAKOTA**
Securities Commissioner
North Dakota Securities Department
600 East Boulevard Avenue
State Capitol Fifth Floor, Dept. 414
Bismarck, North Dakota 58505-0510
(701) 328-4712

**OREGON**
Director
Department of Consumer and Business Services
Division of Finance and Corporate Securities
Labor and Industries Building
Salem, Oregon 97310
(503) 378-4387

**RHODE ISLAND**
Director of Department of Business Regulation
1511 Pontiac Avenue
John O. Pastore Complex – Building 69-1
Cranston, Rhode Island 02920
(401) 462-9500

**SOUTH DAKOTA**
Director of Division of Insurance
Securities Regulation
124 South Euclid Avenue, Suite 104
Pierre, South Dakota 57501
(605) 773-3563

**UTAH**
Division of Consumer Protection
Utah Department of Commerce
160 East Three Hundred South
Salt Lake City, Utah 84145
(801) 530-6601

**VIRGINIA**
Clerk of the State Corporation Commission
1300 East Main Street, 1st Floor
Richmond, Virginia 23219
(804) 371-9733

**WASHINGTON**
Director of Financial Institutions
Securities Division
150 Israel Road, S.W.
Tumwater, Washington 98504
(360) 902-8760

**WISCONSIN**
Commissioner of Securities
Division of Securities
Department of Financial Institutions
4822 Madison Yards Way, North Tower
Madison, Wisconsin 53705
 (608) 266-1064

**THE FRANCHISOR REPRESENTS THAT THIS**

**PROSPECTUS DOES NOT KNOWINGLY OMIT**

**ANY MATERIAL FACT, OR CONTAIN ANY**

**UNTRUE STATEMENT OF A MATERIAL FACT.**

## State Effective Dates

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| STATE | EFFECTIVE DATE |
|---|---|
| California | Pending |
| Hawaii | Pending |
| Illinois | Pending |
| Indiana | Pending |
| Maryland | Pending |
| Michigan | April 8, 2022 |
| Minnesota | Pending |
| New York | Pending |
| North Dakota | Pending |
| Rhode Island | Pending |
| South Dakota | Pending |
| Virginia | Pending |
| Washington | Pending |
| Wisconsin | Pending |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

## **RECEIPT**

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If Five Guys Franchisor, LLC offers you a franchise, Five Guys Franchisor, LLC must provide this Disclosure Document to you at least 14 calendar days before you sign a binding agreement or make any payment to Five Guys Franchisor, LLC or an affiliate in connection with the proposed franchise sale.  Under Michigan law, Five Guys Franchisor, LLC must provide this Disclosure Document to you 10 business days before you sign any contract or make any payment relating to the franchise relationship.  Under New York law, Five Guys Franchisor, LLC must provide this Disclosure Document to you at the earliest of the first personal meeting or 10 business days before you sign any contract or make any payment relating to the franchise relationship.

If Five Guys Franchisor, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and the appropriate state agency listed on Attachment A.

The name, principal business address and telephone number of each franchise seller offering the franchise is as follows:  Mark Moseley, Director of Franchise Sales, 113-5 Founders Way, Strasburg, Virginia 22657, 540-465-2421 and                                                                                          .

Date of Issuance:  April 30, 2022

Five Guys Franchisor, LLC authorizes the agents listed in Attachment A to receive service of process for it.

I have received a Franchise Disclosure Document dated April 30, 2022.  State registration effective dates are listed on the State Registrations Page.  This Disclosure Document includes the following Exhibits:

| | |
|---|---|
| A. | Financial Statements |
| B. | Development Agreement (with state specific amendments) |
| C. | Franchise Agreement (with state specific amendments) |
| D. | List of Franchisees |
| E. | List of Franchisees Who Have Left the System |
| F. | Table of Contents of Operations Manual |
| G. | State Specific Addenda to the Disclosure Document |

Attachment A:  State Administrators/Agents for Service of Process

Dated:_____          _____
(Do not leave blank)                                              Signature of Prospective Franchisee

_____
Print Name

### **(RETAIN FOR YOUR RECORDS)**

**<u>RECEIPT</u>**

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If Five Guys Franchisor, LLC offers you a franchise, Five Guys Franchisor, LLC must provide this Disclosure Document to you at least 14 calendar days before you sign a binding agreement or make any payment to Five Guys Franchisor, LLC or an affiliate in connection with the proposed franchise sale.  Under Michigan law, Five Guys Franchisor, LLC must provide this Disclosure Document to you 10 business days before you sign any contract or make any payment relating to the franchise relationship.  Under New York law, Five Guys Franchisor, LLC must provide this Disclosure Document to you at the earliest of the first personal meeting or 10 business days before you sign any contract or make any payment relating to the franchise relationship.

If Five Guys Franchisor, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and the appropriate state agency listed on Attachment A.

The name, principal business address and telephone number of each franchise seller offering the franchise is as follows:  Mark Moseley, Director of Franchise Sales, 113-5 Founders Way, Strasburg, Virginia 22657, 540-465-2421 and _____.

Date of Issuance:  April 30, 2022

Five Guys Franchisor, LLC authorizes the agents listed in Attachment A to receive service of process for it.

I have received a Franchise Disclosure Document dated April 30, 2022.  State registration effective dates are listed on the State Registrations Page.  This Disclosure Document includes the following Exhibits:

A.    Financial Statements
B.    Development Agreement (with state specific amendments)
C.    Franchise Agreement (with state specific amendments)
D.    List of Franchisees
E.    List of Franchisees Who Have Left the System
F.    Table of Contents of Operations Manual
G.    State Specific Addenda to the Disclosure Document

Attachment A:  State Administrators/Agents for Service of Process

Dated:_____        _____
            (Do not leave blank)                                    Signature of Prospective Franchisee

                                                                        _____
                                                                        Print Name

**(RETURN TO US)**